**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| QUANTUM COMMUNICATIONS LTD, | : | |
| Plaintiff | : | No. 1:17-cv-01640 |
| | : | |
| v. | : | (Judge Kane) |
| | : | |
| EAGLE FORUM, et al., | : | |
| Defendants | : | |

## MEMORANDUM

Before the Court is Defendants Eagle Forum Education and Legal Defense Fund

("EFELDF"), and Edward R. Martin, Jr. ("Martin")'s motion to dismiss Plaintiff Quantum

Communications LTD ("Plaintiff")'s amended complaint pursuant to Federal Rules of Civil

Procedure 12(b)(2) and 12(b)(6). (Doc. No. 18.) For the reasons that follow, the Court will deny

the motion in its entirety.

## I.    BACKGROUND[1]

Plaintiff initiated the above-captioned action by filing a complaint against the

aforementioned Defendants, as well as Defendants Eagle Forum ("Eagle Forum"), Ian A.

Northon ("Northon"), and the law firm Roetzel and Andress, LPA ("Roetzel and Andress"), in

this Court on September 12, 2017, alleging breach of contract and, alternatively, unjust

enrichment, in connection with an alleged breach of an agreement pursuant to which Plaintiff

provided various public relations and strategic communications services for Eagle Forum. (Doc.

No. 1.)

Plaintiff, a Pennsylvania corporation organized under Pennsylvania law and having a

principal place of business in Harrisburg, Pennsylvania (Doc. No. 16 ¶ 2), "is a public relations

---

[1] The facts recited herein are derived from Plaintiff's amended complaint. (Doc. No. 16.) The
Court limits its discussion of the factual background of this case only to those factual allegations
relevant for purposes of disposing of the instant motion.

and strategic communications firm engaged in the business of providing strategies and solutions to customers seeking to strengthen their image, promote an agenda, or engage in a communications campaign throughout a region, state, or the nation" (id. ¶ 11).

During 2016, Northon, of Roetzel and Andress, and Martin, the president of Eagle Forum and EFELDF, contacted Plaintiff at its Harrisburg location, both "individually and on behalf of the remaining [Defendants]," seeking to use Plaintiff's services for purposes of "promot[ing] the achievements of Phyllis Schlafly and . . . to continue her message and views."[2] (Id. ¶ 12.) This communication resulted in "an ongoing contractual relationship for the services rendered by [Plaintiff]," with "[a]ll pre-contract negotiations" occurring in Harrisburg and all telephonic communications with Plaintiff using Plaintiff's "phone number that utilized a 717 area code."[3] (Id. ¶ 12.)

The subject agreement (the "Agreement"), which was signed on September 22, 2016 by Northon and Plaintiff's "senior members," Kevin Harley ("Harley"), Ed Rollins ("Rollins"), and Charlie Gerow ("Gerow"), provided that Plaintiff was to perform services to aid Roetzel and Andress "in their representation of Eagle Forum by providing communication-consulting services to protect and enhance Eagle Forum's reputation." (Id. ¶ 14.) Additionally, the Agreement "included the EFELDF as a party purchasing/receiving the services of [Plaintiff]." (Id.) The Agreement was executed by Roetzel and Andress "to preserve the attorney-client privilege." (Id.) Moreover, "[t]he Agreement provided for a monthly retainer of $20,000.00 that served as good and valuable consideration in exchange for [Plaintiff's] services," and "[a]ll draft

---

[2] The amended complaint does not appear to specify the date on which Northon and Martin, who reside in Michigan and Missouri, respectively (id. ¶¶ 5, 7), initially communicated with Plaintiff for purposes of the Agreement, although certain paragraphs therein indicate that such discussions would have taken place in 2016.

[3] The 717 area code "is an area code located solely in central Pennsylvania." (Id. ¶ 12.)

copies of the [A]greement, as well as the final version, were sent to [Plaintiff] at their location . . . in Harrisburg, Pennsylvania." (Id. ¶¶ 14, 15.)

Plaintiff further alleges that in October of 2016, Martin "contacted and informed Kevin Harley, who was located in Harrisburg . . . that [] Northon was not authorized to sign the Agreement, but that he was authorized and interested in pursuing the services that had been offered, and contractually settled, in the Agreement." (Id. ¶ 16.) Following that exchange, "on or before October 21, 2016, Martin agreed, on behalf of Eagle Forum, to the terms of the original [a]greement and continued, along with [] Northon, to direct the services provided by [Plaintiff]." (Id. ¶ 17.) Martin, who "was fully aware of [Plaintiff's] location in Harrisburg . . . repeatedly contacted [Plaintiff] at that location[,] . . . remained fully aware of all services rendered by [Plaintiff] on behalf of Eagle Forum[,] and made no objections to the services provided, nor the invoices for said services, until April 2017." (Id.)

Under the Agreement, Plaintiff "provided litigation support, as a result of a legal dispute between Schlafly's heirs, throughout October that resulted in consultations and communications, including conference calls," between Plaintiff, Northon, Martin, and another individual affiliated with Roetzel & Andress. (Id. ¶ 18.) Plaintiff also maintains that during the course of the Agreement, Martin "knowingly contacted [Plaintiff] by telephone, email[,] and US Mail . . . [in] Harrisburg," and that "[a]ll emails from . . . Harley and Gerow specifically contained the name and Harrisburg, Pennsylvania address of [Plaintiff]." (Id. ¶ 19.) Specific instances of such contact include the development of a public relations campaign related to a "Phyllis Schlafly video tribute . . . to be utilized for fundraising and promotion by Eagle Forum," the planning of which was discussed "in a conference call on or about November 29, 2016 . . . between Martin, Rollins, Harley and Gerow" (id. ¶ 20), in addition to Plaintiff's receipt of "video footage and still

photos from Eagle Forum[] . . . to be used for the video project," which "were all sent to [Plaintiff] in Harrisburg, Pennsylvania," where the associated work was performed (id. ¶ 21). Plaintiff also states that under the Agreement and pursuant to Martin's direction, it "organized and promoted a reception during the Presidential Inaugural on January 21, 2017," which "entailed substantial preparation" on the part of Plaintiff, all of which "was conducted with the express knowledge and direction of Martin . . . [and] was primarily conducted, with the knowledge of Martin, from Harrisburg, Pennsylvania." (Id. ¶ 22.)

Plaintiff also refers to an instance in which "Harley, Gerow, and their paid film crew flew to St. Louis from Pennsylvania for three days" in January of 2017 to obtain video footage for Eagle Forum (id. ¶ 23), alleging that "[a]ll of the Eagle Forum Board of Directors were fully aware of [Plaintiff's] work, having witnessed much of [Plaintiff's] work and having been personally interviewed on camera" for purposes of the video (id. ¶ 24).[4] Further, Plaintiff "developed a digital 'DeFund Berkeley' campaign that entailed graphic development . . . promotions, [and] social media content," and "this work was primarily conducted in Harrisburg, Pennsylvania and was well known to Martin." (Id. ¶ 27.) In addition to Plaintiff's work on specific projects such as those described above, "[p]ursuant to the Agreement, weekly phone calls were held between [Plaintiff's] officials, located in Harrisburg, Pennsylvania, and Martin to discuss . . . additional promotion of [Schlafly's] legacy at CPAC." (Id. ¶ 28.) Plaintiff alleges that it "communicated with CPAC leadership and secured for [Schlafly's] book to be the only 'premium' (gift) at the Reagan Dinner, paid for the delivery of, and specifically distributed 800 copies of the book to each place setting at the dinner, and arranged for [Schlafly] to be mentioned from the podium at the event." (Id.)

_____

[4] Plaintiff and its film crew also "traveled to Washington, D.C. to interview Ambassador Faith Whittlesey" on February 2, 2017, per Martin's direction. (Id. ¶ 25.)

Plaintiff alleges that during the course of the Agreement, on February 7, 2017, Martin reassured Plaintiff that he would pay the outstanding invoices owed to Plaintiff. (Id. ¶ 26.) Subsequently, on March 10, 2017, Plaintiff and Martin "orally modified their agreement to allow for a decreased monthly retainer of $10,000.00 for the subsequent months" (id. ¶ 29), and on March 17, Plaintiff provided Martin with "wiring instructions confirming that [Plaintiff] would be paid in full, and Martin failed to dispute the invoice" (id. ¶ 30). According to Plaintiff, approximately two days later, "Martin reassured [Plaintiff] that he was meeting with Eagle Forum officials that week and that they, at that time, would write checks to pay [Plaintiff] in full for all services rendered and invoiced." (Id. ¶ 31.) Subsequent to these communications, Plaintiff continued to provide services under the Agreement in late March of 2017, including additional litigation support, "phone conferences with Martin," and phone calls made by Plaintiff from Harrisburg – with Martin's approval – for the purpose of assisting "in getting Martin on the Weyrich lunch agenda, a regularly occurring meeting in Washington, D.C. of conservative leaders." (Id. ¶ 33.)

According to Plaintiff, who made repeated demands for payment in regard to the aforementioned services, Martin informed Plaintiff through email on April 3, 2017 that "he was in a fight with [the] board over the outstanding invoices" and "subsequently continued to admit the obligation and apologize for the lack of payment." (Id. ¶¶ 34-35.) As to the relevant invoices, Plaintiff sent invoices for the services it performed under the Agreement "[e]ach and every month of the contract," and all of the invoices identified Plaintiff "as located at 123 State Street in Harrisburg, Pennsylvania." (Id. ¶ 36.) Prior to April of 2017, none of the invoices sent by Plaintiff were "questioned or disputed," but rather, "payment was always assured to be forthcoming." (Id.) On approximately April 18, 2017, however, "Martin responded to the

regularly-occurring invoice and, for the first time, avoided the obligation to pay the invoices by asserting that the agreement had been 'terminated' in October" of that year. (Id. ¶ 37.)

Following Plaintiff's filing of an amended complaint on December 18, 2017 (Doc. No. 16), Defendants EFELDF and Martin (together referred to herein as "Defendants") filed a motion to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) on January 2, 2018 (Doc. No. 18), along with a brief in support (Doc. No. 22). Plaintiff filed a brief in opposition to the motion on January 30, 2018 (Doc. No. 26), to which Defendants filed a brief in reply on February 12, 2018 (Doc. No. 27).[5] Having been fully briefed, the motion is ripe for disposition.

## II.     LEGAL STANDARD

### A.     Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2)

Federal Rule of Civil Procedure 12(b)(2) permits a defendant to bring a motion challenging the court's right to exercise personal jurisdiction over it. Fed. R. Civ. P. 12(b)(2). Once "the defendant raises the question of personal jurisdiction, the plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction." Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 146 (3d Cir. 1992). To avoid dismissal pursuant to Rule 12(b)(2), the plaintiff must "establish[] jurisdictional facts through sworn affidavits or other competent evidence." Time Share Vacation Club v. Atl. Resorts, 735 F.2d 61, 66 n.9 (3d Cir. 1984). "[A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction." Id.

---

[5] Defendants Northon and Roetzel and Andress were dismissed as Defendants from this action upon Plaintiff's filing of a notice of voluntary dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) on February 12, 2018. (Doc. Nos. 28, 29.)

"A federal court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of the state."  Carteret Sav. Bank, 954 F.2d at 144-45 (quoting Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 436 (3d Cir. 1987)).  Pennsylvania's long-arm statute permits the Court to exercise personal jurisdiction "to the fullest extent allowed under the Constitution of the United States."  42 Pa. Cons. Stat. § 5322(b).  Therefore, in its exercise of personal jurisdiction, this Court is constrained only by the Due Process Clause of the United States Constitution, which requires that a defendant has "certain minimum contacts with [the forum state] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice."  O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 316 (3d Cir. 2007) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  Requiring "minimum contacts" between the defendant and the forum state gives "fair warning" to a defendant that he or she may be called to defend a lawsuit in that state.  See Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007) (quotation omitted).

Two types of personal jurisdiction comport with these notions of due process: specific and general jurisdiction.  Daimler AG v. Bauman, 134 S. Ct. 746 (2014).  Specific jurisdiction encompasses cases "in which the suit 'aris[es] out of or relate[s] to the defendant's contacts with the forum.'"  Id. at 754 (citations omitted).  General jurisdiction, however, may be exercised by a court when foreign corporations' "affiliations with the [s]tate are so 'continuous and systematic' as to render them essentially at home in the forum [s]tate."  Id. (citations omitted).

B.      Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests.  Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  The plaintiff must present facts that, accepted as true, demonstrate a plausible

right to relief.  Fed. R. Civ. P. 8(a).  Although Federal Rule of Civil Procedure 8(a)(2) requires

"only a short and plain statement of the claim showing that the pleader is entitled to relief," a

complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for its

"failure to state a claim upon which relief can be granted."  See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all

factual allegations in the complaint and all reasonable inferences that can be drawn from them,

viewed in the light most favorable to the plaintiff.  See In re Ins. Brokerage Antitrust Litig., 618

F.3d 300, 314 (3d Cir. 2010).  The Court's inquiry is guided by the standards of Bell Atlantic

Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009).  Under

Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of

pleading."  See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  To avoid

dismissal, all civil complaints must set out "sufficient factual matter" to show that a claim is

facially plausible.  Id.  The plausibility standard requires more than a mere possibility that the

Defendant is liable for the alleged misconduct.  As the Supreme Court instructed in Iqbal,

"where the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to

relief.'"  Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the

United States Court of Appeals for the Third Circuit has identified the following steps a district

court must take when determining the sufficiency of a complaint under Rule 12(b)(6): (1)

identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory

allegations contained in the complaint "not entitled" to the assumption of truth; and (3)

determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly

give rise to an entitlement to relief." See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (citation and quotation marks omitted).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)). A court may also consider "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)).

## III.    DISCUSSION

In light of the parties' briefing on the issue of personal jurisdiction, specifically, the absence of any challenge to the existence of general jurisdiction, and a lack of any information indicating Defendants' contacts with Pennsylvania are sufficiently continuous and systematic so as to raise the issue of general jurisdiction, the Court's analysis of personal jurisdiction addresses only the existence of specific jurisdiction.

### A.    Whether the Amended Complaint Should be Dismissed as to Defendants Pursuant to Rule 12(b)(2) for Lack of Personal Jurisdiction

#### 1.    Applicable Legal Standard

In the context of a Rule 12(b)(2) challenge raised in connection with a breach of contract claim, "[t]hough a contract may provide the basis for the proper exercise of personal jurisdiction, a contract alone does not automatically establish sufficient minimum contacts in the other party's home forum." See Element Fin. Corp. v. ComQi, Inc., 52 F. Supp. 3d 739, 746 (E.D. Pa. 2014)

(citing Grand Entm't Grp., Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 482 (3d Cir. 1993)). Accordingly, in evaluating a challenge to the exercise of personal jurisdiction, a court may look to contract negotiations, as well as "mail and telephone communications the defendant sent into the forum state . . . which may count toward the minimum contacts" necessary for purposes of exercising personal jurisdiction over a defendant.  See id.

Moreover, "[i]n contract cases, courts should inquire whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach," and in cases where parties "reach out beyond [their] state and create continuing relationships and obligations with citizens of another state . . . [c]ourts are not reluctant to find personal jurisdiction." Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001) (second alteration in original) (quoting Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 289 (1st Cir. 1999), Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473 (1985)).  "Actual presence during pre-contractual negotiations, performance, and resolution of post-contract difficulties is generally factored into the jurisdictional determination."  Id. (citing Remick v. Manfredy, 238 F.3d 248, 255-56 (3d Cir. 2001)).  "In modern commercial business arrangements, however, communication by electronic facilities, rather than physical presence, is the rule [and] [w]here these types of long-term relationships have been established, actual territorial presence becomes less determinative."  Id. at 150-51 (quoting Burger King, 471 U.S. at 476).  Notably, when assessing jurisdiction in the context of an alleged breach of contract, a court "must consider the totality of the circumstances, including the location and character of the contract negotiations, the terms of the contract negotiations, the terms of the contract, and the parties' actual course of dealing."  See Remick, 238 F.3d at 256 (citing Mellon Bank (East) PSFS, Nat. Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992)).

## 2. Arguments of the Parties

In support of their motion to dismiss for lack of personal jurisdiction, Defendants assert that Plaintiff has failed to demonstrate minimum contacts with Pennsylvania on their part so as to justify any exercise of personal jurisdiction over them by this Court. Defendants argue, <u>inter alia</u>, that the amended complaint is devoid of any allegation "that they attempted to sell any goods or services" or "ever garnered any revenue" in Pennsylvania. (Doc. No. 22 at 9.) Defendants also maintain that although the Agreement contains a Pennsylvania choice of law provision, such a provision, alone, is insufficient to establish personal jurisdiction. (<u>Id.</u>) Additionally, Defendants attack Plaintiff's allegation that all relevant sales and promotional materials were developed by Plaintiff in Pennsylvania, stating that such a statement is conclusory and does nothing to demonstrate that Defendants "could foresee impact within Pennsylvania" by entering into the Agreement. (<u>Id.</u> at 10.)

In opposition, Plaintiff argues that certain considerations – the character of the contractual negotiations and solicitation of business; whether the contract invoked the protections of Pennsylvania law; the contract's terms and contemplated future consequences; and the parties' course of dealing – demonstrate that the exercise of personal jurisdiction over Defendants would be proper. (Doc. No. 26 at 7-9.) As to the character of the negotiations and solicitation of business, Plaintiff states, <u>inter alia</u>, that Martin: (1) solicited Plaintiff's services while acting as EFELDF's president; (2) took part "in pre-agreement discussions with [Plaintiff's] members located in Pennsylvania"; (3) employed Plaintiff's "phone number that utilized a 717 area code" in all of his phone communications with Plaintiff; and (4) "knowingly contacted [Plaintiff], by telephone, email and US Mail . . . [in] Harrisburg." (<u>Id.</u> at 7.) Additionally, Plaintiff states that it negotiated the Agreement "from its principal place of

business in Pennsylvania," where the draft agreements were sent and the Agreement was ultimately executed.  (Id.)  Plaintiff also points to the Agreement's choice of law provision invoking the protections of both Pennsylvania and Florida law (id. at 8), the parties' "[n]umerous phone calls, emails, and mailings" directed to Plaintiff's location in Pennsylvania, and the relevant invoices that "were all sent from [Plaintiff's] principal place of business in Pennsylvania and were payable to that location," as indicative of the existence of personal jurisdiction in Pennsylvania on the basis of the Agreement's terms and the contract's contemplated obligations (id. at 9).

Furthermore, Plaintiff contends that Defendants "were not akin to passive or sporadic internet purchasers of products," pointing to Martin's initiation of contact with Plaintiff so as "to purchase the unique and particular services of [Plaintiff]" for Defendants' benefit, as well as Martin's regular contact with Plaintiff "by phone, email and mail" in relation to the services rendered under the Agreement.  (Id.)  According to Plaintiff, these facts "demonstrate an 'active buyer' who: initiated contact with [Plaintiff]; solicited business from a Pennsylvania corporation; bargained over the ongoing terms of the relationship; regularly directed and approved of the work of [Plaintiff] performed in Pennsylvania; and[] intended a long-term relationship (as demonstrated by the monthly retainers) with [Plaintiff]."  (Id.)

### 3.      Whether This Court May Exercise Jurisdiction Over Defendants

Having considered the arguments advanced by the parties, as well as the totality of the circumstances relevant to the governing personal jurisdiction analysis, the Court finds that its exercise of jurisdiction over both Defendants is proper.  Defendants' emphasis on Martin's lack of physical presence in Pennsylvania at any time relevant to the instant action and their contention that EFELDF does not conduct business in Pennsylvania (Doc. No. 22 at 11-12), are

unavailing, as "physical presence in the forum is no longer determinative in light of modern commercial business arrangements." See Telcordia Tech Inc. v. Telkom SA Ltd., 458 F.3d 172, 177 (3d Cir. 2006) (remarking that "mail and wire communications can constitute purposeful contacts when sent into the forum"). Further, in light of the Court's obligation to examine whether the Defendants' contacts with Pennsylvania "were instrumental in . . . [the contract's] breach," it bears noting that the impact of the alleged breach was felt in Pennsylvania, where Plaintiff is based. See id. at 178 ("[T]he breach of the contract . . . occurred when the payment was not placed in a . . . bank [within the forum] pursuant to the parties' course of dealing."). Defendants' contacts with Pennsylvania are bolstered by their frequent communications with Plaintiff at its Pennsylvania location, which "as a whole involved more entangling contacts than [] mere informational communications." See Remick, 238 F.3d at 256 (internal quotation marks omitted) (finding that there was personal jurisdiction over a defendant in Pennsylvania for purposes of contract claim when "there were repeated 'informational communications' during the course of the contractual relationship between [the parties] with [the plaintiff] at his Philadelphia office").[6]

---

[6] Notably, in Remick, the Court of Appeals commented that in light of the fact that "[m]ost of the services performed by [the plaintiff] . . . were conducted at [the plaintiff's] Philadelphia office," the defendant "certainly should have expected as much as he knew that [the plaintiff's] home office is in Philadelphia," and, therefore, personal jurisdiction over the defendant existed in Pennsylvania. See Remick, 238 F.3d at 256 (emphasis added). As to the instant case, the Court similarly concludes that as a result of Defendants' frequent outreach to Plaintiff, whose location in Pennsylvania was known, it was foreseeable to Defendants that they could face litigation in Pennsylvania as a result of a dispute arising from the Agreement with Plaintiff. Indeed, this Court has so held in similar circumstances. See Shafik v. Curran, No. 1:09-cv-02469, 2010 WL 2510194, *5 (M.D. Pa. June 17, 2010) (finding that personal jurisdiction existed over a defendant in a breach of contract claim and reasoning that "[i]n contemplating [the plaintiff's] services in furtherance of his senatorial campaign, [the defendant] would have known that [the] services would be performed, for the most part, from [the plaintiff's] Pennsylvania office").

Moreover, the allegations in the complaint support the conclusion that Defendants availed themselves of the benefits and protections of Pennsylvania law in the Agreement with Plaintiff. (Doc. No. 16-1 at 3) (setting forth choice of law provision so as to apply "applicable Pennsylvania and Florida law"). Although a choice of law provision does not, ipso facto, render the exercise of personal jurisdiction proper, it is "a factor in showing whether the [D]efendants could foresee that their acts would have effects in Pennsylvania." See Time Share, 735 F.2d at 65. Accordingly, the Court may consider the Agreement's reference to Pennsylvania law in the broader context of its analysis of the "totality of the circumstances" in ascertaining whether personal jurisdiction exists over Defendants. See, e.g., Telcordia, 458 F.3d at 177 (providing that an examination of the "totality of the circumstances" is required of the district court "[i]n determining jurisdiction for a breach of contract [claim]").

Based on the analysis set forth supra, Defendants' motion to dismiss the amended complaint for lack of personal jurisdiction will be denied.[7] Accordingly, the Court examines whether the amended complaint should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

**B.** **Whether the Amended Complaint Should be Dismissed as to Defendants Pursuant to Rule 12(b)(6) for Failure to State a Claim Upon Which Relief May Be Granted**

---

[7] A court's determination as to personal jurisdiction entails "a claim-specific analysis" that, as applied to the case at bar, requires this Court to examine whether the exercise of personal jurisdiction would be proper as to the breach of contract claim set forth in the amended complaint. See Remick, 238 F.3d at 255. The Court notes that Plaintiff has also set forth an alternative claim for unjust enrichment against Defendants. (Doc. No. 16 at 12-13). However, "[i]t may not be necessary to [conduct a claim-specific analysis] in every multiple claim case," and given that Plaintiff's alternative claim is quasi-contractual, a separate personal jurisdiction analysis as to Plaintiff's unjust enrichment claim is unnecessary. See Remick, 238 F.3d at 255-56 (stating that "such differentiation" was required as between contract and tort claims due to "different considerations in analyzing jurisdiction over contract claims and over certain tort claims").

1.    **Plaintiff's Breach of Contract Claim (Count I)**

i.    **Applicable Legal Standard**

A claim for breach of contract under Pennsylvania law includes the following elements: "(1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages." See Burton v. Teleflex, Inc., 707 F.3d 417, 431 (3d Cir. 2013) (citing Braun v. Wal-Mart Stores, Inc., 24 A.3d 875, 896 (Pa. Super. Ct. 2011)).[8] "While not every term of a contract must be stated in complete detail, every element must be specifically pleaded." CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999) (citing Snaith v. Snaith, 422 A.2d 1379, 1382 (Pa. Super. Ct. 1980)); see also Nittany Nova Aggregates, LLC v. WM Capital Partners, LLC, No. 4:16-cv-00120, 2016 WL 6248951, at *3 (Oct. 26, 2016) (stating that "[a] plaintiff need not allege every detail of the contract within its complaint," but noting that "each of the aforementioned elements must be specifically pleaded"). To that end, "[c]larity is particularly important where an oral contract is alleged." See Pennsy Supply, Inc. v. Am. Ash. Recycling Corp. of Pa., 895 A.2d 595, 600 (Pa. Super. Ct. 2006) (citing Snaith, 422 A.2d at 1382).

To prove the existence of an oral contract, a plaintiff must demonstrate that: "(1) both parties manifested an intention to be bound by the terms of the agreement; (2) the terms of the agreement were sufficiently definite to be specifically enforced; and (3) there was mutuality of consideration." CPG Int'l LLC v. Shelter Prods., Inc., No. 3:15-cv-1045, 2017 WL 468224, at *5 (M.D. Pa. Feb. 3, 2017) (citing York Excavating Co., Inc. v. Emp'rs Ins. of Wausau, 834 F. Supp. 733, 740 (M.D. Pa. 1993); In re Estate of Hall, 731 A.2d 617, 621 (Pa. Super. Ct. 1999)).

---

[8] The parties appear to agree that Pennsylvania law governs Plaintiff's breach of contract claim. (Doc. Nos. 22 at 14, 26 at 10.) Accordingly, the Court analyzes the sufficiency of Plaintiff's contract claim under Pennsylvania law.

Pennsylvania law "requires courts . . . to assess the parties' conduct <u>in light of the surrounding circumstances</u> to determine the existence of an oral contract, including its terms." <u>Id.</u> (citing <u>Fenestra, Inc. v. John McShain, Inc.</u>, 248 A.2d 835, 836-37 (Pa. 1969)). Additionally, "[t]he party asserting the existence of an oral contract must establish [that] its terms are 'clear and precise.'" (<u>Id.</u>) (citing <u>Edmondson v. Setusky</u>, 674 A.2d 760, 764 (Pa. Commw. Ct. 1996); <u>Orchard v. Covelli</u>, 590 F. Supp. 1548, 1556 (W.D. Pa. 1984)).

### ii. Arguments of the Parties

In support of their motion to dismiss, Defendants argue primarily that because of Plaintiff's statement in the amended complaint that Defendants explained to Plaintiff on October 31, 2016 that "the written contract attached to the [a]mended [c]omplaint 'was not authorized,'" Defendant Martin "voided any contract that might have been formed, and Plaintiff fully understood the contract was not binding." (Doc. No. 22 at 13.) Defendants maintain that, consequently, "Martin at most indicated he was merely '<u>interested</u> in pursuing the services that had been offered,'" and because mere interest "is not tantamount to being contractually bound . . . there was no written oral contract binding . . . Defendants, by Plaintiff's own allegations." (<u>Id.</u>) Further, Defendants posit that the amended complaint contains insufficient factual allegations as to any oral contract between Plaintiff and Defendants, stating that "Plaintiff fails to allege that the EFELDF Defendants accepted any offer by Plaintiff that was absolute and identical with the terms of the offer" for purposes of Pennsylvania law. (<u>Id.</u> at 14) (internal quotation marks omitted).

In opposition, Plaintiff asserts that it has "more than fulfilled its burden" in pleading a breach of contract claim for purposes of the Court's Rule 12(b)(6) analysis, as there was a signed agreement under which Plaintiff would provide services to assist Roetzel and Andress in

representing Defendant Eagle Forum, and the Agreement "also specified EFELDF as a party purchasing/receiving the services of [Plaintiff]." (Doc. No. 24 at 10) (citing Doc. No. 16 ¶ 14). Further, Plaintiff states that the Agreement was supported by adequate consideration, as demonstrated by its provision "for a monthly retainer of $20,000 in exchange for Plaintiff's services." (Id.) (citing Doc. No. 16 ¶ 14). Plaintiff also maintains that, "Martin orally agreed, on or before October 21, 2016, on behalf of Eagle Forum, to the terms of the original written [a]gremeent . . [and] continued, along with Northon, to direct the services provided by [Plaintiff]" while "Martin repeatedly contacted [Plaintiff] at their Harrisburg location, remained fully aware of all services rendered by [Plaintiff] on behalf of Eagle Forum, and made no objections to the services provided, nor the invoices for said services, until April 2017." (Id. at 11.) According to Plaintiff, therefore, the amended complaint sufficiently alleges the existence of an oral contract, as "Martin agreed to the terms of the original Agreement, showing an intention to be bound," which is further supported by the allegations concerning circumstances that indicate Martin was aware of Plaintiff's services, and made no objections to Plaintiff providing such services, "even orally modif[ying] the [A]greement on or about March 10, 2017 to allow for a decreased monthly retainer." (Id.)

### iii.    Whether Plaintiff has Stated a Claim for Breach of Contract

The Court concludes that the amended complaint sets forth sufficient facts to support a breach of contract claim against Defendants under the standard described supra. Notably, the Agreement explicitly refers to EFELDF in articulating the parties' "terms of [their] engagement." (Doc. No. 16-1 at 2.) Moreover, Plaintiff has pled the requisite elements for a breach of contract claim with sufficient specificity, as the amended complaint alleges: (1) the existence of an agreement, both in writing and/or orally as a result of the alleged oral

modifications to the Agreement; (2) a breach of that agreement as a result of Defendants' failure to reimburse Plaintiff for the services rendered to it under the Agreement by failing to respond to the relevant invoices; and (3) damages of $130,000.00, the amount Plaintiff alleges it is owed as a result of unpaid services rendered under the Agreement. (Id. at 11); see also Burton, 707 F.3d at 431 (setting forth elements of a breach of contract claim). Additionally, to the extent that Plaintiff alleges the existence of an oral contract based on an oral agreement with Martin, on behalf of Eagle Forum, to adhere "to the terms of the original written Agreement" (Doc. No. 26 at 11), the parties' dispute as to the existence of an oral contract renders dismissal of Plaintiff's contract claim inappropriate at this juncture, for in such instances, the terms of the alleged contract and the parties' understanding as expressed through those terms are appropriate for resolution by a factfinder. See, e.g., CPG Int'l LLC, 2017 WL 468224, at *5 (quoting McCormack v. Jermyn, 40 A.2d 477, 479 (Pa. 1945)) (reaffirming that "the meaning of words used in conversation, and what the parties intended to express by them, is exclusively for the jury to determine"). Accordingly, Defendants' motion to dismiss will be denied as to Count I of the amended complaint.

### 2. Plaintiff's Unjust Enrichment Claim (Count II)

#### i. Applicable Legal Standard

The following elements are necessary for a plaintiff to state a claim for unjust enrichment: "(1) benefits conferred on one party by another; (2) appreciation of such benefits by the recipient; and (3) acceptance and retention of these benefits in such circumstances that it would be inequitable for the recipient to retain the benefits without payment of value." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 277 (3d Cir. 2007) (citing Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 446 (3d Cir. 2000)). Further, "[a]lthough plaintiffs

are free to pursue the alternative theories of recovery of breach of contract and unjust enrichment, the finding of a valid contract prevents a party from recovering for unjust enrichment as the measure of damages is limited to that which is provided in the contract itself." Halstead v. Motorcycle Safety Found., Inc., 71 F. Supp. 2d 455, 359 (E.D. Pa. 1999) (citing United States v. Kensington Hosp., 760 F. Supp. 1120, 1135 (E.D. Pa. 1991)). "However . . . a claim for unjust enrichment will not be barred if it concerns conduct outside the scope of the original agreement or contract." Kraus Indus., Inc. v. Moore, Civil Action No. 06-00542, 2007 WL 2744194, at *8 (W.D. Pa. Sept. 18, 2007)).

### ii. Arguments of the Parties

Defendants argue that dismissal of Plaintiff's unjust enrichment claim is warranted because "[a]n unjust enrichment claim . . . is rarely recognized under Pennsylvania law." (Doc. No. 22 at 14.) Further, according to Defendants, an unjust enrichment claim requires at least "that the defendants actually received a benefit, and no specific benefits to the EFELDF Defendants have been alleged by Plaintiff here." (Id. at 15.) Defendants maintain, therefore, that "[a]t most, Plaintiff alleges having done some work without conferring any benefit on" Defendants, and because there was neither any "enrichment" nor "appreciation of enrichment . . . there cannot be any unjust enrichment." (Id.) (internal quotation marks omitted).

Conversely, Plaintiff asserts that unjust enrichment "is in fact alive and well in Pennsylvania," and that the aforementioned argument from Defendants is a "blanket factual assertion" contradicted by the amended complaint's allegations demonstrating that Defendants "directed and received the benefit of extensive work performed by the Plaintiff . . . [and] that Defendants received the 'benefits' of Plaintiff's services without proper payment for those services." (Doc. No. 24 at 12) (citing Doc. No. 16 ¶¶ 18, 20-23, 25, 27-28, 32-33, 43, 35).

Plaintiff argues, therefore, that the amended complaint sets forth sufficient "facts that demonstrate that discovery will reveal that [Plaintiff] conferred a benefit on the Defendants, appreciation of such benefits . . . and acceptance and retention of such benefits under such circumstances that it would be inequitable for Defendants to retain the benefit without payment of value."  (Id.)

### iii.    Whether Plaintiff Has Stated a Claim for Unjust Enrichment

The Court agrees with Plaintiff and finds that dismissal of Plaintiff's unjust enrichment claim is unwarranted.  As an initial matter, the Court notes Defendants' argument that a claim for unjust enrichment is "rarely recognized under Pennsylvania law," which Defendant follows, paradoxically, with citations to decisions in which Pennsylvania courts have indeed recognized such claims.  (Doc. No. 22 at 14-15.)  In addition, the applicable authority weighs against dismissal of Plaintiff's unjust enrichment claim at the Rule 12(b)(6) stage.  See, e.g., Brown & Brown, Inc. v. Cola, 745 F. Supp. 2d 588, 626 (E.D. Pa. 2010) (summarizing applicable case law and stating that "[g]iven that the parties have not fully admitted that [the defendants] are subject to the terms of a valid . . . [a]greement, it is premature at this juncture to dismiss the unjust enrichment claim"); Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 507 (E.D. Pa. 2008) (citing Fed. R. Civ. P. 8(a)) ("Because the Federal Rules of Civil Procedure enable the plaintiffs to plead in the alternative, a claim for breach of contract and unjust enrichment can coexist at this early stage of litigation.").[9]  Accordingly, Defendants' motion to dismiss will be denied as to Count II of the amended complaint.

---

[9] Furthermore, Plaintiff has adequately pled facts establishing a claim for unjust enrichment against Defendants, as the amended complaint alleges that Defendants received a benefit from Plaintiff in that they were provided public relations and marketing services for the purposes set forth in the Agreement (Doc. No. 16 ¶¶ 21-33); Defendants appreciated the benefit of those services, as reflected by Martin's reassurances to Plaintiff "that he would pay the outstanding

## IV.  CONCLUSION

Based on the foregoing, Defendants' motion to dismiss (Doc. No. 18), will be denied in its entirety.  An appropriate Order follows.

<u>s/Yvette Kane</u>
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

invoices" (<u>id.</u> ¶ 26); and Defendants accepted and retained the benefits of Plaintiff's services by permitting Plaintiff to provide its services for several events and projects described in the amended complaint (<u>id.</u> ¶¶ 21-33).