Exhibit B

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

```
QUANTUM COMMUNICATIONS, LTD,       :
                  Plaintiff       :
                                   :  AMENDED COMPLAINT
            VS                     :  CASE NO. 1:17cv1640
                                   :
EAGLE FORUM, EAGLE FORUM           :  (Honorable Yvette Kane)
EDUCATION AND LEGAL DEFENSE        :
FUND, IAN A. NORTHON, ROETZEL      :
AND ANDRESS, LPA, and EDWARD       :
MARTIN, JR.,                       :  JURY TRIAL DEMANDED
                  Defendants      :
```

* * * * *

August 23, 2019

* * * * *

        Oral Deposition of Kevin Harley, held in the
offices of PREMIER REPORTING, LLC, 112 Market Street,
Harrisburg, Pennsylvania, 17101, commencing at 10:02
a.m., on the above date, before Colleen V. Wentz, RMR,
CRR, a Professional Court Reporter and a Notary Public
of the Commonwealth of Pennsylvania.

PREMIER REPORTING, LLC
(717) 243-9770
linda@premierreportingllc.com

8 South Hanover Street          112 Market Street
Suite 201                       Suite 406
Carlisle, PA  17013             Harrisburg, PA  17101

```
1    APPEARANCES:

2         FRANK G. FINA LAW OFFICE
          1000 Germantown Pike, Suite D-3
3         Plymouth Meeting, Pennsylvania 19462
          BY:  FRANK FINA, ESQUIRE
4         (484) 681-9387
          fgflegal@outlook.com
5
               Counsel for the Plaintiff
6
          ANDREW L. SCHLAFLY LAW
7         939 Old Chester Road
          Far Hills, New Jersey 07931
8         BY:  ANDREW SCHLAFLY, ESQUIRE
          (908) 719-8608
9
               Counsel for the Defendant
10             And Counterclaim Plaintiff Eagle Forum
               Education and Legal Defense Fund and
11             Defendant Edward R. Martin, Jr.

12
          KLEINBARD
13        Three Logan Station
          1717 Arch Street, 5th Floor
14        Philadelphia, Pennsylvania  19103
          BY:  EDWARD BUTKOVITZ, ESQUIRE
15        (215) 568-2000
          ebutkovitz@kleinbard.com
16
               Counsel For Eagle Forum
17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX

 2   WITNESS              EXAMINATION          PAGE

 3   Kevin Harley         By Mr. Schlafly         4

 4   Kevin Harley         By Mr. Butkovitz       87

 5   Kevin Harley         By Mr. Fina            95

 6   Kevin Harley         By Mr. Butkovitz       98

 7   Kevin Harley         By Mr. Schlafly       102

 8   Kevin Harley         By Mr. Butkovitz      105

 9   Kevin Harley         By Mr. Fina           108

10   Kevin Harley         By Mr. Butkovitz      110

11

12                      EXHIBITS

13   NO.       DESCRIPTION                      PAGE

14   Harley Exhibit 1   Notice of Deposition       4

15   Harley Exhibit 2   List of allegations in the   6
                        Complaint
16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

(Proceedings commenced at 10:02 a.m.)

\* \* \* \* \*

KEVIN HARLEY, after having been duly

sworn, was examined and testified as follows:

\* \* \* \* \*

EXAMINATION

BY MR. SCHLAFLY:

Q.   Mr. Harley, are you here pursuant to a Notice

of Deposition?  I'll show you.

A    I was asked to be here, so I'm here.

MR. SCHLAFLY:  Okay.  If you can mark this as

-- how should we do the numbering?  Off the record for a

second.

(At this time, a discussion was held off the

record and Harley Exhibit 1 was marked for

identification.)

MR. SCHLAFLY:  Usual stipulations.

BY MR. SCHLAFLY:

Q.    I've shown you, Mr. Harley, what's Exhibit

1, the Notice of Deposition.  And have you seen that

before?

A.    No.

Q.    Have you ever been deposed before?

A.    Yes.

1    Q.    Anybody else on that phone call?

2    A.    Not that I -- not that I can remember.

3    Q.    And on your end of the phone call, would

4  Charlie Gerow have been in the same room as you and you

5  speaking on a speaker phone?

6    A.    Yes.

7    Q.    And would that have been here in these

8  offices in Harrisburg?

9    A.    Yes.

10    Q.    How long was the conversation, to the best

11  of your recollection?

12    A.    I don't -- I don't remember.  I think it was

13  -- we were talking about other issues and other work

14  that we were doing for them.  And this was part of that.

15  If it was in the beginning, middle, or the end, I can't

16  -- I can't remember when it was raised.

17    Q.    Do you recall whether you discussed specific

18  terms of any agreement during that phone call?

19    A.    It's my recollection that Ed agreed to

20  continue with the original agreement and the fee

21  structure.

22    Q.    Do you recall agreeing to any specific terms

23  about the scope of work?

24    A.    No.  That we were continuing to do work on

25  behalf of Eagle Forum Legal Defense Fund and continue to

1    actually expand our work from -- we had many, many

2    conversation about that over a period of time, including

3    weekly telephone calls.

4         Q.    Well, it says here that Martin agreed,

5    comma, on behalf of Eagle Forum, comma.  Is that

6    correct?

7         A.    Yes.  Eagle Forum Legal Defense Fund,

8    whatever -- whatever entity, you know -- internally, we

9    referred to it as Eagle Forum because it was -- there

10   was several different organizations.  But just

11   internally, that's how we would refer to it.

12        Q.    But I'm asking you do you recall which

13   entity?

14        A.    It would have been the original entity that

15   we had the agreement with, which, I believe, was Eagle

16   Forum Legal Defense Fund.

17        Q.    So are you saying that this statement here

18   in paragraph 17 is incorrect then because at 17 --

19   paragraph 17, it refers to on behalf of Eagle Forum.

20        A.    I'm saying it should be whomever we had our

21   original agreement with.  That was -- things continued

22   as they were.  That was what I got from that

23   conversation with Ed Martin.

24        Q.    So it's your testimony, then, that it's not

25   correct as stated here in your pleading, that Martin

```
1    agreed comma, on behalf of Eagle Forum.
2            MR. BUTKOVITZ:  Object to form.
3    BY MR. SCHLAFLY:
4        Q.    You can still answer the question.  You're
5    stating that's incorrect, as stated here, that Martin
6    agreed, comma --
7        A.    I'm not stating that it's incorrect.  What
8    I'm stating is that what Ed Martin agreed to is that we
9    would continue with our original agreement and the terms
10   of the original agreement that we had signed with Ian.
11       Q.    I'm asking you on behalf of whom?
12       A.    Well, it was -- we were representing
13   whomever we were representing, which I believe was Eagle
14   Forum Legal Defense Fund.
15       Q.    So you're saying that Martin -- this is not
16   quite correct, that Martin agreed on behalf of Eagle
17   Forum?
18            MR. BUTKOVITZ:  Objection.  Asked and
19   answered.
20   BY MR. SCHLAFLY:
21       Q.    You can answer.
22       A.    I'm not saying it's incorrect.
23       Q.    The allegation that he agreed to terms of
24   the original agreement, did those terms that Martin
25   allegedly agreed to, did they include a right to
```

1    terminate the agreement?

2        A.    I don't believe there was a conversation --

3    that conversation didn't include -- we didn't discuss

4    that.

5        Q.    Did the terms include who was going to

6    direct the work to be performed?

7        A.    Ed was going to be -- had been and was

8    continuing to be our point of contact.  We would

9    strategize, develop communication plans and -- with him,

10   in coordination with him.

11       Q.    Would he direct the work then?  Would you

12   work, pursuant to his instructions?

13       A.    We would -- well, the way this would work,

14   we would discuss things, strategize, and come up with

15   ideas and plans, kick those around, and then execute.

16   But he was -- he was the -- he was part of all of that,

17   yes.

18       Q.    What -- was the execution of these ideas

19   dependent on his authorization?

20       A.    Sure.  We weren't going to do something that

21   the client didn't want us to do.  Absolutely.

22       Q.    Were expenses to be preapproved?

23       A.    Expenses, I'd have to go back and look at

24   the original contract.  Whatever expenses we -- I don't

25   know that we would have a discussion about expenses.

1    Any travel or anything was put in to the original

2    agreement.

3         Q.    Was preapproval required for expenses?

4         A.    I'd have to go back and look at the original

5    agreement.

6         Q.    Do you recall, as you sit here today in your

7    discussion with Ed Martin, whether there was any --

8         A.    I don't know that -- I don't remember having

9    any discussion with Ed Martin about expenses.  We did

10   incur expenses -- travel expenses numerous times.

11        Q.    And did you get preapproval for those travel

12   expenses?

13        A.    I -- I -- you can ask -- that's a question

14   for Charlie.  I don't know.

15        Q.    So you did not obtain preapproval for

16   expenses; is that right?

17        A.    That is correct.

18        Q.    Did you ever send any film or video to Ed

19   Martin?

20        A.    I did not.

21        Q.    Did anyone at Quantum mechanics -- Quantum

22   Communications send any film or video to Ed Martin?

23        A.    I don't know.

24        Q.    Who would know that?

25        A.    I did not.  You can ask Charlie.  I don't

1    believe we did.

2        Q.    Did you ever review any film or video?

3        A.    Yes.

4        Q.    What happened to it?  Where is the film or

5    the video now?

6        A.    We have it.

7        Q.    You have it.  Did you send that film or

8    video to anyone at Eagle Forum?

9        A.    No.

10        Q.    Did you ever refer any donors to Ed Martin?

11        A.    I did not.  Charlie may have.

12        Q.    Is that something you've done for other

13    clients, referred donors to them, potential donors?

14        A.    It's not something that, you know, we

15    typically -- we do not do fundraising.  Typically, for

16    our political campaigns, if I'm doing a political

17    campaign, usually there's a fundraising aspect of it.

18    If I run into somebody that is interested, I say well,

19    you know, you might want to write a check to this or to

20    that candidate, but --

21        Q.    Okay.  So for some candidates --

22        A.    Yeah.  This was not a candidate, though.

23    This client was not a candidate.  This candidate -- this

24    client was not running for office.

25        Q.    So it was not part of the scope of work for

43

```
1        Q.      Right.  Okay.  Do you have an opinion
2   whether this invoice was addressed to the correct
3   person?
4        A.      I don't.
5        Q.      And the description of the invoice, it says
6   fee for agency services in support of Eagle Forum,
7   November of 2016; is that correct?
8        A.      That's what it says.
9        Q.      And what you know now, as you look at that,
10  is that a correct description of your work?
11       A.      For agency services and support, yeah.
12  That's it.
13       Q.      Is it your view that you were owed $20,000 a
14  month whether you did any work or not?
15       A.      We had a retainer for $20,000 a month.
16       Q.      And is it your view that you were owed that,
17  regardless of whether you did any work?
18       A.      That was the agreement, that we would be
19  paid $20,000 a month.
20       Q.      Regardless of whether you did any work?
21       A.      Well, we did work.
22       Q.      Did you do an equal amount of work in each
23  of these months?
24       A.      Sure.
25       Q.      Really?  Same amount of work in each of
```

44

1  these months?

2      A.    Listen, we had an agreement for $20,000 a

3  month.  It wasn't -- we didn't do itemized billing.  We

4  weren't -- the agreement did not require us to bill

5  against the retainer, nor did it say that you had to

6  keep hourly time logs.  It was for $20,000 a month.  We

7  -- our business, we set up all of our clients pay a

8  monthly retainer.  That's how it works.

9      Q.    Is that true for all of your clients?

10     A.    I believe it is true for all of our clients.

11     Q.    Political candidates, too?

12     A.    Some campaigns we get a monthly retainer

13  when we were doing management services or strategic

14  consultation.  Some campaigns will come to us and just

15  say, you know, we want a direct mail piece and nothing

16  else.  So we'll do that.  And then just bill them the

17  cost plus -- we add in our -- we add in our cost.  But

18  typically, when we are involved in a campaign, we take a

19  monthly retainer.  I would say probably nearly all the

20  campaigns -- nearly all, particularly if it's a

21  significant political campaign, we get a monthly

22  retainer.

23     Q.    But there's some for which you do not do

24  business that way, right?

25     A.    Very few.  Right.

45

```
 1        Q.      But there's some, right?
 2        A.      Yeah.  But -- yeah.  And that's also -- that
 3   would be in an agreement.  A political campaign, again,
 4   is different than doing a strategic communication plan
 5   and executing that for a client.  This is -- this was
 6   not a political campaign.
 7        Q.      And the agreements, you reference, with
 8   these other clients, were they typically in writing?
 9        A.      Yes.
10        Q.      Do you have any oral agreements with other
11   clients of the magnitude of $20,000 a month on retainer?
12        A.      You can talk to my business partner about
13   that.  But I believe we have had oral agreements for
14   significant amounts of money, yes.
15        Q.      And what percentage of your clients would
16   you operate on an oral agreement for $20,000 a month?
17        A.      Well, the clients that I bring in, we have
18   an agreement.  We had an agreement with Eagle Forum.
19        Q.      Are you referring to a written agreement?
20        A.      Yeah.
21        Q.      So clients you work with, you do not have an
22   oral agreement for $20,000; is that right?
23        A.      Typically we have a written agreement, as we
24   had in this case.
25        Q.      Just answer my question.
```

46

```
 1        A.    I did.  I said typically, we have an
 2   agreement, as we had in this case.  I think that
 3   answered your question.
 4        Q.    Do you have any clients whom you work with,
 5   whom you have an oral agreement of a magnitude of
 6   $20,000 a month?
 7        A.    I personally do not.
 8        Q.    And are you aware of Quantum
 9   Communications's having any relationship with any client
10   of the magnitude of $20,000 a month on retainer on an
11   oral, rather than a written basis?
12        A.    You could check with --
13        Q.    No, no.  Don't ask me that.  I'm asking if
14   you are aware?
15        A.    I'm not aware.  But again, I might add, we
16   had a written agreement.
17        Q.    A written agreement that Ed Martin told you
18   was invalid, correct?
19        A.    And that he would continue to abide by the
20   agreement.
21        Q.    And why would he do that?  What's your
22   understanding of why someone would tell you that the
23   written agreement is invalid.  And then days later, tell
24   you it was valid?  Why would somebody do that?
25             MR. FINA:  Objection.  Objection.
```

BY MR. SCHLAFLY:

1

2      Q.    To the best of your knowledge.  Did he

3 explain -- did Ed tell you why he would do that,

4 invalidate a written agreement and then days later say

5 it was valid?

6      A.    Well, he never invalidated the agreement.

7      Q.    Well, let's go back and look at paragraph

8 16, in Exhibit 2.

9      A.    I read it.  Ed agreed to continue with our

10 agreement, including the terms of the agreement --

11      Q.    In paragraph 16.

12      A.    -- which is the $20,000 a month.

13      Q.    Paragraph 16, it says that, Ed contacted and

14 informed you that Ian Northon was not authorized to sign

15 the agreement; is that correct?

16      A.    That is correct.

17      Q.    And it's your testimony a few days later --

18 not on the same day, right?  Or is it your testimony the

19 same day?

20      A.    I don't -- I don't recall.

21      Q.    You don't recall.

22            MR. BUTKOVITZ:  Objection.  What's the

23 question?

24            THE WITNESS:  Yeah.  Did we --

25            MR. BUTKOVITZ:  Hold on one second.  There's

 1    Quantum Communications to do anything for Ed Martin,
 2    personally, or did Ed Martin personally ever agree to
 3    pay anything?
 4         A.    I don't know that Ed Martin ever said he was
 5    going to write a check out of his personal bank account,
 6    if that's what you're asking.
 7         Q.    That's what I'm asking.  Whether -- you know
 8    the difference between someone acting for an
 9    organization and somebody acting for himself, right?
10    And I'm just asking you if you ever had any
11    understanding that Ed Martin was engaging Quantum
12    Communications for him, personally?
13         A.    No.
14              MR. SCHLAFLY:  No further questions.
15              MR. BUTKOVITZ:  I have a very quick
16    follow-up.
17                    CROSS EXAMINATION
18    BY MR. BUTKOVITZ:
19         Q.    So just staying on the exhibit we were just
20    looking at --
21         A.    Okay.
22         Q.    -- the response to request for admissions
23    and interrogatories, the subsequent oral communication
24    that's referenced here, was that a communication that
25    was to you?

1              C E R T I F I C A T I O N

2

3          I, Colleen V. Wentz, RMR, CRR, hereby certify

4     that the proceedings and evidence noted are contained

5     fully and accurately in the notes taken by me during the

6     course of this deposition, and that this is a correct

7     transcript of the same.

8

9

10

11

12

13

14     Colleen V. Wentz, RMR, CRR
       Court Reporter, Notary Public

15
                Commonwealth of Pennsylvania - Notary Seal
                  Colleen Victoria Wentz, Notary Public
16                        Snyder County
                 My commission expires June 8, 2022
                      Commission number 1029397
17         Member, Pennsylvania Association of Notaries

18          The foregoing certification of this transcript

19     does not apply to any reproduction of the same by any

20     means, unless under the direct control and/or

21     supervision of the certifying reporter.

22

23

24

25