UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

QUANTUM COMMUNICATIONS, LTD, Plaintiff : AMENDED COMPLAINT

VS : CASE NO. 1:17cv1640

EAGLE FORUM, EAGLE FORUM EDUCATION AND LEGAL DEFENSE FUND, IAN A. NORTHON, ROETZEL AND ANDRESS, LPA, and EDWARD MARTIN, JR., Defendants : (Honorable Yvette Kane) : JURY TRIAL DEMANDED

* * * * *

August 23, 2019

* * * * *

Oral Deposition of Charlie Gerow, held in the offices of PREMIER REPORTING, LLC, 112 Market Street, Harrisburg, Pennsylvania, 17101, commencing at 1:42 p.m., on the above date, before Colleen V. Wentz, RMR, CRR, a Professional Court Reporter and a Notary Public of the Commonwealth of Pennsylvania.

PREMIER REPORTING, LLC
(717) 243-9770
linda@premierreportingllc.com

8 South Hanover Street
Suite 201
Carlisle, PA 17013

112 Market Street
Suite 406
Harrisburg, PA 17101

APPEARANCES:

FRANK G. FINA LAW OFFICE
1000 Germantown Pike, Suite D-3
Plymouth Meeting, Pennsylvania 19462
BY: FRANK FINA, ESQUIRE
(484) 681-9387
fgflegal@outlook.com

Counsel for the Plaintiff

ANDREW L. SCHLAFLY LAW
939 Old Chester Road
Far Hills, New Jersey 07931
BY: ANDREW SCHLAFLY, ESQUIRE
(908) 719-8608

Counsel for the Defendant
And Counterclaim Plaintiff Eagle Forum
Education and Legal Defense Fund and
Defendant Edward R. Martin, Jr.

KLEINBARD
Three Logan Station
1717 Arch Street, 5th Floor
Philadelphia, Pennsylvania 19103
BY: EDWARD BUTKOVITZ, ESQUIRE
(215) 568-2000
ebutkovitz@kleinbard.com

Counsel For Eagle Forum

INDEX


| WITNESS | EXAMINATION | PAGE |
| --- | --- | --- |
| Charlie Gerow | By Mr. Schlafly | 4 |
| Charlie Gerow | By Mr. Butkovitz | 80 |
| Charlie Gerow | By Mr. Fina | 90 |
| Charlie Gerow | By Mr. Schlafly | 92 |
| Charlie Gerow | By Mr. Fina | 98 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Gerow Exhibit 1 | Notice of Deposition | 4 |

P R O C E E D I N G S

(Proceedings commenced at 1:42 p.m.)

* * * * *

CHARLIE GEROW, after having been duly sworn, was examined and testified as follows:

* * * * *

EXAMINATION

BY MR. SCHLAFLY:

Q. Mr. Gerow, have you ever been deposed before?

A. I have.

Q. About how many times?

A. I think once.

Q. Was it in connection with Quantum Communications?

A No.

Q. Do you understand the process of the deposition?

A. I do.

MR. SCHLAFLY: Let me introduce, as Gerow Exhibit 1, the Notice of Deposition. She's going to mark it. I'll ask you if you've seen that before.

(At this time, Gerow Exhibit 1 was marked for identification.)

THE WITNESS: Thank you.

A. Yes.

Q. And do you recall what the date of that conversation was in -- with more precision than what it says here?

A. No. I'm sure that I could have my recollection refreshed. But I don't recall the specific date three years later.

Q. Was anyone else on that conversation?

A. I don't know. There may have been. There may have been by speaker phone in our -- pardon me -- in our conference room, as we often did when we spoke with Ed.

Q. And who else might have been on that call?

A. Ken Robinson, Kevin Harley, myself, perhaps Ed Rollins. He often joined us, as well. But there may have been others.

Q. Was Ed Rollins in this office very often around that time?

A. No.

Q. So it would be unlikely that Ed Rollins was in the room on that call, right?

A. Highly unlikely. Yeah. In fact, I can say with pretty much assuredness that he was not. He may have been on the phone, though.

Q. Were other terms of this alleged agreement

discussed, such as the right to terminate it?

A. No.

Q. Were terms, such as when work product would be delivered, discussed?

A. No.

Q. Were terms, such as the specific scope of the work to be performed, rather the in general terms, but was there specific work that was discussed in this conversation?

MR. BUTKOVITZ: Objection to form.

THE WITNESS: There were several specifics discussed at that point. But Ed Martin made it very clear that it was going to be an evolving scope of work, that he would transmit to us on an ongoing basis. He was particularly concerned about having himself identified and branded as the successor to Mrs. Schlafly, and he wanted to make sure that that was one of the things that we were constantly keeping in mind.

BY MR. SCHLAFLY:

Q. Did you discuss the film projects on this call?

A. We discussed the possibility of doing it, yes.

Q. Did you discuss how many hours Quantum Communications would spend on the project?

done without a written agreement.

Q. But it's safe to say that in most of your client relationships, there's a written agreement?

A. I would say most, but not necessarily appreciably beyond 50 percent.

Q. And when there is a written agreement, is that typically entered into after there's some sort of oral discussion as to the terms?

A. Yes.

Q. In this case, was there made -- was there any effort made to follow up on this discussion that's described in paragraph 17 with a written agreement?

A. I don't recall that there was, because we already had a written agreement.

Q. Was there any e-mail, any follow-up e-mail memorializing what's alleged here in paragraph 17?

A. I don't recall that there was.

Q. Was it your understanding that $20,000 would be paid at the outset of this alleged agreement?

A. On our first billing, yes.

Q. And was that paid?

A. No.

Q. And did you -- did it occur to you that perhaps there's a misunderstanding?

A. No, because we asked about payment; we were

MR. BUTKOVITZ: Objection to form.

MR. FINA: Objection to form.

THE WITNESS: Well, we could have stopped work, but we were constantly assured that we were going to be paid, and we operated in good faith on that basis.

BY MR. SCHLAFLY:

Q. Did you continue to do the same amount of work from October 21st or thereabouts, 2016 and April of 2018? Is that what you meant?

A. '17. I stand corrected.

Q. That's fine.

A. I stand corrected.

Q. That's fine.

A. Yeah. Just in case there's any question, I said 2018. It should have been 2017. The years all kind of run together.

MR. FINA: And when you terminated work under this contract?

THE WITNESS: Right. Correct.

BY MR. SCHLAFLY:

Q. That's fine. Did you do the same amount of work, roughly, without any reduction in work from October 21st, 2016 or thereabouts and April of 2017?

A. To the middle to end of March, yes.

Q. Did you deliver any video --

A. No.

Q. -- to --

A. Nor would we in ordinary course.

Q. Why not?

A. That's simply not our practice, nor is it an industry practice at all to deliver a video before it's completed. You wouldn't do that.

Q. Okay. Was the video ever completed?

A. The -- the project for Mrs. Schlafly's testimonial or memorial or whatever, no.

Q. Okay.

A. Came very close to it, but we did not -- we did not finally conclude it because we hadn't been paid at that point. And Mr. Martin knew the status of it. We reported it to him regularly.

Q. Did -- was the video interview of Faith Whittlesey ever completed?

A. Yes.

Q. That was completed?

A. Yes.

Q. Did you deliver that?

A. No. As I say, we would not have delivered any partial video until the final project was completed. Hers -- her interview was part of a series of interviews that we did in preparation and production of the

Initially, they were not going to allow us to do that. They were going to charge us to do that.

Q. Do you know what time of day that was, roughly?

A. It was in the afternoon.

Q. Have you ever referred any potential donors to Ed Martin or any of the Eagle Forum entities?

A. I don't know. We held a reception for Eagle Forum in Washington D.C., and there were folks that came there that, you know, may have turned out to be donors or were quote/unquote potential donors. But specifically, I wasn't taking folks out to meet Ed Martin who were potential donors.

Q. Are you in touch with donors in the course of your other work at Quantum Communications --

A. Sure.

Q. -- people that donate to political causes?

A. Yes.

Q. Have you ever referred any of them to any of the Eagle Forum entities?

A. Specifically said why don't you go make a contribution to Eagle Forum?

Q. (Nodded his head.)

A. Not that I recall.

Q. Do you have a regular radio or television

I, Colleen V. Wentz, RMR, CRR, hereby certify that the proceedings and evidence noted are contained fully and accurately in the notes taken by me during the course of this deposition, and that this is a correct transcript of the same.

Colleen V. Wentz, RMR, CRR
Court Reporter, Notary Public

Commonwealth of Pennsylvania - Notary Seal
Colleen Victoria Wentz, Notary Public
Snyder County
My commission expires June 8, 2022
Commission number 1029397
Member, Pennsylvania Association of Notaries

The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.