UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

QUANTUM COMMUNICATIONS, LTD,     :
                    Plaintiff   :
                                :  AMENDED COMPLAINT
            VS                  :  CASE NO. 1:17cv1640
                                :
EAGLE FORUM, EAGLE FORUM        :  (Honorable Yvette Kane)
EDUCATION AND LEGAL DEFENSE     :
FUND, IAN A. NORTHON, ROETZEL   :
AND ANDRESS, LPA, and EDWARD    :
MARTIN, JR.,                    :  JURY TRIAL DEMANDED
                    Defendants  :


* * * * *

August 23, 2019

* * * * *


        Oral Deposition of Charlie Gerow, held in the
offices of PREMIER REPORTING, LLC, 112 Market Street,
Harrisburg, Pennsylvania, 17101, commencing at 1:42
p.m., on the above date, before Colleen V. Wentz, RMR,
CRR, a Professional Court Reporter and a Notary Public
of the Commonwealth of Pennsylvania.


PREMIER REPORTING, LLC
(717) 243-9770
linda@premierreportingllc.com

8 South Hanover Street            112 Market Street
Suite 201                         Suite 406
Carlisle, PA  17013               Harrisburg, PA  17101

2

```
 1    APPEARANCES:

 2         FRANK G. FINA LAW OFFICE
           1000 Germantown Pike, Suite D-3
 3         Plymouth Meeting, Pennsylvania 19462
           BY:  FRANK FINA, ESQUIRE
 4         (484) 681-9387
           fgflegal@outlook.com
 5
                Counsel for the Plaintiff
 6
           ANDREW L. SCHLAFLY LAW
 7         939 Old Chester Road
           Far Hills, New Jersey 07931
 8         BY:  ANDREW SCHLAFLY, ESQUIRE
           (908) 719-8608
 9
                Counsel for the Defendant
10              And Counterclaim Plaintiff Eagle Forum
                Education and Legal Defense Fund and
11              Defendant Edward R. Martin, Jr.

12
           KLEINBARD
13         Three Logan Station
           1717 Arch Street, 5th Floor
14         Philadelphia, Pennsylvania  19103
           BY:  EDWARD BUTKOVITZ, ESQUIRE
15         (215) 568-2000
           ebutkovitz@kleinbard.com
16
                Counsel For Eagle Forum
17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2    WITNESS                EXAMINATION              PAGE

 3    Charlie Gerow          By Mr. Schlafly           4

 4    Charlie Gerow          By Mr. Butkovitz          80

 5    Charlie Gerow          By Mr. Fina               90

 6    Charlie Gerow          By Mr. Schlafly           92

 7    Charlie Gerow          By Mr. Fina               98

 8
                             EXHIBITS
 9
      NO.                    DESCRIPTION              PAGE
10
      Gerow Exhibit 1    Notice of Deposition          4
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                    P R O C E E D I N G S
 2            (Proceedings commenced at 1:42 p.m.)
 3                        *  *  *  *  *
 4               CHARLIE GEROW, after having been duly
 5         sworn, was examined and testified as follows:
 6                        *  *  *  *  *
 7                        EXAMINATION
 8    BY MR. SCHLAFLY:
 9         Q.    Mr. Gerow, have you ever been deposed
10    before?
11         A.    I have.
12         Q.    About how many times?
13         A.    I think once.
14         Q.    Was it in connection with Quantum
15    Communications?
16         A     No.
17         Q.    Do you understand the process of the
18    deposition?
19         A.    I do.
20               MR. SCHLAFLY:  Let me introduce, as Gerow
21    Exhibit 1, the Notice of Deposition.  She's going to
22    mark it.  I'll ask you if you've seen that before.
23               (At this time, Gerow Exhibit 1 was marked
24               for identification.)
25               THE WITNESS:  Thank you.
```

BY MR. SCHLAFLY:

Q.    Have you seen that document before?

A.    No.

Q.    Okay.  You understand you're here pursuant to a Notice of Deposition.

A.    I do.

Q.    Fine.

A.    Do you want me to put these in a particular place?

Q.    Put them over closer to the court reporter, I guess.

A.    Lay them right here.

Q.    Okay.  Did you authorize this lawsuit?

A.    I did.

Q.    And I'd like to introduce Harley Exhibit 2, which is a copy of the Amended Complaint.  Do you recall reviewing that before it was filed?

A.    I do.

Q.    And did you approve it?

A.    I'm sure I did.

Q.    Are you suing for attorney's fees?

A.    I don't see a specific claim in here right now, but it might be in here.  I'd have to look more closely.

Q.    It's always in the end on the last page

```
 1   before the exhibit.
 2        A.     Yes.
 3        Q.     Has Quantum Communications paid any
 4   attorney's fees in this action?
 5        A.     Not to date.
 6        Q.     And why is that?
 7        A.     We haven't been asked to.
 8        Q.     I'm going to ask you a few more questions
 9   about that exhibit.  If you could put that back in front
10   of you.
11               If you could turn to paragraph 16, page 5
12   and just review that paragraph again.
13               MR. BUTKOVITZ:  Which paragraph?
14               MR. SCHLAFLY:  Paragraph 16 on page 5.
15   BY MR. SCHLAFLY:
16        Q.     And is that allegation true?
17        A.     I believe it is.
18        Q.     Turning to the next page, paragraph 17, on
19   page 6, if you could read that paragraph.
20        A.     Okay.
21        Q.     And do you assert that that allegation is
22   true?
23        A.     Yes.
24        Q.     Are there any modifications you'd like to
25   make to that allegation as you sit here today?
```

1    A.    Well, to paragraph 16, he also spoke with

2    me.  Ed Martin also spoke with me to the same effect.

3    And paragraph 17, I would leave as stands.

4    Q.    Paragraph 17 refers to terms -- and let me

5    ask you this.  Was this a conversation between Ed Martin

6    and you in paragraph 17?

7    A.    Yes.

8    Q.    And in that conversation, did you discuss

9    specific terms of an engagement?

10    A.    We did.  We discussed the letter agreement

11    that we had with Ian Northon.  And he agreed to continue

12    to work with us under the same terms and conditions that

13    were set forth there, and he wanted some other things

14    done, as well, which we said we would do.

15    Q.    And did you discuss any specific terms in

16    that conversation referenced in paragraph 17 such as how

17    much would be owed?

18    A.    Yeah.  We specifically discussed a $20,000

19    month retainer.

20    Q.    And --

21    A.    Pardon me.

22    Q.    -- your testimony is that in this

23    conversation that's referred to on or before October

24    21st, 2016, in that conversation with Ed Martin, that

25    there was a specific discussion of $20,000?

1        A.      Yes.

2        Q.      And do you recall what the date of that

3    conversation was in -- with more precision than what it

4    says here?

5        A.      No.  I'm sure that I could have my

6    recollection refreshed.  But I don't recall the specific

7    date three years later.

8        Q.      Was anyone else on that conversation?

9        A.      I don't know.  There may have been.  There

10   may have been by speaker phone in our -- pardon me -- in

11   our conference room, as we often did when we spoke with

12   Ed.

13       Q.      And who else might have been on that call?

14       A.      Ken Robinson, Kevin Harley, myself, perhaps

15   Ed Rollins.  He often joined us, as well.  But there may

16   have been others.

17       Q.      Was Ed Rollins in this office very often

18   around that time?

19       A.      No.

20       Q.      So it would be unlikely that Ed Rollins was

21   in the room on that call, right?

22       A.      Highly unlikely.  Yeah.  In fact, I can say

23   with pretty much assuredness that he was not.  He may

24   have been on the phone, though.

25       Q.      Were other terms of this alleged agreement

1   discussed, such as the right to terminate it?

2        A.    No.

3        Q.    Were terms, such as when work product would

4   be delivered, discussed?

5        A.    No.

6        Q.    Were terms, such as the specific scope of

7   the work to be performed, rather the in general terms,

8   but was there specific work that was discussed in this

9   conversation?

10            MR. BUTKOVITZ:  Objection to form.

11            THE WITNESS:  There were several specifics

12   discussed at that point.  But Ed Martin made it very

13   clear that it was going to be an evolving scope of work,

14   that he would transmit to us on an ongoing basis.  He

15   was particularly concerned about having himself

16   identified and branded as the successor to Mrs.

17   Schlafly, and he wanted to make sure that that was one

18   of the things that we were constantly keeping in mind.

19   BY MR. SCHLAFLY:

20        Q.    Did you discuss the film projects on this

21   call?

22        A.    We discussed the possibility of doing it,

23   yes.

24        Q.    Did you discuss how many hours Quantum

25   Communications would spend on the project?

1          A.      We did.  I told him, you know, generally,

2     what a project of that nature and magnitude would

3     involve, and I don't know that we discussed a specific

4     set number of hours because that would have been

5     impossible to do.

6          Q.      With other clients, do you discuss sometimes

7     how many hours certain things will take?

8          A.      We often give them a rough estimate.  It's

9     impossible to define specifically how long any job is

10    going to take.

11         Q.      Well, I just don't mean -- I'm not speaking

12    just in terms of duration, but also in terms of sort of

13    number of hours per week that something would take?

14         A.      Yeah.  I mean generally, our clients don't

15    ask us how many hours, per se, something's going to

16    take.  We're not a law firm billing by incremental

17    units.  We're billing on a project basis and on a

18    contractual basis.

19         Q.      Is your position that Ed Martin said he

20    would pay or arrange for the payment of $20,000 per

21    month, regardless of how many hours in a given month you

22    all spent?

23         A.      Yeah.

24         Q.      Have you ever entered into this type of

25    alleged agreement with other clients?

1      A.      Sure.

2      Q.      Do you typically put the agreement in

3  writing?

4      A.      Not always.  I would say more often than

5  not.  But not always, no.  We have several clients that

6  we worked for just recently where we didn't have written

7  agreements.

8      Q.      And it's based on a monthly retainer

9  billing?

10      A.      Yes.

11      Q.      Without a written agreement?

12      A.      Yes.

13      Q.      And how long does that go on before there's

14  some sort of written agreement?

15      A.      In the one case, it's gone on for better

16  than 10 years.  In another case, it was a Fortune 500

17  company that came to us at one point, their legal

18  department said are you aware that we don't have a

19  written agreement.  I said yes, I am.  And they said,

20  you know, our chief of this project is a lawyer; you're

21  a lawyer, you know.  Maybe this would be a -- you know,

22  something you'd want to do, and we did it.  But we had

23  gone on with that relationship for several years before

24  we had a written agreement.

25             Most recently, we had project work that was

1    done without a written agreement.

2        Q.    But it's safe to say that in most of your

3    client relationships, there's a written agreement?

4        A.    I would say most, but not necessarily

5    appreciably beyond 50 percent.

6        Q.    And when there is a written agreement, is

7    that typically entered into after there's some sort of

8    oral discussion as to the terms?

9        A.    Yes.

10        Q.    In this case, was there made -- was there

11    any effort made to follow up on this discussion that's

12    described in paragraph 17 with a written agreement?

13        A.    I don't recall that there was, because we

14    already had a written agreement.

15        Q.    Was there any e-mail, any follow-up e-mail

16    memorializing what's alleged here in paragraph 17?

17        A.    I don't recall that there was.

18        Q.    Was it your understanding that $20,000 would

19    be paid at the outset of this alleged agreement?

20        A.    On our first billing, yes.

21        Q.    And was that paid?

22        A.    No.

23        Q.    And did you -- did it occur to you that

24    perhaps there's a misunderstanding?

25        A.    No, because we asked about payment; we were

1  assured it was going to be coming -- forthcoming.

2       Q.    And did Ed Martin ever provide any written

3  assurances that he would pay $20,000 a month?

4       A.    Not specifically.  But he had acknowledged

5  that there was an agreement in place for the payment of

6  $20,000 a month that he was willing to continue.

7       Q.    And are you saying that he acknowledged that

8  in writing?

9       A.    I just said he said.  Not he wrote.

10       Q.    And do you have a legal background?

11       A.    I do.

12       Q.    Do you have a law license?

13       A.    I do.

14       Q.    Do you still have one?

15       A.    I do.

16       Q.    Are you aware of the doctrine to acquiring

17  mitigating damages?

18       A.    I am.

19       Q.    And what's your understanding of that

20  doctrine?

21            MR. BUTKOVITZ:  Objection to form.

22            THE WITNESS:  I -- I -- I don't know that

23  I'm going to be as precise on legal documentation -- or

24  legal theory as I should be, so.

25  BY MR. SCHLAFLY:

1       Q.      No.  That's okay.

2       A.      But I -- I don't know that there was any

3   opportunity to mitigate damages.  What we did was that

4   we ceased to do work when it became very apparent that

5   we were not going to get paid.  And we told him that.

6   We told him -- we gave him plenty of warning in that

7   regard and told him that we would be unable to continue

8   to work if we weren't paid.  That was after we were

9   promised, numerous times, that we were going to be paid

10  and that we had, in fact, been paid.

11      Q.      Were you ever paid?

12      A.      No.  Not a penny.

13      Q.      And the question I'm asking is how long did

14  you wait before you attempted to mitigate damages?

15              MR. BUTKOVITZ:  Objection to form.

16              MR. FINA:  Objection.

17  BY MR. SCHLAFLY:

18      Q.      All right.  Let me rephrase it.  Did you

19  ever attempt to mitigate damages?

20              MR. BUTKOVITZ:  Object to form.  It calls

21  for a legal conclusion.

22              MR. FINA:  Objection.

23              MR. SCHLAFLY:  Well, he understands the

24  term.

25              MR. BUTKOVITZ:  It doesn't matter whether he

1   understands it.  It still calls for a legal conclusion.

2   BY MR. SCHLAFLY:

3        Q.     Fine.  You can answer.  Did you ever attempt

4   to mitigate damages?

5        A.     We ceased to do work for them at that point.

6   Beyond that, I'm not sure how we would have mitigated

7   damages.  The large part of our services was our time.

8   It's pretty tough to recoup time.

9        Q.     And how long did it take you before you

10  started mitigating damages?

11             MR. BUTKOVITZ:  Objection to form.

12             MR. FINA:  Objection to form.

13  BY MR. SCHLAFLY:

14       Q.     When did you start mitigating damages?

15             MR. FINA:  Object.

16             MR. BUTKOVITZ:  Objection to form.

17             THE WITNESS: I've already answered that,

18  too.

19  BY MR. SCHLAFLY:

20       Q.     You didn't say when.  I'm asking when did

21  you mitigate damages?

22             MR. BUTKOVITZ:  Objection to form.

23             MR. FINA:  Objection.

24  BY MR. SCHLAFLY:

25       Q.     Okay.  You may answer.

1          MR. BUTKOVITZ:  You're asking him a question

2    about some conduct that he engaged in?  You keep asking

3    for a legal conclusion.

4          MR. SCHLAFLY:  You can object.  That's fine.

5    He can answer.  Are you instructing him not to answer?

6          MR. BUTKOVITZ:  I'm not instructing him not

7    to answer.

8    BY MR. SCHLAFLY:

9      Q.    When did you start mitigating damages?

10         MR. BUTKOVITZ:  Objection to form.

11         MR. FINA:  Objection.

12         THE WITNESS:  We ceased to do work in April

13    of 2018.

14    BY MR. SCHLAFLY:

15      Q.    Did you attempt to mitigate damages at any

16    time before then?

17         MR. BUTKOVITZ:  Objection to form.

18         MR. FINA:  Objection.

19         THE WITNESS:  Again, I'm not even sure how

20    you would have gone about quote/unquote mitigating

21    damages.  I have no idea.

22    BY MR. SCHLAFLY:

23      Q.    You have no idea?

24      A.    No.

25      Q.    Would stopping work mitigate damages?

1           MR. BUTKOVITZ:  Objection to form.

2           MR. FINA:  Objection to form.

3           THE WITNESS:  Well, we could have stopped

4    work, but we were constantly assured that we were going

5    to be paid, and we operated in good faith on that basis.

6    BY MR. SCHLAFLY:

7        Q.     Did you continue to do the same amount of

8    work from October 21st or thereabouts, 2016 and April of

9    2018?  Is that what you meant?

10       A.     '17.  I stand corrected.

11       Q.     That's fine.

12       A.     I stand corrected.

13       Q.     That's fine.

14       A.     Yeah.  Just in case there's any question, I

15   said 2018.  It should have been 2017.  The years all

16   kind of run together.

17           MR. FINA:  And when you terminated work

18   under this contract?

19           THE WITNESS:  Right.  Correct.

20   BY MR. SCHLAFLY:

21       Q.     That's fine.  Did you do the same amount of

22   work, roughly, without any reduction in work from

23   October 21st, 2016 or thereabouts and April of 2017?

24       A.     To the middle to end of March, yes.

25       Q.     Did you deliver any video --

1      A.      No.

2      Q.      -- to --

3      A.      Nor would we in ordinary course.

4      Q.      Why not?

5      A.      That's simply not our practice, nor is it an

6   industry practice at all to deliver a video before it's

7   completed.  You wouldn't do that.

8      Q.      Okay.  Was the video ever completed?

9      A.      The -- the project for Mrs. Schlafly's

10   testimonial or memorial or whatever, no.

11      Q.      Okay.

12      A.      Came very close to it, but we did not -- we

13   did not finally conclude it because we hadn't been paid

14   at that point.  And Mr. Martin knew the status of it.

15   We reported it to him regularly.

16      Q.      Did -- was the video interview of Faith

17   Whittlesey ever completed?

18      A.      Yes.

19      Q.      That was completed?

20      A.      Yes.

21      Q.      Did you deliver that?

22      A.      No.  As I say, we would not have delivered

23   any partial video until the final project was completed.

24   Hers -- her interview was part of a series of interviews

25   that we did in preparation and production of the

project.

Q.    So you considered the film project of Faith
Whittlesey to be part of the broader film project in
interviewing others?

A.    Yes.

Q.    And did you stop work on that project
because you weren't getting paid?

A.    Yes.

Q.    Did you ever deliver anything of value to Ed
Martin in connection with that film project?

A.    In connection with the film project?  We
were -- we delivered to him regular reports as to the
status.  We were in constant communication with him
about the look, the feel, the story boarding, the use of
particular pieces of film that would be part of it.  He
provided to us some still photos -- pardon me -- and
some video, as well, that we reviewed.  And we talked
about those things with him on a very regular basis.  We
were concerned about the ability to use them for
licensing reasons, etc.  He was working with us to
resolve those issues.  So yeah, we had an awful lot of
communication, but there was nothing to deliver, in
terms of anything physical.

Q.    So is it safe to say that with respect to
the film project, Ed Martin never received anything of

```
 1  value; is that right?
 2       A.    No.  Absolutely not.
 3             MR. FINA:  Object.
 4  BY MR. SCHLAFLY:
 5       Q.    What did he receive of value in connection
 6  with the film project?
 7       A.    He received an awful lot --
 8             MR. BUTKOVITZ:  I didn't hear what the end
 9  of -- the tail end of that question was.  Just try and
10  keep -- you kind of shut off at the end.
11             (The Reporter read back the referred-to
12              portion of the record.)
13             MR. BUTKOVITZ:  I thought I heard something
14  after that.
15             THE WITNESS:  He received our presence in
16  Saint Louis at his direction with a film crew to conduct
17  numerous interviews over several days and to film Mrs.
18  Schlafly's home, etc.  He received regular communication
19  from us and our consultation on the development of this
20  project, both with respect to the concepts and the
21  specific elements of the video.
22             He received direction and support from us
23  with respect to materials that he had that he wanted
24  included in the film, and the process of getting the
25  legal right to use those pieces.
```

```
 1    BY MR. SCHLAFLY:

 2         Q.     What value does that have?  What value do

 3    you place on that?

 4         A.     I place --

 5                MR. BUTKOVITZ:  Object to form.

 6                MR. FINA:  Objection.

 7                THE WITNESS:  I would place far more than

 8    the monthly retainer we were receiving -- we do an awful

 9    lot of -- I shouldn't say an awful lot -- we do -- we

10    have done several of these types of projects and have

11    been compensated for them very handsomely.

12    BY MR. SCHLAFLY:

13         Q.     And those examples that you were just

14    mentioning, did you deliver film product to the client?

15         A.     At the end of the production, yes.

16         Q.     Okay.  In this case, you did not deliver any

17    film product.

18         A.     We didn't get there because Mr. Martin

19    didn't pay us.

20         Q.     So I'm trying to understand why you think

21    Martin got something of value in connection with the

22    film project when --

23                MR. BUTKOVITZ:  Objection.

24    BY MR. SCHLAFLY:

25         Q.     -- you didn't deliver any film to him.
```

1              MR. BUTKOVITZ:  Objection to form.

2    Argumentative at this point.

3              THE WITNESS:  It is argumentative, but I'm

4    happy to answer it because there is value to our time,

5    expertise, talent, and experience, that he paid for and

6    that he was regularly communicated with regarding.  And

7    we, you know, clearly provided value to him because he

8    didn't have to go out and find somebody else to film the

9    dedication of his building, which we did for him.  He

10   didn't have to go out and find somebody else to film all

11   of the folks that he wanted interviewed for this

12   project.  He didn't have to go out and find somebody

13   else that would film he, himself, in connection with

14   this project or to go to Ambassador Whittlesey's place

15   of residence to film her.  So that has value.  That has

16   tremendous value.

17   BY MR. SCHLAFLY:

18        Q.    Okay.  How much value does it have?

19              MR. BUTKOVITZ:  Objection to form.

20              MR. FINA:  Objection.

21              THE WITNESS:  It has -- it has at least as

22   much value as what we were compensated for, perhaps

23   more.

24   BY MR. SCHLAFLY:

25        Q.    Can he sell that to somebody else?

```
 1        A.     He could have sold the final product, had he
 2   paid for it.
 3        Q.     But he didn't get the final product.
 4        A.     No.  Because he didn't pay us.
 5        Q.     And I'm asking you what he did receive?  Can
 6   he sell that to somebody else for something?
 7               MR. FINA:  Objection.
 8               MR. BUTKOVITZ:  Objection to form.
 9               MR. FINA:  How can anybody even answer that
10   question?
11   BY MR. SCHLAFLY:
12        Q.     You can't answer.  Okay.  Fine.
13               MR. FINA:  That's ridiculous.
14   BY MR. SCHLAFLY:
15        Q.     Turn to Count 2 of your Complaint, that you
16   approved.  And --
17               MR. FINA:  What page?
18   BY MR. SCHLAFLY:
19        Q.     Read what it says.  Page 12, your own
20   Complaint.  And read what it says under Count 2.  Read
21   the first two words there.
22        A.     The allegations contained in the foregoing
23   paragraphs.
24        Q.     No.  I'm actually referring to the bold part
25   there.
```

1     A.     You asked me to what was under Count 2.

2     Q.     Right.  In the parentheses, Unjust

3 enrichment.

4     A.     Unjust enrichment pled, in the alternative,

5 to breach of contract.

6     Q.     Okay.  How much do you think Ed Martin was

7 unjustly enriched due to your work?

8     A.     Specifically on the video project --

9     Q.     Yes.

10     A.     -- or over everything?

11     Q.     No.  Specifically on the video project.  How

12 much do you think he was unjustly enriched?

13          MR. BUTKOVITZ:  Object to form.

14          MR. FINA:  Objection.  Calls for a legal

15 conclusion.

16          THE WITNESS:  Yeah.  And I -- you know, I

17 would simply throw out a number.  I would guess probably

18 $75,000 worth of work was done on that project, if not

19 more.

20 BY MR. SCHLAFLY:

21     Q.     That's not what I asked you.

22     A.     I just told you.

23     Q.     I asked you how much do you think Ed Martin

24 --

25     A.     I just told you.  You asked me a question,

1    and I answered it.

2        Q.    Okay.  Ma'am, if you could read back the

3    question.

4            (At this time, the Reporter read back the

5             referred-to portion of the record.)

6            THE WITNESS:  I think --

7            MR. FINA:  He's answered that question.

8            MR. SCHLAFLY:  He didn't.

9            THE WITNESS:  I did.  I did.

10           MR. SCHLAFLY:  Okay.  Ma'am, if you could

11   read it -- read the answer, if you don't mind.

12           (At this time, the Reporter read back the

13            referred-to portion of the record.)

14   BY MR. SCHLAFLY:

15       Q.    I'm not asking about work that was done.

16   I'm asking how much Ed Martin was unjustly enriched.

17       A.    At least --

18           MR. BUTKOVITZ:  Objection.  I mean you're

19   construing the Complaint and trying to parse out

20   services that were provided.  That's not what's pled

21   here, and it's not appropriate subject for a deposition.

22   BY MR. SCHLAFLY:

23       Q.    If you're not going to answer, I'll move to

24   strike the allegation.  How much do you think Ed Martin

25   --

1            MR. FINA:  You can move to strike whatever

2    you want.  He's answered that question.

3            THE WITNESS:  I have.  And I'll answer it

4    again.

5    BY MR. SCHLAFLY:

6        Q.    You haven't answered it.

7        A.    I will answer it again, okay, in case there

8    was a problem with the English language here.  At least

9    $75,000 and perhaps more.

10        Q.    So Ed Martin is $75,000 or more richer

11    today, as we sit here today --

12            MR. BUTKOVITZ:  Objection to form.

13            MR. FINA:  Objection.

14    BY MR. SCHLAFLY:

15        Q.    -- because of that film project?  Is that

16    your testimony?

17            MR. BUTKOVITZ:  Objection to form.

18            MR. FINA:  Objection.

19            THE WITNESS:  Do you want me to answer it?

20            MR. FINA:  You've already answered it.

21            THE WITNESS:  I have.  We can answer it seven

22    or eight more times, if you'd like.

23    BY MR. SCHLAFLY:

24        Q.    You're saying Ed Martin is $75,000 richer or

25    more because of your work on the film project.

```
 1        A.      Because what Ed Martin --

 2                MR. BUTKOVITZ:  Objection to form.  Calls

 3   for a legal conclusion.

 4                MR. FINA:  Objection.

 5                MR. BUTKOVITZ:  The document speaks for

 6   itself.

 7                MR. FINA:  Misconstrues the law --

 8   misconstrues the law, misconstrues the Complaint,

 9   misconstrues the facts.

10   BY MR. SCHLAFLY:

11        Q.      You can answer the question.

12        A.      I did.

13        Q.      You're not going to tell me whether Ed

14   Martin is $75,000 richer today?

15                MR. FINA:  Objection.

16                THE WITNESS:  I have answered your question

17   numerous times.

18   BY MR. SCHLAFLY:

19        Q.      I'm going to take this up with the Judge.

20        A.      Please do.

21                MR. FINA:  Please do.

22   BY MR. SCHLAFLY:

23        Q.      It's a simple question.  Is Ed Martin

24   $75,000 richer --

25        A.      Again -- again --
```

```
 1         Q.     Let me finish my question.  Is Ed Martin

 2  $75,000 richer because of your work on the film project?

 3              MR. BUTKOVITZ:  Objection to form.

 4              THE WITNESS:  He personally is not.

 5  BY MR. SCHLAFLY:

 6         Q.     Okay.

 7         A.     But the entities which he purports to

 8  represent certainly received a great deal of value from

 9  us and are enhanced by that.  And if they had concluded

10  the project, they would have everything.

11         Q.     But that's not -- I'm not asking you about

12  hypotheticals.

13         A.     I'm not -- I'm answering a hypothetical.

14         Q.     You are.  You're saying if they concluded.

15  I'm not asking you if they concluded.  I'm saying are

16  the entities $75,000 richer --

17         A.     Yes.

18         Q.     -- today because of your work on the film

19  project?

20         A.     Yes.

21              MR. BUTKOVITZ:  Just -- I didn't get a

22  chance.   Objection to form and just put on the record

23  that's argumentative at this point.  It's been asked and

24  answered multiple times.  And I just want to have a

25  clear record before this gets in front of the Judge on
```

1    the impending discovery motion.

2    BY MR. SCHLAFLY:

3        Q.    Did you promise to promote Phyllis Schlafly

4    at CPAC in February of 2017?

5        A.    No.  We were asked by Mr. Martin to promote

6    himself as a speaker promoting Phyllis Schlafly, and we

7    did that.

8        Q.    How did you do that?

9        A.    I attempted to have Ed speak at CPAC.  That

10   request was rejected.

11       Q.    And do you have an official position at

12   CPAC?

13       A.    I do.

14       Q.    What's your position?

15       A.    Currently, I'm the vice chairman of the

16   American Conservative Union, which sponsors CPAC.

17       Q.    Were you vice chairman then?

18       A.    I don't think so.  I think I was simply a

19   board member.  I was chairman of a couple of committees,

20   but I was not the vice chairman at that point.

21            MR. FINA:  Were you done with your original

22   answer where you were cut off?

23            THE WITNESS:  With respect to the -- the

24   attempts to promote Mrs. Schlafly at CPAC?  Yeah.  I

25   mean Ed and I had numerous discussions about that and

what the best way to do it was.  It was not anticipated

that was going to be part of the program.  Ed and I both

thought it would be a good idea, and he wanted to be a

speaker on the main stage.  It was principally that was

the thing that he wanted done.  There was no way, given

the legal problems that he was involved in at that

point, that ACU was going to say yes to that and get

involved in a cat fight between conservative

organizations.  So I went back to Ed and said why don't

we see if we can't get the book that you'd like

distributed put at the various tables at the Reagan

dinner, which is the main dinner at CPAC.  And that's

what ultimately was done.

BY MR. SCHLAFLY:

     Q.     How do you know that was done?

     A.     Pardon me?

     Q.     How do you know that was done?

     A.     Because I did it myself.

     Q.     You put the books out yourself?

     A.     I did.

     Q.     You personally put the books out at each

place setting?

     A.     I personally -- not at every one.  I had

some help from some of my staff.  But Mr. Martin simply

had cartons of books delivered to the hotel.  They

1    weren't even paid for to be brought upstairs.  I used my

2    own personal credit card to have that done.  And yes, I

3    personally cut open the boxes, took out the books,

4    placed them at each and every one of the tables until we

5    ran out of books.  And I did that with the help of

6    Brandon Posner from my office and one other person that

7    gave us a hand.

8         Q.    And where did you put it on the table?  I

9    mean how did --

10        A.    We put them on every chair.

11        Q.    You put them on the chair?

12        A.    We put them on the chair.

13        Q.    It wasn't every chair because you said you

14   ran out, right?

15        A.    We put them on every chair so long as we had

16   books.  There were several hundred books, I'd guess

17   probably 6- or 700 books that were sent.  I can't recall

18   exactly.

19        Q.    Do you have any photographs of that?

20        A.    It's not my custom to take photographs of

21   books on chairs.

22        Q.    And you say Brandon Posner helped you with

23   this?

24        A.    He did.

25        Q.    Did you get any feedback about it?

1    A.    Not particularly.

2    Q.    Anybody at ACU approve it?

3    A.    Yes.

4    Q.    Who was that?

5    A.    Probably Dan Schneider, but I spoke to both

6    he and Matt and Karen Walters -- Karin Walters about it.

7    Q.    Matt Schlapp?

8    A.    Matt Schlapp, yes.

9    Q.    Did you receive any feedback about it?

10   A.    About what.

11   Q.    About the books?

12   A.    I already answered that question.

13   Q.    You did?

14   A.    Yes.  And the answer was no, I did not.

15   Q.    Where did you sit at that dinner?  Did you

16   attend the dinner yourself?

17   A.    I did.

18   Q.    Where did you sit?

19   A.    At a table front and center in the

20   auditorium.

21   Q.    VIP table?

22   A.    I assume so.  Board table.  Yes.

23   Q.    Did you put books on those chairs?

24   A.    Yes.

25   Q.    Who else was at your table?

```
 1        A.      I don't recall.
 2        Q.      Did you do any other promotion in connection
 3   with that event?
 4        A.      Yeah.  I asked Matt to mention Mrs.
 5   Schlafly from the stage, which he did.  And that was the
 6   -- that was the additional promotion that we did.
 7        Q.      And what part of the program did he mention
 8   her?
 9        A.      I don't recall.
10        Q.      And you're saying it was Matt Schlapp who
11   did that?
12        A.      Pretty sure.  Not 1,000 percent certain, but
13   one of the folks from ACU did.
14        Q.      Would that have been prior to the keynote
15   address?
16        A.      Yes.
17        Q.      Do you remember who gave the keynote
18   address?
19        A.      Pardon me?
20        Q.      Do you remember who gave the keynote
21   address?
22        A.      I don't.
23        Q.      Was is it Michael Reagan?
24        A.      It could have been.  It could have easily
25   been.  In fact, I believe it was, now that you say that.
```

1    I've -- I'm -- I'm -- I believe it was.

2        Q.    Did you provide any report to Ed Martin

3    about your activities?

4        A.    I sure did.

5        Q.    Have you produced those documents?

6        A.    I don't know -- I don't have them with me

7    today.  I'm not sure it was all in documented form,

8    although my recollection is that we sent him an e-mail

9    because there was an issue with the delivery of the

10   books.  We had to pay to have them brought upstairs out

11   of a loading dock at the Gaylord Center.  And as I said,

12   I paid that personally.  The hotel wanted an additional

13   fee to distribute them, but we negotiated with the

14   hotel, on the fly, to allow us to distribute them

15   ourselves and not have them charge an additional several

16   thousand dollar fee.

17       Q.    I don't see any e-mail about that.  Do you

18   think you would have communicated with Ed Martin by

19   e-mail on this?  Is that how you typically communicated

20   with him?

21       A.    Typically by telephone on something like

22   this, but I may have sent an e-mail, as well.  But I was

23   on the phone with Ed on the day of the dinner because of

24   this snafu with having not paid the fees to have them

25   delivered upstairs.

1              MR. FINA:  I would refer Counsel to QC 96,

2     which -- and this is not the only, I think, document in

3     here.  But the clear listing on an invoice regarding

4     Gaylord Center book delivery.  I would also, for the

5     record, when you say the production, this is the Rule 26

6     production.  This is not a production in response to any

7     discovery requests by Defendants.

8     BY MR. SCHLAFLY:

9         Q.    All right.  If you turn to that QC 96.  It

10    should be -- I don't know --

11        A.    It's not part of our Complaint.

12        Q.    Maybe that's the extra copy I had.  I

13    brought an extra copy.

14             MR. FINA:  No.  This is mine.  Well, I don't

15    know.  It doesn't matter whose it is.

16             MR. SCHLAFLY:  This is Exhibit 34.  I don't

17    know if Mr. Harley took his copy.  It doesn't matter.

18             MR. BUTKOVITZ:  I have extra copies of it

19    that I brought myself.  So if you want to use it as a

20    substitute and remark it?  This is the entire QC --

21             MR. SCHLAFLY:  Yeah.  Exhibit 34.  We've

22    used it before.

23             MR. FINA:  I have two copies, too.  You can

24    use that.

25    BY MR. SCHLAFLY:

1      Q.     All right.  Sir, so I'm referring you to

2  this book delivery --

3      A.     Um-hum.

4      Q.     -- charge.

5      A.     Um-hum.

6      Q.     And do you know what that was for?

7      A.     Yeah.  That was a fee that I paid for the

8  folks at the Gaylord Center to take the books from the

9  loading dock to the auditorium where the dinner was

10  held.

11              Do you need this?

12              MR. FINA:  You can hold on to it.

13  BY MR. SCHLAFLY:

14      Q.     How did you pay it?

15      A.     Pardon me?

16      Q.     How did you pay it?

17      A.     Credit card.

18      Q.     Did you pay that with the hotel concierge or

19  something?  Who did you pay it to?  Who did you give the

20  credit card to?

21      A.     I gave it to the folks at their front

22  office, I believe.  I went right to the manager's office

23  and paid it there because we had to negotiate our

24  ability to take the books once they were upstairs and

25  deliver -- distribute them to the various tables.

1    Initially, they were not going to allow us to do that.

2    They were going to charge us to do that.

3         Q.    Do you know what time of day that was,

4    roughly?

5         A.    It was in the afternoon.

6         Q.    Have you ever referred any potential donors

7    to Ed Martin or any of the Eagle Forum entities?

8         A.    I don't know.  We held a reception for Eagle

9    Forum in Washington D.C., and there were folks that came

10   there that, you know, may have turned out to be donors

11   or were quote/unquote potential donors.  But

12   specifically, I wasn't taking folks out to meet Ed

13   Martin who were potential donors.

14        Q.    Are you in touch with donors in the course

15   of your other work at Quantum Communications --

16        A.    Sure.

17        Q.    -- people that donate to political causes?

18        A.    Yes.

19        Q.    Have you ever referred any of them to any of

20   the Eagle Forum entities?

21        A.    Specifically said why don't you go make a

22   contribution to Eagle Forum?

23        Q.    (Nodded his head.)

24        A.    Not that I recall.

25        Q.    Do you have a regular radio or television

```
 1    show here in Harrisburg?

 2         A.      Yes.

 3         Q.      Which is it?  Radio or television?

 4         A.      Both.

 5         Q.      Okay.  Have you ever mentioned Phyllis

 6    Schlafly or any of the Eagle Forum entities on your

 7    show?

 8         A.      I'm sure I have.

 9         Q.      Well, do you recall doing it?

10         A.      Yes.

11         Q.      You do?

12         A.      I don't know specifically what date or time.

13    But I'm on several times a week.  So --

14         Q.      Right.  Do you recall doing it in the time

15    frame we're talking about here, which would be --

16         A.      Yes, because --

17         Q.      -- October through --

18         A.      I remember specifically talking about her

19    around the time of the 2017 inauguration and the role

20    that she had played in the election.

21         Q.      And that would be in the transcripts of

22    these shows that are made available?

23         A.      To the extent that they exist.  I don't have

24    them.  We don't transcribe them, that's for sure.

25         Q.      Now, you mentioned sponsoring or hosting an
```

1    event in D.C.

2        A.    Yes.

3        Q.    Were you the host of the event?

4        A.    We acted as the host.  We certainly did

5    that.  Ed Martin and Eagle Forum were the host of the

6    event.  But we were there before Mr. Martin arrived, and

7    we were there long after he left.  He felt it necessary

8    for him to leave before the event even concluded.

9        Q.    Did you -- the event was at a restaurant,

10   right?

11       A.    Yes.

12       Q.    And it was just an upper floor of a

13   restaurant; is that right?

14       A.    Yes.  Yes.

15       Q.    And did you incur any charges by the

16   restaurant in connection with the event?

17       A.    Did Quantum Communications?

18       Q.    Yes.

19       A.    No.  It was paid for by Eagle Forum.

20       Q.    Yeah.  Did Quantum Communications reserve

21   the space?

22       A.    Yes.

23       Q.    But --

24       A.    Let me back up.  I believe that we did.  We

25   retained the services of a friend of ours with whom we

1    do a lot of work in Washington D.C., specifically to

2    help us identify a place for this because Ed's ability

3    to make a decision on this ran in to very close

4    proximity to the event itself.

5             And space was very, very tough to come by.

6    And -- his name is Robert Heckman, Bob Heckman

7    identified several locations that were possible,

8    including a couple that were not ordinarily open on

9    Saturday.  But because of relationships that he had,

10   were willing to open on Saturday.  Finally we concluded

11   that Joe's Stone Crab or whatever it's called, I think

12   it's Joe's Stone Crab was the best location.  And I

13   believe that Bob, through a woman in D.C., that worked

14   for Eagle Forum procured that specifically.  But Bob was

15   clearly working with us and as a contractor to us.

16        Q.    Did you pay Bob Heckman any money for this?

17        A.    We did not because we did not get paid.  We

18   owe him $2,000.

19        Q.    For that event?

20        A.    Yes.

21        Q.    I'm looking here at QC 70, which I think you

22   still have open there.  Is there any reason why this

23   charge by Bob Heckman is not on QC 70?

24        A.     It is.  It says list rental contact calls

25   for 121 event.  We paid Bob to rent lists from him and

1    to have his staff make calls to generate attendance at

2    this event, which was a serious concern of ours that

3    there would not be an event at which nobody showed up or

4    very few people showed up.

5           And Bob and his staff did the yeomen work in

6    providing high-end lists of folks that they work with in

7    the conservative community and to making calls.  And Bob

8    also was asked by us and did, in fact, procure the

9    location.

10   Q.    Without paying for it?

11   A.    Yes.  He knew that when we were paid, he

12   would be paid.

13   Q.    No.  No.  I mean he procured the location.

14   But he didn't put a down payment on -- down for the

15   location?

16   A.    I don't --

17   Q.    He didn't pay for the location?

18   A.    I don't believe he did.  No.  I think Eagle

19   Forum used their credit card for it.

20   Q.    Did he ask for RSVP's to the event?

21   A.    RSVP's were asked for, yes, because the

22   invitation called for an RSVP.

23   Q.    Okay.  And did you -- did Quantum

24   Communications receive some RSVP's?

25   A.    I don't -- I don't -- we did, but we were

1  always passing them on to the folks in Washington.

2       Q.     The folks being Bob Heckman?

3       A.     No.  A woman, I think her name was Rebecca.

4  I could be wrong about the name.

5       Q.     Yeah.  Rebecca is a woman who works with --

6       A.     Yeah.  Through her.

7       Q.     All right.  Did you give her any e-mail

8  lists or Ed Martin?  Did you give her, Rebecca, or Ed

9  Martin any e-mail lists?

10      A.     Did we provide them with our propriety list?

11      Q.     Let's start with that.

12      A.     No, we did not, nor would we have.

13      Q.     Did you provide them with e-mail lists of

14 people who had responded in a positive way?

15      A.     But were not going to attend?

16      Q.     Well, attend or not attend.  Just people who

17 responded.  You're building an e-mail list.  I mean did

18 you respond on -- did you provide an e-mail list of

19 people who were interested in the event?

20      A.     I don't know that we got any hey, I'm really

21 interested in Eagle Forum, but I'm not going to attend.

22 We either got an RSVP, we'll be there --

23      Q.     Okay.

24      A.     -- or we didn't get anything.

25      Q.     Okay.  In general, let me just ask this

```
 1    generally.  Has Quantum Communications ever provided any
 2    e-mail list to Ed or the Eagle entities?
 3         A.     No, and we weren't under any obligation to
 4    do so.
 5         Q.     Is it your position that Quantum
 6    Communications should be paid what it demands in this
 7    lawsuit without providing any of the video?
 8               MR. BUTKOVITZ:  Objection to form.
 9               THE WITNESS:  My position is that Quantum
10    Communication should be paid what it was obligated to be
11    paid under the terms of our agreement.
12    BY MR. SCHLAFLY:
13         Q.     And is it your position you still do not
14    have to provide them the video?  Even if you are paid,
15    you would still not be required to provide the video?
16         A.     If we were paid and he wanted the raw
17    footage, I would provide it to him.
18         Q.     Are you familiar with the so-called DeFund
19    Berkeley project?
20         A.     Yes.
21         Q.     What did you all do in connection with the
22    DeFund Berkeley project?
23         A.     This was another of Ed's, you know, ideas
24    that just kind of bubbled up.  He had an awful lot of
25    ideas from time to time which he would blow by us.  And
```

1    there was some incident, I don't recall what it was, at

2    the Berkeley campus that enraged conservative activists,

3    and Ed wanted to take advantage of that.  And he asked

4    us to put up a website and buy some digital advertising,

5    which we did on his behalf.  And Brandon Posner took

6    care of that project for us.

7        Q.    Did you acquire some e-mail addresses in

8    connection with that project?

9        A.    I believe we did.

10       Q.    Did you provide those to Eagle Forum?

11       A.    I don't know.  Brandon may have.  I don't

12   know.  I know he -- I know he acquired lists.  And if he

13   was asked for them, he probably gave them to him.  He

14   was dealing with Ed on that most of the time.

15       Q.    Did Brandon work for you?

16       A.    Um-hum, yes.

17       Q.    Wouldn't he have asked your approval in

18   order to provide e-mail addresses that belonged to

19   Quantum Communications?

20             MR. BUTKOVITZ:  Objection to form.

21             THE WITNESS:  Not necessarily.

22   BY MR. SCHLAFLY:

23       Q.    What sort of expenses did you incur with

24   this DeFund Berkeley campaign?  Anything significant?

25       A.    I -- I have to be candid.  I don't

1  completely recall how the expenses on that were paid.
2  There were expenses because we had to get domain
3  reservations and that kind of thing.  But I don't
4  recall, beyond that, how much expense was actually
5  incurred.  It was relatively nominal.  Am I --
6      Q.    That's okay.
7      A.    Yeah.  I mean Counsel's showing me a
8  document that says that service $1,778 --
9      Q.    What -- which Bates Stamp is that?
10     A.    It says DeFund Berkeley costs, website
11  building.
12     Q.    Right.  There's a Bates stamp at the bottom?
13     A.    Oh, QC 00089.
14           MR. FINA:  89.  It's an attachment e-mail
15  dated April 4th, 2017.
16  BY MR. SCHLAFLY:
17     Q.    In terms of these expenses, did you give Ed
18  Martin notice -- prior notice --
19     A.    Always.
20     Q.    -- of what the actual amount of the
21  expenses?
22     A.    Always.  Well, I mean, in certain instances,
23  we couldn't give him the exact amounts.
24     Q.    No --
25     A.    But we discussed every single expense and

1  every single one was at his direction and, in fact, at

2  his request.  We did nothing that's been invoiced in

3  terms of expenses that Ed Martin didn't specifically

4  direct and approve.

5      Q.      Well, but did you give notice as to an

6  estimate of what the expenses would be?

7      A.      Well, with airfare, I'm sure we told him

8  exactly what the airfare was, because that was purchased

9  in advance, and it was going to Saint Louis.  With

10  respect to the lodging, Mr. Martin had told us that we

11  were going to be on a master account and wouldn't have

12  to worry about it.  So we plunked down credit cards at

13  the front desk to quote/unquote pay for incidentals; and

14  when we were checking out, we found out that there was

15  no master account, or if there was, that we weren't a

16  part of it, and we had to pay for the whole freight.

17          So no, we did not, in advance, tell him what

18  the room rate was at the hotel that he had procured

19  numerous rooms at himself.

20          And with respect to the video shoots on

21  location, we most certainly discussed those with Mr.

22  Martin down to the penny of what it was going to cost

23  for those to be done.

24      Q.      Do you have any evidence of that, of those

25  discussions?

47

```
 1        A.      Telephone.
 2        Q.      Wouldn't that be in an e-mail?  For example,
 3   airfare, it's over $3,000.00.  Do you got any e-mail
 4   that gives him notice of hey, we're going to spend over
 5   $3,000 flying to Saint Louis?
 6        A.      There were four people going to Saint Louis
 7   at, relatively-speaking, the last minute because again,
 8   Ed's proclivity for making last-minute decisions was
 9   such that we couldn't purchase that airfare 30 days in
10   advance, for example.
11        Q.      Okay.  But did you give notice that Ed,
12   sure, we're interested in helping.  But this is going to
13   cost more than 3 grand --
14        A.      It wasn't that we were interested in
15   helping.  I --
16        Q.      -- just to get -- just to get a crew there
17   to film.
18             MR. FINA:  Let him finish his question.
19   MR. SCHLAFLY:
20        Q.      That's all I'm asking.  Did you give him
21   notice?  Yeah, sure.  We'd like to do -- yeah, Ed,
22   that's fine.  We're happy to help.  But it's going to
23   cost you more than 3 grand just to get someone to run
24   the camera, just to get them there and run the camera?
25        A.      We -- we were very, very clear about what it
```

1    was going to cost to have people there running

2    multiple cameras with multiple folks doing the shoots,

3    etc.  We were as clear as could be.

4        Q.    Do you got any evidence of that?  I mean you

5    were having e-mails back and forth.  You've got a lot of

6    e-mails here.  Is there a single e-mail here that

7    mentions that?

8        A.    I -- I don't know that I have any notes that

9    I took of telephone conversations.  That wasn't

10   typically the way we did it.  I don't know because I

11   don't have any e-mails in front of me, whether or not

12   there were, in fact, e-mails that went back and forth on

13   this.  But I am sure, beyond any difficulty of

14   recollection, that we specifically discussed what it was

15   going to cost to do these shoots, what it was going to

16   cost to transport people there, etc.  And there was

17   never any objection raised by Mr. Martin during that

18   period of time or after that period of time to any of

19   these expenses being incurred.  And in point of fact, he

20   offered to pay them, but never did.

21       Q.    I'd like to see some evidence, if you can

22   point to any evidence of Ed Martin offering to pay more

23   than $3,000 to have someone film something -- just to

24   fly out there to film.

25       A.    I'm -- I'm -- again --

```
 1                MR. BUTKOVITZ:  Objection to form.

 2                THE WITNESS:  -- I don't have the stack of

 3    e-mails in front of me.  But I'm relatively sure that's

 4    in writing.

 5    BY MR. SCHLAFLY:

 6        Q.    And that that was advanced notice.  I know

 7    afterwards, he complained about it.  I'm just wondering

 8    --

 9        A.    No.  Afterwards, he said he was going to pay

10    the expenses.

11        Q.    That's not what I'm asking.  I'm asking if

12    you gave him notice beforehand.

13        A.    Of course we did.

14        Q.    Well, I'm not asking of course.  I'm looking

15    --

16        A.    You asked did we.  And I said of course we

17    did, prior to our leaving for St. Louis.

18        Q.    Did you -- did you do it by e-mail?

19        A.    I don't know.  I don't have the e-mails in

20    front of me.

21        Q.    Did you settle with other parties in this

22    case?

23        A.    When you say settle with other parties?

24        Q.    Quantum Communications?  Have you settled

25    with other Defendants in this case?
```

```
1              MR. FINA:  I'm going to object to form.
2    Calls for a legal conclusion.
3              THE WITNESS:  I believe that one of the
4    Defendants has been removed as a party, if that's what
5    you're asking.
6    BY MR. SCHLAFLY:
7         Q.    And did you approve that?
8         A.    I did.
9         Q.    And did they pay anything as part of that?
10        A.    No.
11        Q.    And did you approve that?
12        A.    Yes.
13        Q.    Are you familiar with the type of entity
14   Eagle Forum Education and Legal Defense Fund is?
15        A.    When you say familiar with the type --
16        Q.    Are you familiar that it's -- do you realize
17   it's a charity?
18        A.    I suppose, yes.
19        Q.    Do you have other clients that are
20   charities?
21        A.    We have.
22        Q.    Do you have other clients today who are
23   charities?
24        A.    I believe we do.
25        Q.    Do you have retainer agreements where you
```

1    bill the charities 20 grand a month?

2        A.    We have retainer agreements with them, yes.

3        Q.    And how much do you bill them a month?

4        A.    I don't know specifically because I'm not

5    sure exactly which ones might be -- but we have

6    certainly had retainers that were far in excess of

7    $20,000 a month.

8        Q.    I'm asking with respect to charities.

9        MR. BUTKOVITZ:    Just to be clear on the

10   record, when you say charities, are you referring to

11   something defined under the tax codes of 501c3?

12   BY MR. SCHLAFLY:

13       Q.    Charities are 501c3.  Roughly synonymous.

14       A.    Yeah, and I'm not always specifically clued

15   in as to the various provisions of the Internal Revenue

16   Code that various entities avail themselves, but yeah, I

17   do believe that either C3 or C4s in the past have paid

18   us in excess of 20,000 -- pardon me, $20,000 a month in

19   retainers.

20       Q.    Can you identify any of them?  I'm just

21   trying to determine if they're -- if they have any

22   similarities to Eagle Forum Education and Legal Defense

23   Fund.  That's why I ask.  I'm not trying to probe your

24   other businesses.  But I'm just trying to see if you've

25   ever entered into a relationship with another charity

1    that is similar to what you're alleging against Eagle

2    Forum Education and Legal Defense Fund?

3         A.    There have been entities that we entered

4    into relationships for far in excess of $20,000 that

5    were -- I -- I would -- again, I don't know that they

6    were 501c3s.  They may have been 501C4s now that I think

7    about it, but they certainly provided a charitable

8    purpose.

9         Q.    Well, it isn't, though.  I mean C4 is a

10   different entity.

11        A.    Okay.

12        Q.    So I'm asking about 501c3s.  501c3s.

13        A.    I don't know.

14        Q.    -- the donors get a tax deduction.  It's for

15   public good.

16        A.    I don't know.

17        Q.    You don't know.  So you can't identify, as

18   you sit here today, any entity that's 501c3 in which you

19   have had a similar retainer agreement as you allege in

20   this case?

21        A.    Not as I sit here today.

22             MR. BUTKOVITZ:  Objection.  Form.  Vague and

23   ambiguous.  I don't know what mean by similar.

24   BY MR. SCHLAFLY:

25        Q.    I'll try to clarify this to be -- just to be

1   sure.  Can you think of any other client that is a 501c3

2   organization in which you have had a monthly retainer

3   agreement in excess of $10,000 a month?

4        A.    10,000.

5        Q.    In excess of 10,000.  I'm just trying to

6   establish a floor on it.

7        A.    I believe so.  Yeah.  I -- I think the

8   Vietnam Veteran's Legacy Foundation was in excess of

9   that.

10       Q.    And when was that, just roughly?

11       A.    2005, 2006.

12       Q.    And was that relationship less than two

13  years in duration?

14       A.    No.  It went on for quite a while.  I don't

15  know -- I don't recall specifically how long.  But it

16  went on for quite a while.  It was -- I think they were

17  formed in 2005.  It might have been 2006 when we had

18  them as clients for several years, up until the time

19  that the principal got -- had serious health problems.

20       Q.    And was the termination because the

21  principal had health problems?

22       A.    Yeah.  The entity didn't thrive once he had

23  serious health problems.

24       Q.    And what was the nature of the work you did

25  for them?

1          A.      We did promotional work for them; we did

2     video projects for them; we did a variety of public

3     relations activity for them.

4          Q.      And did you send them bills without

5     itemizing the work done?

6          A.      Yes.

7          Q.      It was just $20,000 a month or whatever?

8          A.      Yes.  Ordinarily, our retainers simply say

9     for professional services rendered and the amount.

10         Q.      And is that the only other entity that falls

11    in this category of 501c3?

12         A.      The only one that I can recollect right at

13    this instant.  There -- there may have been others.  I

14    would have to go back through an awful lot of years of

15    involvement.

16         Q.      Have you been with Quantum Communications

17    since the beginning?

18         A.      Yes.

19         Q.      And are you familiar with all of your

20    clients at any given time?

21         A.      Pretty much.

22         Q.      And Quantum Communications does not enter

23    into a relationship with a new client without your

24    involvement, right?

25         A.      No.  No.  There have been clients that have

1    come in without my involvement, yes.

2         Q.    Who else would approve that, if not --

3         A.    Kevin Harley could.  Scott Stark could.  Ken

4    Robinson could have.  At least those people, and there

5    may have been others.  But at least those folks.  And

6    I'm relatively sure that clients did come in to the firm

7    through them without my expressed, whatever you're

8    asking for, sign off.

9         Q.    Did you have any communications with members

10   of the media about Phyllis Schlafly or any of the Eagle

11   Forum entities?  I'm not asking about your own

12   statements on your own show.  But I'm asking whether you

13   made any statements to the media designed to generate

14   any stories in the media about Phyllis Schlafly or Eagle

15   Forum entities?

16        A.    Oh, to -- to T stories, you mean?

17        Q.    Yes.

18        A.    Or pitch stories?

19        Q.    Pitch stories or to promote --

20        A.    Yeah.

21        Q.    You did?

22        A.    Yes, we did.

23        Q.    Could you explain when?

24        A.    I -- I don't specifically remember who.  But

25   I remember, you know, several times trying to get Ed

1    Martin placed here, there, or the other place.

2        Q.    And this was during the time period of the

3    alleged agreement?

4        A.    Yes.

5        Q.    And -- but you don't recall who you tried to

6    place them with?

7        A.    No, not sitting here today, no.

8        Q.    Was it to generate a new story, or was it to

9    get him on a show?

10       A.    I think in a couple of instances, it was --

11   pardon me -- in response to things that were in the

12   news.  And in a couple of other instances, it was to get

13   him placed.

14       Q.    Was it successful?

15       A.    I don't think so.

16       Q.    None of them were successful, right?

17       A.    I don't know.  I -- I -- I don't know what

18   Ed was able to do.  We passed off several things off to

19   him.

20       Q.    But as far as you know, you can't identify

21   any instances where your contacts with the media

22   resulted in a story or Ed getting on a show?

23       A.    If you can refresh my recollection, I --

24       Q.    No.

25       A.    -- there may be.  I don't recall any sitting

1    here right now.

2        Q.    Yeah.  No.  It's not a trick question.

3    That's fine.  You answered it.

4            Have you had involvement with this

5    conservative majority fund?

6        A.    I'm not familiar with the conservative

7    majority fund.

8        Q.    PAC?

9        A.    I'm not familiar with them.

10       Q.    Okay.  Are you involved in PACs?

11       A.    Our firm?

12       Q.    Yeah.

13       A.    We have done some independent expenditures

14   in political campaigns on behalf of PACs.  But we don't

15   represent any PACs, per se, that I can recall.

16       Q.    And those independent expenditures would be

17   your being retained by a PAC to -- to do an ad campaign

18   or something?

19       A.    Right.

20       Q.    And when you do those, is that billed as a

21   monthly retainer, or is that billed as a per-project

22   basis?

23       A.    Per project.  Simply because they're very,

24   very short durations.  In many cases, it wouldn't even

25   add up to a month.

1    Q.    And does Quantum Communications do numerous

2  per-project engagements?

3    A.    We do a fair number.  I don't know about

4  numerous.  But we do a fair number, yes.

5    Q.    Would you -- could you give me an idea, in

6  proportion, in terms of proportion of clients, which

7  ones operate on a per-project engagement and which ones

8  operate on a monthly retainer arrangement?

9    A.    Most operate on a monthly retainer

10  engagement.  I would say, if I had to pull a number out

11  of the air, based upon my immediate recollection, I

12  would say probably 80 percent are monthly retainers,

13  maybe more.  I'd have to look specifically at what we

14  have now and what we've had historically.

15    Q.    Is there any policy at Quantum

16  Communications against doing per-project engagements?

17    A.    Of course not.

18    Q.    Would you have been interested in doing work

19  for Eagle Forum Education Legal Defense Fund on a

20  per-project basis?

21        MR. BUTKOVITZ:  Objection to form.  Calls

22  for speculation.

23  BY MR. SCHLAFLY:

24    Q.    You can answer.

25    A.    We might have been.  That -- that was never

1    broached with us.  When they came to us, they offered us

2    a monthly retainer.

3         Q.    In the Complaint, paragraph 29, there is an

4    allegation that --

5         A.    Give me a second, please.

6         Q.    Sure, yeah.

7         A.    Okay.

8         Q.    There's an allegation that, On or about

9    March 10, 2017, QC and Martin orally modified their

10   agreement to allow for a decreased monthly retainer of

11   $10,000 for the subsequent months.

12              Is that based on a discussion you had with

13   Ed Martin?

14        A.    Yes.

15        Q.    And what is your understanding as to why he

16   allegedly modified the agreement?

17        A.    He asked if we could, because he believed

18   that at that point, we were nearing the end of the video

19   project.  And after some conversation, we agreed to

20   reduce the monthly retainer to $10,000 for the duration

21   of our work on the video project.  He also agreed or

22   conceded to scale back the scope of work that we were

23   otherwise doing for him.

24        Q.    Do you have any estimate of how much time

25   you were spending, up to that point, on these Eagle

Forum projects?

     A.     On all of them totally?

     Q.     Yeah.

     A.     A ton.  I can tell you that we were
expending more time than we were being compensated for
or should have been compensated for, we were invoicing
for.  We were never compensated.

     Q.     Well, about how many employee hours a week,
ballpark?

     A.     I don't know, because we had several
employees working on the Martin slash Eagle Forum Legal
Defense Fund projects at any given time.  So we had
several people working on them.  I can tell you that I
personally spent a large volume of time working on this
video project.

     Q.     Was that the biggest portion of your time,
the video, compared --

     A.     The biggest portion of my time, with respect
to all of Eagle Forum's --

     Q.     Yeah.  Yeah.

     A.     At that juncture, yes.  There were other
times when other things, for short periods of time took
precedence.  But at -- at the time of mid March, I was
spending a lot of time, because we were wrapping it up.
We were trying to get it done.

61

```
 1        Q.      Well, overall, if you, in fact, ran all the
 2    alleged work --
 3        A.      It's not alleged work, just so we're clear.
 4    And you can laugh, Mr. Schlafly.  It's not alleged work.
 5        Q.      Well, It's not -- Mr. Gerow, you're an
 6    attorney.
 7        A.      I am.
 8        Q.      You know the terminology.  What fraction of
 9    that work was the film projects?
10        A.      Overall?  I don't know.
11        Q.      Yeah.
12        A.      I -- sitting here today, I -- it's --
13        Q.      You --
14        A.      -- it's very, very difficult for me to
15    answer.
16        Q.      Do you have any idea?
17                MR. BUTKOVITZ:  Objection to form.  Are you
18    asking him to guess?
19                THE WITNESS:  Yes.
20    BY MR. SCHLAFLY:
21        Q.      I'm asking -- I'm asking him do you have any
22    idea?  I'm asking for -- let me ask, do you keep any
23    time sheets?
24                MR. FINA:  Asked and answered.
25                THE WITNESS:  No.
```

BY MR. SCHLAFLY:

    Q.    Does anybody in your firm keep time sheets?

    A.    The only time that we keep time sheets, Mr. Schlafly, is for any lobbying work that we do because we're required to do that, and for any projects that we do on an hourly basis.  And we do very, very few projects on an hourly basis.

    Q.    Do you manage your employees such that you know what they spend their time on, approximately?

    A.    I know that our employees work exceptionally hard and do exceptionally good work.  And I am daily advised of what they're doing.

    Q.    Okay.  Roughly, what percentage of the time on an Eagle Forum project was spent on the film project?

    MR. BUTKOVITZ:  Object to form.  Asked and answered.

    MR. FINA:  Same objection.

    THE WITNESS:  And it has been asked and answered.  I'm not sure how much more I can provide you.

BY MR. SCHLAFLY:

    Q.    If you don't know, you don't know.

    MR. BUTKOVITZ:  I believe he said he doesn't know multiple times.

    THE WITNESS:  Yeah.

BY MR. SCHLAFLY:

1    Q.    Okay.  Is that your answer?  You don't know?

2    A.    It's impossible for me, sitting her right

3  now, to tell you what percentage was spent specifically

4  on the video project.

5    Q.    I'm asking approximately.

6    A.    It was a significant portion.

7    Q.    Okay.  Was it more than 30 percent?

8    A.    I would say it probably was more than 30

9  percent, yes.

10    Q.    Do you know if it was more than 50 percent?

11    A.    I don't.

12    Q.    Do you know how many employee hours a month,

13  approximately, was spent on Eagle Forum projects?

14    A.    No.

15    Q.    Is there any way to find out?

16    A.    No.

17          MR. BUTKOVITZ:  At any point do you plan on

18  taking a break?

19          MR. SCHLAFLY:  Yeah.  This is a good time to

20  take a break.  Thank you.

21          (At 2:52 p.m., a recess was held.)

22          (3:00 p.m.)

23  BY MR. SCHLAFLY:

24    Q.    Just a follow-up on the film project.  Do

25  you remember when that started?

1        A.        We began working on it in December of 2016.

2        Q.        I'd like to have you look at Exhibit 35.

3                  MR. SCHLAFLY:  Off the record.

4                  (At this time, a discussion was held off the

5                  record.)

6   BY MR. SCHLAFLY:

7        Q.        I'm just going to ask you about one sentence

8   here.

9        A.        Okay.

10        Q.        These are your sworn interrogatory responses

11   to actually your request by Defendant, Eagle Forum,

12   which is the other Defendant here.

13        A.        Okay.

14        Q.        If you turn to page five, and the last

15   sentence is right above request for admission number

16   two.

17                  It says, Subsequent to that oral

18   communication --

19        A.        Hold on.  Just let me find your place.

20        Q.        Yeah.  Take your time.

21        A.        Do you want to point it out to me?

22        Q.        Page five.  It's the last sentence above

23   that request for admission two.

24        A.        Right here?

25        Q.        Yeah.  Just read that.  And I'll read it in

1    to the record here.

2         A.     Yeah.

3         Q.     Subsequent to that oral communication, on or

4    before October 21, 2016, Martin orally agreed, on behalf

5    of Eagle Forum and EFELDF, which is defined above as

6    Eagle Forum Education and Legal Defense Fund, to the

7    terms of the original agreement and continue to direct

8    the services provided by the Plaintiff.

9              As you sit here today, do you agree with

10   that statement?

11        A.     Yes.

12        Q.     Let me ask you why you're suing Ed Martin

13   personally?  Now I understand Ed Martin is in all of

14   this and is named.  But you have sued him personally.

15   Do you have any claims against Ed Martin personally?

16             MR. FINA:  I'm going to object.  It calls

17   for a legal conclusion.

18             THE WITNESS:  Yes, to the extent that Mr.

19   Martin believes that the legal defense foundation was

20   not responsible for the payment of our services, he

21   ordered them, directed them, and acknowledged and

22   approved them.

23   BY MR. SCHLAFLY:

24        Q.     Here in this statement, you say that he

25   agreed, on behalf of Eagle Forum and EFELDF, correct?

1    A.    Yes.

2    Q.    So according to this statement, you don't

3  believe that Ed Martin was entering into a personal

4  agreement?

5         MR. FINA:  Objection.  That's a totally

6  inappropriate request.  His statement was -- had nothing

7  to do with Mr. Martin.  There was no inquiry about Mr.

8  Martin in response to this statement.  So it's a

9  misconstruction of his statement.  It's an improper

10  question.

11  BY MR. SCHLAFLY:

12    Q.    You can answer.

13    A.    Yeah.  I -- again, I don't know what that

14  oral communication refers to.  But I know that Mr.

15  Martin agreed to the terms of the original agreement

16  that was made with Quantum Communications prior to

17  October 21st of 2016.  I also know that Mr. Martin

18  continued to direct our activities, approve our

19  activities, and consult with us in our activities.

20    Q.    Did Ed Martin sign any agreement with

21  Quantum Communications?

22    A.    I don't believe he did.

23    Q.    Does Quantum Communications maintain a list

24  of its clients internally?

25    A.    A list?  Like a formalized list of some

1    sort?  I mean --

2        Q.    A list of who your clients are?  Do you

3    enter them in?

4        A.    We're -- we're fully aware of who our

5    clients are.  I don't know that we have to have a list.

6        Q.    Do you manage that --

7        A.    Of course we do.

8        Q.    Okay.  Was Ed Martin, personally, ever a

9    client of Quantum Communications?

10       A.    Ed Martin was part of a file that was

11   maintained with respect to activity that he was

12   authorizing and directing.

13       Q.    Did you ever send an invoice to Ed Martin?

14       A.    No, not to him personally.

15       Q.    Did you ever send anything to Ed Martin at

16   his residence?

17       A.    I don't know.  We may have.

18       Q.    I'd like to follow up about the CPAC event,

19   and I'm not asking you to repeat any of your prior

20   testimony.  But would you agree CPAC is the largest

21   annual gathering of conservatives?

22       A.    Certainly like to think that, yes.

23       Q.    And did Quantum Communications promise that

24   Quantum Communications would promote Phyllis Schlafly at

25   that February, 2017 --

1      A.      We discussed with Ed Martin efforts to

2  promote Phyllis Schlafly at that event.  As I testified

3  earlier, Ed wanted to be a speaker on the main stage

4  himself.  That simply wasn't going to occur, despite

5  significant effort on my part.  There was no way around

6  the fact that he had considerable legal problems at that

7  point and was not in a position to take the main stage

8  at CPAC.  There was nobody else that he suggested do

9  that in his stead.

10          What he wanted us to then do, was to promote

11  -- promote is maybe a bad word -- to distribute her book

12  to the widest audience that we could.  And I asked him

13  if he was willing to provide those for free, if we could

14  get the folks that run CPAC to agree to let us

15  distribute them at the dinner, the Reagan dinner, which

16  is, as I said previously, the -- it's now the only

17  dinner.  But I think at that point, it was the major

18  dinner of CPAC.

19      Q.      And we've discussed the books already.  I

20  want to ask if there's -- there were any other efforts

21  you made.  I believe you did mention Matt Schlapp -- you

22  thought it was Matt Schlapp.

23      A.      I'm pretty sure it was Matt.

24      Q.      -- promoting Phyllis Schlafly from the

25  podium.  And you couldn't remember completely, but

```
 1   that's fine.  To the best of your recollection, you
 2   thought probably Matt Schlapp.  But was there anything
 3   else, in addition to that, that you sought to do -- not
 4   that happened -- let's just start with that you
 5   attempted to do to promote Phyllis Schlafly?
 6        A.    I -- I talked with Michael Reagan about it.
 7   And the unfortunate situation with his keynote address,
 8   as you termed it, was it really wasn't an address.  It
 9   was an interview.  And so he wasn't really able to pivot
10   off of the questions that were asked him to go there.
11   And we talked about it subsequent to the -- to the
12   event.  But he was also going to mention her.  But she
13   certainly was very prominent at that dinner.
14        Q.    Well, I'm trying to say was there anything
15   in addition to the books, in addition to maybe Matt
16   Schlapp mentioning her.  Was there anything -- and you
17   said you attempted to get Michael Reagan to plug her --
18        A.    Right.
19        Q.    And -- that didn't happen.  Was there
20   anything else that you attempted to do in the entire
21   CPAC --
22        A.    Well, we attempted to get Ed Martin on as a
23   speaker.
24        Q.    Right?  Right.
25        A.    And that just was a nonstarter.
```

1    Q.    Who -- who shot that down?  I mean -- I'm

2   not going to cause any problems for anybody.  And if you

3   don't want to say -- you know what, if you don't want to

4   say, that's fine.  But was it an individual that shot it

5   down?

6    A.    It was a unanimous opinion among several

7   people that were responsible for developing the main

8   stage speaker.

9    Q.    Was there anything else, in addition to what

10  you've mentioned, to promote Phyllis Schlafly or Eagle

11  Forum Education and Legal Defense Fund, or any of the

12  Eagle Forum entities?

13   A.    Not that I recall.  It was a pretty

14  substantial amount of stuff.

15   Q.    At -- and we're talking about at the CPAC

16  event?

17   A.    No.  No.  No.  Just so we're clear.  Yes,

18  at CPAC.  No, I don't recall anything else.

19   Q.    And would you agree that there are numerous

20  potential donors to Eagle Forum entities who attend

21  CPAC?

22   A.    I'm sure there are potential donors there,

23  yes.

24   Q    And would he agree that there's a lot of

25  publicity about CPAC in the media?

A.    Yes.

Q.    And are you aware of any publicity that got
in to the media from that CPAC event with respect to
Phyllis Schlafly?

A.    No.

Q.    Were you disappointed by that?

A.    No.

Q.    Why not?

A.    That wasn't the purpose.  And it was -- if
that had been our expectation -- anybody's expectation,
I would have told them that was a highly unreasonable
and unlikely expectation.  You know, you come out of
CPAC, there's very little that is focused on
individuals, other than the president's speech from the
main stage.  I mean it's just not the way it works.

Q.    Were you disappointed -- well, are you aware
of any donations that were made to any of the Eagle
Forum entities because of that CPAC event?

A.    I'm not aware of any, no.

Q.    Was that a disappointment?

A.    I -- I'm not aware, so I couldn't be
disappointed by it.

Q.    Are you aware that that was the first CPAC
after Phyllis Schlafly passed away?

A.    I am.

```
 1          Q.      What's Robert Heckman doing today?
 2          A.      He is a principal in Capital City Partners,
 3    and he continues to do advocacy campaigns for
 4    conservative organizations and conservative causes.
 5          Q.      Based in D.C?
 6          A.      Based in D.C.
 7          Q.      Where is the DeFund Berkeley campaign today?
 8          A.      I don't know.  I -- I assume that the domain
 9    is still extant, but I don't know that.  I don't know
10    how long we paid for it to remain.
11          Q.      All right, sir.  Any loose ends on any of
12    the projects that we've discussed?  We covered the film
13    project pretty extensively.  I just asked about DeFund
14    Berkeley campaign.  Are there any other loose ends you
15    can think of?
16          A.      No.
17          Q.      Is it correct that you --
18          A.      Sorry.
19          Q.      That's okay.  Off the record.
20                  (At this time, a discussion was held off the
21                  record.)
22    BY MR. SCHLAFLY:
23          Q.      It says in your Complaint that you went to
24    Saint Louis for the January 2017 film project; is that
25    correct?
```

1        A.      Yes.

2        Q.      Did you go to D.C. for the February 2nd,

3   2017 filming of Ambassador Faith Whittlesey?

4        A.      Yes.

5        Q.      And did you participate in that filming -- I

6   don't mean appearing on camera, but did you supervise

7   it?

8        A.      I supervised it and I appeared on camera.

9        Q.      Did you know Faith Whittlesey?

10       A.      I knew her very, very well.  I knew her for

11  over 45 years.  Not at that point, but at the point of

12  her decease, I had known her for about 45 years.

13       Q.      Do you know whose idea that was to interview

14  Faith Whittlesey?

15       A.      Mine.

16       Q.      How did the interview go?

17       A.      It went well.  Faith had some misgivings

18  about Ed Martin personally.  And so I had to go down and

19  do a preinterview with her in Washington D.C.  But when

20  we sorted through all of the concerns that she had, I

21  thought the interview went very well.

22       Q.      The interview was primarily about Phyllis

23  Schlafly, though, wasn't it?

24       A.      But Ed had asked us with each of the people

25  that we interviewed, to sort of credential him as Mrs.

1    Schlafly's heir or heir apparent or successor.  And so

2    that was something that at his direction, we were doing.

3    And that was the point at which Faith had some serious

4    reservations.

5         Q.    Do you know anything about this allegation

6    with respect to the Weyrich lunch in paragraph 33?  And

7    you can open to see it.  What happened to -- can you

8    give him back the Complaint?

9              MR. FINA:  I think it went --

10             THE WITNESS:  Is it in this pile?

11             MR. FINA:  -- to the court reporter.

12             THE WITNESS:   Yeah I think it disappeared

13   into thin -- Kevin Harley took it.

14             MR. BUTKOVITZ:  Which document are we

15   looking for now?

16             THE WITNESS:  Exhibit 33.

17             MR. FINA:  I don't even have a copy.

18             THE WITNESS: It was here.  It was here.  You

19   gave it to me previously.

20             MR. FINA:  That's 34.

21             (At this time, a discussion was held off the

22             record.)

23   BY MR. SCHLAFLY:

24        Q.    Sir, if you could turn, Mr. Gerow, to

25   paragraph 33.  That starts on page 9, carries over to

1    page 10, of Harley Exhibit 2?

2         A.    Page which?

3         Q.    9 to 10.

4         A.    Okay.  Yes.

5         Q.    And it's not a trick question, but I'm

6    asking what you know about that.

7         A.    The Weyrich lunch has existed for many

8    years, originally constituted by Paul Weyrich, who was a

9    long-term conservative leader, who unfortunately passed

10   away.  It is a gathering of substantive conservative

11   leaders who get together for lunch once a week.

12        Q.    Thank you.  That, I know, but the Court

13   won't know that, necessarily.

14              I want to follow up and see why it would be

15   an issue getting Ed Martin's attendance at that

16   luncheon.  I've been to the luncheon myself.

17        A.    I don't know that it was a quote/unquote

18   issue.  Ed called me up and asked me if I could help

19   him.  He knew that I knew the folks that ran the Weyrich

20   luncheon, and I told him that I would.  I called them,

21   and they eventually called me back and agreed to have Ed

22   there.  And Ed had already done it on his own.  So he --

23   he -- and he told me he was going to make calls, you

24   know, contemporaneous with the ones we made.  But he had

25   gotten to somebody else who said sure.  I don't think it

```
 1   was an issue of any contentiousness.
 2              MR. SCHLAFLY:  Off the record.
 3              (At this time, a discussion was held off the
 4              record.)
 5   BY MR. SCHLAFLY:
 6        Q.    All right.  So Mr. Gerow, if you could
 7   explain how Quantum Communications started and whether
 8   you are one of the founders?
 9        A.    I was.  It was founded in 2001.  It existed
10   for some period of time under the Fictitious Name
11   Registration Act.  And then it was constituted as a
12   Pennsylvania For-Profit Corporation.
13        Q.    And what percentage of Quantum's work falls
14   in to different categories?  Again, just ballpark.  I
15   know you do some lobbying.
16        A.    Very, very limited lobbying.  And let me
17   explain that to you, just so we're clear.
18              It's some years ago, the Pennsylvania
19   General Assembly passed a lobbying disclosure law.  We
20   hadn't previously had one in effect.  And in that, they
21   said if you do anything quote/unquote directly or
22   indirectly, you had to register under the Lobbying
23   Disclosure Act.  And we took a very conservative and
24   cautious approach to that so that anything that impacted
25   on Pennsylvania legislation, we registered for it, even
```

1    where, in many instances, we've never done any

2    quote/unquote lobbying, per se.

3            So I just wanted to give that you context on

4    the lobbying.  So we do quote/unquote some lobbying.

5    I'd say it's probably 10 percent of our business.  The

6    alliance share of our business is issue advocacy, and

7    the rest is two things, public relations -- well, three

8    things, public relations, crisis communications, and

9    video production and digital production.

10   BY MR. SCHLAFLY:

11       Q.    And the issue advocacy, do people retain

12   Quantum Communications to issue advocacy because you

13   know how to place ads and do you produce ads, too?  Is

14   that the idea, or is it more on the side of sort of

15   planning stories and getting people on television?

16       A.    It's mostly -- no.  It's mostly grassroots

17   and grass tops campaigns.  But we have, on a regular

18   basis, produced ads and placed them in the media.

19       Q.    And you have about five full-time employees;

20   is that right?

21       A.    At the time of this contract, we had

22   significantly more than that.  I would have to go back

23   and look at exactly how many we had.

24       Q.    Oh, that's interesting.  So it -- you were a

25   little bigger.  And it would have been as many as 10

1    employees at the time frame we're talking about in this

2    case?

3        A.    Probably.  Yeah.  I would say -- that might

4    have included interns, but we would have probably had 10

5    people at that point.

6        Q.    Do you have anything to do with the

7    invoicing?  Do you manage that, or is that done by an

8    invoicing company?

9        A.    At that point, it was done by Ken Robinson

10   exclusively.

11       Q.    And what would you say is your principal

12   area of responsibility in the firm?  I know you do a lot

13   of different things, but obviously, you don't do

14   invoicing.  It seemed like Kevin Harley did some

15   different things.  It seemed like he was maybe more of

16   media relations.  How would you characterize yourself?

17       A.    I'm the president of the firm.  I am

18   responsible for the overall management of the firm.  I'm

19   responsible for the business development of the firm.

20   I'm developed -- I'm responsible for being the face and

21   voice of the firm.  And I provide a lot of strategic

22   counsel and advice to virtually all of our clients.

23       Q.    Do you know any of the individuals, other

24   than Faith Whittlesey, came up, that you had known her a

25   long time?  Obviously you had dealings with Ed Martin.

```
 1    Are there any other individuals in Eagle Forum entities
 2    you happened to have known prior to this?
 3         A.    I knew Mrs. Schlafly very well.
 4         Q.    Is that right?
 5         A.    Yes.
 6         Q.    How did you know her?
 7         A.    I don't know where I first met her, but I
 8    think it was in the first Reagan campaign.  So it had
 9    been for quite a while.  And, you know, I didn't see her
10    all that regularly, but I often saw her at conservative
11    functions.  I remember we helped her in an event that
12    she regularly did at the Republican National Convention
13    in -- it was in Minnesota, so I have to get the right
14    year, 2008.
15         Q.    Um-hum.  Would that have been, The Life of
16    The Party event?
17         A.    Yes.  Yes.
18         Q.    And did you help in sort of promoting
19    attendance --
20         A.    Yeah.
21         Q.    -- and publicizing?
22         A.    We did that through Bob Heckman, and we did
23    it as volunteers.
24         Q.    Oh, wow.
25         A.    And I had always attended that party, going
```

```
 1    back to '80 or '84, whenever I -- I don't remember the
 2    first one.  But we always attended that party and
 3    contributed.
 4              MR. SCHLAFLY:  No further questions.
 5                          EXAMINATION
 6    BY MR. BUTKOVITZ:
 7         Q.    Good afternoon, Mr. Gerow.
 8         A.    Good afternoon.
 9         Q.    Just to introduce myself on the record.  Ed
10    Butkovitz here on behalf of Eagle Forum.
11              So I'm going to try to make this as quick as
12    possible.  Let's start with -- I just want to be clear
13    on the identities of the parties and how they relate to
14    this case.
15              So there's a lot of talk in the Complaint,
16    testimony today separately referencing Eagle Forum,
17    Eagle Forum Education and Legal Defense Fund.  Do you
18    understand that those are two separate legal entities?
19         A.    Yes.
20         Q.    Is it your understanding that Eagle Forum is
21    a 501c4?
22         A.    That's my understanding.
23         Q.    Is it your understanding that Eagle Forum
24    Education and Legal Defense Fund is a 501c3?
25         A.    That is also my understanding.
```

1      Q.     When -- what role did you have in either --

2  strike that.  After the letter -- I'm going to direct

3  you to Harley 2, which is the Amended Complaint.

4      A.     Okay.  I've got that in front of me, yes.

5      Q.     So the written agreement that's -- that we

6  keep talking about, did you see this after it was

7  signed?

8      A.     Yes.

9      Q.     Okay.  If you look at the first sentence,

10  which reads --

11      A.     Excuse me just one second.  Let me find it.

12  Okay.

13      Q.     Yeah.  It reads, This letter sets forth the

14  terms of our engagement for Eagle Forum, and then in

15  handwritten addition, it says education and legal

16  defense found -- I'm sorry, Eagle Forum Education and

17  Legal Defense Fund, a 501c3 organization, parentheses,

18  Eagle Forum, close parenthesis.

19      A.     Yes.

20      Q.     Did you understand that to define the term

21  Eagle Forum to refer to that entity?

22      A.     Help me out again.  I'm not sure I

23  understand your question.

24      Q.     Yeah.  It was a bad question.  You're an

25  attorney by -- by background, correct?

```
 1        A.      I am.

 2        Q.      Okay.

 3        A.      That probably makes it worse.

 4        Q.      Right.  Do you know what a defined term is?

 5        A.      Yes.

 6        Q.      Do you see here the use of Eagle Forum as a

 7   defined term?

 8        A.      Yes.

 9        Q.      And that defined term defines Eagle Forum as

10   Eagle Forum Education and Legal Defense Fund, a 501c3

11   organization?

12        A.      Yes.

13        Q.      So is it fair to say that all the subsequent

14   references to Eagle Forum are also referring to Eagle

15   Forum Education and Legal Defense Fund, a 501c3

16   organization?

17        A.      Yes.

18        Q.      Was it your understanding that this

19   additional handwritten -- strike that.  Was this

20   addition in handwriting done by Ian?

21        A.      I believe so.

22        Q.      Okay.  Is it your understanding that that

23   addition --

24        A.      I think it's initialed by him, as well.  I'm

25   sorry.  Go ahead.
```

1      Q.      Is it your understanding that that addition
2  did not change anything about the agreement?  It simply
3  clarified the agreement?
4      A.      That was my understanding and belief.
5      Q.      Is it your position that Eagle Forum, a
6  501c4 organization entered into this agreement?
7      A.      No.
8      Q.      Did Eagle Forum, a 501c4 organization ever
9  request or receive services from Quantum Communications?
10      A.      Not that I'm aware of.
11      Q.      Okay.  If I refer to Quantum Communications
12  as QC, is that fine with you?
13      A.      Yeah.  That's fine.  You can refer to us as
14  any way you want, yes.
15      Q.      So go back a couple of pages to the Amended
16  Complaint.  I'll direct you to --
17      A.      Which page are we on now?
18      Q.      Yeah.  I'll direct you one second.  Page 6,
19  paragraph 17.
20      A.      Okay.
21      Q.      So the first sentence, Subsequent to that
22  communication, on or before October 21st, 2016, Martin
23  agreed, on behalf of Eagle Forum, to the terms of the
24  original agreement and continued, along with Ian Northon
25  to direct the services provided by QC.

84

1        Do you see that?

2        A.    Yes.

3        Q.    Should that refer to Eagle Forum -- or

4   strike that.  Is that referring to Eagle Forum 501c4

5   organization?

6        A.    No.

7        Q.    Is that intended to refer to Eagle Forum

8   Education and Legal Defense Fund, a 501c3 organization?

9        A.    Yes.

10        Q.    When you were first approved -- strike that.

11   In September and October of 2016, were you aware of

12   litigation between warring factions within the Eagle

13   Forum 501c4 organization?

14        A.    Yeah.  That was the reason that we were

15   approached in the first place.

16        Q.    And that was to provide what services

17   related to that litigation?

18        A.    Crisis communications services on behalf of

19   Ed Martin and the 501c3.

20        Q.    So was it your understanding, from day one,

21   that since there was a dispute internally within Eagle

22   Forum, that Ed Martin did not necessarily have authority

23   to bind Eagle Forum to an agreement?

24        A.    That's correct.  Although we weren't

25   abundantly clear in that regard.

1    Q.    My understanding is Mr. Martin may have held

2    himself out that he was the correct leader, but there

3    was at least a dispute that you were aware of as to who

4    the leader is?

5    A.    That -- that is better stated, yes.

6    Q.    So paragraph 22 on page 7 refers to QC

7    organizing and promoting a reception during the

8    presidential inaugural on January 21st, 2017?

9    A.    Yes.

10   Q.    Was that provided for the benefit of Eagle

11   Forum, the 50c4?

12   A.    No.

13   Q.    Was that provided for the benefit of Eagle

14   Forum Education and Legal Defense Fund, a 501c3?

15   A.    Yes.

16   Q.    Paragraph 23 on page 8?

17   A.    Yes.

18   Q.    There's reference to this film project

19   that's been extensively received testimony on.  There's

20   reference there to Eagle Forum's board members and

21   Martin.  What -- what board members was this referring

22   to?

23   A.    I believe that all of those board members

24   were, at that time, board members of the Legal Defense

25   Fund, the 501c3 entity.

1        Q.      Do you know what the gang of six is?

2        A.      Yes.

3        Q.      Were those the individuals that were in

4    conflict with Mr. Martin and his supporters over control

5    of Eagle Forum --

6        A.      Yes.

7        Q.      -- the 501c4?

8        A.      Yes.

9        Q.      Were any of those gang of six board members

10   that were being referenced here?

11       A.      No.

12       Q.      Did you ever send any invoices to Eagle

13   Forum 501c4?

14       A.      No.  Not that I'm aware of.  I don't believe

15   we did.  But I don't want to say with metaphysical

16   certainty that we did.  I don't think we did.

17       Q.      Did you ever approach Anne Cori or anyone

18   else --

19       A     No.

20       Q.      -- at Eagle Forum about approving or paying

21   of -- for services provided under this agreement?

22       A.      No.  I have not spoken with Ms. Cori.

23       Q.      Do you know if Ed Martin is an attorney?

24       A.      I believe he is.

25       Q.      When you were sending him the invoices on a

1    monthly basis, did he ever write to you disclaiming

2    them?

3         A.    Never.

4         Q.    Let's look real quick.  If you turn to, this

5    is Exhibit 34.  It's the big packet.

6         A.    Okay.

7         Q.    If you turn to the page labeled QC-63.  It's

8    an e-mail exchange.

9         A.    Okay.  Just one second.  Okay.

10        Q.    It's an e-mail exchange related to this

11   DeFund Berkeley --

12        A.    Yes.

13        Q.    -- component of the work you were providing?

14        A.    Right.

15        Q.    Do you see, towards the bottom there,

16   request for approval that is then obtained from Mr.

17   Martin?

18        A.    Yes.

19        Q.    At this point in time, had Mr. Martin ever

20   disclaimed the -- the written agreement that's the

21   subject of this litigation?

22        A.    No, he had not.

23        Q.    In the amended complaint where you refer to

24   that second conversation as --?

25        A.    Okay.  Let me -- let me switch from here to

1    here.

2        Q.    Where you were refer to the October -- on or

3    before October 21st, 2016?  Does that date jump out?

4        A.    Yes.  Yes.

5        Q.    How did you arrive at that date?  I know

6    it's not necessarily on that date, but how did you come

7    to select that date as the on or before date?

8        A.    I don't specifically recall.  If you can

9    refresh my recollection.

10        Q.    Yes.  I'm going to try.

11        A.    Okay.

12        Q.    So --

13            MR. BUTKOVITZ:  Was this introduced as an

14    exhibit --

15            MR. FINA:  No.

16            MR. BUTKOVITZ:  -- previously?

17            MR. SCHLAFLY:  Previously, it was.  Monday,

18    it was.

19    BY MR. BUTKOVITZ:

20        Q.    See if I don't have to show it to you at

21    all.

22            The warring faction litigation that you were

23    engaged to provide support on, am I correct that that

24    was litigation in Madison County, Illinois?

25        A.    I believe it was, yes.

1    Q.    Were you -- at least today, are you aware of

2    a TRO Order that was entered in that Matter that

3    stripped Mr. Martin of any authority?

4    A.    I -- I'm aware that there was one entered,

5    yes.

6    Q.    Do you know when that order was dated?

7    A.    I'm guessing that it was on or about October

8    21st.  See how quick I am.

9    Q.    It's actually dated October 20th, 2016.

10   When did you become aware of this order?

11   A.    Shortly thereafter.

12   Q.    Were you advised, prior to entry of this

13   order, that the Motion that resulted in the order had

14   been filed?

15   A.    Yes.

16   Q.    In other words --

17   A.    Yeah.  We were aware of the process of

18   litigation.

19   Q.    So you were aware that there was a dispute

20   over Mr. Martin's removal and authority to act on behalf

21   of Eagle Forum?

22   A.    We were.  That was, as I said, that was the

23   genesis of our original -- originally being contacted by

24   Mr. Northon.

25        MR. BUTKOVITZ:  No further questions.

1          MR. FINA:  I have a few questions.

2                    EXAMINATION

3  BY MR. FINA:

4      Q.     You were asked a series of questions about

5  CPAC and questions about whether you got feedback from

6  your involvement in CPAC in relation to Mr. Martin

7  and/or the legal defense fund.  Do you recollect those

8  questions?

9      A.     Yes.

10     Q.     And did you have any separate agreement with

11 Mr. Martin and/or the Legal Defense Fund involving your

12 work with CPAC on their behalf?

13     A.     No.

14     Q.     Specifically, was there any agreement,

15 separate and apart from the agreement alleged in the

16 Complaint of Quantum Communications that in any way

17 required you or obligated you to fundraise for Mr.

18 Martin or the legal defense fund at CPAC?

19     A.     No.  And, in fact, we specifically set forth

20 to both Mr. Martin and to Mr. Northon that we don't do

21 fundraising.  That's simply not our discipline that

22 Quantum Communications engages in.

23     Q.     And, in fact, your agreement -- the original

24 agreement in September of 2016 does not reference in any

25 way, shape, or form, fundraising, correct?

1      A.      That's correct.

2      Q.      And no subsequent oral agreement or addition

3  to that agreement ever involved an obligation to perform

4  fundraising, correct?

5      A.      That's correct.

6      Q.      The books that you were provided to

7  distribute at CPAC, was it very clear, in your

8  conversations with Mr. Martin, that that was your sole

9  obligation, to distribute those books at CPAC?  You

10 weren't required to do anything else vis-a-vis the

11 books?

12     A.      No, absolutely not.  Put them on the chairs

13 at the tables.

14     Q.      So there's no agreement or even expectation

15 that these books would somehow garner a financial result

16 --

17     A.      No.  To the contrary --

18     Q.      -- for -- for the Legal Defense Fund and/or

19 Mr. Martin?

20     A.      No.  And to the contrary.  I mean that was

21 never anything that was discussed, contemplated.  And

22 had it been discussed, I would have said well, that's an

23 unrealistic expectation.

24     Q.      And there was no insert sent with the books

25 from Mr. Martin or from the Legal Defense Fund asking

1    for donations or anything like that that was included

2    with those books?

3         A.    Not that I'm aware of.  If there was

4    anything inserted in the books, I'm -- I -- I wouldn't

5    know.  I read the book, and there wasn't one in mine.

6    But I'm not saying that there wasn't in any of the

7    others.

8         Q    Was there ever any expression to you by Mr.

9    Martin or anybody else associated with the Legal Defense

10   Fund regarding disappointment, dismay, objection, about

11   a lack of contributions resulting from the CPAC event?

12        A.    Not one word.

13             MR. FINA:  I have no further questions.

14             MR. SCHLAFLY:  I just have a few questions

15   relating to these other questions.

16                          EXAMINATION

17   BY MR. SCHLAFLY:

18        Q.    Mr. Gerow, you were asked to refer to this

19   QC-6 3 in Exhibit 34.  You still have it open.  It's

20   that same page.

21        A.    Okay.  I was going to fish for it.

22        Q.    The question was along the lines of whether

23   at the time of this e-mail, Ed Martin had previously

24   ever disclaimed the alleged agreement with Quantum

25   Communications?

1      A.      That's correct.

2      Q.      And your answer was along the lines of no.

3  And I just want to ask for clarification on that,

4  because in your interrogatories and in your pleading,

5  there is a statement that he disclaimed it, and then he

6  reentered into it.  And is that what you meant --

7              MR. BUTKOVITZ:  Objection to form.  It

8  mischaracterizes the documents.

9              MR. FINA:  I join that.

10  BY MR. SCHLAFLY:

11     Q.      Well, all right.  I'll just ask directly.

12  Did Ed Martin disclaim the agreement, and is it your

13  position that he later then reentered into it?

14     A.      That is correct.

15     Q.      And then in connection with the CPAC event,

16  I'm impressed that you said you've read the book.  And

17  if you don't remember, that's fine.  But do you remember

18  what the book was?

19     A.      It was an anthology of speeches and writings

20  of Mrs. Schlafly.

21     Q.      Was it on the topic of Donald Trump?  Does

22  that ring a bell?

23     A.      I read several -- the one that we

24  distributed at CPAC, I'm not exactly.  Because, as you

25  know, there was more than one volume, and I read them

 1    all.

 2         Q.     Well, I'm impressed by that.  But in terms

 3    of the event -- I mean some of your work, even though

 4    it's not directly fundraising, if you're promoting a

 5    legacy of someone, and let me ask you, was that part of

 6    your work, to promote the legacy of Phyllis Schlafly?

 7         A.     Yes, it was.

 8         Q.     And in promoting that, wouldn't you agree

 9    that that implies attracting some donors to keep the

10    work going?

11              MR. BUTKOVITZ:  Objection to form.

12              MR. FINA:  I join that.

13              THE WITNESS: I believe that it would have

14    that effect.  But there are a number of steps that would

15    be taken to actualize or realize the receipt of money

16    based upon the promotion that we would do.  And that

17    would have been up to Ed and his staff to do, not up to

18    us.

19    BY MR. SCHLAFLY:

20         Q.     It would be -- okay.  I understand what

21    you're saying.  And you're not required to do it

22    directly.  But economically, you can't just spend,

23    spend, spend.  Some money's got to start coming in,

24    right?  So wouldn't you agree that your work was partly

25    with the purpose of promoting donations?

1     A.     Yes.  And let me just say, you know, had the

2  video project been brought to fruition, I think it would

3  have had a very significant impact on the overall brand

4  of the Legal Defense Fund because of Mrs. Schlafly's

5  incredible legacy, and I think that would have provided

6  a platform from which Mr. Martin and his staff could

7  have raised money.

8     Q.     And would you agree that at the CPAC event

9  specifically, that it was a reasonable expectation that

10 there would be some donations that would follow, not

11 directly from your work, but indirectly from your work

12 to promote --

13          MR. BUTKOVITZ:  No.  Objection to form.

14          THE WITNESS:  I wouldn't -- I wouldn't say

15 that in way, shape, or form, regardless --

16          MR. FINA:  I'm sorry.  You've got to let

17 Counsel.

18          MR. BUTKOVITZ:  That's all right.  That's

19 all right.  Just try to slow it down in the future.

20          MR. FINA:  I'm sorry.  You can continue.

21 Did you finish?

22          THE WITNESS:  No.  I wanted to let him

23 interpose --

24          MR. BUTKOVITZ:  We'll just leave it as

25 objection to the form for now.

BY MR. SCHLAFLY:

    Q.    All right.  If you explain it, though.
You don't think it's reasonable to expect some donations
to come -- I mean obviously, if she's not promoted at
CPAC, then you would not expect any donations.  But
there are -- would you agree that there are potential
donors who attend CPAC?  Let's start with that.

    A.    The promotion of Mrs. Schlafly's legacy, in
my judgment, was never a one-to-one nexus that if we
promote her legacy, that money is going to flow as a
result from that promotion to the Legal Defense Fund.
And if anybody had asked me, I would have said that's a,
I'll try to put it kindly, stretch to believe that.  It
simply doesn't work that way.  And to believe that
somebody is going to walk into the CPAC dinner, pick up
the book that Mrs. Schlafly wrote, read it, be logically
impressed by that, and then whip out their checkbook and
send a contribution to the Legal Defense Fund to me is
incredible.

    Q.    Well, I agree with you saying it's not going
to be a one-to-one correlation.  But wouldn't you agree
that if you distribute promotional material to 800
people, that it's reasonable to hope that you get at
least one donation?

    MR. BUTKOVITZ:  Objection to form.  I mean

1    reasonable from whose standpoint?

2    BY MR. SCHLAFLY:

3         Q.     He understands.

4         A.     No, I don't.  I think what's reasonable is

5    to believe that that promotion, if people were then

6    solicited, might result in contributions, yes.  But to

7    believe that somebody is just going to get a book, go

8    home and say I've got to send a check, I think is an

9    unreasonable expectation.  Yes.

10        Q.     So you view that promotional work as sort of

11   laying the groundwork for another sort of direct

12   funding?

13        A.     Absolutely.  It's part of a branding process

14   that Ed wanted to undertake and spoke to us about on

15   multiple occasions.  And we explained the strategy to

16   him.  Where, I think, things get really off track is

17   where people believe that one thing is automatically

18   going to open up a floodgate and through no effort on

19   behalf of the entity, that money is simply going to flow

20   into the coffers.  I think that's an unrealistic

21   expectation.

22        Q.     All right.  Okay.  Put aside the donations.

23   Wouldn't you expect that if you promoted somebody to 800

24   people, that the hope is that you would get some

25   positive feedback, even if it's not a check?  You would

```
 1   get somebody emailing you back and say I like that book
 2   I got.  I heard your name here.  If you would get
 3   something, other than just radio silence to take a term
 4   from your --
 5              MR. FINA:  Objection to form.  Speculation.
 6              MR. BUTKOVITZ:  Objection.
 7              THE WITNESS:  Yeah.  You had asked me if I
 8   had gotten any feedback.  I don't know how anybody
 9   sitting in that room would have known I had anything to
10   do with it.  They weren't in the room when I was handing
11   out the book.  I don't know why people would be running
12   up to me saying this is the greatest thing I've ever
13   seen, you know.  This is tremendous.  Where can I get
14   more copies, where can I send a contribution?  No.  I --
15   that didn't surprise me in the least.
16              MR. SCHLAFLY:  No further questions.
17   BY MR. FINA:
18      Q.    Was any -- I'm sorry, Ed.
19              MR. BUTKOVITZ:  None for me.
20                        EXAMINATION
21   BY MR. FINA:
22      Q.    Was any part of the obligation to pay
23   Quantum Communications for their services linked to
24   fundraising or donations to the Legal Defense Fund?
25      A.    None.
```

1        Q.      Was that ever discussed explicitly,

2   implicitly, in any way, shape, or form?

3        A.      No, it was not.

4        Q.      You were asked about Mr. Martin disclaiming

5   the agreement, the original agreement.  Do you recollect

6   that question?

7        A.      Yes.

8        Q.      To be clear, isn't it accurate that Mr.

9   Martin never disclaimed any terms of that agreement.

10  Instead, disclaimed whether or not Mr. Northon had the

11  authority to enter into that agreement?

12       A.      That is -- that is better stated.  And you

13  are correct.  What he disclaimed was Attorney Northon's

14  ability or authority to execute that agreement.

15       Q.      Which was subsequently cured by Mr. Martin

16  himself?

17       A.      That's correct.

18              MR. SCHLAFLY:  Objection.  Calls for a legal

19  conclusion.

20              THE WITNESS:   That is correct.

21              MR. FINA:  I have no further questions.

22              MR. SCHLAFLY:  Okay.  Just one follow-up.

23  BY MR. SCHLAFLY:

24       Q.      With your own clients, when you do work for

25  your other clients, do any of your clients have an

1   expectation to get some revenue in to show for their

2   expenses that they've paid you?

3           MR. BUTKOVITZ:   Objection to form.  Calls

4   for speculation.

5           MR. FINA:  Same objection.

6           THE WITNESS:  I have no idea what they

7   expect.

8   BY MR. SCHLAFLY:

9       Q.    Well, you must have an idea of what your

10  clients expect?

11          MR. BUTKOVITZ:  Object to form.

12          THE WITNESS:  I know that our clients are

13  very satisfied with your work.  So, you know, to the

14  extent that they have expectations, those expectations

15  are met and exceeded.

16  BY MR. SCHLAFLY:

17      Q.    Are you saying none of your clients ever

18  raise the issue of how they're going to cover their

19  costs?

20      A.    None ever has.

21          MR. BUTKOVITZ:  Objection to form.

22          THE WITNESS:  None ever has.  I'm happy to

23  state that on the record.  None ever has.

24          MR. SCHLAFLY:  No further questions.

25          MR. FINA:  Nothing.

1          MR. BUTKOVITZ:  None from me.

2          THE WITNESS:  Have a good weekend, everyone.

3          (At 3:50 p.m., the deposition was

4          concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

     I, Colleen V. Wentz, RMR, CRR, hereby certify that the proceedings and evidence noted are contained fully and accurately in the notes taken by me during the course of this deposition, and that this is a correct transcript of the same.

_____
Colleen V. Wentz, RMR, CRR
Court Reporter, Notary Public

     The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.

**A**

ability 19:19
  36:24 40:2
  99:14
able 56:18 69:9
absolutely 20:2
  91:12 97:13
abundantly
  84:25
account 46:11
  46:15
accurate 99:8
accurately 102:5
acknowledged
  13:4,7 65:21
acquire 44:7
acquired 44:12
acquiring 13:16
act 76:11,23
  89:20
acted 39:4
action 6:4
activists 44:2
activities 34:3
  66:18,19,19
activity 54:3
  67:11
actual 45:20
actualize 94:15
ACU 30:7 32:2
  33:13
ad 57:17
add 57:25
addition 69:3,15
  69:15 70:9
  81:15 82:20,23
  83:1 91:2
additional 33:6
  34:12,15 82:19
address 33:15
  33:18,21 69:7
  69:8
addresses 44:7
  44:18
admission 64:15
  64:23
ads 77:13,13,18

advance 46:9,17
  47:10
advanced 49:6
advantage 44:3
advertising 44:4
advice 78:22
advised 62:12
  89:12
advocacy 72:3
  77:6,11,12
afternoon 37:5
  80:7,8
ago 76:18
agree 65:9 67:20
  68:14 70:19,24
  94:8,24 95:8
  96:6,20,21
agreed 7:11
  59:19,21 65:4
  65:25 66:15
  75:21 83:23
agreement 7:10
  8:25 10:25
  11:2,11,14,19
  11:24 12:1,3,6
  12:12,14,19
  13:5 43:11
  52:19 53:3
  56:3 59:10,16
  65:7 66:4,15
  66:20 81:5
  83:2,3,6,24
  84:23 86:21
  87:20 90:10,14
  90:15,23,24
  91:2,3,14
  92:24 93:12
  99:5,5,9,11,14
agreements 11:7
  50:25 51:2
ahead 82:25
air 58:11
airfare 46:7,8
  47:3,9
allegation 6:16
  6:21,25 25:24
  59:4,8 74:5

allegations
  23:22
allege 52:19
alleged 8:25
  10:25 12:16,19
  56:3 61:2,3,4
  90:15 92:24
allegedly 59:16
alleging 52:1
alliance 77:6
allow 34:14 37:1
  59:10
alternative 24:4
Ambassador
  22:14 73:3
ambiguous
  52:23
amended 1:3
  5:16 81:3
  83:15 87:23
American 29:16
amount 17:7,21
  45:20 54:9
  70:14
amounts 45:23
and/or 90:7,11
  91:18 102:20
ANDRESS 1:6
ANDREW 2:6,8
Anne 86:17
annual 67:21
answer 15:3,25
  16:5,5,7 22:4
  23:9,12 25:11
  25:23 26:3,7
  26:19,21 27:11
  29:22 32:14
  58:24 61:15
  63:1 66:12
  93:2
answered 15:17
  25:1,7 26:2,6
  26:20 27:16
  28:24 32:12
  57:3 61:24
  62:16,19
answering 28:13

anthology 93:19
anticipated 30:1
anybody 23:9
  32:2 62:2 70:2
  92:9 96:12
  98:8
anybody's 71:10
apart 90:15
apparent 14:4
  74:1
APPEARANC...
  2:1
appeared 73:8
appearing 73:6
apply 102:19
appreciably
  12:5
approach 76:24
  86:17
approached
  84:15
appropriate
  25:21
approval 44:17
  87:16
approve 5:19
  32:2 46:4 50:7
  50:11 55:2
  66:18
approved 23:16
  65:22 84:10
approving 86:20
approximately
  62:9 63:5,13
April 16:12 17:8
  17:23 45:15
Arch 2:13
area 78:12
argumentative
  22:2,3 28:23
arrange 10:20
arrangement
  58:8
arrive 88:5
arrived 39:6
aside 97:22
asked 6:7 12:25

24:1,21,23,25
  28:23 29:5
  33:4 41:8,21
  44:3,13,17
  49:16 59:17
  61:24 62:15,18
  68:12 69:10
  72:13 73:24
  75:18 90:4
  92:18 96:12
  98:7 99:4
asking 14:13
  15:20 16:1,2
  23:5 25:15,16
  28:11,15 47:20
  49:11,11,14
  50:5 51:8
  52:12 55:8,11
  55:12 61:18,21
  61:21,22 63:5
  67:19 75:6
  91:25
Assembly 76:19
assert 6:21
associated 92:9
assume 32:22
  72:8
assurances 13:3
assured 13:1
  17:4
assuredness
  8:23
attachment
  45:14
attempt 14:19
  15:3 16:15
attempted 14:14
  29:9 69:5,17
  69:20,22
attempts 29:24
attend 32:16
  42:15,16,16,21
  70:20 96:7
attendance 41:1
  75:15 79:19
attended 79:25
  80:2

attorney 61:6
81:25 86:23
99:13
attorney's 5:21
6:4
attracting 94:9
audience 68:12
auditorium
32:20 36:9
August 1:11
authority 84:22
89:3,20 99:11
99:14
authorize 5:13
authorizing
67:12
automatically
97:17
avail 51:16
available 38:22
aware 11:18
13:16 67:4
71:2,16,19,21
71:23 83:10
84:11 85:3
86:14 89:1,4
89:10,17,19
92:3
awful 19:21 20:7
21:8,9 43:24
54:14

**B**

back 6:9 20:11
25:2,4,12 30:9
39:24 48:5,12
54:14 59:22
74:8 75:21
77:22 80:1
83:15 98:1
background
13:10 81:25
bad 68:11 81:24
ballpark 60:9
76:14
based 11:8 58:11
59:12 72:5,6

94:16
basis 9:14 10:17
10:18 17:5
19:18 57:22
58:20 62:6,7
77:18 87:1
Bates 45:9,12
began 64:1
beginning 54:17
behalf 44:5
57:14 65:4,25
80:10 83:23
84:18 89:20
90:12 97:19
belief 83:4
believe 6:17
33:25 34:1
36:22 39:24
40:13 41:18
44:9 50:3,24
51:17 53:7
62:22 66:3,22
68:21 82:21
85:23 86:14,24
88:25 94:13
96:13,14 97:5
97:7,17
believed 59:17
believes 65:19
bell 93:22
belonged 44:18
benefit 85:10,13
Berkeley 43:19
43:22 44:2,24
45:10 72:7,14
87:11
best 30:1 40:12
69:1
better 11:15
85:5 99:12
beyond 12:5
15:6 45:4
48:13
big 87:5
bigger 77:25
biggest 60:16,18
bill 51:1,3

billed 57:20,21
billing 10:16,17
11:9 12:20
bills 54:4
bind 84:23
blow 43:25
board 29:19
32:22 85:20,21
85:23,24 86:9
boarding 19:14
Bob 40:6,13,14
40:16,23,25
41:5,7 42:2
79:22
bold 23:24
book 30:10 35:4
36:2 68:11
92:5 93:16,18
96:16 97:7
98:1,11
books 30:19,21
30:25 31:3,5
31:16,16,17,21
32:11,23 34:10
36:8,24 68:19
69:15 91:6,9
91:11,15,24
92:2,4
bottom 45:12
87:15
boxes 31:3
brand 95:3
branded 9:16
branding 97:13
Brandon 31:6
31:22 44:5,11
44:15
breach 24:5
break 63:18,20
broached 59:1
broader 19:3
brought 31:1
34:10 35:13,19
95:2
bubbled 43:24
building 22:9
42:17 45:11

business 77:5,6
78:19
businesses 51:24
Butkovitz 2:14
3:4 6:13 9:10
13:21 14:15,20
14:25 15:11,16
15:22 16:1,6
16:10,17 17:1
20:8,13 21:5
21:23 22:1,19
23:8 24:13
25:18 26:12,17
27:2,5 28:3,21
35:18 43:8
44:20 49:1
51:9 52:22
58:21 61:17
62:15,22 63:17
74:14 80:6,10
88:13,16,19
89:25 93:7
94:11 95:13,18
95:24 96:25
98:6,19 100:3
100:11,21
101:1
buy 44:4

**C**

C 4:1 102:1,1
C3 51:17
C4 52:9
C4s 51:17
call 8:13,21 9:21
called 40:11
41:22 75:18,20
75:21
calls 14:20 15:1
24:14 27:2
40:24 41:1,7
50:2 58:21
65:16 75:23
99:18 100:3
camera 47:24,24
73:6,8
cameras 48:2

campaign 44:24
57:17 72:7,14
79:8
campaigns
57:14 72:3
77:17
campus 44:2
candid 64:25
Capital 72:2
card 31:2 36:17
36:20 41:19
cards 46:12
care 44:6
Carlisle 1:24
carries 74:25
cartons 30:25
case 1:4 11:15
11:16 12:10
17:14 21:16
26:7 49:22,25
52:20 78:2
80:14
cases 57:24
cat 30:8
categories 76:14
category 54:11
cause 70:2
causes 37:17
72:4
cautious 76:24
ceased 14:4 15:5
16:12
center 32:19
34:11 35:4
36:8
certain 10:7
33:12 45:22
certainly 28:8
39:4 46:21
51:6 52:7
67:22 69:13
certainty 86:16
certification
102:18
certify 102:3
certifying
102:21

**chair** 31:10,11
31:12,13,15
**chairman** 29:15
29:17,19,20
**chairs** 31:21
32:23 91:12
**chance** 28:22
**change** 83:2
**characterize**
78:16
**charge** 34:15
36:4 37:2
40:23
**charges** 39:15
**charitable** 52:7
**charities** 50:20
50:23 51:1,8
51:10,13
**charity** 50:17
51:25
**Charlie** 1:14 3:3
3:4,5,6,7 4:4
**check** 97:8,25
**checkbook**
96:17
**checking** 46:14
**Chester** 2:7
**chief** 11:20
**City** 72:2
**claim** 5:22
**claims** 65:15
**clarification**
93:3
**clarified** 83:3
**clarify** 52:25
**clear** 9:13 28:25
35:3 47:25
48:3 51:9 61:3
70:17 76:17
80:12 84:25
91:7 99:8
**clearly** 22:7
40:15
**client** 12:3 21:14
53:1 54:23
67:9
**clients** 10:6,14

10:25 11:5
50:19,22 53:18
54:20,25 55:6
58:6 66:24
67:2,5 78:22
99:24,25,25
100:10,12,17
**close** 18:12 40:3
81:18
**closely** 5:24
**closer** 5:10
**clued** 51:14
**Code** 51:16
**codes** 51:11
**coffers** 97:20
**Colleen** 1:17
102:3,13
**come** 40:5 55:1,6
71:12 88:6
96:4
**coming** 13:1
94:23
**commenced** 4:2
**commencing**
1:16
**committees**
29:19
**Commonwealth**
1:19
**communicated**
22:6 34:18,19
**communication**
19:13,22 20:18
43:10 64:18
65:3 66:14
83:22
**communicatio...**
1:2 4:15 6:3
9:25 37:15
39:17,20 41:24
43:1,6 44:19
49:24 54:16,22
55:9 58:1,16
66:16,21,23
67:9,23,24
76:7 77:8,12
83:9,11 84:18

90:16,22 92:25
98:23
**community** 41:7
**company** 11:17
78:8
**compared** 60:17
**compensated**
21:11 22:22
60:5,6,7
**complained** 49:7
**complaint** 1:3
5:16 23:15,20
25:19 27:8
35:11 59:3
72:23 74:8
80:15 81:3
83:16 87:23
90:16
**completed** 18:7
18:8,17,19,23
**completely** 45:1
68:25
**component**
87:13
**conceded** 59:22
**concepts** 20:20
**concern** 41:2
**concerned** 9:15
19:19
**concerns** 73:20
**concierge** 36:18
**conclude** 18:13
**concluded** 28:9
28:14,15 39:8
40:10 101:4
**conclusion**
14:21 15:1
16:3 24:15
27:3 50:2
65:17 99:19
**conditions** 7:12
**conduct** 16:2
20:16
**conference** 8:11
**conflict** 86:4
**connection** 4:14
19:10,11 20:5

21:21 22:13
33:2 39:16
43:21 44:8
93:15
**conservative**
29:16 30:8
41:7 44:2 57:5
57:6 72:4,4
75:9,10 76:23
79:10
**conservatives**
67:21
**considerable**
68:6
**considered** 19:2
**constant** 19:13
**constantly** 9:18
17:4
**constituted** 75:8
76:11
**construing**
25:19
**consult** 66:19
**consultation**
20:19
**contact** 40:24
**contacted** 89:23
**contacts** 56:21
**contained** 23:22
102:4
**contemplated**
91:21
**contemporane...**
75:24
**contentiousness**
76:1
**context** 77:3
**continue** 7:11
13:6 14:7 17:7
65:7 95:20
**continued** 66:18
83:24
**continues** 72:3
**contract** 17:18
24:5 77:21
**contractor** 40:15
**contractual**

10:18
**contrary** 91:17
91:20
**contributed** 80:3
**contribution**
37:22 96:18
98:14
**contributions**
92:11 97:6
**control** 86:4
102:20
**Convention**
79:12
**conversation** 7:5
7:8,16,23,24
8:3,8 9:9 59:19
87:24
**conversations**
48:9 91:8
**copies** 35:18,23
98:14
**copy** 5:16 35:12
35:13,17 74:17
**Cori** 86:17,22
**Corporation**
76:12
**correct** 17:19
65:25 72:17,25
81:25 84:24
85:2 88:23
90:25 91:1,4,5
93:1,14 99:13
99:17,20 102:6
**corrected** 17:10
17:12
**correlation**
96:21
**cost** 46:22 47:13
47:23 48:1,15
48:16
**costs** 45:10
100:19
**counsel** 2:5,9,16
35:1 78:22
95:17
**Counsel's** 45:7
**Count** 23:15,20

24:1
**Counterclaim**
2:10
**County** 88:24
**couple** 29:19
40:8 56:10,12
83:15
**course** 18:3
37:14 49:13,14
49:16 58:17
67:7 102:6
**court** 1:1,18
5:10 74:11
75:12 102:14
**cover** 100:18
**covered** 72:12
**CPAC** 29:4,9,12
29:16,24 30:12
67:18,20 68:8
68:14,18 69:21
70:15,18,21,25
71:3,13,18,23
90:5,6,12,18
91:7,9 92:11
93:15,24 95:8
96:5,7,15
**Crab** 40:11,12
**credential** 73:25
**credit** 31:2
36:17,20 41:19
46:12
**crew** 20:16
47:16
**crisis** 77:8 84:18
**CRR** 1:18 102:3
102:13
**cured** 99:15
**Currently** 29:15
**custom** 31:20
**cut** 29:22 31:3

———————
**D**
**D** 4:1
**D-3** 2:2
**D.C** 37:9 39:1
40:1,13 72:5,6
73:2,19

**daily** 62:11
**damages** 13:17
14:3,14,19
15:4,7,10,14
15:21 16:9,15
16:21,25
**Dan** 32:5
**date** 1:17 6:5 8:2
8:7 38:12 88:3
88:5,6,7,7
**dated** 45:15 89:6
89:9
**day** 34:23 37:3
84:20
**days** 20:17 47:9
**deal** 28:8
**dealing** 44:14
**dealings** 78:25
**decease** 73:12
**December** 64:1
**decision** 40:3
**decisions** 47:8
**decreased** 59:10
**dedication** 22:9
**deduction** 52:14
**Defendant** 2:9
2:11 64:11,12
**Defendants** 1:7
35:7 49:25
50:4
**defense** 1:5 2:10
50:14 51:22
52:2 58:19
60:12 65:6,19
70:11 80:17,24
81:16,17 82:10
82:15 84:8
85:14,24 90:7
90:11,18 91:18
91:25 92:9
95:4 96:11,18
98:24
**define** 10:9
81:20
**defined** 51:11
65:5 82:4,7,9
**defines** 82:9

**DeFund** 43:18
43:22 44:24
45:10 72:7,13
87:11
**deliver** 17:25
18:6,21 19:9
19:22 21:14,16
21:25 36:25
**delivered** 9:4
18:22 19:12
30:25 34:25
**delivery** 34:9
35:4 36:2
**DEMANDED**
1:7
**demands** 43:6
**department**
11:18
**deposed** 4:9
**deposition** 1:14
3:10 4:18,21
5:5 25:21
101:3 102:6
**described** 12:12
**DESCRIPTION**
3:9
**designed** 55:13
**desk** 46:13
**despite** 68:4
**determine** 51:21
**developed** 78:20
**developing** 70:7
**development**
20:19 78:19
**different** 52:10
76:14 78:13,15
**difficult** 61:14
**difficulty** 48:13
**digital** 44:4 77:9
**dinner** 30:12,12
32:15,16 34:23
36:9 68:15,15
68:17,18 69:13
96:15
**direct** 46:4 65:7
66:18 81:2
83:16,18,25

97:11 102:20
**directed** 65:21
**directing** 67:12
**direction** 20:16
20:22 46:1
74:2
**directly** 76:21
93:11 94:4,22
95:11
**disappeared**
74:12
**disappointed**
71:6,16,22
**disappointment**
71:20 92:10
**discipline** 90:21
**disclaim** 93:12
**disclaimed**
87:20 92:24
93:5 99:9,10
99:13
**disclaiming** 87:1
99:4
**disclosure** 76:19
76:23
**discovery** 29:1
35:7
**discuss** 7:8,15
9:20,24 10:6
**discussed** 7:10
7:18 9:1,4,8,12
9:22 10:3
45:25 46:21
48:14 68:1,19
72:12 91:21,22
99:1
**discussion** 7:25
12:8,11 59:12
64:4 72:20
74:21 76:3
**discussions**
29:25 46:25
**dismay** 92:10
**dispute** 84:21
85:3 89:19
**distribute** 34:13
34:14 36:25

68:11,15 91:7
91:9 96:22
**distributed**
30:11 93:24
**DISTRICT** 1:1
1:1
**dock** 34:11 36:9
**doctrine** 13:16
13:20
**document** 5:2
27:5 35:2 45:8
74:14
**documentation**
13:23
**documented**
34:7
**documents** 34:5
93:8
**doing** 9:22 38:9
38:14 48:2
58:16,18 59:23
62:12 72:1
74:2
**dollar** 34:16
**domain** 45:2
72:8
**Donald** 93:21
**donate** 37:17
**donation** 96:24
**donations** 71:17
92:1 94:25
95:10 96:3,5
97:22 98:24
**donors** 37:6,10
37:11,13,14
52:14 70:20,22
94:9 96:7
**due** 24:7
**duly** 4:4
**duration** 10:12
53:13 59:20
**durations** 57:24

———————
**E**
**E** 4:1,1 102:1
**e-mail** 12:15,15
34:8,17,19,22

42:7,9,13,17
42:18 43:2
44:7,18 45:14
47:2,3 48:6
49:18 87:8,10
92:23
**e-mails** 48:5,6
48:11,12 49:3
49:19
**Eagle** 1:5,5 2:10
2:16 37:7,8,20
37:22 38:6
39:5,19 40:14
41:18 42:21
43:2 44:10
50:14 51:22
52:1 55:10,14
58:19 59:25
60:11,19 62:14
63:13 64:11
65:5,6,25
70:10,12,20
71:17 79:1
80:10,16,17,20
80:23 81:14,16
81:18,21 82:6
82:9,10,14,14
83:5,8,23 84:3
84:4,7,12,21
84:23 85:10,13
85:20 86:5,12
86:20 89:21
**earlier** 68:3
**easily** 33:24
**ebutkovitz@k...**
2:15
**economically**
94:22
**Ed** 7:2,5,24 8:12
8:15,17,20
9:12 10:19
13:2 19:9,25
24:6,23 25:16
25:24 26:10,24
27:1,13,23
28:1 29:9,25
30:2,9 34:2,18

34:23 37:7,12
39:5 42:8,8
43:2 44:3,14
45:17 46:3
47:11,21 48:22
55:25 56:18,22
59:13 65:12,13
65:15 66:3,20
67:8,10,13,15
68:1,3 69:22
73:18,24 75:15
75:18,21,22
78:25 80:9
84:19,22 86:23
92:23 93:12
94:17 97:14
98:18
**Ed's** 40:2 43:23
47:8
**education** 1:5
2:10 50:14
51:22 52:2
58:19 65:6
70:11 80:17,24
81:15,16 82:10
82:15 84:8
85:14
**Edward** 1:6 2:11
2:14
**EFELDF** 65:5
65:25
**effect** 7:2 76:20
94:14
**effort** 12:11 68:5
97:18
**efforts** 68:1,20
**eight** 26:22
**either** 42:22
51:17 81:1
**election** 38:20
**elements** 20:21
**emailing** 98:1
**employee** 60:8
63:12
**employees** 60:11
62:8,10 77:19
78:1

**ends** 72:11,14
**engaged** 16:2
88:23
**engagement** 7:9
58:7,10 81:14
**engagements**
58:2,16
**engages** 90:22
**English** 26:8
**enhanced** 28:9
**enraged** 44:2
**enriched** 24:7,12
25:16
**enrichment** 24:3
24:4
**enter** 54:22 67:3
99:11
**entered** 10:24
12:7 51:25
52:3 83:6 89:2
89:4
**entering** 66:3
**entire** 35:20
69:20
**entities** 28:7,16
37:7,20 38:6
43:2 51:16
52:3 55:11,15
70:12,20 71:18
79:1 80:18
**entity** 50:13
52:10,18 53:22
54:10 81:21
85:25 97:19
**entry** 89:12
**ESQUIRE** 2:3,8
2:14
**establish** 53:6
**estimate** 10:8
46:6 59:24
**event** 33:3 39:1
39:3,6,8,9,16
40:4,19,25
41:2,3,20
42:19 67:18
68:2 69:12
70:16 71:3,18

79:11,16 92:11
93:15 94:3
95:8
**eventually** 75:21
**evidence** 46:24
48:4,21,22
102:4
**evolving** 9:13
**exact** 45:23
**exactly** 31:18
46:8 51:5
77:23 93:24
**EXAMINATI...**
3:2 4:7 80:5
90:2 92:16
98:20
**examined** 4:5
**example** 47:2,10
**examples** 21:13
**exceeded** 100:15
**exceptionally**
62:10,11
**excess** 51:6,18
52:4 53:3,5,8
**exchange** 87:8
87:10
**exclusively**
78:10
**Excuse** 81:11
**execute** 99:14
**exhibit** 3:10 4:21
4:23 5:15 6:1,9
35:16,21 64:2
74:16 75:1
87:5 88:14
92:19
**EXHIBITS** 3:8
**exist** 38:23
**existed** 75:7 76:9
**expect** 96:3,5
97:23 100:7,10
**expectation**
71:10,10,12
91:14,23 95:9
97:9,21 100:1
**expectations**
100:14,14

**expending** 60:5
**expenditures**
57:13,16
**expense** 45:4,25
**expenses** 44:23
45:1,2,17,21
46:3,6 48:19
49:10 100:2
**experience** 22:5
**expertise** 22:5
**explain** 55:23
76:7,17 96:2
**explained** 97:15
**explicitly** 99:1
**expressed** 55:7
**expression** 92:8
**extant** 72:9
**extensively**
72:13 85:19
**extent** 38:23
65:18 100:14
**extra** 35:12,13
35:18

---

**F**

**F** 102:1
**face** 78:20
**fact** 8:22 14:10
33:25 41:8
46:1 48:12,19
61:1 68:6
90:19,23
**faction** 88:22
**factions** 84:12
**facts** 27:9
**fair** 58:3,4 82:13
**faith** 17:5 18:16
19:2 73:3,9,14
73:17 74:3
78:24
**falls** 54:10 76:13
**familiar** 43:18
50:13,15,16
54:19 57:6,9
**far** 2:7 21:7 51:6
52:4 56:20
**February** 29:4

67:25 73:2
**fee** 34:13,16 36:7
**feedback** 31:25
  32:9 90:5
  97:25 98:8
**feel** 19:14
**fees** 5:21 6:4
  34:24
**felt** 39:7
**fgflegal@outl...**
  2:4
**Fictitious** 76:10
**fight** 30:8
**file** 67:10
**filed** 5:17 89:14
**film** 9:20 19:2,3
  19:10,11,15,25
  20:6,16,17,24
  21:14,17,22,25
  22:8,10,13,15
  26:15,25 28:2
  28:18 47:17
  48:23,24 61:9
  62:14 63:24
  72:12,24 85:18
**filming** 73:3,5
**Fina** 2:2,3 3:5,7
  14:16,22 15:12
  15:15,23 16:11
  16:18 17:2,17
  20:3 21:6
  22:20 23:7,9
  23:13,17 24:14
  25:7 26:1,13
  26:18,20 27:4
  27:7,15,21
  29:21 35:1,14
  35:23 36:12
  45:14 47:18
  50:1 61:24
  62:17 65:16
  66:5 74:9,11
  74:17,20 88:15
  90:1,3 92:13
  93:9 94:12
  95:16,20 98:5
  98:17,21 99:21

100:5,25
**final** 18:23 23:1
  23:3
**finally** 18:13
  40:10
**financial** 91:15
**find** 22:8,10,12
  63:15 64:19
  81:11
**fine** 5:7 15:3
  16:4 17:11,13
  17:21 23:12
  47:22 57:3
  69:1 70:4
  83:12,13 93:17
**finish** 28:1 47:18
  95:21
**firm** 10:16 55:6
  57:11 62:2
  78:12,17,18,19
  78:21
**first** 12:20 23:21
  71:23 79:7,8
  80:2 81:9
  83:21 84:10,15
**fish** 92:21
**five** 64:14,22
  77:19
**floodgate** 97:18
**floor** 2:13 39:12
  53:6
**flow** 96:10 97:19
**fly** 34:14 48:24
**flying** 47:5
**focused** 71:13
**folks** 22:11
  33:13 36:8,21
  37:9,12 41:6
  42:1,2 48:2
  55:5 68:14
  75:19
**follow** 12:11
  67:18 75:14
  95:10
**follow-up** 12:15
  63:24 99:22
**follows** 4:5

**footage** 43:17
**For-Profit** 76:12
**foregoing** 23:22
  102:18
**form** 9:10 13:21
  14:15,20 15:11
  15:12,16,22
  16:10,17 17:1
  17:2 21:5 22:1
  22:19 23:8
  24:13 26:12,17
  27:2 28:3,22
  34:7 43:8
  44:20 49:1
  50:1 52:22
  58:21 61:17
  62:15 90:25
  93:7 94:11
  95:13,15,25
  96:25 98:5
  99:2 100:3,11
  100:21
**formalized**
  66:25
**formed** 53:17
**forth** 7:13 48:5
  48:12 81:13
  90:19
**forthcoming**
  13:1
**Fortune** 11:16
**Forum** 1:5,5
  2:10,16 37:7,9
  37:20,22 38:6
  39:5,19 40:14
  41:19 42:21
  44:10 50:14
  51:22 52:2
  55:11,15 58:19
  60:1,11 62:14
  63:13 64:11
  65:5,6,25
  70:11,12,20
  71:18 79:1
  80:10,16,17,20
  80:23 81:14,16
  81:18,21 82:6

82:9,10,14,15
  83:5,8,23 84:3
  84:4,7,13,22
  84:23 85:11,14
  86:5,13,20
  89:21
**Forum's** 60:19
  85:20
**found** 46:14
  81:16
**foundation** 53:8
  65:19
**founded** 76:9
**founders** 76:8
**four** 47:6
**fraction** 61:8
**frame** 38:15
  78:1
**FRANK** 2:2,3
**free** 68:13
**freight** 46:16
**friend** 39:25
**front** 6:9 28:25
  32:19 36:21
  46:13 48:11
  49:3,20 81:4
**fruition** 95:2
**full-time** 77:19
**fully** 67:4 102:5
**functions** 79:11
**fund** 1:6 2:10
  50:14 51:23
  52:2 57:5,7
  58:19 60:12
  65:6 70:11
  80:17,24 81:17
  82:10,15 84:8
  85:14,25 90:7
  90:11,18 91:18
  91:25 92:10
  95:4 96:11,18
  98:24
**funding** 97:12
**fundraise** 90:17
**fundraising**
  90:21,25 91:4
  94:4 98:24

**further** 80:4
  89:25 92:13
  98:16 99:21
  100:24
**future** 95:19

--- **G** ---

**G** 2:2 4:1
**gang** 86:1,9
**garner** 91:15
**gathering** 67:21
  75:10
**Gaylord** 34:11
  35:4 36:8
**general** 9:7
  42:25 76:19
**generally** 10:1
  10:14 43:1
**generate** 41:1
  55:13 56:8
**genesis** 89:23
**Germantown**
  2:2
**Gerow** 1:14 3:3
  3:4,5,6,7,10
  4:4,9,20,23
  61:5 74:24
  76:6 80:7
  92:18
**getting** 19:7
  20:24 56:22
  75:15 77:15
**give** 10:8 36:19
  42:7,8 45:17
  45:23 46:5
  47:11,20 58:5
  59:5 74:8 77:3
**given** 10:21 30:5
  54:20 60:12
**gives** 47:4
**go** 11:13 22:8,10
  22:12,14 37:21
  54:14 69:10
  73:2,16,18
  77:22 82:25
  83:15 97:7
**going** 4:21 6:8

9:13 10:10,15
13:1,23 14:5,9
17:4 25:23
27:13,19 30:2
30:7 37:1,2
42:15,21 46:9
46:11,22 47:4
47:6,12,22
48:1,15,15
49:9 50:1 64:7
65:16 68:4
69:12 70:2
75:23 79:25
80:11 81:2
88:10 92:21
94:10 96:10,15
96:20 97:7,18
97:19 100:18
**good** 17:5 30:3
52:15 62:11
63:19 80:7,8
101:2
**gotten** 75:25
98:8
**grand** 47:13,23
51:1
**grass** 77:17
**grassroots** 77:16
**great** 28:8
**greatest** 98:12
**groundwork**
97:11
**guess** 5:11 24:17
31:16 61:18
**guessing** 89:7

**H**
**hand** 31:7
**handing** 98:10
**handsomely**
21:11
**handwriting**
82:20
**handwritten**
81:15 82:19
**Hanover** 1:23
**happen** 69:19

**happened** 69:4
74:7 79:2
**happy** 22:4
47:22 100:22
**hard** 62:11
**Harley** 5:15 8:14
35:17 55:3
74:13 75:1
78:14 81:3
**Harrisburg** 1:16
1:24 38:1
**head** 37:23
**health** 53:19,21
53:23
**hear** 20:8
**heard** 20:13
98:2
**Heckman** 40:6,6
40:16,23 42:2
72:1 79:22
**heir** 74:1,1
**held** 1:14 36:10
37:8 63:21
64:4 72:20
74:21 76:3
85:1
**help** 30:24 31:5
40:2 47:22
75:18 79:18
81:22
**helped** 31:22
79:11
**helping** 47:12,15
**hey** 42:20 47:4
**high-end** 41:6
**highly** 8:22
71:11
**Hills** 2:7
**historically**
58:14
**hold** 36:12 64:19
**home** 20:18 97:8
**Honorable** 1:5
**hope** 96:23
97:24
**host** 39:3,4,5
**hosting** 38:25

**hotel** 30:25
34:12,14 36:18
46:18
**hourly** 62:6,7
**hours** 9:24 10:4
10:7,13,15,21
60:8 63:12
**hundred** 31:16
**hypothetical**
28:13
**hypotheticals**
28:12

**I**
**Ian** 1:6 7:11
82:20 83:24
**idea** 16:21,23
30:3 58:5
61:16,22 73:13
77:14 100:6,9
**ideas** 43:23,25
**identification**
4:24
**identified** 9:16
40:7
**identify** 40:2
51:20 52:17
56:20
**identities** 80:13
**Illinois** 88:24
**immediate** 58:11
**impact** 95:3
**impacted** 76:24
**impending** 29:1
**implicitly** 99:2
**implies** 94:9
**impossible** 10:5
10:9 63:2
**impressed** 93:16
94:2 96:17
**improper** 66:9
**inappropriate**
66:6
**inaugural** 85:8
**inauguration**
38:19
**incident** 44:1

**incidentals**
46:13
**included** 20:24
78:4 92:1
**including** 40:8
**incredible** 95:5
96:19
**incremental**
10:16
**incur** 39:15
44:23
**incurred** 45:5
48:19
**independent**
57:13,16
**INDEX** 3:1
**indirectly** 76:22
95:11
**individual** 70:4
**individuals**
71:14 78:23
79:1 86:3
**industry** 18:6
**initialed** 82:24
**Initially** 37:1
**inquiry** 66:7
**insert** 91:24
**inserted** 92:4
**instances** 45:22
56:10,12,21
77:1
**instant** 54:13
**instructing** 16:5
16:6
**intended** 84:7
**interested** 42:19
42:21 47:12,14
58:18
**interesting**
77:24
**Internal** 51:15
**internally** 66:24
84:21
**interns** 78:4
**interpose** 95:23
**interrogatories**
93:4

**interrogatory**
64:10
**interview** 18:16
18:24 69:9
73:13,16,21,22
**interviewed**
22:11 73:25
**interviewing**
19:4
**interviews** 18:24
20:17
**introduce** 4:20
5:15 80:9
**introduced**
88:13
**invitation** 41:22
**invoice** 35:3
67:13
**invoiced** 46:2
**invoices** 86:12
86:25
**invoicing** 60:6
78:7,8,14
**involve** 10:3
**involved** 30:6,8
57:10 91:3
**involvement**
54:15,24 55:1
57:4 90:6
**involving** 90:11
**issue** 34:9 75:15
75:18 76:1
77:6,11,12
100:18
**issues** 19:21
**itemizing** 54:5

**J**
**January** 72:24
85:8
**Jersey** 2:7
**job** 10:9
**Joe's** 40:11,12
**join** 93:9 94:12
**joined** 8:15
**Jr** 1:7 2:11
**Judge** 27:19

28:25
**judgment** 96:9
**jump** 88:3
**juncture** 60:21
**JURY** 1:7

**K**

**Kane** 1:5
**Karen** 32:6
**Karin** 32:6
**keep** 16:2 20:10
  61:22 62:2,3
  81:6 94:9
**keeping** 9:18
**Ken** 8:14 55:3
  78:9
**Kevin** 8:14 55:3
  74:13 78:14
**keynote** 33:14
  33:17,20 69:7
**kind** 17:16 20:10
  43:24 45:3
**kindly** 96:13
**KLEINBARD**
  2:12
**knew** 18:14
  41:11 73:10,10
  75:19,19 79:3
**know** 8:9 10:1,3
  11:20,21,21
  13:22 14:2
  22:7 24:16
  30:15,17 34:6
  35:10,15,17
  36:6 37:3,8,10
  38:12 42:20
  43:23 44:11,12
  44:12,12 48:8
  48:10 49:6,19
  51:4 52:5,13
  52:16,17,23
  53:15 55:25
  56:17,17,20
  58:3 60:10
  61:8,10 62:9
  62:10,21,21,23
  63:1,10,12

66:13,14,17
67:5,17 70:3
71:12 72:8,9,9
73:9,13 74:5
75:6,12,13,17
75:24 76:15
77:13 78:12,23
79:6,7,9 82:4
86:1,23 88:5
89:6 92:5
93:25 95:1
98:8,11,13
100:12,13
**known** 73:12
  78:24 79:2
  98:9

**L**

**L** 2:6
**labeled** 87:7
**lack** 92:11
**language** 26:8
**large** 15:7 60:14
**largest** 67:20
**last-minute** 47:8
**laugh** 61:4
**law** 2:2,6 10:16
  13:12 27:7,8
  76:19
**lawsuit** 5:13
  43:7
**lawyer** 11:20,21
**Lay** 5:12
**laying** 97:11
**leader** 75:9 85:2
  85:4
**leaders** 75:11
**leave** 7:3 39:8
  95:24
**leaving** 49:17
**left** 39:7
**legacy** 53:8 94:5
  94:6 95:5 96:8
  96:10
**legal** 1:5 2:10
  11:17 13:10,23
  13:24 14:21

15:1 16:3
20:25 24:14
27:3 30:6 50:2
50:14 51:22
52:2 58:19
60:11 65:6,17
65:19 68:6
70:11 80:17,18
80:24 81:15,17
82:10,15 84:8
85:14,24 90:7
90:11,18 91:18
91:25 92:9
95:4 96:11,18
98:24 99:18
**legislation** 76:25
**let's** 42:11 69:4
  80:12 87:4
  96:7
**letter** 7:10 81:2
  81:13
**license** 13:12
**licensing** 19:20
**Life** 79:15
**limited** 76:16
**linda@premie...**
  1:22
**lines** 92:22 93:2
**linked** 98:23
**list** 40:24 42:10
  42:17,18 43:2
  66:23,25,25
  67:2,5
**listing** 35:3
**lists** 40:25 41:6
  42:8,9,13
  44:12
**litigation** 84:12
  84:17 87:21
  88:22,24 89:18
**little** 71:13 77:25
**LLC** 1:15,21
**loading** 34:11
  36:9
**lobbying** 62:4
  76:15,16,19,22
  77:2,4,4

**location** 40:12
  41:9,13,15,17
  46:21
**locations** 40:7
**lodging** 46:10
**Logan** 2:13
**logically** 96:16
**long** 10:9 11:13
  14:13 15:9
  31:15 39:7
  53:15 72:10
  78:25
**long-term** 75:9
**look** 5:23 19:14
  58:13 64:2
  77:23 81:9
  87:4
**looking** 40:21
  49:14 74:15
**loose** 72:11,14
**lot** 19:21 20:7
  21:9,9 40:1
  43:24 48:5
  54:14 60:24
  70:24 78:12,21
  80:15
**Louis** 20:16 46:9
  47:5,6 49:17
  72:24
**LPA** 1:6
**lunch** 74:6 75:7
  75:11
**luncheon** 75:16
  75:16,20

**M**

**Ma'am** 25:2,10
**Madison** 88:24
**magnitude** 10:2
**main** 30:4,12
  68:3,7 70:7
  71:15
**maintain** 66:23
**maintained**
  67:11
**major** 68:17
**majority** 57:5,7

**making** 41:7
  47:8
**manage** 62:8
  67:6 78:7
**management**
  78:18
**manager's** 36:22
**March** 17:24
  59:9 60:23
**mark** 4:22
**marked** 4:23
**Market** 1:15,23
**Martin** 1:7 2:11
  7:2,5,24 9:12
  10:19 13:2
  18:14 19:10,25
  21:18,21 24:6
  24:23 25:16,24
  26:10,24 27:1
  27:14,23 28:1
  29:5 30:24
  34:2,18 37:7
  37:13 39:5,6
  42:8,9 45:18
  46:3,10,22
  48:17,22 56:1
  59:9,13 60:11
  65:4,12,13,15
  65:19 66:3,7,8
  66:15,17,20
  67:8,10,13,15
  68:1 69:22
  73:18 78:25
  83:22 84:19,22
  85:1,21 86:4
  86:23 87:17,19
  89:3 90:6,11
  90:18,20 91:8
  91:19,25 92:9
  92:23 93:12
  95:6 99:4,9,15
**Martin's** 75:15
  89:20
**master** 46:11,15
**material** 96:22
**materials** 20:23
**Matt** 32:6,7,8

33:4,10 68:21
68:22,23 69:2
69:15
**matter** 14:25
35:15,17 89:2
**mean** 10:11,14
25:18 29:25
31:9 41:13
42:17 45:7,22
48:4 52:9,23
55:16 67:1
70:1 71:15
73:6 91:20
94:3 96:4,25
**means** 102:20
**meant** 17:9 93:6
**media** 55:10,13
55:14 56:21
70:25 71:3
77:18 78:16
**meet** 37:12
**Meeting** 2:3
**member** 29:19
**members** 55:9
85:20,21,23,24
86:9
**memorial** 18:10
**memorializing**
12:16
**mention** 33:4,7
68:21 69:12
**mentioned** 38:5
38:25 70:10
**mentioning**
21:14 69:16
**mentions** 48:7
**met** 79:7 100:15
**metaphysical**
86:15
**Michael** 33:23
69:6,17
**mid** 60:23
**middle** 1:1 17:24
**mind** 9:18 25:11
**mine** 35:14
73:15 92:5
**Minnesota** 79:13

**minute** 47:7
**mischaracteri...**
93:8
**misconstruction**
66:9
**misconstrues**
27:7,8,8,9
**misgivings** 73:17
**misunderstan...**
12:24
**mitigate** 14:3,14
14:19 15:4,21
16:15,25
**mitigated** 15:6
**mitigating** 13:17
15:10,14 16:9
16:20
**modifications**
6:24
**modified** 59:9
59:16
**Monday** 88:17
**money** 40:16
94:15 95:7
96:10 97:19
**money's** 94:23
**month** 7:19
10:21,21 13:3
13:6 51:1,3,7
51:18 53:3
54:7 57:25
63:12
**monthly** 11:8
21:8 53:2
57:21 58:8,9
58:12 59:2,10
59:20 87:1
**months** 59:11
**motion** 29:1
89:13
**move** 25:23 26:1
**multiple** 28:24
48:2,2 62:23
97:15

—————
**N**
**N** 4:1 102:1

**name** 40:6 42:3
42:4 76:10
98:2
**named** 65:14
**National** 79:12
**nature** 10:2
53:24
**nearing** 59:18
**necessarily** 12:4
44:21 75:13
84:22 88:6
**necessary** 39:7
**need** 36:11
**negotiate** 36:23
**negotiated** 34:13
**never** 19:25
48:17,20 58:25
60:7 77:1 87:3
91:21 96:9
99:9
**new** 2:7 54:23
56:8
**news** 56:12
**nexus** 96:9
**Nodded** 37:23
**nominal** 45:5
**nonstarter** 69:25
**Northon** 1:6
7:11 83:24
89:24 90:20
99:10
**Northon's** 99:13
**Notary** 1:18
102:14
**noted** 102:4
**notes** 48:8 102:5
**notice** 3:10 4:21
5:5 45:18,18
46:5 47:4,11
47:21 49:6,12
**number** 10:4,13
24:17 58:3,4
58:10 64:15
94:14
**numerous** 14:9
20:17 27:17
29:25 46:19

58:1,4 70:19
—————
**O**
**O** 4:1 102:1
**object** 14:20
15:15 16:4
20:3 21:5
24:13 50:1
62:15 65:16
100:11
**objection** 9:10
13:21 14:15,16
14:22 15:11,12
15:16,22,23
16:10,11,17,18
17:1,2 21:6,23
22:1,19,20
23:7,8 24:14
25:18 26:12,13
26:17,18 27:2
27:4,15 28:3
28:22 43:8
44:20 48:17
49:1 52:22
58:21 61:17
62:17 66:5
92:10 93:7
94:11 95:13,25
96:25 98:5,6
99:18 100:3,5
100:21
**obligated** 43:10
90:17
**obligation** 43:3
91:3,9 98:22
**obtained** 87:16
**obviously** 78:13
78:25 96:4
**occasions** 97:15
**occur** 12:23 68:4
**October** 7:23
17:8,23 38:17
65:4 66:17
83:22 84:11
88:2,3 89:7,9
**offered** 48:20
59:1

**offering** 48:22
**office** 2:2 8:17
31:6 36:22,22
**offices** 1:15
**official** 29:11
**Oh** 45:13 55:16
77:24 79:24
**okay** 5:4,13 6:20
14:1 15:25
18:8,11 21:16
22:18 23:12
24:6 25:2,10
26:7 28:6 38:5
41:23 42:23,25
45:6 47:11
52:11 57:10
59:7 62:13
63:1,7 64:9,13
67:8 72:19
75:4 81:4,9,12
82:2,22 83:11
83:20 87:6,9,9
87:25 88:11
92:21 94:20
97:22 99:22
**Old** 2:7
**once** 4:13 36:24
53:22 75:11
**one-to-one** 96:9
96:21
**ones** 51:5 58:7,7
75:24
**ongoing** 9:14
**open** 31:3 40:8
40:10,22 74:7
92:19 97:18
**operate** 58:7,8,9
**operated** 17:5
**opinion** 70:6
**opportunity**
14:3
**oral** 1:14 12:8
64:17 65:3
66:14 91:2
**orally** 59:9 65:4
**order** 44:18 89:2
89:6,10,13,13

ordered 65:21
ordinarily 40:8
  54:8
ordinary 18:3
organization
  53:2 81:17
  82:11,16 83:6
  83:8 84:5,8,13
organizations
  30:9 72:4
organizing 85:7
original 29:21
  65:7 66:15
  83:24 89:23
  90:23 99:5
originally 75:8
  89:23
outset 12:19
overall 61:1,10
  78:18 95:3
owe 40:18
owed 7:17

**P**

P 4:1
p.m 1:17 4:2
  63:21,22 101:3
PA 1:24,24
PAC 57:8,17
packet 87:5
PACs 57:10,14
  57:15
page 3:2,9 5:25
  6:11,14,18,19
  23:17,19 64:14
  64:22 74:25
  75:1,2 83:17
  83:18 85:6,16
  87:7 92:20
pages 83:15
paid 6:3 12:19
  12:21 14:5,8,9
  14:10,11 17:5
  18:13 19:7
  22:5 23:2 31:1
  34:12,24 36:7
  36:23 39:19

40:17,25 41:11
  41:12 43:6,10
  43:11,14,16
  45:1 51:17
  72:10 100:2
paragraph 6:11
  6:12,13,14,18
  6:19 7:1,3,4,6
  7:16 12:12,16
  59:3 74:6,25
  83:19 85:6,16
paragraphs
  23:23
pardon 7:21
  8:10 19:16
  30:16 33:19
  36:15 51:18
  56:11
parentheses
  24:2 81:17
parenthesis
  81:18
parse 25:19
part 15:7 18:24
  19:3,15 23:24
  30:2 33:7
  35:11 46:16
  50:9 67:10
  68:5 94:5
  97:13 98:22
partial 18:23
participate 73:5
particular 5:8
  19:15
particularly
  9:15 32:1
parties 49:21,23
  80:13
partly 94:24
Partners 72:2
party 50:4 79:16
  79:25 80:2
passed 56:18
  71:24 75:9
  76:19
passing 42:1
Paul 75:8

pay 10:20 13:3
  21:19 23:4
  34:10 36:14,16
  36:18,19 40:16
  41:17 46:13,16
  48:20,22 49:9
  50:9 98:22
paying 41:10
  86:20
payment 10:20
  12:25 13:5
  41:14 65:20
Pennsylvania
  1:1,16,19 2:3
  2:14 76:12,18
  76:25
penny 14:12
  46:22
people 37:17
  41:4 42:14,16
  42:19 47:6
  48:1,16 55:4
  60:13 70:7
  73:24 77:11,15
  78:5 96:23
  97:5,17,24
  98:11
per-project
  57:21 58:2,7
  58:16,20
percent 12:5
  33:12 58:12
  63:7,9,10 77:5
percentage
  62:13 63:3
  76:13
perform 91:3
performed 9:7
period 48:18,18
  56:2 76:10
periods 60:22
person 31:6
personal 31:2
  66:3
personally 28:4
  30:21,23 31:3
  34:12 60:14

65:13,14,15
  67:8,14 73:18
Philadelphia
  2:14
phone 8:10,24
  34:23
photographs
  31:19,20
photos 19:16
Phyllis 29:3,6
  38:5 55:10,14
  67:24 68:2,24
  69:5 70:10
  71:4,24 73:22
  94:6
physical 19:23
pick 96:15
pieces 19:15
  20:25
Pike 2:2
pile 74:10
pitch 55:18,19
pivot 69:9
place 5:9 13:5
  21:3,4,7 22:14
  30:22 40:2
  56:1,6 64:19
  77:13 84:15
placed 31:4 56:1
  56:13 77:18
Plaintiff 1:3 2:5
  2:10 65:8
plan 63:17
planning 77:15
platform 95:6
played 38:20
pleading 93:4
please 27:20,21
  59:5
pled 24:4 25:20
plenty 14:6
plug 69:17
plunked 46:12
Plymouth 2:3
podium 68:25
point 9:12 11:17
  15:5 18:14

22:2 28:23
  29:20 30:7
  48:19,22 59:18
  59:25 63:17
  64:21 68:7,17
  73:11,11 74:3
  78:5,9 87:19
policy 58:15
political 37:17
  57:14
portion 20:12
  25:5,13 60:16
  60:18 63:6
position 10:19
  29:11,14 43:5
  43:9,13 68:7
  83:5 93:13
positive 42:14
  97:25
Posner 31:6,22
  44:5
possibility 9:22
possible 40:7
  80:12
potential 37:6
  37:11,13 70:20
  70:22 96:6
practice 18:5,6
precedence
  60:23
precise 13:23
precision 8:3
preinterview
  73:19
PREMIER 1:15
  1:21
preparation
  18:25
presence 20:15
president 78:17
president's
  71:14
presidential
  85:8
pretty 8:23 15:8
  33:12 54:21
  68:23 70:13

72:13
**previously** 68:16
  74:19 76:20
  88:16,17 92:23
**primarily** 73:22
**principal** 53:19
  53:21 72:2
  78:11
**principally** 30:4
**prior** 33:14
  45:18 49:17
  66:16 67:19
  79:2 89:12
**probably** 24:17
  31:17 32:5
  44:13 58:12
  63:8 69:2 77:5
  78:3,4 82:3
**probe** 51:23
**problem** 26:8
**problems** 30:6
  53:19,21,23
  68:6 70:2
**proceedings** 4:2
  102:4
**process** 4:17
  20:24 89:17
  97:13
**proclivity** 47:8
**procure** 41:8
**procured** 40:14
  41:13 46:18
**produce** 77:13
**produced** 34:5
  77:18
**product** 9:3
  21:14,17 23:1
  23:3
**production**
  18:25 21:15
  35:5,6,6 77:9,9
**professional**
  1:18 54:9
**program** 30:2
  33:7
**project** 9:25
  10:2,17 11:20

11:25 18:9,23
19:1,2,3,6,10
19:11,25 20:6
20:20 21:22
22:12,14 24:8
24:11,18 26:15
26:25 28:2,10
28:19 43:19,22
44:6,8 57:23
59:19,21 60:15
62:14,14 63:4
63:24 72:13,24
85:18 95:2
**projects** 9:20
  21:10 54:2
  60:1,12 61:9
  62:5,7 63:13
  72:12
**prominent** 69:13
**promise** 29:3
  67:23
**promised** 14:9
**promote** 29:3,5
  29:24 55:19
  67:24 68:2,10
  68:11 69:5
  70:10 94:6
  95:12 96:10
**promoted** 96:4
  97:23
**promoting** 29:6
  68:24 79:18
  85:7 94:4,8,25
**promotion** 33:2
  33:6 94:16
  96:8,11 97:5
**promotional**
  54:1 96:22
  97:10
**proportion** 58:6
  58:6
**propriety** 42:10
**provide** 13:2
  34:2 42:10,13
  42:18 43:14,15
  43:17 44:10,18
  62:19 68:13

78:21 84:16
88:23
**provided** 19:16
  22:7 25:20
  43:1 52:7 65:8
  83:25 85:10,13
  86:21 91:6
  95:5
**providing** 41:6
  43:7 87:13
**provisions** 51:15
**proximity** 40:4
**public** 1:18
  52:15 54:2
  77:7,8 102:14
**publicity** 70:25
  71:2
**publicizing**
  79:21
**pull** 58:10
**purchase** 47:9
**purchased** 46:8
**purports** 28:7
**purpose** 52:8
  71:9 94:25
**pursuant** 5:4
**put** 5:8,10 6:9
  11:2 28:22
  30:11,19,21
  31:8,10,11,12
  31:15 32:23
  41:14 44:4
  91:12 96:13
  97:22

---
**Q**
**QC** 35:1,9,20
  40:21,23 45:13
  59:9 83:12,25
  85:6
**QC-6** 92:19
**QC-63** 87:7
**Quantum** 1:2
  4:14 6:3 9:24
  37:15 39:17,20
  41:23 43:1,5,9
  44:19 49:24

54:16,22 58:1
58:15 66:16,21
66:23 67:9,23
67:24 76:7
77:12 83:9,11
90:16,22 92:24
98:23
**Quantum's**
  76:13
**question** 14:13
  16:1 17:14
  20:9 23:10
  24:25 25:3,7
  26:2 27:11,16
  27:23 28:1
  32:12 47:18
  57:2 66:10
  75:5 81:23,24
  92:22 99:6
**questions** 6:8
  69:10 80:4
  89:25 90:1,4,5
  90:8 92:13,14
  92:15 98:16
  99:21 100:24
**quick** 80:11 87:4
  89:8
**quite** 53:14,16
  79:9
**quote/unquote**
  16:20 37:11
  46:13 75:17
  76:21 77:2,4

---
**R**
**R** 2:11 4:1 102:1
**radio** 37:25 38:3
  98:3
**raise** 100:18
**raised** 48:17
  95:7
**ran** 31:5,14 40:3
  61:1 75:19
**rate** 46:18
**raw** 43:16
**read** 6:19 20:11
  23:19,20,20

25:2,4,11,11
25:12 64:25,25
92:5 93:16,23
93:25 96:16
**reads** 81:10,13
**Reagan** 30:11
  33:23 68:15
  69:6,17 79:8
**real** 87:4
**realize** 50:16
  94:15
**really** 42:20 69:8
  69:9 97:16
**reason** 40:22
  84:14
**reasonable** 95:9
  96:3,23 97:1,4
**reasons** 19:20
**Rebecca** 42:3,5
  42:8
**recall** 5:16 8:2,6
  12:13,17 31:17
  33:1,9 37:24
  38:9,14 44:1
  45:1,4 53:15
  56:5,25 57:15
  70:13,18 88:8
**receipt** 94:15
**receive** 20:5
  23:5 32:9
  41:24 83:9
**received** 19:25
  20:7,15,18,22
  28:8 85:19
**receiving** 21:8
**reception** 37:8
  85:7
**recess** 63:21
**recollect** 54:12
  90:7 99:5
**recollection** 8:6
  34:8 48:14
  56:23 58:11
  69:1 88:9
**record** 20:12
  25:5,13 28:22
  28:25 35:5

51:10 64:3,5
65:1 72:19,21
74:22 76:2,4
80:9 100:23
**recoup** 15:8
**reduce** 59:20
**reduction** 17:22
**reentered** 93:6
93:13
**refer** 35:1 81:21
83:11,13 84:3
84:7 87:23
88:2 92:18
**reference** 85:18
85:20 90:24
**referenced** 7:16
86:10
**references** 82:14
**referencing**
80:16
**referred** 7:23
37:6,19
**referred-to**
20:11 25:5,13
**referring** 23:24
36:1 51:10
82:14 84:4
85:21
**refers** 7:4 66:14
85:6
**refresh** 56:23
88:9
**refreshed** 8:6
**regard** 14:7
84:25
**regarding** 22:6
35:3 92:10
**regardless** 10:21
95:15
**register** 76:22
**registered** 76:25
**Registration**
76:11
**regular** 19:12,18
20:18 37:25
77:17
**regularly** 18:15

22:6 79:10,12
**rejected** 29:10
**relate** 80:13
**related** 84:17
87:10
**relating** 92:15
**relation** 90:6
**relations** 54:3
77:7,8 78:16
**relationship**
11:23 51:25
53:12 54:23
**relationships**
12:3 40:9 52:4
**relatively** 45:5
49:3 55:6
**relatively-spea...**
47:7
**remain** 72:10
**remark** 35:20
**remember** 33:17
33:20 38:18
55:24,25 63:25
68:25 79:11
80:1 93:17,17
**removal** 89:20
**removed** 50:4
**rendered** 54:9
**rent** 40:25
**rental** 40:24
**repeat** 67:19
**rephrase** 14:18
**report** 34:2
**reported** 18:15
**reporter** 1:18
5:10 20:11
25:4,12 74:11
102:14,21
**REPORTING**
1:15,21
**reports** 19:12
**represent** 28:8
57:15
**reproduction**
102:19
**Republican**
79:12

**request** 29:10
46:2 64:11,15
64:23 66:6
83:9 87:16
**requests** 35:7
**required** 43:15
62:5 90:17
91:10 94:21
**reservations**
45:3 74:4
**reserve** 39:20
**residence** 22:15
67:16
**resolve** 19:21
**respect** 19:24
20:20,23 29:23
46:10,20 51:8
60:18 67:11
71:3 74:6
**respond** 42:18
**responded** 42:14
42:17
**response** 35:6
56:11 66:8
**responses** 64:10
**responsibility**
78:12
**responsible**
65:20 70:7
78:18,19,20
**rest** 77:7
**restaurant** 39:9
39:13,16
**result** 91:15
96:11 97:6
**resulted** 56:22
89:13
**resulting** 92:11
**retain** 77:11
**retained** 39:25
57:17
**retainer** 7:19
11:8 21:8
50:25 51:2
52:19 53:2
57:21 58:8,9
59:2,10,20

**retainers** 51:6
51:19 54:8
58:12
**revenue** 51:15
100:1
**review** 6:12
**reviewed** 19:17
**reviewing** 5:17
**richer** 26:10,24
27:14,24 28:2
28:16
**ridiculous** 23:13
**right** 5:12,22
8:21 9:1 14:18
17:19 20:1,25
24:2 31:14
35:9 36:1,22
38:14 39:10,13
42:7 45:12
54:12,24 56:16
57:1,19 63:2
64:15,24 69:18
69:24,24 72:11
76:6 77:20
79:4,13 82:4
87:14 93:11
94:24 95:18,19
96:2 97:22
**ring** 93:22
**RMR** 1:17 102:3
102:13
**Road** 2:7
**Robert** 40:6
72:1
**Robinson** 8:14
55:4 78:9
**ROETZEL** 1:6
**role** 38:19 81:1
**Rollins** 8:15,17
8:20
**room** 8:11,21
46:18 98:9,10
**rooms** 46:19
**rough** 10:8
**roughly** 17:22
37:4 51:13
53:10 62:13

**RSVP** 41:22
42:22
**RSVP's** 41:20
41:21,24
**Rule** 35:5
**run** 17:16 47:23
47:24 68:14
**running** 48:1
98:11

**S**

**S** 4:1
**safe** 12:2 19:24
**Saint** 20:16 46:9
47:5,6 72:24
**satisfied** 100:13
**Saturday** 40:9
40:10
**saw** 79:10
**saying** 13:7
26:24 28:14,15
33:10 92:6
94:21 96:20
98:12 100:17
**says** 8:4 23:19
23:20 40:24
45:8,10 64:17
72:23 81:15
**scale** 59:22
**Schlafly** 2:6,8
3:3,6 4:8,20
5:1 6:14,15
9:17,19 13:25
14:17,23 15:2
15:13,19,24
16:4,8,14,22
17:6,20 20:4
21:1,12,24
22:17,24 23:11
23:14,18 24:20
25:8,10,14,22
26:5,14,23
27:10,18,22
28:5 29:2,3,6
29:24 30:14
33:5 35:8,16
35:21,25 36:13

38:6 43:12
44:22 45:16
47:19 49:5
50:6 51:12
52:24 55:10,14
58:23 61:4,20
62:1,4,20,25
63:19,23 64:3
64:6 65:23
66:11 67:24
68:2,24 69:5
70:10 71:4,24
72:22 73:23
74:23 76:2,5
77:10 79:3
80:4 88:17
92:14,17 93:10
93:20 94:6,19
96:1,16 97:2
98:16 99:18,22
99:23 100:8,16
100:24
**Schlafly's** 18:9
20:18 74:1
95:4 96:8
**Schlapp** 32:7,8
33:10 68:21,22
69:2,16
**Schneider** 32:5
**scope** 9:6,13
59:22
**Scott** 55:3
**se** 10:15 57:15
77:2
**second** 59:5
81:11 83:18
87:9,24
**see** 5:22 30:10
34:17 48:21
51:24 74:7
75:14 79:9
81:6 82:6 84:1
87:15 88:20
89:8
**seen** 4:22 5:2
98:13
**select** 88:7

**sell** 22:25 23:6
**send** 54:4 67:13
67:15 86:12
96:18 97:8
98:14
**sending** 86:25
**sent** 31:17 34:8
34:22 91:24
**sentence** 64:7,15
64:22 81:9
83:21
**separate** 80:18
90:10,15
**separately** 80:16
**September**
84:11 90:24
**series** 18:24 90:4
**serious** 41:2
53:19,23 74:3
**service** 45:8
**services** 15:7
25:20 39:25
54:9 65:8,20
83:9,25 84:16
84:18 86:21
98:23
**set** 7:13 10:4
90:19
**sets** 81:13
**setting** 30:22
**settle** 49:21,23
**settled** 49:24
**seven** 26:21
**shape** 90:25
95:15 99:2
**share** 77:6
**sheets** 61:23
62:2,3
**shoots** 46:20
48:2,15
**short** 57:24
60:22
**Shortly** 89:11
**shot** 70:1,4
**show** 38:1,7
55:12 56:9,22
88:20 100:1

**showed** 41:3,4
**showing** 45:7
**shows** 38:22
**shut** 20:10
**side** 77:14
**sign** 55:8 66:20
**signed** 81:7
**significant** 44:24
63:6 68:5 95:3
**significantly**
77:22
**silence** 98:3
**similar** 52:1,19
52:23
**similarities**
51:22
**simple** 27:23
**simply** 18:5
24:17 29:18
30:24 54:8
57:23 68:4
83:2 90:21
96:14 97:19
**single** 45:25 46:1
48:6
**sir** 36:1 72:11
74:24
**sit** 6:25 26:11
32:15,18 52:18
52:21 65:9
**sitting** 56:7,25
61:12 63:2
98:9
**situation** 69:7
**six** 86:1,9
**slash** 60:11
**slow** 95:19
**snafu** 34:24
**so-called** 43:18
**sold** 23:1
**sole** 91:8
**solicited** 97:6
**somebody** 22:8
22:10,12,25
23:6 75:25
96:15 97:7,23
98:1

**something's**
10:15
**sorry** 72:18
81:16 82:25
95:16,20 98:18
**sort** 10:12 11:14
12:7 44:23
67:1 73:25
77:14 79:18
97:10,11
**sorted** 73:20
**sought** 69:3
**South** 1:23
**space** 39:21 40:5
**speak** 29:9
**speaker** 8:10
29:6 30:4 68:3
69:23 70:8
**speaking** 10:11
**speaks** 27:5
**specific** 5:22 7:9
7:15,25 8:6 9:6
9:8 10:3 20:21
**specifically** 7:18
10:9 13:4 24:8
24:11 37:12,21
38:12,18 40:1
40:14 46:3
48:14 51:4,14
53:15 55:24
58:13 63:3
88:8 90:14,19
95:9
**specifics** 9:11
**speculation**
58:22 98:5
100:4
**speech** 71:14
**speeches** 93:19
**spend** 9:25 47:4
62:9 94:22,23
94:23
**spending** 59:25
60:24
**spent** 10:22
60:14 62:14
63:3,13

**spoke** 7:1,2 8:11
32:5 97:14
**spoken** 86:22
**sponsoring**
38:25
**sponsors** 29:16
**St** 49:17
**stack** 49:2
**staff** 30:24 41:1
41:5 94:17
95:6
**stage** 30:4 33:5
68:3,7 70:8
71:15
**stamp** 45:9,12
**stand** 17:10,12
**standpoint** 97:1
**stands** 7:3
**Stark** 55:3
**start** 15:14 16:9
42:11 69:4
80:12 94:23
96:7
**started** 15:10
63:25 76:7
**starts** 74:25
**state** 100:23
**stated** 85:5
99:12
**statement** 65:10
65:24 66:2,6,8
66:9 93:5
**statements**
55:12,13
**STATES** 1:1
**Station** 2:13
**status** 18:14
19:13
**stead** 68:9
**steps** 94:14
**Stone** 40:11,12
**stop** 19:6
**stopped** 17:3
**stopping** 16:25
**stories** 55:14,16
55:18,19 77:15
**story** 19:14 56:8

56:22
**strategic** 78:21
**strategy** 97:15
**Street** 1:15,23
  1:23 2:13
**stretch** 96:13
**strike** 25:24 26:1
  81:2 82:19
  84:4,10
**stripped** 89:3
**stuff** 70:14
**subject** 25:21
  87:21
**subsequent**
  59:11 64:17
  65:3 69:11
  82:13 83:21
  91:2
**subsequently**
  99:15
**substantial**
  70:14
**substantive**
  75:10
**substitute** 35:20
**successful** 56:14
  56:16
**successor** 9:16
  74:1
**sued** 65:14
**suggested** 68:8
**suing** 5:21 65:12
**Suite** 1:24,24 2:2
**supervise** 73:6
**supervised** 73:8
**supervision**
  102:21
**support** 20:22
  88:23
**supporters** 86:4
**suppose** 50:18
**sure** 5:20 8:5
  9:17 11:1 15:6
  16:19 33:12
  34:4,7 37:16
  38:8,24 46:7
  47:12,21 48:13

49:3 51:5 53:1
  55:6 59:6
  62:19 68:23
  70:22 75:25
  81:22
**surprise** 98:15
**switch** 87:25
**sworn** 4:5 64:10
**synonymous**
  51:13
___
**T**
**T** 55:16 102:1,1
**table** 31:8 32:19
  32:21,22,25
**tables** 30:11
  31:4 36:25
  91:13
**tail** 20:9
**take** 10:7,10,13
  10:16 15:9
  27:19 31:20
  36:8,24 44:3
  63:20 64:20
  68:7 98:3
**taken** 94:15
  102:5
**talent** 22:5
**talk** 80:15
**talked** 19:17
  69:6,11
**talking** 38:15,18
  70:15 78:1
  81:6
**tax** 51:11 52:14
**telephone** 34:21
  47:1 48:9
**television** 37:25
  38:3 77:15
**tell** 27:13 46:17
  60:4,13 63:3
**term** 14:24
  81:20 82:4,7,9
  98:3
**termed** 69:8
**terminate** 9:1
**terminated**

17:17
**termination**
  53:20
**terminology**
  61:8
**terms** 7:4,9,12
  7:15 8:25 9:3,6
  9:7 10:12,12
  12:8 19:23
  43:11 45:17
  46:3 58:6 65:7
  66:15 81:14
  83:23 94:2
  99:9
**testified** 4:5 68:2
**testimonial**
  18:10
**testimony** 7:22
  26:16 67:20
  80:16 85:19
**Thank** 4:25
  63:20 75:12
**theory** 13:24
**thereabouts**
  17:8,23
**thin** 74:13
**thing** 30:5 45:3
  97:17 98:12
**things** 7:13 9:18
  10:7 19:18
  56:11,18 60:22
  77:7,8 78:13
  78:15 97:16
**think** 4:13 21:20
  24:6,12,23
  25:6,24 29:18
  29:18 34:18
  35:2 40:11,21
  41:18 42:3
  52:6 53:1,7,16
  56:10,15 67:22
  68:17 72:15
  74:9,12 75:25
  79:8 82:24
  86:16 95:2,5
  96:3 97:4,8,16
  97:20

**thought** 20:13
  30:3 68:22
  69:2 73:21
**thousand** 34:16
**three** 2:13 8:7
  77:7
**thrive** 53:22
**throw** 24:17
**time** 4:23 8:18
  15:7,8 16:16
  22:4 25:4,12
  37:3 38:12,14
  38:19 43:25,25
  44:14 48:18,18
  53:18 54:20
  56:2 59:24
  60:5,12,14,16
  60:18,22,23,24
  61:23 62:2,3,3
  62:9,13 63:19
  64:4,20 72:20
  74:21 76:3,10
  77:21 78:1,25
  85:24 87:19
  92:23
**times** 4:12 14:9
  26:22 27:17
  28:24 38:13
  55:25 60:22
  62:23
**today** 6:25 26:11
  26:11 27:14
  28:18 34:7
  50:22 52:18,21
  56:7 61:12
  65:9 72:1,7
  80:16 89:1
**told** 10:1 14:5,6
  14:7 24:22,25
  46:7,10 71:11
  75:20,23
**ton** 60:4
**topic** 93:21
**tops** 77:17
**totally** 60:2 66:5
**touch** 37:14
**tough** 15:8 40:5

**track** 97:16
**transcribe** 38:24
**transcript** 102:7
  102:18
**transcripts**
  38:21
**transmit** 9:14
**transport** 48:16
**tremendous**
  22:16 98:13
**TRIAL** 1:7
**trick** 57:2 75:5
**tried** 56:5
**TRO** 89:2
**true** 6:16,22
**Trump** 93:21
**try** 20:9 52:25
  80:11 88:10
  95:19 96:13
**trying** 21:20
  25:19 51:21,23
  51:24 53:5
  55:25 60:25
  69:14
**turn** 6:11 23:15
  35:9 64:14
  74:24 87:4,7
**turned** 37:10
**Turning** 6:18
**two** 23:21 35:23
  53:12 64:16,23
  77:7 80:18
**type** 10:24 50:13
  50:15
**types** 21:10
**typically** 11:2
  12:7 34:19,21
  48:10
___
**U**
**ultimately** 30:13
**Um-hum** 36:3,5
  44:16 79:15
**unable** 14:7
**unanimous** 70:6
**understand** 4:17
  5:4 21:20

65:13 80:18
81:20,23 94:20
**understanding**
12:18 13:19
59:15 80:20,22
80:23,25 82:18
82:22 83:1,4
84:20 85:1
**understands**
14:23 15:1
97:3
**undertake** 97:14
**unfortunate**
69:7
**unfortunately**
75:9
**Union** 29:16
**UNITED** 1:1
**units** 10:17
**Unjust** 24:2,4
**unjustly** 24:7,12
25:16
**unrealistic** 91:23
97:20
**unreasonable**
71:11 97:9
**upper** 39:12
**upstairs** 31:1
34:10,25 36:24
**use** 19:14,19
20:25 35:19,24
82:6

_____

**V**

**V** 1:17 102:3,13
**Vague** 52:22
**value** 19:9 20:1
20:5 21:2,2,21
22:4,7,15,16
22:18,22 28:8
**variety** 54:2
**various** 30:11
36:25 51:15,16
**Veteran's** 53:8
**vice** 29:15,17,20
**video** 17:25 18:6
18:8,16,23

19:17 20:21
24:8,11 43:7
43:14,15 46:20
54:2 59:18,21
60:15,17 63:4
77:9 95:2
**Vietnam** 53:8
**view** 97:10
**VIP** 32:21
**virtually** 78:22
**vis-a-vis** 91:10
**voice** 78:21
**volume** 60:14
93:25
**volunteers** 79:23
**VS** 1:4

_____

**W**

**wait** 14:14
**walk** 96:15
**Walters** 32:6,6
**want** 5:8 11:22
26:2,19 28:24
35:19 64:21
68:20 70:3,3
75:14 80:12
83:14 86:15
93:3
**wanted** 7:13
9:17 20:23
22:11 30:3,5
34:12 43:16
44:3 68:3,10
77:3 95:22
97:14
**warning** 14:6
**warring** 84:12
88:22
**Washington**
37:9 40:1 42:1
73:19
**wasn't** 31:13
37:12 47:14
48:9 68:4 69:8
69:9 71:9
73:23 92:5,6
**way** 30:1,5

42:14 48:10
63:15 68:5
71:15 83:14
90:16,25 95:15
96:14 99:2
**we'll** 42:22
95:24
**we're** 10:16,17
38:15 47:4,12
47:22 61:3
62:5 67:4,4
70:15,17 76:17
78:1
**we've** 35:21
58:14 68:19
72:12 77:1
**website** 44:4
45:10
**week** 10:13
38:13 60:8
75:11
**weekend** 101:2
**went** 30:9 36:22
48:12 53:14,16
72:23 73:17,21
74:9
**Wentz** 1:17
102:3,13
**weren't** 14:8
19:7 31:1 43:3
46:15 84:24
91:10 98:10
**Weyrich** 74:6
75:7,8,19
**whip** 96:17
**Whittlesey**
18:17 19:3
73:3,9,14
78:24
**Whittlesey's**
22:14
**widest** 68:12
**willing** 13:6
40:10 68:13
**WITNESS** 3:2
4:25 9:11
13:22 15:17

16:12,19 17:3
17:19 20:15
21:7 22:3,21
24:16 25:6,9
26:3,19,21
27:16 28:4
29:23 43:9
44:21 49:2
50:3 61:19,25
62:18,24 65:18
74:10,12,16,18
94:13 95:14,22
98:7 99:20
100:6,12,22
101:2
**woman** 40:13
42:3,5
**wondering** 49:7
**word** 68:11
92:12
**words** 23:21
89:16
**work** 7:12 9:3,7
9:8,13 11:25
14:4,8 15:5
16:12,25 17:4
17:8,17,22,22
19:6 24:7,18
25:15 26:25
28:2,18 37:15
40:1 41:5,6
44:15 53:24
54:1,5 58:18
59:21,22 61:2
61:3,4,9 62:4
62:10,11 76:13
87:13 90:12
94:3,6,10,24
95:11,11 96:14
97:10 99:24
100:13
**worked** 11:6
40:13
**working** 19:20
40:15 60:11,13
60:14 64:1
**works** 42:5

71:15
**worry** 46:12
**worse** 82:3
**worth** 24:18
**wouldn't** 18:7
44:17 46:11
47:2 57:24
92:4 94:8,24
95:14,14 96:21
97:23
**wow** 79:24
**wrapping** 60:24
**write** 87:1
**writing** 11:3
13:8 49:4
**writings** 93:19
**written** 11:6,11
11:14,19,24
12:1,3,6,12,14
13:2 81:5
87:20
**wrong** 42:4
**wrote** 13:9 96:16

_____

**X**

_____

**Y**

**yeah** 7:18 8:22
10:14,23 17:14
19:21 24:16
29:24 33:4
35:21 36:7
39:20 42:5,6
45:7 47:21,21
51:14,16 53:7
53:22 55:20
57:2,12 59:6
60:3,20,20
61:11 62:24
63:19 64:20,25
65:2 66:13
74:12 78:3
79:20 81:13,24
83:13,18 84:14
89:17 98:7
**year** 79:14
**years** 8:7 11:16

11:23 17:15
53:13,18 54:14
73:11,12 75:8
76:18
**yeomen** 41:5
**Yvette** 1:5

_____
**Z**
_____

**0**
**00089** 45:13
**07931** 2:7

_____
**1**
**1** 3:10 4:21,23
**1,000** 33:12
**1,778** 45:8
**1:17cv1640** 1:4
**1:42** 1:16 4:2
**10** 11:16 59:9
75:1,3 77:5,25
78:4
**10,000** 53:3,4,5
59:11,20
**1000** 2:2
**112** 1:15,23
**12** 23:19
**121** 40:25
**16** 6:11,14 7:1
**17** 6:18 7:3,4,6
7:16 12:12,16
17:10 83:19
**17013** 1:24
**17101** 1:16,24
**1717** 2:13
**19103** 2:14
**19462** 2:3

_____
**2**
**2** 5:15 23:15,20
24:1 75:1 81:3
**2,000** 40:18
**2:52** 63:21
**20** 51:1
**20,000** 7:18,25
10:20 12:18
13:3,6 51:7,18
51:18 52:4

54:7
**2001** 76:9
**2005** 53:11,17
**2006** 53:11,17
**2008** 79:14
**201** 1:24
**2016** 7:24 17:8
17:23 64:1
65:4 66:17
83:22 84:11
88:3 89:9
90:24
**2017** 17:15,23
29:4 38:19
45:15 59:9
67:25 72:24
73:3 85:8
**2018** 16:13 17:9
17:15
**2019** 1:11
**20th** 89:9
**21** 65:4
**215** 2:15
**21st** 7:24 17:8,23
66:17 83:22
85:8 88:3 89:8
**22** 85:6
**23** 1:11 85:16
**243-9770** 1:22
**26** 35:5
**29** 59:3
**2nd** 73:2

_____
**3**
**3** 47:13,23 92:19
**3,000** 47:5 48:23
**3,000.00** 47:3
**3:00** 63:22
**3:50** 101:3
**30** 47:9 63:7,8
**33** 74:6,16,25
**34** 35:16,21
74:20 87:5
92:19
**35** 64:2

_____
**4**

**4** 3:3,10
**406** 1:24
**45** 73:11,12
**484** 2:4
**4th** 45:15

_____
**5**
**5** 6:11,14
**50** 12:5 63:10
**500** 11:16
**501c3** 51:11,13
52:18 53:1
54:11 80:24
81:17 82:10,15
84:8,19 85:14
85:25
**501c3s** 52:6,12
52:12
**501c4** 80:21 83:6
83:8 84:4,13
86:7,13
**501C4s** 52:6
**50c4** 85:11
**568-2000** 2:15
**5th** 2:13

_____
**6**
**6** 6:19 83:18
**6-** 31:17
**681-9387** 2:4

_____
**7**
**7** 85:6
**70** 40:21,23
**700** 31:17
**717** 1:22
**719-8608** 2:8
**75,000** 24:18
26:9,10,24
27:14,24 28:2
28:16

_____
**8**
**8** 1:23 85:16
**80** 3:4 58:12
80:1
**800** 96:22 97:23
**84** 80:1

**89** 45:14

_____
**9**
**9** 74:25 75:3
**90** 3:5
**908** 2:8
**92** 3:6
**939** 2:7
**96** 35:1,9
**98** 3:7