UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

QUANTUM COMMUNICATIONS, LTD,      :
                    Plaintiff    :
                                 :  AMENDED COMPLAINT
            VS                   :  CASE NO. 1:17cv1640
                                 :
EAGLE FORUM, EAGLE FORUM         :  (Honorable Yvette Kane)
EDUCATION AND LEGAL DEFENSE      :
FUND, IAN A. NORTHON, ROETZEL    :
AND ANDRESS, LPA, and EDWARD     :
MARTIN, JR.,                     :  JURY TRIAL DEMANDED
                    Defendants   :


                    * * * * *

                 August 23, 2019

                    * * * * *


        Oral Deposition of Kevin Harley, held in the
offices of PREMIER REPORTING, LLC, 112 Market Street,
Harrisburg, Pennsylvania, 17101, commencing at 10:02
a.m., on the above date, before Colleen V. Wentz, RMR,
CRR, a Professional Court Reporter and a Notary Public
of the Commonwealth of Pennsylvania.


                PREMIER REPORTING, LLC
                   (717) 243-9770
             linda@premierreportingllc.com

8 South Hanover Street          112 Market Street
Suite 201                       Suite 406
Carlisle, PA  17013             Harrisburg, PA  17101

```
 1    APPEARANCES:

 2         FRANK G. FINA LAW OFFICE
           1000 Germantown Pike, Suite D-3
 3         Plymouth Meeting, Pennsylvania 19462
           BY:  FRANK FINA, ESQUIRE
 4         (484) 681-9387
           fgflegal@outlook.com
 5
                    Counsel for the Plaintiff
 6
           ANDREW L. SCHLAFLY LAW
 7         939 Old Chester Road
           Far Hills, New Jersey 07931
 8         BY:  ANDREW SCHLAFLY, ESQUIRE
           (908) 719-8608
 9
                    Counsel for the Defendant
10                  And Counterclaim Plaintiff Eagle Forum
                    Education and Legal Defense Fund and
11                  Defendant Edward R. Martin, Jr.

12
           KLEINBARD
13         Three Logan Station
           1717 Arch Street, 5th Floor
14         Philadelphia, Pennsylvania  19103
           BY:  EDWARD BUTKOVITZ, ESQUIRE
15         (215) 568-2000
           ebutkovitz@kleinbard.com
16
                    Counsel For Eagle Forum
17

18

19

20

21

22

23

24

25
```

3

```
1                        INDEX
2    WITNESS              EXAMINATION           PAGE
3    Kevin Harley         By Mr. Schlafly          4
4    Kevin Harley         By Mr. Butkovitz        87
5    Kevin Harley         By Mr. Fina             95
6    Kevin Harley         By Mr. Butkovitz        98
7    Kevin Harley         By Mr. Schlafly        102
8    Kevin Harley         By Mr. Butkovitz       105
9    Kevin Harley         By Mr. Fina            108
10   Kevin Harley         By Mr. Butkovitz       110
11
12                      EXHIBITS
13   NO.        DESCRIPTION                      PAGE
14   Harley Exhibit 1   Notice of Deposition       4
15   Harley Exhibit 2   List of allegations in the 6
                        Complaint
16
17
18
19
20
21
22
23
24
25
```

```
 1                    P R O C E E D I N G S

 2            (Proceedings commenced at 10:02 a.m.)

 3                        *  *  *  *  *

 4               KEVIN HARLEY, after having been duly

 5         sworn, was examined and testified as follows:

 6                        *  *  *  *  *

 7                       EXAMINATION

 8    BY MR. SCHLAFLY:

 9         Q.   Mr. Harley, are you here pursuant to a Notice

10    of Deposition?  I'll show you.

11         A    I was asked to be here, so I'm here.

12            MR. SCHLAFLY:  Okay.  If you can mark this as

13    -- how should we do the numbering?  Off the record for a

14    second.

15               (At this time, a discussion was held off the

16                record and Harley Exhibit 1 was marked for

17                identification.)

18            MR. SCHLAFLY:  Usual stipulations.

19    BY MR. SCHLAFLY:

20         Q.    I've shown you, Mr. Harley, what's Exhibit

21    1, the Notice of Deposition.  And have you seen that

22    before?

23         A.    No.

24         Q.    Have you ever been deposed before?

25         A.    Yes.
```

```
 1        Q.      About how many times?

 2        A.      Two or three.

 3        Q.      And is that while working for Quantum -- do

 4   you work for Quantum Communications?

 5        A.      I do.

 6        Q.      And were the other depositions while working

 7   for Quantum Communications?

 8        A.      No.

 9        Q.      Do you understand the procedure, then, of a

10   deposition, and you're familiar with the process?

11        A.      Yes.

12        Q.      How long have you been working for Quantum

13   Communications?

14        A.      It will be six years this September.

15        Q.      And in general, what are your job duties at

16   Quantum Communications?

17        A.      We're a strategic communications firm.  We

18   do issue advocacy and media.  So I have a variety of

19   clients.  We do a lot of crisis communication.  We also

20   work on political campaigns, so we do all the media,

21   television commercials, radio commercials, and digital

22   direct mail for political campaigns.  Issue advocacy, we

23   do take -- take an issue or whatever it happens to be,

24   and we build grassroots, grasstop support and do the

25   media campaigns for those.  And we also provide media
```

1    training for certain clients.  We work for different

2    associations.  We have a variety of clients from Fortune

3    500 to smaller businesses, associations.

4          Q.    Do you describe -- does Quantum

5    Communications describe its services on its website?

6          A.    It does.

7          Q.    And have you had a chance to look at what is

8    on Quantum Communications' website?

9          A.    I have.

10         Q.    And is that information accurate?

11         A.    To the best of my knowledge, it is.

12         Q.    Have you had a chance to review the

13   pleadings in this case?

14         A.    Yes.

15               MR. SCHLAFLY:  I'll introduce Exhibit 2.

16               (At this time, Harley Exhibit 2 was marked

17               for identification.)

18   BY MR. SCHLAFLY:

19         Q.    And have you seen Harley Exhibit 2 before?

20         A.    Yes.

21         Q.    And have you had a chance to review it

22   before?

23         A.    Yes.

24         Q.    And is Harley Exhibit 2 the allegations by

25   Quantum Communications in this case?

1        A.      Yes.

2        Q.      And to the best of your knowledge, are the

3   allegations by Quantum Communications in Harley Exhibit

4   2 correct?

5        A.      Yes.

6        Q.      Please direct your attention to paragraph 16

7   on page 5 of Harley Exhibit 2.  Please review that.  Are

8   the allegations in paragraph 16 on page 5 of Harley

9   Exhibit 2 correct?

10       A.      Yes.  That's an accurate description.

11       Q.      Please turn your attention to paragraph 17

12  on page 6 on the same exhibit.

13       A.      Yes.

14       Q.      Are the allegations in paragraph 17 of this

15  exhibit correct?

16       A.      Yes.

17       Q.      I'm going to ask you a number of questions

18  now about this particular paragraph, and you've had a

19  chance to review that paragraph as we sit here?

20       A.      Yes.

21       Q.      Can you provide any greater detail as to the

22  date in which these allegations refer?  It says here on

23  or before October 21st, 2016.  And as you sit here

24  today, we're now several years after that.  Can you

25  provide any greater detail as to that date?

1    A.    Well, I think when I heard from Ed Martin

2    about that, that was, like, what we -- it was a little

3    bit of a shock, so we dealt with Ed and had a

4    conversation with him around that time.  And as

5    paragraph 17 states, he agreed to the terms of the

6    agreement.  It was certainly our understanding at all

7    times that Ian Northon had the authority, on behalf of

8    Ed Martin, to enter in to an agreement with Quantum

9    Communications.

10    Q.    I'd like to just focus for now on the date

11    which has particular significance.  And if you can't

12    recall at this time, then you can't recall.  But it says

13    in the allegation.  On or before October 21st, 2016.

14    And is there any way -- is there anything you might look

15    at to refresh your recollection as to what the

16    particular date was that paragraph 17 refers to?

17    A.    I don't -- I don't have anything in -- with

18    me today that I could -- I could narrow that down.

19    There may have been a record of a phone call with Ed

20    Martin or a set up of a phone call, but I don't have

21    that data in front of me today.

22    Q.    Do you generally keep records --

23    A.    Not for phone calls, I don't.  But we were

24    in regular communication with Ed Martin at that time,

25    so.

1      Q.      And who would we be?

2      A.      Charlie, myself, Ed Rollins, to a certain

3  degree.

4      Q.      And Charlie refers to Charlie Gerow?

5      A.      Charlie Gerow, correct.

6      Q.      Does paragraph 17, does it refer to one

7  conversation, or does it refer to multiple

8  conversations?

9      A.      It's my recollection that when we were

10 notified about paragraph 16, we dealt with that, and as

11 is stated in paragraph 17.  So I think it was one

12 conversation.

13     Q.      One telephone conversation?

14     A.      To the best of my recollection, that's when

15 it was -- the issue that Ed Martin raised was resolved.

16     Q.      It was not an in-person meeting, for

17 example?

18     A.      It was not.

19     Q.      I'll continue to have questions about this

20 paragraph 17.  Do you recall who was on that phone

21 conversation?

22     A.      I believe, to the best of my recollection,

23 it was Ed Martin, Charlie, and myself.  And I think we

24 were discussing other issues, and this was one of the

25 issues.  That's my recollection.

1      Q.      Anybody else on that phone call?

2      A.      Not that I -- not that I can remember.

3      Q.      And on your end of the phone call, would

4  Charlie Gerow have been in the same room as you and you

5  speaking on a speaker phone?

6      A.      Yes.

7      Q.      And would that have been here in these

8  offices in Harrisburg?

9      A.      Yes.

10     Q.      How long was the conversation, to the best

11 of your recollection?

12     A.      I don't -- I don't remember.  I think it was

13 -- we were talking about other issues and other work

14 that we were doing for them.  And this was part of that.

15 If it was in the beginning, middle, or the end, I can't

16 -- I can't remember when it was raised.

17     Q.      Do you recall whether you discussed specific

18 terms of any agreement during that phone call?

19     A.      It's my recollection that Ed agreed to

20 continue with the original agreement and the fee

21 structure.

22     Q.      Do you recall agreeing to any specific terms

23 about the scope of work?

24     A.      No.  That we were continuing to do work on

25 behalf of Eagle Forum Legal Defense Fund and continue to

1   actually expand our work from -- we had many, many

2   conversation about that over a period of time, including

3   weekly telephone calls.

4        Q.    Well, it says here that Martin agreed,

5   comma, on behalf of Eagle Forum, comma.  Is that

6   correct?

7        A.    Yes.  Eagle Forum Legal Defense Fund,

8   whatever -- whatever entity, you know -- internally, we

9   referred to it as Eagle Forum because it was -- there

10  was several different organizations.  But just

11  internally, that's how we would refer to it.

12       Q.    But I'm asking you do you recall which

13  entity?

14       A.    It would have been the original entity that

15  we had the agreement with, which, I believe, was Eagle

16  Forum Legal Defense Fund.

17       Q.    So are you saying that this statement here

18  in paragraph 17 is incorrect then because at 17 --

19  paragraph 17, it refers to on behalf of Eagle Forum.

20       A.    I'm saying it should be whomever we had our

21  original agreement with.  That was -- things continued

22  as they were.  That was what I got from that

23  conversation with Ed Martin.

24       Q.    So it's your testimony, then, that it's not

25  correct as stated here in your pleading, that Martin

1    agreed comma, on behalf of Eagle Forum.

2             MR. BUTKOVITZ:  Object to form.

3    BY MR. SCHLAFLY:

4        Q.    You can still answer the question.  You're

5    stating that's incorrect, as stated here, that Martin

6    agreed, comma --

7        A.    I'm not stating that it's incorrect.  What

8    I'm stating is that what Ed Martin agreed to is that we

9    would continue with our original agreement and the terms

10   of the original agreement that we had signed with Ian.

11       Q.    I'm asking you on behalf of whom?

12       A.    Well, it was -- we were representing

13   whomever we were representing, which I believe was Eagle

14   Forum Legal Defense Fund.

15       Q.    So you're saying that Martin -- this is not

16   quite correct, that Martin agreed on behalf of Eagle

17   Forum?

18             MR. BUTKOVITZ:  Objection.  Asked and

19   answered.

20   BY MR. SCHLAFLY:

21       Q.    You can answer.

22       A.    I'm not saying it's incorrect.

23       Q.    The allegation that he agreed to terms of

24   the original agreement, did those terms that Martin

25   allegedly agreed to, did they include a right to

1  terminate the agreement?

2       A.    I don't believe there was a conversation --

3  that conversation didn't include -- we didn't discuss

4  that.

5       Q.    Did the terms include who was going to

6  direct the work to be performed?

7       A.    Ed was going to be -- had been and was

8  continuing to be our point of contact.  We would

9  strategize, develop communication plans and -- with him,

10  in coordination with him.

11       Q.    Would he direct the work then?  Would you

12  work, pursuant to his instructions?

13       A.    We would -- well, the way this would work,

14  we would discuss things, strategize, and come up with

15  ideas and plans, kick those around, and then execute.

16  But he was -- he was the -- he was part of all of that,

17  yes.

18       Q.    What -- was the execution of these ideas

19  dependent on his authorization?

20       A.    Sure.  We weren't going to do something that

21  the client didn't want us to do.  Absolutely.

22       Q.    Were expenses to be preapproved?

23       A.    Expenses, I'd have to go back and look at

24  the original contract.  Whatever expenses we -- I don't

25  know that we would have a discussion about expenses.

 1    Any travel or anything was put in to the original

 2    agreement.

 3         Q.    Was preapproval required for expenses?

 4         A.    I'd have to go back and look at the original

 5    agreement.

 6         Q.    Do you recall, as you sit here today in your

 7    discussion with Ed Martin, whether there was any --

 8         A.    I don't know that -- I don't remember having

 9    any discussion with Ed Martin about expenses.  We did

10    incur expenses -- travel expenses numerous times.

11         Q.    And did you get preapproval for those travel

12    expenses?

13         A.    I -- I -- you can ask -- that's a question

14    for Charlie.  I don't know.

15         Q.    So you did not obtain preapproval for

16    expenses; is that right?

17         A.    That is correct.

18         Q.    Did you ever send any film or video to Ed

19    Martin?

20         A.    I did not.

21         Q.    Did anyone at Quantum mechanics -- Quantum

22    Communications send any film or video to Ed Martin?

23         A.    I don't know.

24         Q.    Who would know that?

25         A.    I did not.  You can ask Charlie.  I don't

1    believe we did.

2         Q.    Did you ever review any film or video?

3         A.    Yes.

4         Q.    What happened to it?  Where is the film or

5    the video now?

6         A.    We have it.

7         Q.    You have it.  Did you send that film or

8    video to anyone at Eagle Forum?

9         A.    No.

10         Q.    Did you ever refer any donors to Ed Martin?

11         A.    I did not.  Charlie may have.

12         Q.    Is that something you've done for other

13    clients, referred donors to them, potential donors?

14         A.    It's not something that, you know, we

15    typically -- we do not do fundraising.  Typically, for

16    our political campaigns, if I'm doing a political

17    campaign, usually there's a fundraising aspect of it.

18    If I run into somebody that is interested, I say well,

19    you know, you might want to write a check to this or to

20    that candidate, but --

21         Q.    Okay.  So for some candidates --

22         A.    Yeah.  This was not a candidate, though.

23    This client was not a candidate.  This candidate -- this

24    client was not running for office.

25         Q.    So it was not part of the scope of work for

1    -- for you to refer any potential donors to this client;

2    is that your testimony?

3        A.      In the initial -- yes, that is my testimony,

4    that we did not -- I did not refer any potential donors

5    to them.

6        Q.      Did you ever obtain promotion in the media

7    of Phyllis Schlafly or anyone associated with any of

8    these entities?

9        A.      I did not personally, but I believe that

10   Charlie did.

11       Q.      And what do you believe that Charlie did?

12       A.      It's my understanding that he promoted her

13   with -- and Ed Martin with -- in talking to different

14   political reporters, national reporters.

15       Q.      And did that ever end up in any published --

16       A.      I'm not aware.

17       Q.      Did you ever provide any e-mail lists to Ed

18   Martin?

19       A.      I believe that we did not provide him with

20   e-mail lists, but this is more of a question for

21   Charlie.  We did promote heavily to build a crowd for

22   their event in Washington the day after the

23   inauguration.  We e-mailed the invitation far and wide

24   and made follow-up phone calls, got people in Washington

25   to help generate a crowd for that event.

1    Q.    And did you receive any e-mails back from

2  anybody in connection with that alleged work?

3    A.    We may have.  I -- it's not -- that would --

4  that would not have been part of my specific areas of

5  responsibility.

6    Q.    Does Quantum Communications ever collect

7  e-mail addresses in connection with its work?

8    A.    Yes.

9    Q.    And did Quantum Communications ever provide

10  any e-mail addresses to Ed Martin?

11    A.    I don't -- you can ask Charlie this because

12  he was more involved in this part with the conversations

13  with Ed, but I think what we -- it's my recollection

14  that we said that we would e-mail specifically that

15  invitation that we designed to all of our people that we

16  believed would be in Washington from Pennsylvania and

17  other parts and to the Washington -- to a lot of the

18  conservative activists in Washington.  So we did that.

19    Q.    All right, but --

20    A.    That -- that would have been -- that would

21  have been people that we had originally in our e-mail

22  database.

23    Q.    Okay.  Did you provide --

24    A.    So we were providing -- we were giving

25  Eagle, Ed Martin, the benefit of our list.

18

```
 1        Q.      But did you give Ed Martin or anyone
 2   associated with Ed Martin any of the actual e-mail
 3   addresses?
 4        A.      Not that I'm aware of.  We may have.
 5        Q.      Who may have?
 6        A.      Well, somebody at Quantum may have.  I don't
 7   know that Ed ever asked for that.
 8        Q.      Would they do it without your knowledge?
 9        A.      They could.  But that wasn't -- you know,
10   that wasn't -- I was not overtly involved in -- in
11   contacting -- I wasn't involved in generating crowds for
12   -- Quantum was -- but I was not personally doing that.
13   There were other people in the firm that were working on
14   that.
15        Q.      And what were their names?
16        A.      Charlie Gerow, Scott Stark designed it.  He
17   had some younger people that were working, some of the
18   younger females were making phone calls.  I believe that
19   Charlie asked Bob Heckman, who's a conservative activist
20   in D.C. -- I believe we even paid him -- to generate
21   support and send a list.  And Heckman sent it to his
22   people, as well, as I recall, to his own list.
23        Q.      Did you attend any of these events that
24   you've described?  You just mentioned one in D.C.  Did
25   you personally attend any of these?
```

1        A.      I did.

2        Q.      Did you attend the event in D.C. that Ed

3   Martin had around the inauguration?

4        A.      I just said I did.

5        Q.      You personally attended it?

6        A.      Yes.  I was the first one there and I think

7   the last one to leave.  Although Ed Martin,

8   interestingly enough, left about an hour before the

9   event was over, which I thought was very strange.

10       Q.      And did you recognize any other attendees at

11  that event who were there because of any work done by

12  Quantum Communications?

13       A.      Yeah.  Sure.  They could have gotten

14  invitations from different places, but certainly there

15  were people there that we asked to come that came.

16       Q.      And who did you recognize?

17       A.      It was -- there were probably 130 people,

18  140 people coming in and out, so, you know, I can't -- I

19  can't recall at the moment everybody that I would have

20  recognized at the reception.  I've probably been to 200

21  receptions since -- since that one.

22       Q.      Do you recall anybody?

23       A.      Anybody in the room?

24       Q.      Whom was there because of work done by

25  Quantum Communications?

1          A.     I think Bob Heckman, Grover Norquist was

2     there.  There were -- there were -- there were a lot of

3     people there.

4          Q.     And you're saying Grover Norquist was there

5     because of what Quantum Communications --

6          A.     I'm not saying -- I'm saying Grover Norquist

7     was there.  I'm assuming that we may have asked Grover

8     to come.  I don't know.  He could have gotten five

9     invitations for the event.

10         Q.     Okay.  So you don't know --

11         A.     All's I know --

12         Q.     -- what prompted --

13         A.     -- is Ed Martin was extremely nervous about

14    not having a crowd because we put this together very

15    quickly.  We aggressively put this out, sent it to

16    everybody we knew, made probably hundreds and hundreds

17    of phone calls to people asking them to come to this

18    event.  The event was highly attended and I think

19    considered, by Ed Martin, to be a success.

20         Q.     And as you testified earlier, attendance was

21    about 130 or so; is that right?

22         A.     Listen, it was a reception.  People come;

23    people go.  You know, you don't have to stay.  It's not

24    like a dinner where you stay.  So people were coming in

25    and leaving.

```
 1          Q.      And where was it held?

 2          A.      Joe's Steak and Crab Shack.

 3          Q.      So it was a room in a restaurant?

 4          A.      On the second floor of a restaurant.  And we

 5     helped Ed decide the location, and we had a lot of phone

 6     calls with Ed about that, almost, probably daily,

 7     sometimes more than daily.  And different

 8     responsibilities, within our firm, were divvied up, just

 9     like you would normally do.

10          Q.      Did Quantum Communications reserve the room?

11          A.      I can't -- I don't -- I don't remember.

12          Q.      Did Charlie Gerow attend that?

13          A.      Charlie was there, yes.

14          Q.      Did you receive any feedback about that

15     event?

16          A.      I think from Ed.

17          Q.      From anybody else?

18          A.      Well, he was our client.  That was the

19     person that was most important.  He was pleased with it,

20     pleased with the work that we did to get -- as I recall,

21     pleased with the hard work we did to get the attendance

22     up.

23          Q.      Did you receive any feedback from anybody

24     else?

25          A.      I didn't.
```

1          Q.      Did you receive any RSVP's for the event?

2          A.      I'm sure we did.  I didn't -- again, that

3    was not my area of responsibility.

4          Q.      But you're sure that Quantum Communications

5    received some RSVP's?

6          A.      Listen, we sent out -- I'd have to look at

7    the invitation.  I don't know if the RSVP's went to

8    somewhere else or they went to us or people on the phone

9    said they were coming.  I can't -- I can't recall.  This

10   is how you do events.  You get people to come.  You

11   didn't have -- I don't even know if you had to RSVP.  I

12   can't remember.

13         Q.      Did the event make money?

14         A.      I don't know if it made money because I

15   don't think they charged anything for it.

16         Q.      So it was a money loser?

17               MR. BUTKOVITZ:  Objection.  Form.

18               THE WITNESS:  I don't know if it was -- I

19   don't think the purpose of the event was to make money.

20   BY MR. SCHLAFLY:

21         Q.      Well, I'm not asking you what the purpose of

22   the event.  I'm just asking --

23         A.      Usually, when you do a political reception

24   like that, the -- there is a cost involved.  But the

25   cost is to increase your profile or increase your

1   network, and that is why people do that.

2       Q.    I appreciate the comments, but I'm just

3   asking you, did the event lose money?

4       A.    How would -- I have no -- I don't know if it

5   lost money.

6       Q.    Well, you said they didn't charge anything,

7   so presumably, it lost money, right?

8       A.    Well --

9             MR. FINA:  Objection.

10            THE WITNESS: I guess it depends on your

11  definition of lost money.

12            MR. SCHLAFLY:  I'll take that as ambiguous,

13  but I'll move on.

14  BY MR. SCHLAFLY:

15      Q.    Did you attend the Reagan dinner at CPAC in

16  February of 2017?

17      A.    No.

18      Q.    Did you do any work in connection with the

19  Reagan dinner at CPAC --

20      A.    No.

21      Q.    -- in February of 2017?

22      A.    No.  Charlie did that.  He's the vice

23  chairman of the American Conservative Union and is very

24  involved in CPAC.

25      Q.    So it's your testimony you had no

1    involvement with that particular event?

2        A.    Correct.

3        Q.    If you could return to Exhibit 2, and there

4    are a few other projects that are alleged here.  And

5    I'll just ask if you had any involvement in these other

6    projects.  And if you did, I'll follow up.

7              So for example, in paragraph 27, there's a

8    reference to the quote DeFund Berkeley, close quote

9    campaign.  Did you have any involvement in that alleged

10   project?

11       A.    I did not.

12       Q.    Do you know who did?

13       A.    Charlie and Brandon Posner.

14       Q.    Is Brandon Posner still with Quantum

15   Communications?

16       A.    No, he's not.

17       Q.    Do you know where he moved on to?

18       A.    I think he is at -- he's at one of the big

19   accounting firms.

20       Q.    Does he have an accounting background?

21       A.    I think he's got a Masters in Business from

22   William and Mary.

23       Q.    Is it your testimony that Charlie Gerow and

24   Brandon Posner worked on the DeFund Berkeley campaign?

25   Is there anyone else, in addition to those two, who

1    worked on that?

2        A.    Well, you'd have to ask Charlie.  Scott

3    Stark may have been involved, too.  I think he probably

4    did in terms of getting some of the Facebook things.

5    But I don't know that for certain.  It may have been

6    Brandon that did that.

7        Q.    And do you have any knowledge of what work

8    product was delivered to Ed Martin or anyone affiliated

9    with Ed Martin in connection with this project?

10        A.    I mean I recall seeing some of the stuff and

11    knowing that it went pretty well.  I mean it was a very

12    quick campaign in reaction to some of the stuff that was

13    going on at Berkeley at the time.  And so we quickly put

14    that together for Ed.  And -- but I was not overtly

15    involved in it.

16        Q.    Are you aware of any finished product that

17    was delivered to Ed Martin or anyone else in connection

18    with this project, such as e-mail addresses, that would

19    have been gathered by the project?

20        A.    I'm not sure that the project was -- that

21    was the purpose of the project, but I'm not -- I'm not

22    aware of it.  I know that Ed was updated on what was

23    happening, just in conversations I had with Charlie.

24        Q.    If you look at paragraph 25, it makes

25    reference to film crew traveling to Washington D.C. to

1   interview Ambassador Faith Whittlesey.  Do you have any
2   knowledge of that?
3        A.     I have knowledge of it.  I did not -- I did
4   not go.
5        Q.     What's your knowledge of that allegation?
6        A.     My knowledge of that allegation is that as
7   part of the film project that we were working on, that
8   in conversations that Ed and Charlie had, that having
9   Faith Whittlesey talk about the legacy of Phyllis
10  Schlafly and the ongoing work of Eagle Forum would be a
11  positive thing.  So Charlie went down with film crew and
12  interviewed Ambassador Whittlesey.
13       Q.     Did you ever see any of the film?
14       A.     I don't know that I did.  I may have.
15       Q.     Okay.  So you don't recall specifically
16  watching any of the film?
17       A.     Specifically her?  I don't -- I don't -- you
18  know, I may have.  I've looked at a lot of film, so I
19  may have seen her.  I can't remember.
20       Q.     Is there a reason -- I believe you testified
21  earlier that you never provided any film to Ed Martin.
22  Is there a reason why none of this film was provided to
23  Ed Martin?
24            MR. BUTKOVITZ:  Objection to form.
25  BY MR. SCHLAFLY:

1    Q.    Okay.  I'll strike that.  Was this film ever
2    provided to Ed Martin?
3    A.    No.
4    Q.    Is there a reason why it was never provided
5    to Ed Martin?
6    A.    I think the reason might be why we're here
7    today.
8    Q.    I'm just asking.
9    A.    Yeah.  Well, one, we had put together, you
10   do the film, it's raw footage; it gets produced and
11   edited.  And then we show the client basically drafts.
12   And then you go back and forth.  That's how -- that's
13   how these things are done.  But the fact that Ed Martin
14   had refused to pay us what we're owed for our work is
15   why he never got the finished product.  I think that's
16   pretty straightforward and simple.
17   Q.    Is -- is that in any e-mail anywhere that
18   you've ever seen that --
19   A.    I believe it is in an e-mail.
20   Q.    Is it?
21   A.    I believe, yes.  When we were trying to
22   collect our money from Ed Martin over a long period of
23   time, I believe that is in an e-mail.  That's my
24   recollection.
25   Q.    Did -- would it have been an e-mail that you

1    had written or someone else had written?  I'm asking.

2    I'm -- I'm generally wondering.

3          A.    I believe that it was an e-mail back and

4    forth with Charlie and Ed.  That's my recollection.

5          Q.    Where -- where you or Charlie said we've got

6    this film and --

7          A.    We were going to finish it.  It's like, you

8    know, we weren't getting paid.  We were supposed to be

9    getting paid from September.

10         Q.    Okay.  I need to cut you off.

11         A.    And we go in to January, and we're still not

12    paid.  And they didn't pay our -- he said he would pay

13    our expenses and -- and everything going to Saint Louis.

14    We incurred expenses hiring a film crew, did the event

15    in Saint Louis.  And then Charlie went down after that

16    and did the interview with Faith Whittlesey, and we had

17    -- and that's where -- that's where things are.  I don't

18    know that that's that complicated.

19         Q.    Is that in an e-mail somewhere that Ed, if

20    you'd just -- if you'd pay us, we'll get you this film?

21         A.    You can talk to Charlie more specifically

22    about that because he's the one that was communicating

23    with Ed specifically on getting the money that we were

24    owed and -- and the film project.

25         Q.    Did you produce e-mails in this action?

1    A.    Did I?

2    Q.    Yeah.

3    A.    No.

4    Q.    Did you give e-mails to your attorney?

5    A.    Did I give e-mails?

6    Q.    Yeah.

7    A.    I gave e-mails to my attorney.

8    Q.    Did you give an e-mail that asks this

9  information you're talking about?

10    A.    It wasn't my e-mail, so.

11    Q.    But you received e-mail, I would assume?

12    A.    You can -- you can ask Charlie more

13  specifically about that conversation and e-mail exchange

14  that he had with Ed Martin about that.

15    Q.    And I'll ask Charlie.  I appreciate that

16  advice.  I can handle my questions to Charlie.  I'm

17  asking you questions about what you know and what you've

18  seen and what you've produced.

19          By this time, February 2nd, 2017, you had

20  not been paid anything; is that right?

21    A.    That's my understanding.

22    Q.    And yet you continued to incur expenses; is

23  that right?

24    A.    That's right.

25    Q.    Did you get preapproval for those expenses?

1        A.      We did.  We got preapproval from Ed Martin

2   to go do the interview -- to come -- to come to Saint

3   Louis and then go down to -- to go interview Faith

4   Whittlesey.  We didn't make it up and just decide to go

5   down and say hey, I've got a great idea.  We'll go down

6   and interview Faith Whittlesey, and then hey, by the

7   way, Ed Martin, we went and interviewed Faith

8   Whittlesey.  That's not how -- that's not how it works

9   in our business.

10       Q.      That's not how it works.  Okay.  That's

11  fine.  Did Ed Martin agree to pay some amount for this

12  allegation in paragraph 25?

13       A.      You can talk to Charlie about that.  But we

14  -- we would not have done that without the approval of

15  Ed Martin.

16       Q.      And did you give him an estimate of how much

17  expenses would be?

18       A.      You can talk to Charlie about that.  I

19  wasn't involved in the Faith Whittlesey one.

20       Q.      That's fine.  I appreciate you just

21  answering the question, though.  You've said that now a

22  dozen times.

23       A.      Well, I'm just trying to --

24       Q.      If you know -- I asked you, did you give Ed

25  Martin --

1          A.      I did not.

2          Q.      Thank you.

3          A.      I did not give -- I did not have a

4     conservation with Ed Martin about that.

5               MR. FINA:  Just for the record, he has asked

6     and answered those questions repeatedly.  So you don't

7     need to direct him --

8               MR. SCHLAFLY:  I'm sorry.  I'm sorry.

9               MR. FINA:  -- on the way he should answer

10    the questions.

11              MR. SCHLAFLY:  I'm sorry, but that's the

12    first time I've asked him that question, Frank.

13              MR. FINA:  It is not.  You've asked him,

14    he's answered what communications he's had about Faith

15    Whittlesey and that -- that work over and over again.

16    And he's told you repeatedly that he was not involved

17    and that Charlie Gerow handled that.

18              MR. SCHLAFLY:  The record will reflect

19    that's the first time I asked that question.  Rather

20    than simply answering yes or no, he said talk to

21    Charlie.

22              THE WITNESS:  I'm just trying to be helpful

23    to you, but --

24              MR. SCHLAFLY:  Thank you.

25    BY MR. SCHLAFLY:

1      Q.      Okay.  The next allegation in paragraph 26,

2  there's an assertion that Martin reassured QC that he

3  would pays the outstanding invoices.

4              Does that refer to you?

5      A.      It's QC.  I think you know that that refers

6  to Quantum Communications.

7      Q.      I do.  But I'm asking you, did Martin

8  reassure you --

9      A.      No.

10     Q.      -- that he would --

11             Was there any understanding between you and

12  Ed Martin as to the time it would take to perform on

13  some of these tasks, such as editing the film?  You're

14  thinking about the answer?

15     A.      Yeah.  I'm trying to think if we ever

16  provided a time line.  I think -- you know, it's my

17  recollection in the conversations, the multiple

18  conversations we had about the film project is that it

19  would -- you know, once we got all the interviews done,

20  all the legacy video kind of edited, what we could use,

21  what we couldn't use, that it would probably be, you

22  know -- I don't know that there was -- Ed ever said he

23  needed it by a certain day.  But, you know, usually it

24  would be a couple of months.

25     Q.      And was that part of any agreement, any

1  terms of an agreement that you ever discussed with Ed

2  Martin?

3       A.    I think, you know, in terms of the video

4  project or the film project, that was all done verbally

5  with Ed Martin.

6       Q.    And I'm asking you if you had any verbal

7  conversations with Ed Martin about how long it would

8  take for you to complete any film project?

9       A.    I did not have any -- I, personally, did not

10 have any conversation with Ed Martin about that.

11      Q.    Do you have any knowledge about the filming

12 that was allegedly done in Saint Louis?

13      A.    Yes.

14      Q.    Okay.  And what do you know about that?

15      A.    Well, I was there.

16      Q.    Did you observe the film crew interview

17 anybody?

18      A.    Yes.

19      Q.    And about how many people did they

20 interview?

21      A.    It was about five -- five or six.  I can't

22 remember.  I'd have to go back and go through the

23 archives, go through the notes.  These were primarily

24 all people that Ed suggested that we interview.  We also

25 went to your mother's house and got B-roll there.

34

```
1         Q.     And if you can explain what a B-roll is?

2         A.     B-roll is just film that you use to fill.

3         Q.     And did you view any of that film?

4         A.     I viewed some of it that day and some of it,

5    I believe, at the studio.

6         Q.     Where's the studio?

7         A      It's over in Camp Hill.

8         Q.     And was there any editing done on that film?

9         A.     They started to edit, yes.

10        Q.     And was any of that have film ever shown to

11   Ed Martin?

12        A.     No.  I might add that we also interviewed Ed

13   Martin at the -- in Saint Louis.

14        Q.     Do you still have that film today?

15        A.     Yes.  And there was -- we had suggested

16   interviewing -- there was somebody -- I don't know if it

17   was you or your brother that was there, and we asked Ed,

18   should we get one of the family members.  And Ed

19   strongly suggested that we don't.

20        Q.     Is there still more work to do before that

21   film would be considered a finished product?

22        A.     There is still work to be done.

23        Q.     And is that true for the interview of Faith

24   Whittlesey, too?

25        A.     It probably needs to be finished in terms of
```

1  the editing and the production.

2      Q.    Do you have any idea how much more work

3  would need to be done?

4      A.    I don't know.  I'd have to go back and look

5  at it.  I haven't looked at it for over two years.

6          MR. SCHLAFLY:  Off the record.

7          (A discussion was held off the record.)

8  BY MR. SCHLAFLY:

9      Q.    And you have the Faith Whittlesey film also,

10  right?

11      A.    Yes.

12      Q.    Is there any other project that you recall

13  working on --

14      A.    Yes.

15      Q.    -- in connection --

16      A.    I wrote -- I drafted numerous press releases

17  early on with Ian, talking to Ian about different -- as

18  I recall, there were lots of different court proceedings

19  and different jurisdictions and things were moving

20  pretty quickly.  So I talked to Ian and Charlie and

21  consulted with Ed Rollins and drafted press release, get

22  it back to -- suggested press releases, draft press

23  releases, suggested language, get those back to Ian.

24      Q.    And you say numerous.  What do you mean by

25  numerous?

1      A.      More than a couple.  Three, four.  I can't

2  remember.  Ian would call and say hey, this is what's

3  coming up.  We've got to be prepared for this.  Or this

4  just happened, here's what happened.

5      Q.      And just to clarify your answer, you said

6  three or four?

7      A.      I'd have to go back and look.

8      Q.      And I understand.  I understand.  But about

9  three or four --

10      A.      I don't know.  I -- numerous press releases.

11  How about that.

12      Q.      Well, okay.  Less than 10?

13      A.      I'd have to go back and look.

14      Q.      Any idea?  Less than 1,000?

15      A.      Less than 1,000.

16      Q.      Okay.  Less than 50?

17      A.      Less than 50.

18      Q.      Less than 20?

19      A.      Less than -- less than 20.

20      Q.      Less than 10?

21      A.      I'd have to go back.  I don't know.  There

22  were numerous press releases and drafts and going back

23  and forth.

24      Q.      Any other project that you worked on --

25      A.      Well --

1          Q.       -- in connection with this matter?

2          A.       -- you know, in multiple weekly

3    conversations, sometimes more than weekly conversations

4    with Ed Martin, he wanted to basically have us develop a

5    strategic communications plan for him and his

6    organization, which we spent a lot of time brain

7    storming on that.  And that's part of -- and as part of

8    that, he wanted a film project.  We gave him some ideas

9    on how we could modernize the organization.  And we

10   spent a lot of time working on that, coming up with

11   ideas that we thought would be effective how he could

12   communicate basically taking Eagle Forum in to the

13   digital age.

14         Q.       Did you provide a strategic plan?

15         A.       Yes.  And we wrote him a detailed memo.

16         Q.       About when was that?

17         A.       It was October, November.  I'd have to go

18   back and look.

19         Q.       Did you -- were you involved in providing

20   invoices?

21         A.       No.

22         Q.       Do you have any knowledge about the

23   invoices?

24         A.       I know they were sent and not paid.

25         Q.       Did the invoices describe any work done?

1      A.      I'd have to go back and look at the
2  invoices.  I'm sure it said for professional services is
3  what usually our invoices say.
4      Q.      When you do work for other clients, do your
5  invoices sometimes include work done?
6      A.      It's my understanding that most of our
7  invoices say for professional services.
8      Q.      Without --
9      A.      Or a specific -- yeah.  Yeah.
10      Q.      Without any detail of actual work done?
11      A.      Yep.  Or communication with our clients on
12  the work that's being done.  The invoice says for
13  professional services.
14      Q.      Do you do work for any charities?
15      A.      We do work for nonprofits.  Is that a
16  charity?
17      Q.      Well, it depends on what kind of nonprofit.
18  What kind of nonprofits do you work for?
19      A.      We work for nonprofit associations.
20      Q.      Do you work -- do you do any work for 501c3
21  organizations?  And do you understand what I mean?
22      A.      Yeah, I understand.  Some of the groups that
23  we work with have a 501c3.
24      Q.      Do you ever invoice 501c3 organizations
25  without describing what work was done?

1              MR. BUTKOVITZ:  Objection.  Are you

2   referring to organizations other than Eagle Forum

3   Education Legal Defense Fund?

4   BY MR. SCHLAFLY:

5       Q.    Any other organizations?

6       A.    I don't do the invoices, so normally our

7   invoices say for professional services.

8       Q.    So you have no knowledge of sending an

9   invoice like that to a section 501c3 organization?

10      A.    Not to my knowledge.

11      Q.    I'm sorry.  You have to --

12      A.    No.

13      Q.    I'm just not -- just off the record.

14            (At this time, a discussion was held off the

15            record.)

16  BY MR. SCHLAFLY:

17      Q.    Okay.  I want to refer to this Exhibit 34

18  that was used in the last deposition.  So hopefully you

19  all have this.

20            MR. BUTKOVITZ:  Can you identify it on the

21  record by Bates number?

22  BY MR. SCHLAFLY:

23      Q.    Yeah.  Exhibit 34 was used in the deposition

24  of Ed Martin, and bate stamps QC 1 through QC-104.  And

25  here's a copy for the witness.

1              MR. BUTKOVITZ:  Just to be clear, the

2     exhibit is the entire --

3              MR. SCHLAFLY:  Yes.

4              MR. BUTKOVITZ:  -- QC production?

5              MR. SCHLAFLY:  And that's how it was

6     introduced at Ed Martin's deposition, actually, by your

7     CoCounsel.

8     BY MR. SCHLAFLY:

9        Q.    I'm not going to ask you to review this

10    whole exhibit, but I would like to direct your attention

11    to several invoices that are in it.  And here's an

12    invoice.  QC-22.  Have you ever seen that invoice

13    before?

14       A.    I may have reviewed it in -- in looking at

15    documents.  But it wouldn't have been something that I

16    would have normally had to see in the regular course of

17    my, you know, daily responsibilities.

18       Q.    So you do not ordinarily review invoices

19    before they're sent out?

20       A.    No.  I mean if we get a new client, you

21    know, I would talk to the person who's preparing the

22    invoice and say what the invoice, who it's to, how much

23    it is, and what it's -- you know, what it's for.

24    Sometimes it you could be -- if it's, for example, if

25    we're doing a print job and you have a separate invoice

1    for that, you could say printing on top of your

2    professional services, if that was added on.  I would

3    just give them the numbers, but I don't typically review

4    the invoice.

5         Q.    Is this invoice addressed to the correct

6    person?

7         A.    As far as I know.  That's who I believe we

8    were told to invoice.  I think Ian told us to invoice

9    him.

10        Q.    In your Amended Complaint, which is Exhibit

11   2, your allegation is that, On or about October 13,

12   2016, Ed Martin, President of such-and-such, contacted

13   and informed Kevin Harley, such-and-such, that Ian

14   Northon was not authorized to sign the agreement.

15              And here, the invoice is dated November

16   18th, 2016 for the period of November, 2016, and you're

17   invoicing Ian Northon; is that correct?

18              MR. FINA:  I'm going to object to that

19   question.  It's -- it's inconsistent with his prior

20   testimony.  It's inconsistent with the facts in these

21   documents.

22   BY MR. SCHLAFLY:

23        Q.    Approach -- approach the witness.  Is this

24   correct, invoicing Ian Northon on November 18th, 2016,

25   in light of your allegations?

1      A.      Say this again?

2      Q.      Is this correct, for you to invoice Ian

3  Northon --

4      A.      Listen.  Again, I'll make this clear.  I

5  didn't -- I didn't do the invoices.  Okay.  I did work.

6  I didn't do the invoices.  That's -- it would be more

7  the back office operation that did the invoices.  I

8  didn't do the invoices.  I wasn't -- so --

9  MR. SCHLAFLY:

10     Q.      Okay.

11     A.      So I wouldn't -- you know, I've seen it

12  probably after the fact.  But I didn't see it when it

13  went out.

14     Q.      But did Ed Martin tell you on October 13th,

15  2016, Ian Northon was not authorized to sign the

16  agreement?

17     A.      I think it's -- you can revert to my prior

18  testimony on -- on what Ian Northon, what -- our

19  conversation with Ed Martin post that -- whatever

20  paragraph that was in the Complaint, 17 or whatever that

21  was.  I think that -- that answers it.

22     Q.      So you have no opinion whether this invoice

23  is correct or not; is that right?

24     A.      I have an opinion that we were owed money

25  that we weren't paid.  I have an opinion on that.

1    Q.    Right.  Okay.  Do you have an opinion

2  whether this invoice was addressed to the correct

3  person?

4    A.    I don't.

5    Q.    And the description of the invoice, it says

6  fee for agency services in support of Eagle Forum,

7  November of 2016; is that correct?

8    A.    That's what it says.

9    Q.    And what you know now, as you look at that,

10  is that a correct description of your work?

11    A.    For agency services and support, yeah.

12  That's it.

13    Q.    Is it your view that you were owed $20,000 a

14  month whether you did any work or not?

15    A.    We had a retainer for $20,000 a month.

16    Q.    And is it your view that you were owed that,

17  regardless of whether you did any work?

18    A.    That was the agreement, that we would be

19  paid $20,000 a month.

20    Q.    Regardless of whether you did any work?

21    A.    Well, we did work.

22    Q.    Did you do an equal amount of work in each

23  of these months?

24    A.    Sure.

25    Q.    Really?  Same amount of work in each of

1    these months?

2        A.    Listen, we had an agreement for $20,000 a

3    month.  It wasn't -- we didn't do itemized billing.  We

4    weren't -- the agreement did not require us to bill

5    against the retainer, nor did it say that you had to

6    keep hourly time logs.  It was for $20,000 a month.  We

7    -- our business, we set up all of our clients pay a

8    monthly retainer.  That's how it works.

9        Q.    Is that true for all of your clients?

10       A.    I believe it is true for all of our clients.

11       Q.    Political candidates, too?

12       A.    Some campaigns we get a monthly retainer

13   when we were doing management services or strategic

14   consultation.  Some campaigns will come to us and just

15   say, you know, we want a direct mail piece and nothing

16   else.  So we'll do that.  And then just bill them the

17   cost plus -- we add in our -- we add in our cost.  But

18   typically, when we are involved in a campaign, we take a

19   monthly retainer.  I would say probably nearly all the

20   campaigns -- nearly all, particularly if it's a

21   significant political campaign, we get a monthly

22   retainer.

23       Q.    But there's some for which you do not do

24   business that way, right?

25       A.    Very few.  Right.

45

1       Q.      But there's some, right?

2       A.      Yeah.  But -- yeah.  And that's also -- that

3    would be in an agreement.  A political campaign, again,

4    is different than doing a strategic communication plan

5    and executing that for a client.  This is -- this was

6    not a political campaign.

7       Q.      And the agreements, you reference, with

8    these other clients, were they typically in writing?

9       A.      Yes.

10      Q.      Do you have any oral agreements with other

11   clients of the magnitude of $20,000 a month on retainer?

12      A.      You can talk to my business partner about

13   that.  But I believe we have had oral agreements for

14   significant amounts of money, yes.

15      Q.      And what percentage of your clients would

16   you operate on an oral agreement for $20,000 a month?

17      A.      Well, the clients that I bring in, we have

18   an agreement.  We had an agreement with Eagle Forum.

19      Q.      Are you referring to a written agreement?

20      A.      Yeah.

21      Q.      So clients you work with, you do not have an

22   oral agreement for $20,000; is that right?

23      A.      Typically we have a written agreement, as we

24   had in this case.

25      Q.      Just answer my question.

1       A.      I did.  I said typically, we have an

2   agreement, as we had in this case.  I think that

3   answered your question.

4       Q.      Do you have any clients whom you work with,

5   whom you have an oral agreement of a magnitude of

6   $20,000 a month?

7       A.      I personally do not.

8       Q.      And are you aware of Quantum

9   Communications's having any relationship with any client

10  of the magnitude of $20,000 a month on retainer on an

11  oral, rather than a written basis?

12      A.      You could check with --

13      Q.      No, no.  Don't ask me that.  I'm asking if

14  you are aware?

15      A.      I'm not aware.  But again, I might add, we

16  had a written agreement.

17      Q.      A written agreement that Ed Martin told you

18  was invalid, correct?

19      A.      And that he would continue to abide by the

20  agreement.

21      Q.      And why would he do that?  What's your

22  understanding of why someone would tell you that the

23  written agreement is invalid.  And then days later, tell

24  you it was valid?  Why would somebody do that?

25              MR. FINA:  Objection.  Objection.

BY MR. SCHLAFLY:

1  Q.     To the best of your knowledge.  Did he
explain -- did Ed tell you why he would do that,
invalidate a written agreement and then days later say
it was valid?

6  A.     Well, he never invalidated the agreement.

7  Q.     Well, let's go back and look at paragraph
16, in Exhibit 2.

9  A.     I read it.  Ed agreed to continue with our
agreement, including the terms of the agreement --

11  Q.     In paragraph 16.

12  A.     -- which is the $20,000 a month.

13  Q.     Paragraph 16, it says that, Ed contacted and
informed you that Ian Northon was not authorized to sign
the agreement; is that correct?

16  A.     That is correct.

17  Q.     And it's your testimony a few days later --
not on the same day, right?  Or is it your testimony the
same day?

20  A.     I don't -- I don't recall.

21  Q.     You don't recall.

22  MR. BUTKOVITZ:  Objection.  What's the
question?

24  THE WITNESS:  Yeah.  Did we --

25  MR. BUTKOVITZ:  Hold on one second.  There's

48

1    a lot of compound here.

2                MR. SCHLAFLY:  He understood that question.

3                MR. BUTKOVITZ:  Okay.  Well, I didn't.  The

4    record maybe did not.

5    BY MR. SCHLAFLY:

6        Q.    Okay.  Well, let's turn on to paragraph 17

7    where you say that Martin allegedly agreed on behalf of

8    Eagle Forum.

9                Was that in the same conversation you

10   referred to in paragraph 16 on October 13th?

11       A.    I thought I answered all of this before in

12   your -- in the beginning.  What happened is I got the

13   e-mail.  Then we ended up talking to Ed about it.  And

14   he said -- he agreed to go forward.  That's --

15       Q.    I'm asking you if it was on the same day.

16       A.    I don't know if it was on the same day.  If

17   it wasn't the same day, it was close to it.

18       Q.    And did Ed explain why he would do that?  I

19   mean I don't understand -- did you ever understand what

20   the purpose of that was, to invalidate and then

21   reinstate it orally?

22                MR. FINA:  Objection.

23                MR. BUTKOVITZ:  Objection.  It

24   mischaracterizes the allegations, as well as the

25   testimony.  He never said that he invalidated the

1    agreement.  I believe his testimony was that he was

2    notified that Mr. Northon was not authorized to enter

3    into it, and then subsequently, Mr. Martin corrected

4    that issue by authorizing the agreement.

5    BY MR. SCHLAFLY:

6         Q.    I'm asking the witness -- I'm asking you if

7    Ed Martin explained to you why he would do what you're

8    alleging he did?

9         A.    In the subsequent conversation that we had

10   with Ed Martin, I don't remember the details of why Ian

11   was or was not authorized.  But the important part, from

12   my perspective, was that we were going to continue on

13   with our services and fee structure.

14        Q.    I'm asking you if Ed Martin explained to you

15   why he was allegedly doing it that way?

16        A.    Didn't I just answer that question?

17        Q.    No, you didn't.  Did he explain to you why

18   he was allegedly doing it that way?

19        A.    I cannot recall the specifics of the

20   conversation of why or why not Ian may or may not, in

21   his mind, have been authorized to do it.  I don't know

22   if things changed.  I don't know.  All's I know is that

23   he said -- the most important part of the conversation

24   that I was interested in is that we were going to

25   continue our work for Eagle, working with Ed, and the

1    terms of the agreement.

2        Q.    And in that conversation, were there any

3    representations about when work product would be

4    provided to Ed?

5        A.    We were providing him work product.

6            MR. FINA:  I'm going to object.  Asked and

7    answered.  He's already -- you've already asked him

8    about whether there were deadlines, when stuff was going

9    to be produced, and he's answered this question.

10           MR. SCHLAFLY:  I have not asked this

11   question before.  Are you instructing the witness not to

12   answer this question?

13           MR. FINA:  You have asked this question

14   before.

15           MR. SCHLAFLY:  I have not asked this

16   question before.

17           MR. FINA:  Yeah.  Don't answer the question.

18           MR. SCHLAFLY:  Okay.  Are you asking the

19   witness not to answer?  Are you taking your attorney's

20   advice not to answer this question?

21           THE WITNESS:  Yes.  Yes.

22           MR. SCHLAFLY.  Read my question back again.

23           (At this time, the Reporter read back the

24           referred-to portion of the record.)

25           MR. FINA:  Answer the question about whether

1    the conversation you had with Martin about continuing

2    the contract, whether there were any deadline

3    discussions.

4                THE WITNESS:  I don't recall.

5                MR. SCHLAFLY:  I object to you rephrasing my

6    question.

7                MR. BUTKOVITZ:  Since there's no question

8    pending at the moment, is there any plan to take a break

9    at a particular time?

10                MR. SCHLAFLY:  We can take a break.

11                MR. BUTKOVITZ:  Two minutes?

12    BY MR. SCHLAFLY:

13        Q.    Just for the record, what are you reading

14    from there, Mr. Harley?

15        A.    Some notes.  Is that okay?

16        Q.    Yeah.  I'd like a copy of those.

17                MR. FINA:  I'll see what they are.  We'll

18    decide if they're discoverable.

19                MR. SCHLAFLY:  He's reading from notes

20    during -- during a deposition.  I'm entitled to that.

21                MR. FINA:  I don't know what they are.  I

22    have to look at them.

23                MR. SCHLAFLY:  Well, if he's reading them

24    during a deposition, it doesn't matter what they are.

25                MR. FINA:  If they're appropriate to turn

```
 1   over and they're not privileged, I will turn them over.
 2              THE WITNESS:  They may be privileged.  I
 3   don't know.
 4              MR. SCHLAFLY:  We can take a break.
 5              (At 11:10 a.m., a recess was held.)
 6              (11:18 a.m.)
 7   BY MR. SCHLAFLY:
 8        Q.    So I reiterate my request to see a copy of
 9   what you were reading from.  Let me ask you, Mr. Harley,
10   were you reading from some notes there during my
11   questioning before our break?
12        A.    Yeah.  I was refreshing my memory on a
13   question that you asked.
14        Q.    And what were those notes?
15        A.    It was just some notes on, like, a time
16   line.
17              MR. SCHLAFLY:  I renew my request to see
18   those.
19              MR. FINA:  I reiterate my statement that I
20   will look at them and determine if they're
21   attorney/client work product or some other privilege.
22   If they're not, I will get you a copy of them pursuant
23   to your discovery request.
24   BY MR. BUTKOVITZ:
25        Q.    I would just like to clarify on the record.
```

1    You didn't review every single page of whatever stated
2    papers that you had, did you?
3         A.    No.
4         Q.    Was it a single page?
5         A.    It was one paragraph, a single page.
6         Q.    Are the pages numbered?
7         A.    I don't even think they're numbered.
8         Q.    Do you have it in front of you?
9         A.    It's in my file.
10        Q.    I just want to be able to keep it limited to
11   what the actual request is.  Can -- maybe can you just
12   take it out and figure out if it's not numbered, what
13   page it is?  And maybe you can identify, just for the
14   record, a paragraph, as well?
15              MR. FINA:  He was looking at a paragraph --
16              MR. BUTKOVITZ:  Maybe just number -- assign
17   a number.
18              MR. FINA:  On the second page of the
19   document, paragraph at the bottom of the page.
20              MR. SCHLAFLY:  I object to the attorney
21   testifying for the witness.  I mean -- the witness --
22              MR. FINA:  I'm just trying -- I'm not
23   testifying.
24              MR. SCHLAFLY:  You are.  You don't know what
25   he's looking at.  Ask the witness what he's looking at.

1    I don't --

2              MR. FINA:  The witness handed me a document

3    and pointed at what he was looking at.

4              MR. SCHLAFLY:  And that's fine.  And that's

5    not proper for a deposition.  We're having a deposition

6    here.

7              MR. BUTKOVITZ:  I just want to identify,

8    just for the record --

9              MR. SCHLAFLY:  No.  You talk to the attorney

10   on your own time.  The witness is here to answer

11   questions.

12             MR. BUTKOVITZ:  I mean --

13             MR. SCHLAFLY:  If you want to say what you

14   were looking at, that's fine, but we're not going to

15   have testimony from an attorney.

16             MR. BUTKOVITZ:  You placed the request on

17   the record for a document.  I just want to clarify on

18   the record what the document is that you're --

19             MR. SCHLAFLY:  Then ask the witness.

20             MR. BUTKOVITZ:  Okay.

21             MR. SCHLAFLY:  Don't ask his attorney.

22             MR. BUTKOVITZ:  I did ask him --

23             THE WITNESS:  He did ask me.

24             MR. SCHLAFLY:  Okay.  So what were you

25   looking at on the document?

1          THE WITNESS:  And I handed it to my

2    attorney.  I will let my attorney determine whether I

3    should answer this question or not.

4          MR. SCHLAFLY.  No.  Well, okay, fine.  If

5    the attorney wants to object, that's fine.  We're not

6    going to have the attorney testify.

7          MR. BUTKOVITZ:  I'll tell you -- Mr. Harley,

8    could you just identify the page number and the number

9    of paragraphs from the top which paragraph you were

10    looking at?

11          THE WITNESS:   Page two.  Nine.

12          MR. BUTKOVITZ:  The ninth paragraph from the

13    top?

14          THE WITNESS:  Yes.

15          MR. BUTKOVITZ:  Okay.

16    BY MR. SCHLAFLY:

17     Q.    And is your testimony that's the only part

18    of the document that you were looking at there?

19     A.    Yes.

20     Q.    And was that document prepared by an

21    attorney for you?

22     A.    No.

23     Q.    And who prepared that document?

24     A.    I'd have to go back.  It's -- I'd have to go

25    back and look.  I think it was --

1      Q.      Are you finished answering?

2      A.      Yeah.  I have to go back and look.

3      Q.      Where would you look?

4      A.      Go back an the computer, see --

5      Q.      Somebody e-mailed you the document?

6      A.      No.  I don't recall getting it in an e-mail.

7   I think it was an internal document.

8      Q.      Did you prepare part of the document?

9      A.      I did not type the document.

10      Q.      Did you write the document?

11      A.      No.

12      Q.      So the document is on your computer?

13      A.      I don't think it's on my -- it may not be on

14   my computer.  I don't know.

15              MR. SCHLAFLY:  Well, I'd request a copy of

16   it.  It's influenced the deposition.  I'm inclined to

17   call the Court if you're not going to turn it over.

18   It's not provided by his attorney.  What's -- do you

19   object to producing it?

20              MR. FINA:  I do, because I don't -- I'm not

21   exactly sure what it is.  And I've got to look at it and

22   I've got to --

23              MR. SCHLAFLY:  Look at it right now.

24              MR. FINA:  No, no.  Look, we're not here

25   today to produce documents.  You didn't say -- there's

```
 1   no request for production.  He's looked at a single
 2   paragraph.  He's identified what the paragraph is.  I
 3   said I would review it to determine whether it's
 4   appropriate to provide in discovery.
 5             MR. SCHLAFLY:  I'm inclined to call the
 6   Court.  He's been looking at a document during the
 7   deposition; I'm entitled to see it and ask him questions
 8   about it.  And if you're not going to allow that, I'll
 9   give you -- you can have a little time to look at it
10   yourself.  It's not from an attorney.  There's not --
11             MR. FINA:  I'm not in a position here to
12   redact other things from the document that may be my
13   writings or may be privileged writings.  He says he
14   looked at a single paragraph.  If you want me to try to
15   extract that single paragraph here today, I will do
16   that.
17             MR. SCHLAFLY:  No.  No.  Shall we call the
18   Court?
19             MR. FINA:  You're free to call the Court or
20   do whatever you want.
21             MR. SCHLAFLY:  Okay.  All right.  Let's call
22   the Court.  Is there's a way to do it on your phone, or
23   do you want to do it on my cell phone?  I guess I can
24   the ask the court reporter.  Do you know if we can call
25   out from here?
```

```
 1                    (At this time, a discussion was held off the
 2                     record and Mr. Schlafly called the
 3                     Court.)
 4     BY MR. SCHLAFLY:
 5          Q.     In the arrangements that you have with other
 6     clients at Quantum Communications, how are those
 7     arrangements typically terminated?
 8          A.     It depends.  It depends on the project; it
 9     depends on the client; it depends on the scope of work.
10          Q.     Have you been involved in litigation with
11     any other clients at Quantum Communications?
12          A.     No.  They pay their bills.
13          Q.     Do all your other clients pay all their
14     bills?
15          A.     Yes.
16          Q.     You've never had another client that doesn't
17     pay their bill; is that your testimony?
18          A.     I have not had a client that hasn't paid.
19          Q.     Has Quantum Communications ever had a client
20     --
21          A.     Quantum's been around before I was -- joined
22     them six years ago.  They may have.  I'm not aware of
23     any.
24          Q.     But in the last six years, you're not aware
25     of any other client that did not pay their bill?
```

1          A.     Nope.

2          Q.     And you're not aware of any other litigation

3    regarding Quantum Communications?

4          A.     No.

5          Q.     And how do these other clients -- give me

6    some examples of how other clients terminate their

7    relationship with Quantum Communications?

8          A.     Well, it depends on what the scope of work

9    is.  We work with some clients that it will be for a

10   specific project, and when the project is completed, we

11   know that going in, that -- the work is done.  It's

12   spelled out in the agreement for a specific amount of

13   time.

14         Q.     Do your agreements typically have a time

15   duration within them?

16         A.     It depends.  Some do; some don't.

17         Q.     The ones that do not have a time duration in

18   them, how have those been terminated?

19         A.     I'm not sure that they have been.  We've had

20   clients for many, many years.

21         Q.     So you're not aware of any other clients who

22   have terminated their relationship with Quantum

23   Communications?

24         A.     Sure.  When we've completed work or there's

25   oftentimes we'll have a -- we're talking to our clients

1    all the time.  So if it appears that they're to the

2    point where a specific project is done that we are

3    working on, then we're done, and we move on to get other

4    clients.  Or if they have another project that they're

5    -- that comes in, they'll contact us to see if we're

6    interested.

7         Q.    Are those clients you do work for on a

8    project basis, are they paying you a monthly retainer?

9         A.    Yes.

10        Q.    Do they pay you a monthly retainer after the

11   project is done?

12        A.    It's -- it's spelled out in the agreement

13   for how long the -- if it's, you know -- there are some

14   that, you know, it may be three or four months for a

15   specific project.  But if the project continues, for

16   whatever reason, then it's usually just a verbal

17   agreement that okay, hey, we've got this -- these, you

18   know, other things that we've got to do to complete this

19   and just invoice us for another month.  It's worked that

20   way in the past.

21        Q.    And would those invoices typically be for

22   just some flat retainer without any --

23        A.    Yeah.

24        Q.    And are the terminations done verbally?

25        A.    No.  Some -- often, if we have a client, or

1    sometimes we'll get them in writing.

2        Q.    In writing, meaning by e-mail?

3        A.    E-mail.  Letter.  There's not a lot of

4    terminations.

5        Q.    But there's some, right?

6        A.    Well, some are project-based, right.  We've

7    had some clients, you know, we've had, you know, some

8    Fortune 500 companies, a big tech company that we worked

9    on a specific project that went a little bit longer, and

10   then -- and then it was done.  I think we may have gone

11   month-to-month determining how long that project was

12   going to last.  And -- and then -- and then it was --

13   then we just said all right; I think we're as far as we

14   can go with it; and that was it.

15       Q.    Has any client ever terminated the

16   relationship when Quantum Communications wanted to do

17   more work?

18       A.    I can't recall.

19       Q.    You don't recall any instances --

20       A.    Well, listen, I mean we would love to

21   continue to work for everybody, but sometimes, you know,

22   projects are done and you -- and you know you're done.

23   You've finished the project.

24       Q.    Okay.  Well, when it's not project-specific,

25   are there sometimes when clients terminate the

1   relationship and say we don't need you any more?

2        A.     I'm trying to think.  You know, I'm sure

3   it's happened.  I can't recall any, off the top of my

4   head.

5        Q.     You can't think of a single instance of

6   losing a client in that way?

7        A.     I'd -- I'd have to go back and look at our

8   old client list to see who we had.  And then, you know,

9   what -- what the specifics were, if -- if they moved on.

10  But, you know, generally, depending on the services that

11  the client wants, some are over a long period of time.

12  Others, as I said, are more project -- project-based.

13  Some -- some we know it's going to be a very short kind

14  of sprint because they'll need us for a short period of

15  time.  Others, we have a long multiple-year ongoing

16  relationship with where we get a monthly retainer.

17       Q.     I'm asking you, in your six years at Quantum

18  Communications, your testimony, as you sit here today,

19  you're not aware of a single client terminating the

20  relationship?

21            MR. FINA:  I'm going to object.  That's

22  mischaracterizing his testimony.

23            MR. SCHLAFLY.  I'm not -- I'm not

24  characterizing.

25            THE WITNESS:  I think I said --

1              MR. SCHLAFLY:  I didn't characterize his

2    testimony.

3              MR. FINA:  You just said your testimony is.

4              MR. SCHLAFLY:  Please read that back.

5    Please read back my question.

6              MR. BUTKOVITZ:  The objection is on the

7    record.

8    BY MR. SCHLAFLY:

9         Q.    Okay.  Go ahead, if you understand.

10        A.    I think I said I'd have to go back and look

11   --

12        Q.    That's fine.

13        A.    -- at all the clients that we've had since

14   I've been here.  And some, I've worked on; some I

15   haven't, to determine why -- what -- if we don't have

16   them any more, what was the reason that we don't have

17   them any more.

18        Q.    And you're not aware of that, as you sit

19   here today.  You can't testify to that as you sit here

20   today; is that right?

21        A.    That's right, without having to review six

22   years' worth of clients.

23        Q.    Have you lost any clients in 2019?

24        A.    Nope.

25        Q.    Not a single one?

1      A.      No.

2      Q.      Lost any clients in 2018?

3      A.      Let's see.  We -- we had one client that did

4  not renew, an anesthesiologist.  But we were working on

5  some legislation that did not -- did not advance, and

6  they moved in another direction.

7      Q.      Was there a term period in your agreement

8  with that client?

9      A.      I can't remember.  I'd have to go back and

10 look at the agreement.

11     Q.      What did you mean by it did not renew?

12     A.      I think it was at the end of the year, the

13 legislative session was starting a new legislative

14 session, and the legislation that we were advocating for

15 them did not pass.

16     Q.      And was your agreement tied to the

17 legislative calendar?

18     A.      I -- I have to go back.  I didn't write that

19 -- or I wasn't involved in writing that agreement or

20 contract.  So I can't -- I can't speak to the specifics

21 of the agreement.

22     Q.      Was that a monthly retainer fee?

23     A.      It was.

24     Q.      Was that for lobbying work?

25     A.      It was for lobbying communications work.

1      Q.      Can you think of any other client you lost
2  in 2018?
3      A.      Nope.
4      Q.      About how many clients did you have in 2018?
5      A.      I'd have to go -- I'd have to go through
6  because, you know, there's some clients that I work on.
7  And there's clients that other people in the firm work
8  on.  I'd have to go through the entire client list, and
9  I don't have that in front of me.
10     Q.      Is it more than 30?
11     A.      It's not more than 30.
12     Q.      Is it more than 20?
13     A.      I'd have to go through the list.  I don't
14  know.
15     Q.      Okay.  But it's not more than 30 clients
16  that you're billing on this monthly retainer system,
17  right?
18     A.      No.
19     Q.      How many people work for Quantum
20  Communications?
21     A.      We have right now three, four, five.
22     Q.      Five total, including yourself?
23     A.      Um-hum.
24     Q.      Including Charlie Gerow?
25     A.      Yep.

1    Q.    Have you ever heard Charlie Gerow talk about

2  Phyllis Schlafly?

3    A.    In what way?

4    Q.    In any way.

5    A.    I'm sure we've had plenty of discussions

6  about Phyllis Schlafly when we had this project.  It was

7  a client.

8    Q.    Well, other than internal discussions

9  relating directly to the project, did you ever hear him,

10  Charlie, reference Phyllis Schlafly?

11    A.    I think when she passed away, I think we had

12  a conversation about her.

13    Q.    Did you ever hear him mention her on his

14  television or radio show?

15    A.    I can't recall.

16    Q.    Who handles the billing at Quantum

17  Communications?

18    A.    Well, it was Ken Robinson until February of

19  this year.  Now it's Crystal Wheeler.

20    Q.    Do you know if Crystal Wheeler handled any

21  of the invoices in this matter?

22    A.    She did not.

23    Q.    And Ken Robinson has passed away, right?

24    A.    Correct.

25    Q.    In your job duties at Quantum

1    Communications, just in a rough estimate, how do you

2    spend your time?  How do you spend your workday?  Is it

3    -- much of it dealing with clients, much of it on the

4    computer?  Just give me an idea of how -- what your job

5    duties are like.  You don't have to be precise.  Just

6    how do you spend your time?

7         A.    I spend my time working on behalf of our

8    clients; and certainly it's a varied -- you've got

9    various clients with different needs.  And so there's

10   e-mails, there's research, there's -- I spend, you know,

11   probably a large part of my day on the phone.

12        Q.    Do you travel much?

13        A.    It depends.  Sometimes you have to for

14   clients.  But primarily, we work out of our office here.

15        Q.    When did you decide -- when did Quantum

16   Communications decide to stop doing any work related to

17   Ed Martin in any way?

18        A.    I'd have to go back and review, but I

19   believe it was probably -- my recollection is maybe

20   March, April of 2017, somewhere around there, when it

21   became apparent that Ed Martin was telling us one thing

22   and then not doing another, that we weren't going to get

23   paid.

24        Q.    Was there a discussion you had internally

25   about that?

1       A.      It's my recollection that, you know, Charlie

2   and I were discussing the fact that we were continuing

3   to work but they weren't getting paid; I think Charlie

4   thought that -- believed Ed, that he would, in his

5   conversations, I heard Ed say this, he would -- he would

6   pay us.  So it was, like, all right.  We will continue

7   to work, thinking that he was an honorable person.  And

8   -- but then when -- something to the effect that he was

9   having a problem with his board or something.  I don't

10  know what -- all the particulars are, without looking --

11  reviewing everything, is that it looked like we were not

12  going to get paid.  So it was, like, all right.  Well,

13  we're not getting paid, then we'll stop invoicing, stop

14  working.

15      Q.      And did you, as part of that decision-making

16  process, did you decide not to send any work product to

17  Ed Martin?

18      A.      What work product?

19      Q.      Film, for example.

20      A.      The film project wasn't done.  I think I

21  told you before that we don't send raw video.  We don't

22  send a nearly-completed project to the client to let

23  them review it.  They don't get the uncut versions.

24      Q.      The -- what percentage, just ballpark, of

25  the work that you allegedly did in connection with Ed

1   Martin, what percentage of that work was spent on the

2   film project, in all the work you did?  Just ballpark,

3   what percentage was spent on the film project?  And that

4   would include the Saint Louis film and the Faith

5   Whittlesey film and any other film.

6           MR. FINA:  Can we get clarification that you

7   means just Kevin, Mr. Harley?

8   BY MR. SCHLAFLY:

9       Q.    No.  I mean Quantum Communications.  Thank

10  you.

11      A.    Oh, well, I can't speak to Quantum.  I don't

12  know how much -- I know Charlie spent a lot more time on

13  it than I did.  I certainly went to Saint Louis, did

14  research on some of the people that Ed had given us so

15  that we could -- some of people to be interviewed, so

16  that we could, you know, ask them the right questions.

17  Worked with the film crew, making sure that they were --

18  had everything they needed.

19           And then the post-production, I wasn't real

20  involved in that.  That was -- Charlie was more involved

21  in post-production.  But I saw some of the raw video, as

22  I said, some of the -- I saw some of the interviews.

23      Q.    What percentage of your time was spent on

24  that, as a percentage of all the work you allegedly did

25  in connection with Ed Martin?

1     A.     I don't know percentage.  We spent four days

2  in Saint Louis or three days in Saint Louis.  We did

3  prep work, the work afterwards.  I couldn't put -- you

4  know, I'm not putting that in a percentage.  I don't

5  know -- I'd have to go back and think about all the work

6  I did prior to that in the fall, all the -- all the

7  phone calls, all the -- everything else.  I -- I don't

8  -- I can't put it in a percentage.

9     Q.     Do you keep track of your time in any way?

10    A.     I don't.  I don't do time sheets.

11    Q.     Of any work that Ed Martin or anyone

12 affiliated with Ed Martin ever received from Quantum

13 Communications, can you estimate what the value of that

14 work was that Ed Martin did receive, if any?

15    A.     Sure.  He received 130,000 or $20,000 a

16 month worth of professional services from Quantum

17 Communications.

18    Q.     And what's your basis for that?

19    A.     That was the agreed-upon agreement, and they

20 agreed to it; Ed agreed to it, and the value, the

21 counsel, advice, and work product that we were giving

22 him.

23    Q.     But you never sent him any film.

24    MR. FINA:  Objection.

25 BY MR. SCHLAFLY:

1       Q.    Okay.  What was the value of the film that he

2   received from you, if any?

3       A.       The value of the film project?

4       Q.       That he received from Quantum Communications

5   -- Quantum Communications, if any.

6            MR. FINA:  Object to the question.  He's

7   answered --

8   BY MR. SCHLAFLY:

9       Q.    I can rephrase, if you don't understand.

10  No.  Did Ed Martin receive anything of value in

11  connection with your filming?

12      A.       Ed Martin didn't pay the bill, so Ed Martin

13  didn't get the final product or even the next to the

14  final draft.  That's how it works.

15      Q.       Okay.  You didn't answer my question

16  directly.  Is it your testimony that Ed Martin received

17  zero value on the film project?

18            MR. FINA:  Object to the form of the

19  question.  It mischaracterizes his testimony.

20            MR. SCHLAFLY:  I'm asking him what his

21  testimony is.  I'm just asking him to answer the

22  question.

23            THE WITNESS:  The film project, by itself,

24  was probably -- the final product probably would have

25  been worth 100,000-plus by itself.  But we didn't get

1    paid, so the film project wasn't completed.

2    BY MR. SCHLAFLY:

3        Q.    Or delivered, right?

4            MR. FINA:  Asked and answered.  Go ahead.

5    Answer it again.

6            THE WITNESS:  As I've stated numerous times,

7    you do not give a client raw video.  You give a client a

8    product that is near completion so that they have the

9    opportunity to make edits on it before you go to final

10   production.

11   BY MR. SCHLAFLY:

12       Q.    And did the film project get to a stage of

13   near completion?

14       A.    It was getting close.  Charlie, again, was

15   working on that more than I was.

16       Q.    So is your answer yes or no?  To the best of

17   your knowledge, did the film project get to that stage

18   of near completion you just referenced?

19       A.    I'd have to go back and review it again to

20   see how close --

21           MR. FINA:  I'm going to object, as well.

22   Asked and answered.  He's stated it was getting close.

23           MR. SCHLAFLY:  And I'm trying to find out

24   what that means.

25           MR. FINA:  Well, then ask him what that

1    means.

2    BY MR. SCHLAFLY:

3        Q.    In your words, getting close, does that mean

4    near completion?

5        A.    Well, we had the interviews done; we had the

6    b-roll; we had the legacy video, photos.  It was a

7    matter of -- and a lot of the video had been edited by

8    the -- our film crew, our production crew.  So it was a

9    matter of putting -- putting the rest of it together,

10   which the -- the -- the hardest part, when you -- when

11   you do the video, is getting the videos done, and then

12   the post-production normally goes pretty quickly when

13   you've -- once you have -- you have to have the product,

14   and then you -- then you edit the product.  So the

15   editing post-production goes relatively fast.

16       Q.    Is any of the filming that you've done in --

17   in near completion stage where you would release it to

18   the client?

19       A.    I don't think it was to the point that it

20   was ready to be released to the client.

21       Q.    I'm going to ask about Exhibit 32.  I have

22   one copy for the witness.  This is --

23            MR. BUTKOVITZ:  What's the Bates stamp?

24            MR. SCHLAFLY:  It's QC 1213.

25            MR. BUTKOVITZ:  One more time.  What was it

```
 1    previously marked as?
 2                  MR. FINA:  32.
 3                  MR. SCHLAFLY:  32.
 4    BY MR. SCHLAFLY:
 5        Q.    Do you recognize this document, which was a
 6    letter from Ian Northon to -- no.  It's a letter from
 7    Quantum Communications to Ian Northon.
 8        A.    Yes.
 9        Q.    Did you participate in drafting this letter?
10        A.    Yes.
11        Q.    Did you get any assistance of Counsel?
12        A.    Assistance of Counsel?  No.  I discussed it
13    with Ed Rollins on the scope of work and then discussed
14    more of the particulars with -- with Charlie Gerow and
15    drafted it, let him draft it.  Also, in conversations I
16    had with Ian on what the scope of work would be, and
17    those were, as I recall, you know, conference calls with
18    Ian.
19        Q.    So you were the primary drafter of this
20    document; is that correct?
21        A.    Well, I -- I -- yes.  I took the
22    information, put it down on paper.
23        Q.    Took the information from various sources?
24        A.    Yes.
25        Q.    If you look at -- well, is this your
```

1    signature?

2          A.      Yes.

3          Q.      Look at the second paragraph from the

4    bottom.  There's a sentence that says, Any such expense,

5    in excess of $500, will require prior approval.

6                  MR. FINA:  That's on page two, correct?

7                  MR. SCHLAFLY:  Right.

8    BY MR. SCHLAFLY:

9          Q.      Was that your intent?

10         A.      That's kind of standard operating procedure.

11         Q.      Are you aware of seeking prior approval for

12   any of the expenses in connection with any of the work

13   done?

14         A.      Yes.

15         Q.      Did you seek prior approval?

16         A.      Charlie, in discussions we had with Ed

17   Martin to do the film project, travel to Saint Louis,

18   and then I didn't travel to Washington, but that was all

19   with Ed's approval.

20         Q.      And your testimony is that Ed gave prior

21   approval for those travel expenses?

22         A.      We did not -- yes, the film project, it was

23   Ed's suggestion we come to Saint Louis and do that.  I

24   wasn't involved in the Faith Whittlesey, but that was --

25   Ed was involved in that decision, as well.  So we had

```
1   prior approval from Ed Martin.
2        Q.    Was your intent for the initial $20,000 to
3   be paid upon execution of this agreement?
4        A.    It was.
5        Q.    And was that $20,000 paid?
6        A.    No.
7        Q.    And were you aware that it was not paid?
8        A.    I became aware that it was not paid.
9        Q.    When did you become aware that it was not
10  paid?
11       A.    Well, at some point, I guess, the next
12  month.
13       Q.    Well, you guess, but do you know?
14       A.    I don't know specifically, but I know that
15  we've had subsequent conversations with Ed Martin, who
16  said he would pay it.
17       Q.    And your testimony is that Ed Martin said he
18  would pay $20,000?
19       A.    He said he would go by the terms of the
20  original agreement.
21       Q.    Did he specifically say that he would pay
22  $20,000?
23       A.    It's my understanding that he said that he
24  would pay what -- what -- yes.  Yes.  He would pay --
25  abide by the terms of the agreement.
```

1      Q.      Well, okay.  But I'm asking -- is that all

2   he said, that he would just abide -- that he would abide

3   by the terms, or did he specifically say that he would

4   pay $20,000?

5      A.      Now listen, this is -- we had conversations

6   where we're talking about a lot of other things, and

7   then this would come up, and he said he would -- he

8   would make sure we got paid.

9      Q.      Did he say he would pay you $20,000 a month?

10     A.      Yes.  It is my understanding, very clearly,

11  that he would pay -- that it was for $20,000 a month.

12     Q       I'm not asking you what your understanding

13  was.  I'm asking you if Ed Martin told you that he would

14  pay $20,000 a month?

15          MR. FINA:  Objection.

16          THE WITNESS:  It is my recollection that Ed

17  Martin said very specifically, on more than one

18  occasion, that he would pay us for the services that we

19  have performed and continue to engage us moving forward.

20  BY MR. SCHLAFLY:

21     Q.      Is that a no answer?

22          MR. FINA:  Objection.

23  BY MR. SCHLAFLY:

24     Q.      I'm sorry.  I have to get an answer to this

25  question.

```
 1              MR. FINA:  He did answer the question.
 2   BY MR. SCHLAFLY:
 3        Q.    No.  I'm sorry.  Did Ed Martin ever tell you
 4   that Ed Martin would pay $20,000 a month?  I have to get
 5   an answer to that.
 6              MR. FINA:  Asked and answered.
 7              THE WITNESS:  Well, the easy answer then is
 8   yes.  He said he would abide by the terms of the
 9   agreement.
10   BY MR. SCHLAFLY:
11        Q.    And did he say that more than once?
12        A.    We had discussions about our lack of payment
13   numerous times, and each time, he said that he would pay
14   us.
15        Q.    Pay you what?
16        A.    Pay us what we were owed from prior invoices
17   and continue to pay us moving forward.  There was at
18   some point, and I don't remember the exact date, where
19   there was a discussion about moving forward and taking
20   it -- our retainer from 20, and I believe Charlie had
21   this discussion with him, but he shared it with me, from
22   20,000 a month to 10,000 a month, which Ed agreed to.  I
23   don't know if that -- I can't remember if that was at
24   the end of the year, beginning of January, somewhere
25   around there.
```

1      Q.      Is there anything in writing on that, that

2   you're aware of?

3      A.      I believe so.

4      Q.      And what do you believe that is?

5      A.      I believe there's an e-mail between Charlie

6   and Ed.

7      Q.      And you think you've seen that e-mail?

8      A.      I think I've seen it.  I don't know if I was

9   cc'ed on it, but I think I've seen it.

10      Q.      You think that e-mail references $10,000 a

11   month?

12      A.      It's my understanding it does.

13      Q.      Have you produced that e-mail in this

14   litigation?

15      A.      Excuse me?

16      Q.      Have you produced that e-mail in this

17   litigation?

18      A.      I don't know.

19             MR. FINA:  It was one of the exhibits with

20   Mr. Martin.

21             MR. SCHLAFLY:  Where it refers to $10,000 a

22   month?

23             MR. FINA:  Yep.

24             MR. SCHLAFLY:  Which exhibit is that?

25             MR. FINA:  I don't remember the number.  I

1    believe it was the e-mail of March 17th, Exhibit 3.

2            MR. SCHLAFLY:  Does it have the QC number at

3    the bottom?

4            MR. FINA:  68.  Do you want me to read from

5    it?

6    BY MR. SCHLAFLY:

7        Q.    Well, that's an e-mail from Charlie.  That's

8    not an e-mail from Ed to Charlie.  Is that what you were

9    referring to, that Charlie hoped he would get $10,000 a

10   month?

11           MR. FINA:  Objection.  That's not what the

12   document says.

13           MR. SCHLAFLY:  The document is an e-mail

14   from Charlie to Ed.

15   BY MR. SCHLAFLY:

16       Q.    Is that the e-mail you were referencing in

17   your testimony here?

18       A.    Yeah.  And it's -- as I testified to, it was

19   my understanding that Ed and Charlie had a discussion

20   about this, and that Ed agreed to it.

21       Q.    Okay.  But you're -- are you aware of any

22   written communication from Ed to anyone at Quantum

23   Communications that --

24           MR. BUTKOVITZ:  Are you asking him other

25   than page 2, QC 69 where he responds to Charlie, Got it?

1                MR. SCHLAFLY:  No.  He included that.  And

2    let me finish my question.

3    BY MR. SCHLAFLY:

4        Q.     Are you aware of any communication from Ed

5    Martin to anyone at Quantum Communications where Ed said

6    that he would pay 10,000 a month or $20,000 a month or

7    anything a month?

8        A.     Am I aware of any communication?  Yes, I am

9    aware.  I'm aware of communication -- verbal

10   communication multiple times --

11       Q.     That's not what I asked.

12       A.     -- with Ed Martin.

13       Q.     That's not what I asked.

14       A.     And then on this one, he says, Got it.

15       Q.     Yeah.  He got it.  Okay.  I'm asking you are

16   you aware of any written communication from Ed Martin to

17   anyone at Quantum Communications where Ed Martin said he

18   would pay $10,000 a month or $20,000 a month?

19       A.     Yes.  I'm aware of e-mails going back and

20   forth where Ed said he would pay our invoices, and then

21   this is 10,000 going forward, and he agreed to that.

22       Q.     Okay.  So your testimony, just to clarify,

23   that you considered QC 69 as a written communication

24   from Ed Martin to Quantum Communications that Ed would

25   pay 10 or $20,000 a month?  Is that your testimony?

1          A.      If you read the prior e-mail from Charlie to
2    Ed, it lays it out.  And Ed's e-mail back to Charlie,
3    Got it.  Agreed.
4          Q.      That's what got it means to you?  Agreement?
5                  MR. FINA:  Objection.
6                  THE WITNESS:  Not only that.  That was in --
7    in prior conversations --
8    BY MR. SCHLAFLY:
9          Q.      No.  Stick to my question.
10         A.      -- is that it was the understanding that he
11   was going to pay our prior invoices, and moving forward,
12   we would go from 20 to 10.
13         Q.      Do you interpret got it as meaning I agree?
14         A.      I do.
15         Q.      And what was the date of that e-mail?
16                 MR. FINA:  March 17th, 2017.
17   BY MR. SCHLAFLY:
18         Q.      Did you do any work after this date for Ed?
19         A.      I'd have to go back and look.  I don't -- I
20   don't know.
21         Q.      Are you aware of any work that anyone at
22   Quantum Communications did after this e-mail?
23         A.      Well, I think we were still -- I have to go
24   back and look at the -- at the time line exactly when it
25   was that we were continuing to work up until the point

1    where it was clear that we weren't going to get paid.

2    So whenever that was.  We continued to work.

3        Q.    Can you identify any project that you worked

4    on --

5        A.    We were working on the --

6        Q.    -- for Ed after this time?

7        A.    Sure.  We were working on the -- on the film

8    and other things.

9        Q.    After this time?

10        A.    Giving him, you know, strategic counsel on

11   getting out there, using technology much more

12   effectively than had been done, which I might add, I

13   think he took -- he took our counsel wisely and has

14   done.

15        Q.    Has Quantum Communications ever refunded any

16   money to any clients?

17        A.    I don't think so.

18        Q.    Has Quantum Communications every received

19   any complaints from any clients?

20        A.    I'm not aware of any.

21        Q.    You're not aware of any complaints?

22        A.    I'm not aware of any complaints.

23        Q.    Are you aware of any specific contacts that

24   Quantum Communications made with anyone in the media in

25   connection with anything in this case?

1        A.     No.

2        Q.     And is that media work a big part of the

3   work that Quantum Communications does for other clients?

4        A.     It depends on the client; it depends on the

5   work, on the scope of work.

6        Q.     Do you promote, on your website, that you do

7   media work -- that Quantum Communications does media

8   work for clients?

9        A.     Yes.

10       Q.     I just have a few more questions.  Does

11  Quantum Communications do any litigation support for any

12  clients?

13       A.     We do crisis communications, where law firms

14  will engage us to -- to assist them.

15       Q.     And is that media-related work?

16       A.     It is both media, anticipating what the

17  media may do.  Typically, you know, we'll work with the

18  lawyers and other principals on crafting messages and

19  then determining the best way to deliver those, and

20  certainly on a case-by-case basis.

21       Q.     Did Quantum Communications do any litigation

22  support work for Ed Martin?

23       A.     Sure.  That was part of our original --

24  working with the law firm on the litigation aspects of

25  the lawsuits going back and forth between Ed, your side,

1    and your sister.

2         Q.    Did Quantum Communications ever communicate

3    to Ed that Quantum Communications would no longer do any

4    work related to Ed?

5         A.    I'd have to go back through.  I did not.

6    I'd have to go back through and review what Charlie

7    said, I believe.

8         Q.    Does Quantum Communications ever terminate

9    relationships with any clients?

10        A.    When you say terminate, what's your

11   definition of terminate?  There are times when, as I

12   mentioned earlier, that projects are done, campaign,

13   election day happens, and we terminated our work.  But

14   are you saying firing a client?  Is that what you mean?

15        Q.    If you want to put it that way, yes.

16        A.    I don't know that we've done that since I've

17   been here.  It could have happened before.

18        Q.    Does Quantum Communications do any PAC work?

19        A.    What's your definition of PAC work?

20        Q.    Does it raise any political money?  Does it

21   have any entities upon which it takes in political

22   donations?

23        A.    Are you saying do we have a PAC?  What's

24   your question?

25        Q.    Well, I'm saying do you raise any money for

1   PAC?  Do you do any work connected with political

2   fundraising to a PAC or entity like that?

3         A.      Well, we have clients that have had PACs or

4   have a PAC, and we will advise them on -- we have

5   clients that have PACs, and we've discussed with them,

6   you know, ways in which they can either spend the PAC

7   money and/or ideas on how to raise more PAC money.  But

8   we don't -- it's more strategic counsel than doing any

9   of the work.

10        Q.      And in those relationships, do you bill on a

11  monthly basis, as well?

12        A.      Yes.

13        Q.      And do the political campaigns pay you out

14  of their campaigns for that work?

15        A.      I wasn't referring to political campaigns.

16  I was referring to political action committees.  There's

17  a difference.

18        Q.      Okay.  Do the political action committees

19  pay you out of the PAC fund?

20        A.      No.  No.  If we have a client that happens

21  to have a PAC, and they may ask us for strategic advice

22  on how to either increase the funding for the PAC and/or

23  on -- they may ask our advice on whether it's -- they

24  should give to this person or that person, this

25  candidate or that candidate, we may give them our advice

1    as part of our -- and that would be part of our monthly

2    retainer.

3         Q.    And what type of client would that be?  An

4    individual typically or --

5         A.    Typically an association or corporation that

6    has a PAC.

7              MR. SCHLAFLY:  Okay.  I have no further

8    questions, but I may have some redirect after the other

9    questions.

10                   CROSS EXAMINATION

11   BY MR. BUTKOVITZ:

12        Q.    Okay.  What time is it?  Good afternoon, Mr.

13   Harley.  My name is Ed Butkovitz.  I represent Eagle

14   Forum in this case.  Hopefully just a few questions for

15   you.

16              So in your earlier testimony, you said that

17   the term Eagle Forum was a term they used internally to

18   refer to the entity Eagle Forum Education and Legal

19   Defense Fund; is that correct?

20        A.    That's correct.

21        Q.    Are you aware that there are separate legal

22   entities, one being named Eagle Forum and another being

23   named Eagle Forum Education and Legal Defense Fund?

24        A.    Yes.

25        Q.    Do you understand that Eagle Forum is a

1    501c4?

2         A.    Yes.

3         Q.    Do you understand that Eagle Forum Education

4    and Legal Defense Fund is a 501c3?

5         A.    Yes.

6         Q.    Is it your position that the agreement that

7    was entered into with -- with Quantum Communications was

8    with Eagle Forum Education and Legal Defense Fund?

9         A.    Yes.

10        Q.    If you look to Exhibit 32, it's Bates label

11    QC 12 through 13.  That's the letter agreement.

12        A.    Is that --

13              MR. FINA:  Yeah.

14              THE WITNESS:  Okay.  Go ahead.

15   BY MR. BUTKOVITZ:

16        Q.    I just want to start by reading you the

17   first sentence with the inclusion of the handwritten

18   notations there.

19        A.    Yes.

20        Q.    That says, This letter sets forth the terms

21   of our engagement for Eagle Forum Education and Legal

22   Defense Fund, a 501c3 organization, parenthesis, Eagle

23   Forum, closed parenthesis.

24              Do you see that?

25        A.    I do.

1        Q.      And who added that language?

2        A.      Ian Northon.

3        Q.      Is it your understanding that -- strike

4    that.  Do you know what a defined term is?

5        A.      Go ahead.

6        Q.      So you see in parentheses, it says Eagle

7    Forum?

8        A.      I do.

9        Q.      So does that indicate to you or did -- when

10   you received this back, did you interpret every instance

11   of the phrase Eagle Forum to then refer to what's stated

12   in that first sentence, Eagle Forum Education and Legal

13   Defense Fund, a 501c3 organization?

14       A.      Yes, yes.  Just -- if I could just explain.

15   So in -- in our conversations -- early conversations

16   with Ian, he kind of walked us through that.  And then

17   subsequently, Ed walked us through all of that.  So it

18   was -- you know, if you're coming in from the outside,

19   and you're saying okay who are -- who are the players,

20   where -- okay.  So we have, you know, the sides.  So we

21   have the legal defense fund, which is the Martin side.

22   Eagle Forum, which I think is -- everybody knows Eagle

23   Forum is the -- is the Cori side.  And then there were

24   -- as it was explained, and it's coming back to me now,

25   there were individual state chapters and there's a lot

```
 1    of different moving parts to this.  But to make it
 2    simple in our mind, we were working for the legal
 3    defense fund, which was Ed Martin, but I think there was
 4    some other organization that he may or may not have been
 5    involved in.  I don't know if it was the Missouri Eagle
 6    Forum or the Eagles -- I think there was a group called
 7    Eagles.  But to simplify it, we were working for the
 8    legal defense fund, i.e., Ed Martin.
 9              So internally, even though I know you guys
10    have different terminology, we would just say Eagle
11    Forum, even though that may not have been legally
12    accurate.  But if we're talking amongst ourselves, we
13    would just refer to it as Eagle Forum.  Does that make
14    sense to you?
15         Q.    That absolutely does.  Thank you for the
16    clarification and explanation.
17              Based on what you know today, did the Eagle
18    Forum entity ever request services from Quantum
19    Communications?
20         A.    No.
21         Q.    Did Quantum Communications ever provide
22    services for the benefit of quote Eagle Forum?
23         A.    No.
24         Q.    So am I correct, just to nail down what
25    you've already said, this handwritten addition that
```

1    clarifies education and legal defense fund, a 501c3

2    organization, that didn't amend this agreement; it just

3    clarified what was always the intent?

4         A.    Correct.

5         Q.    Okay.  Were you aware -- strike that.  There

6    have been references to litigation, litigation support.

7    What case is that referring to?

8         A.    I have to go back and think about this for a

9    second.  If that -- you want me to try and remember or

10   --

11        Q.    Strike that for a second.  Maybe the easier

12   way to do this, I can -- you can confirm whether --

13   whether what I think the case is, is correct?

14        A.    Okay.  Yep.

15        Q.    Was that a case in which it was being

16   litigated who had authority to control Eagle Forum, the

17   501c4 organization?

18        A.    Yes.

19        Q.    Yes.  Is it your understanding that in that

20   litigation, the Court removed Mr. Martin as an officer

21   of Eagle Forum, the 501c4 organization?

22        A.    Yes.

23        Q.    So was it your understanding that Mr.

24   Martin had no authority to act on behalf of or bind

25   Eagle Forum, the 501c4 organization?

1      A.      Correct.

2      Q.      Who are the gang of six?  And I'm not

3 looking for necessarily the individual names.  Can you

4 just describe what that generally is referring to?

5      A.      Okay.  That would be the -- Counsel's

6 sister, Anne Cori, along with five other board members

7 or presidents of state chapters, but leaders of, I think

8 the original Eagle Forum, but who were not happy with Ed

9 Martin taking over Eagle Forum.  I don't want to get --

10 and so there was a fight, which I think -- a fight for

11 leadership, as I recall.  You know, the -- Ed Martin

12 believed that Phyllis wanted him to lead the

13 organization.  I think Anne Cori did not believe that.

14 So there was this fight, which became a legal battle.

15 And -- but basically, a fight for control of the

16 organization.

17      Q.      Okay.  Was Ms. Cori one of the gang of six?

18      A.      Yes.

19      Q.      Is it your understanding that Ms. Cori

20 either by herself or with some other members of that

21 gang of six, were the officers and those with -- with

22 actual authority over Eagle Forum?

23      A.      You know, I don't know if I have an opinion

24 on that.  I think that was part of what was being

25 litigated.

1      Q.      Fair enough.  Did you ever reach out to any

2   of the gang of six, including Ms. Cori, in connection

3   with the services you were providing under the written

4   agreement that we looked at?

5      A.      No.

6      Q.      When you talked about doing -- taking some

7   video footage, and I think interviewing some board

8   members, were any of those board members members of the

9   gang of six?

10     A.      No.

11     Q.      Were they board members of the Eagle Forum

12   Education and Legal Defense Fund, a 501c3?

13     A.      I'd have to go back and look.  I don't know

14   if -- they may have been board members of something or

15   local president chapters or long-time friends of

16   Phyllis.  But whether -- what their -- whether they were

17   board member of the 501c3, I don't -- I don't recall.

18     Q.      Fair enough.  But is it fair to say you were

19   -- you were certain that they were not board members of

20   Eagle Forum, the 501c4?

21     A.      Let me say that I'm certain that they were

22   for Ed Martin and not for Anne Cori.  So whether -- I

23   know -- I don't know if they could have been a board

24   member of the C4.  I don't know.  I'd have to go back

25   and look.  I probably knew it at the time, but I don't

94

1   now.

2        Q.     I'm almost done.  Getting close.  If you

3   turn to Exhibit 34, which is the entire Quantum

4   Communications production, I'd like to direct you to

5   particular pages that begin with Bates label QC 49

6   through QC 54.  Strike that.  We can get to this

7   quicker.

8             Did you ever send or did Quantum

9   Communications ever send invoices to Eagle Forum, a

10  501c4?

11       A.     No, not that I'm aware of.

12       Q.     So other than invoices that were sent to the

13  address listed as -- I'm not going to pronounce it

14  correct -- Rotzel and Andress, like after a particular

15  time, you started sending invoices to another address;

16  is that correct?  And I'd direct you'd to QC 70 as an

17  example.

18       A.     Yes.  70.  Yes.

19             MR. SCHLAFLY:  Excuse me.  QC 78?

20             MR. BUTKOVITZ:  70.

21  BY MR. BUTKOVITZ:

22       Q.     That indicates that the invoice was -- was

23  sent to Eagle Trust Fund and Eagle Forum Education,

24  Phyllis Schlafly Center to the attention of John

25  Schlafly or Ed Martin?

1        A.      Yes.

2        Q.      Are you aware of any other addresses that

3    you directly sent invoices to?

4        A.      Not -- again, I wasn't in charge of the

5    invoices.  But I knew that, at one point, Ed said send

6    him the invoices.

7                MR. BUTKOVITZ:  No further questions.  Thank

8    you.

9                MR. FINA:  I just have a few follow-ups.

10                        CROSS EXAMINATION

11    BY MR. FINA:

12        Q.    Mr. Harley, at the time that you had your

13    initial conversations with Mr. Martin in September and

14    October of 2016, was he representing to you that he was

15    president of both Eagle Forum and Eagle Forum Education

16    and Legal Defense Fund?

17        A.      It is my recollection that he certainly had

18    done that.  And this is one of the reasons why it was

19    always a little -- he wasn't necessarily agreeing that

20    he didn't have control over Eagle -- of the C4.  And

21    that was part of the litigation.

22        Q.      So during the work that you were doing, was

23    there a lack of clarity to you, and if you know, Quantum

24    Communications, as to whether or not they were

25    performing work for just the legal defense fund or for

1    Eagle Forum in some form, or some governing entity of

2    Eagle Forum?

3          A.      I think to clarify this a little bit easier,

4    I mean Ed Martin -- we -- we considered Eagle Forum, Ed

5    Martin, to be our client.  And that's who we were --

6    that's who we were performing work for.  We knew,

7    obviously, there was litigation going back and forth.

8    But we were continuing to call it Eagle Forum.  Eagle

9    Forum on the phone with Ed.  I think Ed referred to it

10   as Eagle Forum, unless it was a written invitation for

11   Joe's Crab Shack.  But other than that, it was kind of

12   just known -- it was just used as Eagle Forum.

13         Q.      You were aware that there was a fight going

14   on --

15         A.      Yes.

16         Q.      -- both as a matter of litigation and I

17   suppose as a matter of personal relations --

18         A.      Correct.

19         Q.      -- between members of the Schlafly family?

20         A.      Yes.

21         Q.      And that fight extended, as well, to members

22   of, say, the board of directors of Eagle Forum?

23         A.      Yes.

24         Q.      So there were some members of the board of

25   directors of Eagle Forum that were in favor of Mr.

1   Martin, as far as you were aware, and then there were

2   clearly at least six who were not in favor of Mr.

3   Martin, as far as you were aware?

4        A.    Correct.

5        Q.    And again, that would lead to a lack of

6   clarity as to who, exactly, Mr. Martin had control of or

7   was president of?

8        A.    Right.

9        Q.    Now, as you previously responded to a

10  question, in -- today, you have more clarity in

11  retrospect than you did at the time that you were doing

12  the work and communicating with Mr. Martin, correct?

13       A.    Right.  It was all -- there was a lot going

14  back -- it was a lot of litigation and internal fights,

15  family fights, but then also I would kind of refer to

16  them as political fights, with a small P, for control.

17       Q.    And again, without getting in to all the

18  litigation documents, even the litigation documents, a

19  question here, never had clarity as to which entity

20  exactly was suing what entity.  It was more individuals

21  and personalities involved in that litigation, correct?

22       A.    That is -- that is correct.

23       Q.    Okay.  On the film interviews, again, you

24  don't know whether you interviewed people who had been

25  associated with Eagle Forum as opposed to just people

 1    who were only associated with Eagle Forum Education and

 2    Legal Defense Fund?

 3         A.    Well, if I could just clarify that --

 4         Q.    Sure.

 5         A.    -- please?  It's my understanding that the

 6    people that we interviewed were -- were long -- some of

 7    them were long-time Eagle Forum members or leaders,

 8    personal friends of Phyllis and had different roles in

 9    the organization.  Whether, at the time that we

10    interviewed them, whether they were a board member of

11    the C4 or the C3, I don't -- I don't recall.  But they

12    -- at least some point, when Phyllis was alive, were

13    leaders within her organization or different entities

14    within her organization.

15              MR. FINA:  Thank you.  I have no further

16    questions.

17              MR. BUTKOVITZ:  I have some follow-up.

18              MR. SCHLAFLY:  I do, too.

19              MR. BUTKOVITZ:  I think it probably makes

20    sense for me to just follow up, since his was on my --

21              MR. SCHLAFLY:  Okay.  Fine.

22                    RECROSS EXAMINATION

23    BY MR. BUTKOVITZ:

24         Q.    Okay.  So you just testified that you lacked

25    some clarity in, I guess, the September or October time

1    frame as to what entity you were communicating with and

2    providing services to, something along those lines; is

3    that correct?

4         A.    Yes.

5         Q.    What did you do to -- did you do anything to

6    gain clarity?

7         A.    Well, as I recall, is the litigation was

8    kind of continuing; it would start and stop; it was in

9    different jurisdictions.  There was a lot -- it was kind

10   of very muddy.  So we continued to provide some

11   strategic communications, counsel.  It was, like, okay,

12   this -- the lawsuits, at some point, are going to be

13   over.  But you -- you know, in order to lead the

14   organization to continue Phyllis's legacy, these are the

15   things that you need -- that we suggest that you

16   consider in terms of, you know, becoming much more

17   advanced in your communications, doing the film, for an

18   example, professionalizing the organization, and looking

19   -- not only helping them with the litigation as -- and

20   any communications needs they had as litigation is going

21   forward, but looking beyond that, to the organization,

22   how they would grow the organization after losing a --

23        Q.    I'm sorry.  Let me stop you there.  Who is

24   the them in that statement?  You said to help them with

25   the organization and beyond the organization?

1       A.      Ed Martin.

2       Q.      Who did you expect to receive a check from?

3  So be real specific.  You get a check.  What name do you

4  expect to be on that check either at the top or

5  signature?

6       A.      I didn't.  I don't see the checks when they

7  come in.  So, you know, whomever was being billed would

8  write the check.  And so it's not something that I would

9  have gotten that granular on.

10      Q.      Your understanding was you were providing

11 services in connection with a dispute between two

12 warring factions within Eagle Forum, correct?

13      A.      Right.  So whether it was the legal defense

14 -- you know, I don't know who would write the check.

15 But, you know, it would be the legal defense fund, then

16 that's where it would come from.

17      Q.      Did you expect Eagle Forum, the entity that

18 was being fought over, would pay for a dispute between

19 two factions?

20      A.      The -- no.  In my mind, just to make it a

21 little simpler because I'm not -- you know, so you had

22 the gang of six.  So we didn't expect the gang of six to

23 pay for us, if that makes -- if that helps clarify.

24      Q.      Right.  So did you understand from day one,

25 that there was at least a dispute or challenge to Ed

1    Martin's authority within Eagle Forum?

2        A.    Yes.

3        Q.    So you recognized that it was unlikely that

4    Ed Martin would be approving and signing a check on

5    Eagle Forum letterhead on behalf of Eagle Forum, a

6    501c4?

7        A.    Correct.

8        Q.    I think you previously testified that in --

9    in October, possibly in one conversation, maybe two, Ed

10   Martin called and conveyed to you that he was agreeing

11   to abide by the terms of that original written

12   agreement?

13       A.    Correct.

14       Q.    Did he indicate to you in any way that he

15   would be changing or modifying the agreement?

16       A.    No.  And as I said, we had weekly calls,

17   sometimes more, where we would discuss, you know,

18   communication strategy, political strategies for Ed and

19   the organization.

20       Q.    So to the extent it was your understanding

21   that he was adopting the written agreement, did that

22   include this defined term of Eagle Forum, meaning Eagle

23   Forum Education and Legal Defense Fund, a 501c3

24   organization?

25       A.    As far as I know, yes.

```
 1          Q.      Did Ed Martin ever say that hey, in addition
 2   to that, you know, if -- if they don't pay, you can get
 3   it from Eagle Forum?
 4          A.      No.
 5                  MR. BUTKOVITZ:  No further questions.
 6                  MR. SCHLAFLY:  Okay.
 7                       REDIRECT EXAMINATION
 8   BY MR. SCHLAFLY:
 9          Q.      By the way, I want to complement you on your
10   tie there.
11          A.      Thank you.  Joe Banks.  Keeping poor men
12   looking good.
13          Q.      I want to show you Exhibit 35.  Here.  This
14   is from the prior -- I've turned it to the page.  You
15   don't have to look at the whole thing.  But Exhibit 35
16   is Plaintiff's -- that's Quantum Communications's
17   responses and objections to first request for admissions
18   and interrogatories of Defendant Eagle Forum.
19                  So basically, Mr. Harley, it's your
20   company's sworn responses.  Charlie swore to it at the
21   end -- you'll see a signature page here at the end -- in
22   response to some questions.
23                  It's kind of hard to read because there are
24   objections in here and stuff, but I'm just going to ask
25   you something about three lines here on page five.
```

1          MR. BUTKOVITZ:  Is there a reason you're

2    asking him about a document that's verified by our next

3    witness?

4          MR. SCHLAFLY:  There is, because there's a

5    statement in here by Charlie that differs from my

6    understanding of what you just testified to, Mr.

7    Harley.  So I want to just ask you whether you disagree

8    with Charlie's statement.

9          THE WITNESS:  Okay.

10   BY MR. SCHLAFLY:

11   Q.    It's along -- I apologize.  If you want to

12   take your time to read it, but there's really only three

13   lines I'm going to ask you about on page five.  But I am

14   telling you, this is sworn responses by Charlie Gerow to

15   questions by Eagle Forum's Counsel.

16   A.    Okay.

17   Q.    And it says here --

18   A.    What?  Where are you?

19   Q.    Yeah.  It's at the end of that carry-over

20   paragraph on page five.  Subsequent to that oral

21   communication, on or before --

22   A.    I don't -- I don't find you.

23   Q.    On page five?

24   A.    I'm not following you.

25          MR. FINA:  Top of the page?  Bottom of the

1   page?

2   BY MR. SCHLAFLY:

3       Q.      Top of the page, the carry-over paragraph,

4   the last sentence.  Subsequent to that oral

5   communications, about three lines down.

6       A.      Oh, you didn't say the end.  Okay.  Go

7   ahead.  I see it now.

8       Q.      I'll just read it out loud here.  Subsequent

9   to that oral communication, on or before October 21st,

10  2016, Martin orally agreed, on behalf of Eagle Forum and

11  EFELDF, which is defined a few lines earlier as the

12  Education Legal Defense Fund, to the terms of the

13  original agreement and continued to direct the services

14  be provided by Plaintiff.

15          And I'm just asking you if you agree with

16  that statement.

17      A.      I do.

18      Q.      Okay.  And then just moving on, just quickly

19  to the issue of whether Eagle Forum -- well, strike

20  that.  Whether Ed Martin personally ever obligated

21  himself to anything personally?

22      A.      I'm not sure I follow.

23      Q.      Did you do any -- here it says right here

24  that Martin orally agreed, on behalf of Eagle Forum and

25  EFELDF.  And I'm just asking now, did Ed Martin ever ask

105

1    Quantum Communications to do anything for Ed Martin,

2    personally, or did Ed Martin personally ever agree to

3    pay anything?

4        A.    I don't know that Ed Martin ever said he was

5    going to write a check out of his personal bank account,

6    if that's what you're asking.

7        Q.    That's what I'm asking.  Whether -- you know

8    the difference between someone acting for an

9    organization and somebody acting for himself, right?

10   And I'm just asking you if you ever had any

11   understanding that Ed Martin was engaging Quantum

12   Communications for him, personally?

13       A.    No.

14             MR. SCHLAFLY:  No further questions.

15             MR. BUTKOVITZ:  I have a very quick

16   follow-up.

17                    CROSS EXAMINATION

18   BY MR. BUTKOVITZ:

19       Q.    So just staying on the exhibit we were just

20   looking at --

21       A.    Okay.

22       Q.    -- the response to request for admissions

23   and interrogatories, the subsequent oral communication

24   that's referenced here, was that a communication that

25   was to you?

1      A.      Let me just go back.

2      Q.      I'm not trying to hide the ball.  I think

3  the answer -- I think it would -- correct me if I'm

4  wrong --

5              MR. SCHLAFLY:  Don't do that.

6              MR. BUTKOVITZ:  I'm allowed.  He's not my

7  witness.

8              MR. SCHLAFLY:  I guess.

9  BY MR. BUTKOVITZ:

10     Q.      Okay.  But the communication was to you?

11             MR. SCHLAFLY:  Objection.  Argumentative.

12             MR. FINA:  Well, I'm objecting.  This has

13 been asked and answered.  I mean he's been asked who was

14 on this phone call, and he's answered it previously.  It

15 was he, Gerow, and Martin, and maybe -- he can't

16 remember anybody else.

17             MR. BUTKOVITZ:  Those are the people on the

18 first conversation.

19 BY MR. BUTKOVITZ:

20     Q.      To the extent there was a second

21 conversation, do you recall whether that was a call or

22 communication to which anyone other than you and Ed

23 Martin were a party?

24     A.      Yeah, I didn't have that many one-on-one

25 calls with Ed, other than usually to set up calls

1    because to track him down, and say, okay, he was, like,

2    let's do the call at so-and-so, and then we got a

3    regular time to do it.  But I don't -- I don't recall if

4    it was -- whenever we were talking about anything

5    larger, including money or anything like that, it was

6    usually the three of us on the phone.

7        Q.    Well, do you know if this was a scheduled

8    call, or whether this -- whether Ed Martin just called

9    you right up?

10       A.    I think that this call was a scheduled call

11   or we reached out to him.  I can't -- I can't remember.

12   But that was for the clarification on the agreement.

13       Q.    So to the extent that you agree with that

14   last sentence, what's the basis for your assertion that

15   Martin orally agreed on behalf of Eagle Forum, the

16   extent that you're asserting that it's on behalf of

17   Eagle Forum, the 501c4?

18       A.    Well, as I said, it was kind of mixed

19   together.  So, you know, when you're having a

20   conversation about what you're doing, you wouldn't --

21   you know, you didn't use the acronym.  We used -- Ed

22   would refer to Eagle Forum.  We referred to Eagle Forum.

23       Q.    So is it your testimony that this call on or

24   before October 21st, Ed Martin said something -- may

25   have referred to Eagle Forum and someone may have

1  interpreted that to mean Eagle Forum and EFELDF?

2      A.    I can't -- I can't recall that.

3      Q.    Do you recall whether Martin represented

4  himself to have authority to act on behalf of Eagle

5  Forum, the 501c4, prior to October 21st, 2016?

6      A.    I don't recall because I know that was all

7  being -- it was a big -- there was a fight about that.

8  And that was what was in litigation, as well.  I don't

9  remember if he was removed before that, after that.  I

10  can't -- I'd have to go back and review all of those

11  documents.

12      Q.    But it's also accurate that you never

13  expected to receive payment or provide services to Eagle

14  Forum, a 501c4?

15      A.    Correct, as I testified earlier.

16           MR. BUTKOVITZ:  No further questions.

17           MR. SCHLAFLY:  No further questions.

18                    RECROSS EXAMINATION

19  BY MR. FINA.

20      Q.    Just to clarify that last question, I

21  believe -- is it fair to say your earlier testimony is

22  that you did not expect to receive payment from Eagle

23  Forum, which is different from providing services to

24  Eagle Forum?

25      A.    Yes.  I think that's -- that's accurate.

1    But just to -- if I can just clarify this a little bit,

2    just so we're not -- I understood we were working for Ed

3    Martin and the -- kind of the -- the Phyllis Schlafly

4    team, if you want to call it that.  We were not working

5    with -- which would be oftentimes referred to as Eagle

6    Forum, as opposed to specifically Anne Cori.  We were

7    not working for Anne Cori or the gang of six.  We were

8    working for Ed Martin and that team.  Because it -- does

9    that help?  And the term Eagle Forum gets thrown around

10   --

11       Q.    Yeah.

12       A.    -- on both sides.

13       Q.    Is it fair to say that there was a time when

14   multiple entities, whether they were comprised of an

15   individual or groups of individuals, were all claiming

16   to govern or have control of Eagle Forum?

17       A.    Yes.

18       Q.    Okay.  And isn't it fair to say that you

19   entered in to a relationship and agreement with Ed

20   Martin as the primary contact person --

21       A.    Yes.

22       Q.    -- at a time when these multiple entities

23   were claiming to control Eagle Forum?

24       A.    Yes.

25       Q.    And isn't it true that when you entered into

 1    the agreement with Mr. Martin, he was the president of

 2    Eagle Forum?

 3            A.     That is my recollection.

 4                        RECROSS EXAMINATION

 5    BY MR. BUTKOVITZ:

 6            Q.     I'm trying not to go all day with this.  But

 7    -- I'll just ask one question.

 8            A.     That's all right.

 9            Q.     I think I can do it in one.  Were you --

10    following up on your Counsel's question, were you aware,

11    at this time, in September and October of 2016, that

12    there were conflicting claims to authority and control

13    over those organizations?

14            A.     Yes.

15                   MR. BUTKOVITZ:  No further questions.

16                   MR. SCHLAFLY:  No further questions.

17                   (At 12:46 p.m., the proceedings were

18                    concluded.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3          I, Colleen V. Wentz, RMR, CRR, hereby certify

4    that the proceedings and evidence noted are contained

5    fully and accurately in the notes taken by me during the

6    course of this deposition, and that this is a correct

7    transcript of the same.

8

9

10

11

12

13                    _____
                      Colleen V. Wentz, RMR, CRR
14                    Court Reporter, Notary Public

15

16

17

18          The foregoing certification of this transcript

19   does not apply to any reproduction of the same by any

20   means, unless under the direct control and/or

21   supervision of the certifying reporter.

22

23

24

25

**A**

**a.m** 1:17 4:2
  52:5,6
**abide** 46:19
  76:25 77:2,2
  78:8 101:11
**able** 53:10
**absolutely** 13:21
  90:15
**account** 105:5
**accounting**
  24:19,20
**accurate** 6:10
  7:10 90:12
  108:12,25
**accurately** 111:5
**acronym** 107:21
**act** 91:24 108:4
**acting** 105:8,9
**action** 28:25
  86:16,18
**activist** 18:19
**activists** 17:18
**actual** 18:2
  38:10 53:11
  92:22
**add** 34:12 44:17
  44:17 46:15
  83:12
**added** 41:2 89:1
**addition** 24:25
  90:25 102:1
**address** 94:13
  94:15
**addressed** 41:5
  43:2
**addresses** 17:7
  17:10 18:3
  25:18 95:2
**admissions**
  102:17 105:22
**adopting** 101:21
**advance** 64:5
**advanced** 99:17
**advice** 29:16
  50:20 70:21
  86:21,23,25

**advise** 86:4
**advocacy** 5:18
  5:22
**advocating**
  64:14
**affiliated** 25:8
  70:12
**afternoon** 87:12
**age** 37:13
**agency** 43:6,11
**aggressively**
  20:15
**ago** 58:22
**agree** 30:11
  82:13 104:15
  105:2 107:13
**agreed** 8:5 10:19
  11:4 12:1,6,8
  12:16,23,25
  47:9 48:7,14
  70:20,20 78:22
  80:20 81:21
  82:3 104:10,24
  107:15
**agreed-upon**
  70:19
**agreeing** 10:22
  95:19 101:10
**agreement** 8:6,8
  10:18,20 11:15
  11:21 12:9,10
  12:24 13:1
  14:2,5 32:25
  33:1 41:14
  42:16 43:18
  44:2,4 45:3,16
  45:18,18,19,22
  45:23 46:2,5
  46:16,17,20,23
  47:4,6,10,10
  47:15 49:1,4
  50:1 59:12
  60:12,17 64:7
  64:10,16,19,21
  70:19 76:3,20
  76:25 78:9
  82:4 88:6,11

**91**:2 93:4
  101:12,15,21
  104:13 107:12
  109:19 110:1
**agreements** 45:7
  45:10,13 59:14
**ahead** 63:9 72:4
  88:14 89:5
  104:7
**alive** 98:12
**All's** 20:11 49:22
**allegation** 8:13
  12:23 26:5,6
  30:12 32:1
  41:11
**allegations** 3:15
  6:24 7:3,8,14
  7:22 41:25
  48:24
**alleged** 17:2
  24:4,9
**allegedly** 12:25
  33:12 48:7
  49:15,18 68:25
  69:24
**alleging** 49:8
**allow** 57:8
**allowed** 106:6
**Ambassador**
  26:1,12
**ambiguous**
  23:12
**amend** 91:2
**Amended** 1:3
  41:10
**American** 23:23
**amount** 30:14
  43:22,25 59:12
**amounts** 45:14
**and/or** 86:7,22
  111:20
**Andress** 1:6
  94:14
**ANDREW** 2:6,8
**anesthesiologist**
  64:4
**Anne** 92:6,13

**93**:22 109:6,7
**answer** 12:4,21
  31:9 32:14
  36:5 45:25
  49:16 50:12,17
  50:19,20,25
  54:10 55:3
  71:15,21 72:5
  72:16 77:21,24
  78:1,5,7 106:3
**answered** 12:19
  31:6,14 46:3
  48:11 50:7,9
  71:7 72:4,22
  78:6 106:13,14
**answering** 30:21
  31:20 56:1
**answers** 42:21
**anticipating**
  84:16
**anybody** 10:1
  17:2 19:22,23
  21:17,23 33:17
  106:16
**apologize** 103:11
**apparent** 67:21
**APPEARANC...**
  2:1
**appears** 60:1
**apply** 111:19
**appreciate** 23:2
  29:15 30:20
**approach** 41:23
  41:23
**appropriate**
  51:25 57:4
**approval** 30:14
  75:5,11,15,19
  75:21 76:1
**approving** 101:4
**April** 67:20
**Arch** 2:13
**archives** 33:23
**area** 22:3
**areas** 17:4
**Argumentative**
  106:11

**arrangements**
  58:5,7
**asked** 4:11 12:18
  18:7,19 19:15
  20:7 30:24
  31:5,12,13,19
  34:17 50:6,7
  50:10,13,15
  52:13 72:4,22
  78:6 81:11,13
  106:13,13
**asking** 11:12
  12:11 20:17
  22:21,22 23:3
  27:8 28:1
  29:17 32:7
  33:6 46:13
  48:15 49:6,6
  49:14 50:18
  62:17 71:20,21
  77:1,12,13
  80:24 81:15
  103:2 104:15
  104:25 105:6,7
  105:10
**asks** 29:8
**aspect** 15:17
**aspects** 84:24
**asserting** 107:16
**assertion** 32:2
  107:14
**assign** 53:16
**assist** 84:14
**assistance** 74:11
  74:12
**associated** 16:7
  18:2 97:25
  98:1
**association** 87:5
**associations** 6:2
  6:3 38:19
**assume** 29:11
**assuming** 20:7
**attend** 18:23,25
  19:2 21:12
  23:15
**attendance**

20:20 21:21
**attended** 19:5
  20:18
**attendees** 19:10
**attention** 7:6,11
  40:10 94:24
**attorney** 29:4,7
  53:20 54:9,15
  54:21 55:2,2,5
  55:6,21 56:18
  57:10
**attorney's** 50:19
**attorney/client**
  52:21
**August** 1:11
**authority** 8:7
  91:16,24 92:22
  101:1 108:4
  110:12
**authorization**
  13:19
**authorized**
  41:14 42:15
  47:14 49:2,11
  49:21
**authorizing** 49:4
**aware** 16:16
  18:4 25:16,22
  46:8,14,15
  58:22,24 59:2
  59:21 62:19
  63:18 75:11
  76:7,8,9 79:2
  80:21 81:4,8,9
  81:9,16,19
  82:21 83:20,21
  83:22,23 87:21
  91:5 94:11
  95:2 96:13
  97:1,3 110:10

———————
        **B**
———————
**b-roll** 33:25 34:1
  34:2 73:6
**back** 13:23 14:4
  17:1 27:12
  28:3 33:22

35:4,22,23
  36:7,13,21,22
  37:18 38:1
  42:7 47:7
  50:22,23 55:24
  55:25 56:2,4
  62:7 63:4,5,10
  64:9,18 67:18
  70:5 72:19
  81:19 82:2,19
  82:24 84:25
  85:5,6 89:10
  89:24 91:8
  93:13,24 96:7
  97:14 106:1
  108:10
**background**
  24:20
**ball** 106:2
**ballpark** 68:24
  69:2
**bank** 105:5
**Banks** 102:11
**Based** 90:17
**basically** 27:11
  37:4,12 92:15
  102:19
**basis** 46:11 60:8
  70:18 84:20
  86:11 107:14
**bate** 39:24
**Bates** 39:21
  73:23 88:10
  94:5
**battle** 92:14
**becoming** 99:16
**beginning** 10:15
  48:12 78:24
**behalf** 8:7 10:25
  11:5,19 12:1
  12:11,16 48:7
  67:7 91:24
  101:5 104:10
  104:24 107:15
  107:16 108:4
**believe** 9:22
  11:15 12:13

13:2 15:1 16:9
  16:11,19 18:18
  18:20 26:20
  27:19,21,23
  28:3 34:5 41:7
  44:10 45:13
  49:1 67:19
  78:20 79:3,4,5
  80:1 85:7
  92:13 108:21
**believed** 17:16
  68:4 92:12
**benefit** 17:25
  90:22
**Berkeley** 24:8
  24:24 25:13
**best** 6:11 7:2
  9:14,22 10:10
  47:2 72:16
  84:19
**beyond** 99:21,25
**big** 24:18 61:8
  84:2 108:7
**bill** 44:4,16
  58:17,25 71:12
  86:10
**billed** 100:7
**billing** 44:3
  65:16 66:16
**bills** 58:12,14
**bind** 91:24
**bit** 8:3 61:9 96:3
  109:1
**board** 68:9 92:6
  93:7,8,11,14
  93:17,19,23
  96:22,24 98:10
**Bob** 18:19 20:1
**bottom** 53:19
  75:4 80:3
  103:25
**brain** 37:6
**Brandon** 24:13
  24:14,24 25:6
**break** 51:8,10
  52:4,11
**bring** 45:17

**brother** 34:17
**build** 5:24 16:21
**business** 24:21
  30:9 44:7,24
  45:12
**businesses** 6:3
**Butkovitz** 2:14
  3:4,6,8,10 12:2
  12:18 22:17
  26:24 39:1,20
  40:1,4 47:22
  47:25 48:3,23
  51:7,11 52:24
  53:16 54:7,12
  54:16,20,22
  55:7,12,15
  63:6 73:23,25
  80:24 87:11,13
  88:15 94:20,21
  95:7 98:17,19
  98:23 102:5
  103:1 105:15
  105:18 106:6,9
  106:17,19
  108:16 110:5
  110:15

———————
        **C**
———————
**C** 4:1 111:1,1
**C3** 98:11
**C4** 93:24 95:20
  98:11
**calendar** 64:17
**call** 8:19,20 10:1
  10:3,18 36:2
  56:17 57:5,17
  57:19,21,24
  96:8 106:14,21
  107:2,8,10,21
  107:23 109:4
**called** 58:2 90:6
  101:10 107:8
**calls** 8:23 11:3
  16:24 18:18
  20:17 21:6
  70:7 74:17
  101:16 106:25

106:25
**Camp** 34:7
**campaign** 15:17
  24:9,24 25:12
  44:18,21 45:3
  45:6 85:12
**campaigns** 5:20
  5:22,25 15:16
  44:12,14,20
  86:13,14,15
**candidate** 15:20
  15:22,23,23
  86:25,25
**candidates**
  15:21 44:11
**Carlisle** 1:24
**carry-over**
  103:19 104:3
**case** 1:4 6:13,25
  45:24 46:2
  83:25 87:14
  91:7,13,15
**case-by-case**
  84:20
**cc'ed** 79:9
**cell** 57:23
**Center** 94:24
**certain** 6:1 9:2
  25:5 32:23
  93:19,21
**certainly** 8:6
  19:14 67:8
  69:13 84:20
  95:17
**certification**
  111:18
**certify** 111:3
**certifying**
  111:21
**chairman** 23:23
**challenge** 100:25
**chance** 6:7,12,21
  7:19
**changed** 49:22
**changing** 101:15
**chapters** 89:25
  92:7 93:15

63:1
characterizing
  62:24
charge 23:6 95:4
charged 22:15
charities 38:14
charity 38:16
Charlie 9:2,4,4,5
  9:23 10:4
  14:14,25 15:11
  16:10,11,21
  17:11 18:16,19
  21:12,13 23:22
  24:13,23 25:2
  25:23 26:8,11
  28:4,5,15,21
  29:12,15,16
  30:13,18 31:17
  31:21 35:20
  65:24 66:1,10
  68:1,3 69:12
  69:20 72:14
  74:14 75:16
  78:20 79:5
  80:7,8,9,14,19
  80:25 82:1,2
  85:6 102:20
  103:5,14
Charlie's 103:8
check 15:19
  46:12 100:2,3
  100:4,8,14
  101:4 105:5
checks 100:6
Chester 2:7
claiming 109:15
  109:23
claims 110:12
clarification
  69:6 90:16
  107:12
clarified 91:3
clarifies 91:1
clarify 36:5
  52:25 54:17
  81:22 96:3
  98:3 100:23

108:20 109:1
clarity 95:23
  97:6,10,19
  98:25 99:6
clear 40:1 42:4
  83:1
clearly 77:10
  97:2
client 13:21
  15:23,24 16:1
  21:18 27:11
  40:20 45:5
  46:9 58:9,16
  58:18,19,25
  60:25 61:15
  62:6,8,11,19
  64:3,8 65:1,8
  66:7 68:22
  72:7,7 73:18
  73:20 84:4
  85:14 86:20
  87:3 96:5
clients 5:19 6:1,2
  15:13 38:4,11
  44:7,9,10 45:8
  45:11,15,17,21
  46:4 58:6,11
  58:13 59:5,6,9
  59:20,21,25
  60:4,7 61:7,25
  63:13,22,23
  64:2 65:4,6,7
  65:15 67:3,8,9
  67:14 83:16,19
  84:3,8,12 85:9
  86:3,5
close 24:8 48:17
  72:14,20,22
  73:3 94:2
closed 88:23
CoCounsel 40:7
collect 17:6
  27:22
Colleen 1:17
  111:3,13
come 13:14
  19:15 20:8,17

20:22 22:10
  30:2,2 44:14
  75:23 77:7
  100:7,16
comes 60:5
coming 19:18
  20:24 22:9
  36:3 37:10
  89:18,24
comma 11:5,5
  12:1,6
commenced 4:2
commencing
  1:16
comments 23:2
commercials
  5:21,21
committees
  86:16,18
Commonwealth
  1:19
communicate
  37:12 85:2
communicating
  28:22 97:12
  99:1
communication
  5:19 8:24 13:9
  38:11 45:4
  80:22 81:4,8,9
  81:10,16,23
  101:18 103:21
  104:9 105:23
  105:24 106:10
  106:22
communicatio...
  1:2 5:4,7,13,16
  5:17 6:5,25 7:3
  8:9 14:22 17:6
  17:9 19:12,25
  20:5 21:10
  22:4 24:15
  31:14 32:6
  37:5 58:6,11
  58:19 59:3,7
  59:23 61:16
  62:18 64:25

65:20 66:17
  67:1,16 69:9
  70:13,17 71:4
  71:5 74:7
  80:23 81:5,17
  81:24 82:22
  83:15,18,24
  84:3,7,11,13
  84:21 85:2,3,8
  85:18 88:7
  90:19,21 94:4
  94:9 95:24
  99:11,17,20
  104:5 105:1,12
Communicati...
  6:8
Communicati...
  46:9 102:16
companies 61:8
company 61:8
company's
  102:20
Complaint 1:3
  3:15 41:10
  42:20
complaints
  83:19,21,22
complement
  102:9
complete 33:8
  60:18
completed 59:10
  59:24 72:1
completion 72:8
  72:13,18 73:4
  73:17
complicated
  28:18
compound 48:1
comprised
  109:14
computer 56:4
  56:12,14 67:4
concluded
  110:18
conference
  74:17

confirm 91:12
conflicting
  110:12
connected 86:1
connection 17:2
  17:7 23:18
  25:9,17 35:15
  37:1 68:25
  69:25 71:11
  75:12 83:25
  93:2 100:11
conservation
  31:4
conservative
  17:18 18:19
  23:23
consider 99:16
considered
  20:19 34:21
  81:23 96:4
consultation
  44:14
consulted 35:21
contact 13:8
  60:5 109:20
contacted 41:12
  47:13
contacting 18:11
contacts 83:23
contained 111:4
continue 9:19
  10:20,25 12:9
  46:19 47:9
  49:12,25 61:21
  68:6 77:19
  78:17 99:14
continued 11:21
  29:22 83:2
  99:10 104:13
continues 60:15
continuing
  10:24 13:8
  51:1 68:2
  82:25 96:8
  99:8
contract 13:24
  51:2 64:20

92:15 95:20
97:6,16 109:16
109:23 110:12
111:20
**conversation** 8:4
9:7,12,13,21
10:10 11:2,23
13:2,3 29:13
33:10 42:19
48:9 49:9,20
49:23 50:2
51:1 66:12
101:9 106:18
106:21 107:20
**conversations**
9:8 17:12
25:23 26:8
32:17,18 33:7
37:3,3 68:5
74:15 76:15
77:5 82:7
89:15,15 95:13
**conveyed** 101:10
**coordination**
13:10
**copy** 39:25
51:16 52:8,22
56:15 73:22
**Cori** 89:23 92:6
92:13,17,19
93:2,22 109:6
109:7
**corporation**
87:5
**correct** 7:4,9,15
9:5 11:6,25
12:16 14:17
24:2 41:5,17
41:24 42:2,23
43:2,7,10
46:18 47:15,16
66:24 74:20
75:6 87:19,20
90:24 91:4,13
92:1 94:14,16
96:18 97:4,12
97:21,22 99:3

100:12 101:7
101:13 106:3
108:15 111:6
**corrected** 49:3
**cost** 22:24,25
44:17,17
**counsel** 2:5,9,16
70:21 74:11,12
83:10,13 86:8
99:11 103:15
**Counsel's** 92:5
110:10
**Counterclaim**
2:10
**couple** 32:24
36:1
**course** 40:16
111:6
**court** 1:1,18
35:18 56:17
57:6,18,19,22
57:24 58:3
91:20 111:14
**CPAC** 23:15,19
23:24
**Crab** 21:2 96:11
**crafting** 84:18
**crew** 25:25
26:11 28:14
33:16 69:17
73:8,8
**crisis** 5:19 84:13
**CROSS** 87:10
95:10 105:17
**crowd** 16:21,25
20:14
**crowds** 18:11
**CRR** 1:18 111:3
111:13
**Crystal** 66:19,20
**cut** 28:10

—— D ——

**D** 4:1
**D-3** 2:2
**D.C** 18:20,24
19:2 25:25

**daily** 21:6,7
40:17
**data** 8:21
**database** 17:22
**date** 1:17 7:22
7:25 8:10,16
78:18 82:15,18
**dated** 41:15
**day** 16:22 32:23
34:4 47:18,19
48:15,16,17
67:11 85:13
100:24 110:6
**days** 46:23 47:4
47:17 70:1,2
**deadline** 51:2
**deadlines** 50:8
**dealing** 67:3
**dealt** 8:3 9:10
**decide** 21:5 30:4
51:18 67:15,16
68:16
**decision** 75:25
**decision-maki...**
68:15
**Defendant** 2:9
2:11 102:18
**Defendants** 1:7
**defense** 1:5 2:10
10:25 11:7,16
12:14 39:3
87:19,23 88:4
88:8,22 89:13
89:21 90:3,8
91:1 93:12
95:16,25 98:2
100:13,15
101:23 104:12
**defined** 89:4
101:22 104:11
**definition** 23:11
85:11,19
**DeFund** 24:8,24
**degree** 9:3
**deliver** 84:19
**delivered** 25:8
25:17 72:3

**DEMANDED**
1:7
**dependent** 13:19
**depending** 62:10
**depends** 23:10
38:17 58:8,8,9
58:9 59:8,16
67:13 84:4,4
**deposed** 4:24
**deposition** 1:14
3:14 4:10,21
5:10 39:18,23
40:6 51:20,24
54:5,5 56:16
57:7 111:6
**depositions** 5:6
**describe** 6:4,5
37:25 92:4
**described** 18:24
**describing** 38:25
**description** 3:13
7:10 43:5,10
**designed** 17:15
18:16
**detail** 7:21,25
38:10
**detailed** 37:15
**details** 49:10
**determine** 52:20
55:2 57:3
63:15
**determining**
61:11 84:19
**develop** 13:9
37:4
**difference** 86:17
105:8
**different** 6:1
11:10 16:13
19:14 21:7
35:17,18,19
45:4 67:9 90:1
90:10 98:8,13
99:9 108:23
**differs** 103:5
**digital** 5:21
37:13

**dinner** 20:24
23:15,19
**direct** 5:22 7:6
13:6,11 31:7
40:10 44:15
94:4,16 104:13
111:20
**direction** 64:6
**directly** 66:9
71:16 95:3
**directors** 96:22
96:25
**disagree** 103:7
**discoverable**
51:18
**discovery** 52:23
57:4
**discuss** 13:3,14
101:17
**discussed** 10:17
33:1 74:12,13
86:5
**discussing** 9:24
68:2
**discussion** 4:15
13:25 14:7,9
35:7 39:14
58:1 67:24
78:19,21 80:19
**discussions** 51:3
66:5,8 75:16
78:12
**dispute** 100:11
100:18,25
**DISTRICT** 1:1
1:1
**divvied** 21:8
**document** 53:19
54:2,17,18,25
55:18,20,23
56:5,7,8,9,10
56:12 57:6,12
74:5,20 80:12
80:13 103:2
**documents**
40:15 41:21
56:25 97:18,18

108:11
**doing** 10:14
 15:16 18:12
 40:25 44:13
 45:4 49:15,18
 67:16,22 86:8
 93:6 95:22
 97:11 99:17
 107:20
**donations** 85:22
**donors** 15:10,13
 15:13 16:1,4
**dozen** 30:22
**draft** 35:22
 71:14 74:15
**drafted** 35:16,21
 74:15
**drafter** 74:19
**drafting** 74:9
**drafts** 27:11
 36:22
**duly** 4:4
**duration** 59:15
 59:17
**duties** 5:15
 66:25 67:5

— E —

**E** 4:1,1 111:1
**e-mail** 16:17,20
 17:7,10,14,21
 18:2 25:18
 27:17,19,23,25
 28:3,19 29:8
 29:10,11,13
 48:13 56:6
 61:2,3 79:5,7
 79:10,13,16
 80:1,7,8,13,16
 82:1,2,15,22
**e-mailed** 16:23
 56:5
**e-mails** 17:1
 28:25 29:4,5,7
 67:10 81:19
**Eagle** 1:5,5 2:10
 2:16 10:25

11:5,7,9,15,19
12:1,13,16
15:8 17:25
26:10 37:12
39:2 43:6
45:18 48:8
49:25 87:13,17
87:18,22,23,25
88:3,8,21,22
89:6,11,12,22
89:22 90:5,10
90:13,17,22
91:16,21,25
92:8,9,22
93:11,20 94:9
94:23,23 95:15
95:15,20 96:1
96:2,4,8,8,10
96:12,22,25
97:25 98:1,7
100:12,17
101:1,5,5,22
101:22 102:3
102:18 103:15
104:10,19,24
107:15,17,22
107:22,25
108:1,4,13,22
108:24 109:5,9
109:16,23
110:2
**Eagles** 90:6,7
**earlier** 20:20
 26:21 85:12
 87:16 104:11
 108:15,21
**early** 35:17
 89:15
**easier** 91:11
 96:3
**easy** 78:7
**ebutkovitz@k...**
 2:15
**Ed** 8:1,3,8,19,24
 9:2,15,23
 10:19 11:23
 12:8 13:7 14:7

14:9,18,22
15:10 16:13,17
17:10,13,25
18:1,2,7 19:2,7
20:13,19 21:5
21:6,16 25:8,9
25:14,17,22
26:8,21,23
27:2,5,13,22
28:4,19,23
29:14 30:1,7
30:11,15,24
31:4 32:12,22
33:1,5,7,10,24
34:11,12,17,18
35:21 37:4
39:24 40:6
41:12 42:14,19
46:17 47:3,9
47:13 48:13,18
49:7,10,14,25
50:4 67:17,21
68:4,5,17,25
69:14,25 70:11
70:12,14,20
71:10,12,12,16
74:13 75:16,20
75:25 76:1,15
76:17 77:13,16
78:3,4,22 79:6
80:8,14,19,20
80:22 81:4,5
81:12,16,17,20
81:24,24 82:2
82:18 83:6
84:22,25 85:3
85:4 87:13
89:17 90:3,8
92:8,11 93:22
94:25 95:5
96:4,4,9,9
100:1,25 101:4
101:9,18 102:1
104:20,25
105:1,2,4,11
106:22,25
107:8,21,24

109:2,8,19
**Ed's** 75:19,23
 82:2
**edit** 34:9 73:14
**edited** 27:11
 32:20 73:7
**editing** 32:13
 34:8 35:1
 73:15
**edits** 72:9
**education** 1:5
 2:10 39:3
 87:18,23 88:3
 88:8,21 89:12
 91:1 93:12
 94:23 95:15
 98:1 101:23
 104:12
**Edward** 1:6 2:11
 2:14
**EFELDF** 104:11
 104:25 108:1
**effect** 68:8
**effective** 37:11
**effectively** 83:12
**either** 86:6,22
 92:20 100:4
**election** 85:13
**ended** 48:13
**engage** 77:19
 84:14
**engagement**
 88:21
**engaging** 105:11
**enter** 8:8 49:2
**entered** 88:7
 109:19,25
**entire** 40:2 65:8
 94:3
**entities** 16:8
 85:21 87:22
 98:13 109:14
 109:22
**entitled** 51:20
 57:7
**entity** 11:8,13,14
 86:2 87:18

90:18 96:1
97:19,20 99:1
 100:17
**equal** 43:22
**ESQUIRE** 2:3,8
 2:14
**estimate** 30:16
 67:1 70:13
**event** 16:22,25
 19:2,9,11 20:9
 20:18,18 21:15
 22:1,13,19,22
 23:3 24:1
 28:14
**events** 18:23
 22:10
**everybody** 19:19
 20:16 61:21
 89:22
**evidence** 111:4
**exact** 78:18
**exactly** 56:21
 82:24 97:6,20
**EXAMINATI...**
 3:2 4:7 87:10
 95:10 98:22
 102:7 105:17
 108:18 110:4
**examined** 4:5
**example** 9:17
 24:7 40:24
 68:19 94:17
 99:18
**examples** 59:6
**excess** 75:5
**exchange** 29:13
**Excuse** 79:15
 94:19
**execute** 13:15
**executing** 45:5
**execution** 13:18
 76:3
**exhibit** 3:14,15
 4:16,20 6:15
 6:16,19,24 7:3
 7:7,9,12,15
 24:3 39:17,23

40:2,10 41:10
47:8 73:21
79:24 80:1
88:10 94:3
102:13,15
105:19
**exhibits** 3:12
79:19
**expand** 11:1
**expect** 100:2,4
100:17,22
108:22
**expected** 108:13
**expense** 75:4
**expenses** 13:22
13:23,24,25
14:3,9,10,10
14:12,16 28:13
28:14 29:22,25
30:17 75:12,21
**explain** 34:1
47:3 48:18
49:17 89:14
**explained** 49:7
49:14 89:24
**explanation**
90:16
**extended** 96:21
**extent** 101:20
106:20 107:13
107:16
**extract** 57:15
**extremely** 20:13

___ F ___

**F** 111:1
**Facebook** 25:4
**fact** 27:13 42:12
68:2
**factions** 100:12
100:19
**facts** 41:20
**fair** 93:1,18,18
108:21 109:13
109:18
**Faith** 26:1,9
28:16 30:3,6,7

30:19 31:14
34:23 35:9
69:4 75:24
**fall** 70:6
**familiar** 5:10
**family** 34:18
96:19 97:15
**far** 2:7 16:23
41:7 61:13
97:1,3 101:25
**fast** 73:15
**favor** 96:25 97:2
**February** 23:16
23:21 29:19
66:18
**fee** 10:20 43:6
49:13 64:22
**feedback** 21:14
21:23
**females** 18:18
**fgflegal@outl...**
2:4
**fight** 92:10,10
92:14,15 96:13
96:21 108:7
**fights** 97:14,15
97:16
**figure** 53:12
**file** 53:9
**fill** 34:2
**film** 14:18,22
15:2,4,7 25:25
26:7,11,13,16
26:18,21,22
27:1,10 28:6
28:14,20,24
32:13,18 33:4
33:8,16 34:2,3
34:8,10,14,21
35:9 37:8
68:19,20 69:2
69:3,4,5,5,17
70:23 71:1,3
71:17,23 72:1
72:12,17 73:8
75:17,22 83:7
97:23 99:17

**filming** 33:11
71:11 73:16
**Fina** 2:2,3 3:5,9
23:9 31:5,9,13
41:18 46:25
48:22 50:6,13
50:17,25 51:17
51:21,25 52:19
53:15,18,22
54:2 56:20,24
57:11,19 62:21
63:3 69:6
70:24 71:6,18
72:4,21,25
74:2 75:6
77:15,22 78:1
78:6 79:19,23
79:25 80:4,11
82:5,16 88:13
95:9,11 98:15
103:25 106:12
108:19
**final** 71:13,14,24
72:9
**find** 72:23
103:22
**fine** 30:11,20
54:4,14 55:4,5
63:12 98:21
**finish** 28:7 81:2
**finished** 25:16
27:15 34:21,25
56:1 61:23
**firing** 85:14
**firm** 5:17 18:13
21:8 65:7
84:24
**firms** 24:19
84:13
**first** 19:6 31:12
31:19 88:17
89:12 102:17
106:18
**five** 20:8 33:21
33:21 65:21,22
92:6 102:25
103:13,20,23

**flat** 60:22
**floor** 2:13 21:4
**focus** 8:10
**follow** 24:6
98:20 104:22
**follow-up** 16:24
98:17 105:16
**follow-ups** 95:9
**following** 103:24
110:10
**follows** 4:5
**footage** 27:10
93:7
**foregoing**
111:18
**form** 12:2 22:17
26:24 71:18
96:1
**forth** 27:12 28:4
36:23 81:20
84:25 88:20
96:7
**Fortune** 6:2 61:8
**Forum** 1:5,5
2:10,16 10:25
11:5,7,9,16,19
12:1,14,17
15:8 26:10
37:12 39:2
43:6 45:18
48:8 87:14,17
87:18,22,23,25
88:3,8,21,23
89:7,11,12,22
89:23 90:6,11
90:13,18,22
91:16,21,25
92:8,9,22
93:11,20 94:9
94:23 95:15,15
96:1,2,4,8,9,10
96:12,22,25
97:25 98:1,7
100:12,17
101:1,5,5,22
101:23 102:3
102:18 104:10

104:19,24
107:15,17,22
107:22,25
108:1,5,14,23
108:24 109:6,9
109:16,23
110:2
**Forum's** 103:15
**forward** 48:14
77:19 78:17,19
81:21 82:11
99:21
**fought** 100:18
**four** 36:1,6,9
60:14 65:21
70:1
**frame** 99:1
**Frank** 2:2,3
31:12
**free** 57:19
**friends** 93:15
98:8
**front** 8:21 53:8
65:9
**fully** 111:5
**fund** 1:6 2:10
10:25 11:7,16
12:14 39:3
86:19 87:19,23
88:4,8,21
89:13,21 90:3
90:8 91:1
93:12 94:23
95:16,25 98:2
100:15 101:23
104:12
**funding** 86:22
**fundraising**
15:15,17 86:2
**further** 87:7
95:7 98:15
102:5 105:14
108:16,17
110:15,16

___ G ___

**G** 2:2 4:1

gain 99:6
gang 92:2,17,21
  93:2,9 100:22
  100:22 109:7
gathered 25:19
general 5:15
generally 8:22
  28:2 62:10
  92:4
generate 16:25
  18:20
generating
  18:11
Germantown
  2:2
Gerow 9:4,5
  10:4 18:16
  21:12 24:23
  31:17 65:24
  66:1 74:14
  103:14 106:15
getting 25:4 28:8
  28:9,23 56:6
  68:3,13 72:14
  72:22 73:3,11
  83:11 94:2
  97:17
give 18:1 29:4,5
  29:8 30:16,24
  31:3 41:3 57:9
  59:5 67:4 72:7
  72:7 86:24,25
given 69:14
giving 17:24
  70:21 83:10
go 13:23 14:4
  20:23 26:4
  27:12 28:11
  30:2,3,3,4,5
  33:22,22,23
  35:4 36:7,13
  36:21 37:17
  38:1 47:7
  48:14 55:24,24
  56:2,4 61:14
  62:7 63:9,10
  64:9,18 65:5,5

65:8,13 67:18
70:5 72:4,9,19
76:19 82:12,19
82:23 85:5,6
88:14 89:5
91:8 93:13,24
104:6 106:1
108:10 110:6
goes 73:12,15
going 7:17 13:5
  13:7,20 25:13
  28:7,13 36:22
  40:9 41:18
  49:12,24 50:6
  50:8 54:14
  55:6 56:17
  57:8 59:11
  61:12 62:13,21
  67:22 68:12
  72:21 73:21
  81:19,21 82:11
  83:1 84:25
  94:13 96:7,13
  97:13 99:12,20
  102:24 103:13
  105:5
good 87:12
  102:12
gotten 19:13
  20:8 100:9
govern 109:16
governing 96:1
granular 100:9
grassroots 5:24
grasstop 5:24
great 30:5
greater 7:21,25
group 90:6
groups 38:22
  109:15
Grover 20:1,4,6
  20:7
grow 99:22
guess 23:10
  57:23 76:11,13
  98:25 106:8
guys 90:9

**H**
handed 54:2
  55:1
handle 29:16
handled 31:17
  66:20
handles 66:16
handwritten
  88:17 90:25
Hanover 1:23
happened 15:4
  36:4,4 48:12
  62:3 85:17
happening
  25:23
happens 5:23
  85:13 86:20
happy 92:8
hard 21:21
  102:23
hardest 73:10
Harley 1:14 3:3
  3:4,5,6,7,8,9
  3:10,14,15 4:4
  4:9,16,20 6:16
  6:19,24 7:3,7,8
  41:13 51:14
  52:9 55:7 69:7
  87:13 95:12
  102:19 103:7
Harrisburg 1:16
  1:24 10:8
head 62:4
hear 66:9,13
heard 8:1 66:1
  68:5
heavily 16:21
Heckman 18:19
  18:21 20:1
held 1:14 4:15
  21:1 35:7
  39:14 52:5
  58:1
help 16:25 99:24
  109:9
helped 21:5
helpful 31:22

helping 99:19
helps 100:23
hey 30:5,6 36:2
  60:17 102:1
hide 106:2
highly 20:18
Hill 34:7
Hills 2:7
hiring 28:14
Hold 47:25
honorable 1:5
  68:7
hoped 80:9
hopefully 39:18
  87:14
hour 19:8
hourly 44:6
house 33:25
hundreds 20:16
  20:16

**I**
i.e 90:8
Ian 1:6 8:7
  12:10 35:17,17
  35:20,23 36:2
  41:8,13,17,24
  42:2,15,18
  47:14 49:10,20
  74:6,7,16,18
  89:2,16
idea 30:5 35:2
  36:14 67:4
ideas 13:15,18
  37:8,11 86:7
identification
  4:17 6:17
identified 57:2
identify 39:20
  53:13 54:7
  55:8 83:3
important 21:19
  49:11,23
in-person 9:16
inauguration
  16:23 19:3
inclined 56:16

57:5
include 12:25
  13:3,5 38:5
  69:4 101:22
included 81:1
including 11:2
  47:10 65:22,24
  93:2 107:5
inclusion 88:17
inconsistent
  41:19,20
incorrect 11:18
  12:5,7,22
increase 22:25
  22:25 86:22
incur 14:10
  29:22
incurred 28:14
INDEX 3:1
indicate 89:9
  101:14
indicates 94:22
individual 87:4
  89:25 92:3
  109:15
individuals
  97:20 109:15
influenced 56:16
information
  6:10 29:9
  74:22,23
informed 41:13
  47:14
initial 16:3 76:2
  95:13
instance 62:5
  89:10
instances 61:19
instructing
  50:11
instructions
  13:12
intent 75:9 76:2
  91:3
interested 15:18
  49:24 60:6
interestingly

19:8
**internal** 56:7
66:8 97:14
**internally** 11:8
11:11 67:24
87:17 90:9
**interpret** 82:13
89:10
**interpreted**
108:1
**interrogatories**
102:18 105:23
**interview** 26:1
28:16 30:2,3,6
33:16,20,24
34:23
**interviewed**
26:12 30:7
34:12 69:15
97:24 98:6,10
**interviewing**
34:16 93:7
**interviews** 32:19
69:22 73:5
97:23
**introduce** 6:15
**introduced** 40:6
**invalid** 46:18,23
**invalidate** 47:4
48:20
**invalidated** 47:6
48:25
**invitation** 16:23
17:15 22:7
96:10
**invitations**
19:14 20:9
**invoice** 38:12,24
39:9 40:12,12
40:22,22,25
41:4,5,8,8,15
42:2,22 43:2,5
60:19 94:22
**invoices** 32:3
37:20,23,25
38:2,3,5,7 39:6
39:7 40:11,18

42:5,6,7,8
60:21 66:21
78:16 81:20
82:11 94:9,12
94:15 95:3,5,6
**invoicing** 41:17
41:24 68:13
**involved** 17:12
18:10,11 22:24
23:24 25:3,15
30:19 31:16
37:19 44:18
58:10 64:19
69:20,20 75:24
75:25 90:5
97:21
**involvement**
24:1,5,9
**issue** 5:18,22,23
9:15 49:4
104:19
**issues** 9:24,25
10:13
**itemized** 44:3

_____

**J**

**January** 28:11
78:24
**Jersey** 2:7
**job** 5:15 40:25
66:25 67:4
**Joe** 102:11
**Joe's** 21:2 96:11
**John** 94:24
**joined** 58:21
**Jr** 1:7 2:11
**jurisdictions**
35:19 99:9
**JURY** 1:7

_____

**K**

**Kane** 1:5
**keep** 8:22 44:6
53:10 70:9
**Keeping** 102:11
**Ken** 66:18,23
**Kevin** 1:14 3:3,4

3:5,6,7,8,9,10
4:4 41:13 69:7
**kick** 13:15
**kind** 32:20 38:17
38:18 62:13
75:10 89:16
96:11 97:15
99:8,9 102:23
107:18 109:3
**KLEINBARD**
2:12
**knew** 20:16
93:25 95:5
96:6
**know** 11:8 13:25
14:8,14,23,24
15:14,19 18:7
18:9 19:18
20:8,10,11,23
22:7,11,14,18
23:4 24:12,17
25:5,22 26:14
26:18 28:8,18
29:17 30:24
32:5,16,19,22
32:22,23 33:3
33:14 34:16
35:4 36:10,21
37:2,24 40:17
40:21,23 41:7
42:11 43:9
44:15 48:16
49:21,22,22
51:21 52:3
53:24 56:14
57:24 59:11
60:13,14,18
61:7,7,21,22
62:2,8,10,13
65:6,14 66:20
67:10 68:1,10
69:12,12,16
70:1,4,5 74:17
76:13,14,14
78:23 79:8,18
82:20 83:10
84:17 85:16

86:6 89:4,18
89:20 90:5,9
90:17 92:11,23
92:23 93:13,23
93:23,24 95:23
97:24 99:13,16
100:7,14,14,15
100:21 101:17
101:25 102:2
105:4,7 107:7
107:19,21
108:6
**knowing** 25:11
**knowledge** 6:11
7:2 18:8 25:7
26:2,3,5,6
33:11 37:22
39:8,10 47:2
72:17
**known** 96:12
**knows** 89:22

_____

**L**

L 2:6
**label** 88:10 94:5
**lack** 78:12 95:23
97:5
**lacked** 98:24
**language** 35:23
89:1
**large** 67:11
**larger** 107:5
**law** 2:2,6 84:13
84:24
**lawsuits** 84:25
99:12
**lawyers** 84:18
**lays** 82:2
**lead** 92:12 97:5
99:13
**leaders** 92:7
98:7,13
**leadership** 92:11
**leave** 19:7
**leaving** 20:25
**left** 19:8
**legacy** 26:9

32:20 73:6
99:14
**legal** 1:5 2:10
10:25 11:7,16
12:14 39:3
87:18,21,23
88:4,8,21
89:12,21 90:2
90:8 91:1
92:14 93:12
95:16,25 98:2
100:13,15
101:23 104:12
**legally** 90:11
**legislation** 64:5
64:14
**legislative** 64:13
64:13,17
**let's** 47:7 48:6
57:21 64:3
107:2
**letter** 61:3 74:6
74:6,9 88:11
88:20
**letterhead** 101:5
**light** 41:25
**limited** 53:10
**linda@premie...**
1:22
**line** 32:16 52:16
82:24
**lines** 99:2 102:25
103:13 104:5
104:11
**list** 3:15 17:25
18:21,22 62:8
65:8,13
**listed** 94:13
**listen** 20:22 22:6
42:4 44:2
61:20 77:5
**lists** 16:17,20
**litigated** 91:16
92:25
**litigation** 58:10
59:2 79:14,17
84:11,21,24

91:6,6,20
95:21 96:7,16
97:14,18,18,21
99:7,19,20
108:8
**little** 8:2 57:9
61:9 95:19
96:3 100:21
109:1
**LLC** 1:15,21
**lobbying** 64:24
64:25
**local** 93:15
**location** 21:5
**Logan** 2:13
**logs** 44:6
**long** 5:12 10:10
27:22 33:7
60:13 61:11
62:11,15 98:6
**long-time** 93:15
98:7
**longer** 61:9 85:3
**look** 6:7 8:14
13:23 14:4
22:6 25:24
35:4 36:7,13
37:18 38:1
43:9 47:7
51:22 52:20
55:25 56:2,3
56:21,23,24
57:9 62:7
63:10 64:10
74:25 75:3
82:19,24 88:10
93:13,25
102:15
**looked** 26:18
35:5 57:1,14
68:11 93:4
**looking** 40:14
53:15,25,25
54:3,14,25
55:10,18 57:6
68:10 92:3
99:18,21

102:12 105:20
**lose** 23:3
**loser** 22:16
**losing** 62:6
99:22
**lost** 23:5,7,11
63:23 64:2
65:1
**lot** 5:19 17:17
20:2 21:5
26:18 37:6,10
48:1 61:3
69:12 73:7
77:6 89:25
97:13,14 99:9
**lots** 35:18
**loud** 104:8
**Louis** 28:13,15
30:3 33:12
34:13 69:4,13
70:2,2 75:17
75:23
**love** 61:20
**LPA** 1:6

———————
**M**
**magnitude**
45:11 46:5,10
**mail** 5:22 44:15
**making** 18:18
69:17
**management**
44:13
**March** 67:20
80:1 82:16
**mark** 4:12
**marked** 4:16
6:16 74:1
**Market** 1:15,23
**Martin** 1:7 2:11
8:1,8,20,24
9:15,23 11:4
11:23,25 12:5
12:8,15,16,24
14:7,9,19,22
15:10 16:13,18
17:10,25 18:1

18:2 19:3,7
20:13,19 25:8
25:9,17 26:21
26:23 27:2,5
27:13,22 29:14
30:1,7,11,15
30:25 31:4
32:2,7,12 33:2
33:5,7,10
34:11,13 37:4
39:24 41:12
42:14,19 46:17
48:7 49:3,7,10
49:14 51:1
67:17,21 68:17
69:1,25 70:11
70:12,14 71:10
71:12,12,16
75:17 76:1,15
76:17 77:13,17
78:3,4 79:20
81:5,12,16,17
81:24 84:22
89:21 90:3,8
91:20,24 92:9
92:11 93:22
94:25 95:13
96:4,5 97:1,3,6
97:12 100:1
101:4,10 102:1
104:10,20,24
104:25 105:1,2
105:4,11
106:15,23
107:8,15,24
108:3 109:3,8
109:20 110:1
**Martin's** 40:6
101:1
**Mary** 24:22
**Masters** 24:21
**matter** 37:1
51:24 66:21
73:7,9 96:16
96:17
**mean** 25:10,11
35:24 38:21

40:20 48:19
53:21 54:12
61:20 64:11
69:9 73:3
85:14 96:4
106:13 108:1
**meaning** 61:2
82:13 101:22
**means** 69:7
72:24 73:1
82:4 111:20
**mechanics** 14:21
**media** 5:18,20
5:25,25 16:6
83:24 84:2,7,7
84:16,17
**media-related**
84:15
**meeting** 2:3 9:16
93:24 98:10
**member** 93:17
93:24 98:10
**members** 34:18
92:6,20 93:8,8
93:8,11,14,19
96:19,21,24
98:7
**memo** 37:15
**memory** 52:12
**men** 102:11
**mention** 66:13
**mentioned** 18:24
85:12
**messages** 84:18
**middle** 1:1 10:15
**mind** 49:21 90:2
100:20
**minutes** 51:11
**mischaracteri...**
48:24 71:19
**mischaracteri...**
62:22
**Missouri** 90:5
**mixed** 107:18
**modernize** 37:9
**modifying**
101:15
**moment** 19:19

51:8
**money** 22:13,14
22:16,19 23:3
23:5,7,11
27:22 28:23
42:24 45:14
83:16 85:20,25
86:7,7 107:5
**month** 43:14,15
43:19 44:3,6
45:11,16 46:6
46:10 47:12
60:19 70:16
76:12 77:9,11
77:14 78:4,22
78:22 79:11,22
80:10 81:6,6,7
81:18,18,25
**month-to-mon...**
61:11
**monthly** 44:8,12
44:19,21 60:8
60:10 62:16
64:22 65:16
86:11 87:1
**months** 32:24
43:23 44:1
60:14
**mother's** 33:25
**move** 23:13 60:3
**moved** 24:17
62:9 64:6
**moving** 35:19
77:19 78:17,19
82:11 90:1
104:18
**muddy** 99:10
**multiple** 9:7
32:17 37:2
81:10 109:14
109:22
**multiple-year**
62:15

———————
**N**
**N** 4:1 111:1
**nail** 90:24

name 87:13
  100:3
named 87:22,23
names 18:15
  92:3
narrow 8:18
national 16:14
near 72:8,13,18
  73:4,17
nearly 44:19,20
nearly-comple...
  68:22
necessarily 92:3
  95:19
need 28:10 31:7
  35:3 62:1,14
  99:15
needed 32:23
  69:18
needs 34:25 67:9
  99:20
nervous 20:13
network 23:1
never 26:21 27:4
  27:15 47:6
  48:25 58:16
  70:23 97:19
  108:12
new 2:7 40:20
  64:13
Nine 55:11
ninth 55:12
nonprofit 38:17
  38:19
nonprofits 38:15
  38:18
Nope 59:1 63:24
  65:3
normally 21:9
  39:6 40:16
  73:12
Norquist 20:1,4
  20:6
Northon 1:6 8:7
  41:14,17,24
  42:3,15,18
  47:14 49:2

74:6,7 89:2
Notary 1:18
  111:14
notations 88:18
noted 111:4
notes 33:23
  51:15,19 52:10
  52:14,15 111:5
Notice 3:14 4:9
  4:21
notified 9:10
  49:2
November 37:17
  41:15,16,24
  43:7
number 7:17
  39:21 53:16,17
  55:8,8 79:25
  80:2
numbered 53:6
  53:7,12
numbering 4:13
numbers 41:3
numerous 14:10
  35:16,24,25
  36:10,22 72:6
  78:13

                O

O 4:1 111:1
object 12:2
  41:18 50:6
  51:5 53:20
  55:5 56:19
  62:21 71:6,18
  72:21
objecting 106:12
objection 12:18
  22:17 23:9
  26:24 39:1
  46:25,25 47:22
  48:22,23 63:6
  70:24 77:15,22
  80:11 82:5
  106:11
objections
  102:17,24

obligated 104:20
observe 33:16
obtain 14:15
  16:6
obviously 96:7
occasion 77:18
October 7:23
  8:13 37:17
  41:11 42:14
  48:10 95:14
  98:25 101:9
  104:9 107:24
  108:5 110:11
office 2:2 15:24
  42:7 67:14
officer 91:20
officers 92:21
offices 1:15 10:8
oftentimes 59:25
  109:5
Oh 69:11 104:6
okay 4:12 15:21
  17:23 20:10
  26:15 27:1
  28:10 30:10
  32:1 33:14
  36:12,16 39:17
  42:5,10 43:1
  48:3,6 50:18
  51:15 54:20,24
  55:4,15 57:21
  60:17 61:24
  63:9 65:15
  71:1,15 77:1
  80:21 81:15,22
  86:18 87:7,12
  88:14 89:19,20
  91:5,14 92:5
  92:17 97:23
  98:21,24 99:11
  102:6 103:9,16
  104:6,18
  105:21 106:10
  107:1 109:18
old 2:7 62:8
once 32:19 73:13
  78:11

one-on-one
  106:24
ones 59:17
ongoing 26:10
  62:15
operate 45:16
operating 75:10
operation 42:7
opinion 42:22,24
  42:25 43:1
  92:23
opportunity
  72:9
opposed 97:25
  109:6
oral 1:14 45:10
  45:13,16,22
  46:5,11 103:20
  104:4,9 105:23
orally 48:21
  104:10,24
  107:15
order 99:13
ordinarily 40:18
organization
  37:6,9 39:9
  88:22 89:13
  90:4 91:2,17
  91:21,25 92:13
  92:16 98:9,13
  98:14 99:14,18
  99:21,22,25,25
  101:19,24
  105:9
organizations
  11:10 38:21,24
  39:2,5 110:13
original 10:20
  11:14,21 12:9
  12:10,24 13:24
  14:1,4 76:20
  84:23 92:8
  101:11 104:13
originally 17:21
outside 89:18
outstanding
  32:3

overtly 18:10
  25:14
owed 27:14
  28:24 42:24
  43:13,16 78:16

                P

P 4:1 97:16
p.m 110:17
PA 1:24,24
PAC 85:18,19
  85:23 86:1,2,4
  86:6,7,19,21
  86:22 87:6
PACs 86:3,5
page 3:2,13 7:7
  7:8,12 53:1,4,5
  53:13,18,19
  55:8,11 75:6
  80:25 102:14
  102:21,25
  103:13,20,23
  103:25 104:1,3
pages 53:6 94:5
paid 18:20 28:8
  28:9,12 29:20
  37:24 42:25
  43:19 58:18
  67:23 68:3,12
  68:13 72:1
  76:3,5,7,8,10
  77:8 83:1
paper 74:22
papers 53:2
paragraph 7:6,8
  7:11,14,18,19
  8:5,16 9:6,10
  9:11,20 11:18
  11:19 24:7
  25:24 30:12
  32:1 42:20
  47:7,11,13
  48:6,10 53:5
  53:14,15,19
  55:9,12 57:2,2
  57:14,15 75:3
  103:20 104:3

paragraphs 55:9
parentheses
89:6
parenthesis
88:22,23
part 10:14 13:16
15:25 17:4,12
26:7 32:25
37:7,7 49:11
49:23 55:17
56:8 67:11
68:15 73:10
84:2,23 87:1,1
92:24 95:21
participate 74:9
particular 7:18
8:11,16 24:1
51:9 94:5,14
particularly
44:20
particulars
68:10 74:14
partner 45:12
parts 17:17 90:1
party 106:23
pass 64:15
passed 66:11,23
pay 27:14 28:12
28:12,20 30:11
44:7 58:12,13
58:17,25 60:10
68:6 71:12
76:16,18,21,24
76:24 77:4,9
77:11,14,18
78:4,13,15,16
78:17 81:6,18
81:20,25 82:11
86:13,19
100:18,23
102:2 105:3
paying 60:8
payment 78:12
108:13,22
pays 32:3
pending 51:8
Pennsylvania

1:1,16,19 2:3
2:14 17:16
people 16:24
17:15,21 18:13
18:17,22 19:15
19:17,18 20:3
20:17,22,23,24
22:8,10 23:1
33:19,24 65:7
65:19 69:14,15
97:24,25 98:6
106:17
percentage
45:15 68:24
69:1,3,23,24
70:1,4,8
perform 32:12
performed 13:6
77:19
performing
95:25 96:6
period 11:2
27:22 41:16
62:11,14 64:7
person 21:19
40:21 41:6
43:3 68:7
86:24,24
109:20
personal 96:17
98:8 105:5
personalities
97:21
personally 16:9
18:12,25 19:5
33:9 46:7
104:20,21
105:2,2,12
perspective
49:12
Philadelphia
2:14
phone 8:19,20
8:23 9:20 10:1
10:3,5,18
16:24 18:18
20:17 21:5

22:8 57:22,23
67:11 70:7
96:9 106:14
107:6
photos 73:6
phrase 89:11
Phyllis 16:7 26:9
66:2,6,10
92:12 93:16
94:24 98:8,12
109:3
Phyllis's 99:14
piece 44:15
Pike 2:2
placed 54:16
places 19:14
Plaintiff 1:3 2:5
2:10 104:14
Plaintiff's
102:16
plan 37:5,14
45:4 51:8
plans 13:9,15
players 89:19
pleading 11:25
pleadings 6:13
please 7:6,7,11
63:4,5 98:5
pleased 21:19,20
21:21
plenty 66:5
plus 44:17
Plymouth 2:3
point 13:8 60:2
73:19 76:11
78:18 82:25
95:5 98:12
99:12
pointed 54:3
political 5:20,22
15:16,16 16:14
22:23 44:11,21
45:3,6 85:20
85:21 86:1,13
86:15,16,18
97:16 101:18
poor 102:11

portion 50:24
position 57:11
88:6
positive 26:11
Posner 24:13,14
24:24
possibly 101:9
post 42:19
post-production
69:19,21 73:12
73:15
potential 15:13
16:1,4
preapproval
14:3,11,15
29:25 30:1
preapproved
13:22
precise 67:5
PREMIER 1:15
1:21
prep 70:3
prepare 56:8
prepared 36:3
55:20,23
preparing 40:21
president 41:12
93:15 95:15
97:7 110:1
presidents 92:7
press 35:16,21
35:22,22 36:10
36:22
presumably
23:7
pretty 25:11
27:16 35:20
73:12
previously 74:1
97:9 101:8
106:14
primarily 33:23
67:14
primary 74:19
109:20
principals 84:18
print 40:25

printing 41:1
prior 41:19
42:17 70:6
75:5,11,15,20
76:1 78:16
82:1,7,11
102:14 108:5
privilege 52:21
privileged 52:1
52:2 57:13
probably 19:17
19:20 20:16
21:6 25:3
32:21 34:25
42:12 44:19
67:11,19 71:24
71:24 93:25
98:19
problem 68:9
procedure 5:9
75:10
proceedings 4:2
35:18 110:17
111:4
process 5:10
68:16
produce 28:25
56:25
produced 27:10
29:18 50:9
79:13,16
producing 56:19
product 25:8,16
27:15 34:21
50:3,5 52:21
68:16,18 70:21
71:13,24 72:8
73:13,14
production 35:1
40:4 57:1
72:10 73:8
94:4
professional
1:18 38:2,7,13
39:7 41:2
70:16
professionalizi...

99:18
**profile** 22:25
**project** 24:10
  25:9,18,19,20
  25:21 26:7
  28:24 32:18
  33:4,4,8 35:12
  36:24 37:8
  58:8 59:10,10
  60:2,4,8,11,15
  60:15 61:9,11
  61:23 62:12
  66:6,9 68:20
  68:22 69:2,3
  71:3,17,23
  72:1,12,17
  75:17,22 83:3
**project-based**
  61:6 62:12
**project-specific**
  61:24
**projects** 24:4,6
  61:22 85:12
**promote** 16:21
  84:6
**promoted** 16:12
**promotion** 16:6
**prompted** 20:12
**pronounce**
  94:13
**proper** 54:5
**provide** 5:25
  7:21,25 16:17
  16:19 17:9,23
  37:14 57:4
  90:21 99:10
  108:13
**provided** 26:21
  26:22 27:2,4
  32:16 50:4
  56:18 104:14
**providing** 17:24
  37:19 50:5
  93:3 99:2
  100:10 108:23
**Public** 1:18
  111:14

**published** 16:15
**purpose** 22:19
  22:21 25:21
  48:20
**pursuant** 4:9
  13:12 52:22
**put** 14:1 20:14
  20:15 25:13
  27:9 70:3,8
  74:22 85:15
**putting** 70:4
  73:9,9

---

**Q**

**QC** 32:2,5 39:24
  40:4 73:24
  80:2,25 81:23
  88:11 94:5,6
  94:16,19
**QC-104** 39:24
**QC-22** 40:12
**Quantum** 1:2
  5:3,4,7,12,16
  6:4,8,25 7:3
  8:8 14:21,21
  17:6,9 18:6,12
  19:12,25 20:5
  21:10 22:4
  24:14 32:6
  46:8 58:6,11
  58:19 59:3,7
  59:22 61:16
  62:17 65:19
  66:16,25 67:15
  69:9,11 70:12
  70:16 71:4,5
  74:7 80:22
  81:5,17,24
  82:22 83:15,18
  83:24 84:3,7
  84:11,21 85:2
  85:3,8,18 88:7
  90:18,21 94:3
  94:8 95:23
  102:16 105:1
  105:11
**Quantum's**

58:21
**question** 12:4
  14:13 16:20
  30:21 31:12,19
  41:19 45:25
  46:3 47:23
  48:2 49:16
  50:9,11,12,13
  50:16,17,20,22
  50:25 51:6,7
  52:13 55:3
  63:5 71:6,15
  71:19,22 77:25
  78:1 81:2 82:9
  85:24 97:10,19
  108:20 110:7
  110:10
**questioning**
  52:11
**questions** 7:17
  9:19 29:16,17
  31:6,10 54:11
  57:7 69:16
  84:10 87:8,9
  87:14 95:7
  98:16 102:5,22
  103:15 105:14
  108:16,17
  110:15,16
**quick** 25:12
  105:15
**quicker** 94:7
**quickly** 20:15
  25:13 35:20
  73:12 104:18
**quite** 12:16
**quote** 24:8,8
  90:22

---

**R**

**R** 2:11 4:1 111:1
**radio** 5:21 66:14
**raise** 85:20,25
  86:7
**raised** 9:15
  10:16
**raw** 27:10 68:21

69:21 72:7
**reach** 93:1
**reached** 107:11
**reaction** 25:12
**read** 47:9 50:22
  50:23 63:4,5
  80:4 82:1
  102:23 103:12
  104:8
**reading** 51:13
  51:19,23 52:9
  52:10 88:16
**ready** 73:20
**Reagan** 23:15,19
**real** 69:19 100:3
**really** 43:25
  103:12
**reason** 26:20,22
  27:4,6 60:16
  63:16 103:1
**reasons** 95:18
**reassure** 32:8
**reassured** 32:2
**recall** 8:12,12
  9:20 10:17,22
  11:12 14:6
  18:22 19:19,22
  21:20 22:9
  25:10 26:15
  35:12,18 47:20
  47:21 49:19
  51:4 56:6
  61:18,19 62:3
  66:15 74:17
  92:11 93:17
  98:11 99:7
  106:21 107:3
  108:2,3,6
**receive** 17:1
  21:14,23 22:1
  70:14 71:10
  100:2 108:13
  108:22
**received** 22:5
  29:11 70:12,15
  71:2,4,16
  83:18 89:10

**reception** 19:20
  20:22 22:23
**receptions** 19:21
**recess** 52:5
**recognize** 19:10
  19:16 74:5
**recognized**
  19:20 101:3
**recollection** 8:15
  9:9,14,22,25
  10:11,19 17:13
  27:24 28:4
  32:17 67:19
  68:1 77:16
  95:17 110:3
**record** 4:13,16
  8:19 31:5,18
  35:6,7 39:13
  39:15,21 48:4
  50:24 51:13
  52:25 53:14
  54:8,17,18
  58:2 63:7
**records** 8:22
**RECROSS**
  98:22 108:18
  110:4
**redact** 57:12
**redirect** 87:8
  102:7
**refer** 7:22 9:6,7
  11:11 15:10
  16:1,4 32:4
  39:17 87:18
  89:11 90:13
  97:15 107:22
**reference** 24:8
  25:25 45:7
  66:10
**referenced**
  72:18 105:24
**references** 79:10
  91:6
**referencing**
  80:16
**referred** 11:9
  15:13 48:10

96:9 107:22,25
109:5
**referred-to**
50:24
**referring** 39:2
45:19 80:9
86:15,16 91:7
92:4
**refers** 8:16 9:4
11:19 32:5
79:21
**reflect** 31:18
**refresh** 8:15
**refreshing** 52:12
**refunded** 83:15
**refused** 27:14
**regarding** 59:3
**regardless** 43:17
43:20
**regular** 8:24
40:16 107:3
**reinstate** 48:21
**reiterate** 52:8,19
**related** 67:16
85:4
**relating** 66:9
**relations** 96:17
**relationship**
46:9 59:7,22
61:16 62:1,16
62:20 109:19
**relationships**
85:9 86:10
**relatively** 73:15
**release** 35:21
73:17
**released** 73:20
**releases** 35:16
35:22,23 36:10
36:22
**remember** 10:2
10:12,16 14:8
21:11 22:12
26:19 33:22
36:2 49:10
64:9 78:18,23
79:25 91:9

106:16 107:11
108:9
**removed** 91:20
108:9
**renew** 52:17
64:4,11
**repeatedly** 31:6
31:16
**rephrase** 71:9
**rephrasing** 51:5
**reporter** 1:18
50:23 57:24
111:14,21
**reporters** 16:14
16:14
**REPORTING**
1:15,21
**represent** 87:13
**representations**
50:3
**represented**
108:3
**representing**
12:12,13 95:14
**reproduction**
111:19
**request** 52:8,17
52:23 53:11
54:16 56:15
57:1 90:18
102:17 105:22
**require** 44:4
75:5
**required** 14:3
**research** 67:10
69:14
**reserve** 21:10
**resolved** 9:15
**responded** 97:9
**responds** 80:25
**response** 102:22
105:22
**responses**
102:17,20
103:14
**responsibilities**
21:8 40:17

**responsibility**
17:5 22:3
**rest** 73:9
**restaurant** 21:3
21:4
**retainer** 43:15
44:5,8,12,19
44:22 45:11
46:10 60:8,10
60:22 62:16
64:22 65:16
78:20 87:2
**retrospect** 97:11
**return** 24:3
**revert** 42:17
**review** 6:12,21
7:7,19 15:2
40:9,18 41:3
53:1 57:3
63:21 67:18
68:23 72:19
85:6 108:10
**reviewed** 40:14
**reviewing** 68:11
**right** 12:25
14:16 17:19
20:21 23:7
29:20,23,24
35:10 42:23
43:1 44:24,25
45:1,22 47:18
56:23 57:21
61:5,6,13
63:20,21 65:17
65:21 66:23
68:6,12 69:16
72:3 75:7 97:8
97:13 100:13
100:24 104:23
105:9 107:9
110:8
**RMR** 1:17 111:3
111:13
**Road** 2:7
**Robinson** 66:18
66:23
**ROETZEL** 1:6

**roles** 98:8
**Rollins** 9:2
35:21 74:13
**room** 10:4 19:23
21:3,10
**Rotzel** 94:14
**rough** 67:1
**RSVP** 22:11
**RSVP's** 21:4,8 66:2,6
**RSVP's** 22:1,5,7
**run** 15:18
**running** 15:24

---

**S**

**S** 4:1
**Saint** 28:13,15
30:2 33:12
34:13 69:4,13
70:2,2 75:17
75:23
**saw** 69:21,22
**saying** 11:17,20
12:15,22 20:4
20:6,6 85:14
85:23,25 89:19
**says** 7:22 8:12
11:4 38:12
43:5,8 47:13
57:13 75:4
80:12 81:14
88:20 89:6
103:17 104:23
**scheduled** 107:7
107:10
**Schlafly** 2:6,8
3:3,7 4:8,12,18
4:19 6:15,18
12:3,20 16:7
22:20 23:12,14
26:10,25 31:8
31:11,18,24,25
35:6,8 39:4,16
39:22 40:3,5,8
41:22 42:9
47:1 48:2,5
49:5 50:10,15
50:18,22 51:5
51:10,12,19,23

52:4,7,17
53:20,24 54:4
54:9,13,19,21
54:24 55:4,16
56:15,23 57:5
57:17,21 58:2
58:4 62:23
63:1,4,8 66:2,6
66:10 69:8
70:25 71:8,20
72:2,11,23
73:2,24 74:3,4
75:7,8 77:20
77:23 78:2,10
79:21,24 80:2
80:6,13,15
81:1,3 82:8,17
87:7 94:19,24
94:25 96:19
98:18,21 102:6
102:8 103:4,10
104:2 105:14
106:5,8,11
108:17 109:3
110:16
**scope** 10:23
15:25 58:9
59:8 74:13,16
84:5
**Scott** 18:16 25:2
**second** 4:14 21:4
47:25 53:18
75:3 91:9,11
106:20
**section** 39:9
**see** 26:13 40:16
42:12 51:17
52:8,17 56:4
57:7 60:5 62:8
64:3 72:20
88:24 89:6
100:6 102:21
104:7
**seeing** 25:10
**seek** 75:15
**seeking** 75:11
**seen** 4:21 6:19

26:19 27:18
29:18 40:12
42:11 79:7,8,9
send 14:18,22
15:7 18:21
68:16,21,22
94:8,9 95:5
sending 39:8
94:15
sense 90:14
98:20
sent 18:21 20:15
22:6 37:24
40:19 70:23
94:12,23 95:3
sentence 75:4
88:17 89:12
104:4 107:14
separate 40:25
87:21
September 5:14
28:9 95:13
98:25 110:11
services 6:5 38:2
38:7,13 39:7
41:2 43:6,11
44:13 49:13
62:10 70:16
77:18 90:18,22
93:3 99:2
100:11 104:13
108:13,23
session 64:13,14
set 8:20 44:7
106:25
sets 88:20
Shack 21:2
96:11
shared 78:21
sheets 70:10
shock 8:3
short 62:13,14
show 4:10 27:11
66:14 102:13
shown 4:20
34:10
side 84:25 89:21

89:23
sides 89:20
109:12
sign 41:14 42:15
47:14
signature 75:1
100:5 102:21
signed 12:10
significance
8:11
significant 44:21
45:14
signing 101:4
simple 27:16
90:2
simpler 100:21
simplify 90:7
simply 31:20
single 53:1,4,5
57:1,14,15
62:5,19 63:25
sister 85:1 92:6
sit 7:19,23 14:6
62:18 63:18,19
six 5:14 33:21
58:22,24 62:17
63:21 92:2,17
92:21 93:2,9
97:2 100:22,22
109:7
small 97:16
smaller 6:3
so-and-so 107:2
somebody 15:18
18:6 34:16
46:24 56:5
105:9
sorry 31:8,8,11
39:11 77:24
78:3 99:23
sources 74:23
South 1:23
speak 64:20
69:11
speaker 10:5
speaking 10:5
specific 10:17,22

17:4 38:9
59:10,12 60:2
60:15 61:9
83:23 100:3
specifically
17:14 26:15,17
28:21,23 29:13
76:14,21 77:3
77:17 109:6
specifics 49:19
62:9 64:20
spelled 59:12
60:12
spend 67:2,2,6,7
67:10 86:6
spent 37:6,10
69:1,3,12,23
70:1
sprint 62:14
stage 72:12,17
73:17
stamp 73:23
stamps 39:24
standard 75:10
Stark 18:16 25:3
start 88:16 99:8
started 34:9
94:15
starting 64:13
state 89:25 92:7
stated 9:11
11:25 12:5
53:1 72:6,22
89:11
statement 11:17
52:19 99:24
103:5,8 104:16
states 1:1 8:5
stating 12:5,7,8
Station 2:13
stay 20:23,24
staying 105:19
Steak 21:2
Stick 82:9
stipulations 4:18
stop 67:16 68:13
68:13 99:8,23

storming 37:7
straightforward
27:16
strange 19:9
strategic 5:17
37:5,14 44:13
45:4 83:10
86:8,21 99:11
strategies
101:18
strategize 13:9
13:14
strategy 101:18
Street 1:15,23
1:23 2:13
strike 27:1 89:3
91:5,11 94:6
104:19
strongly 34:19
structure 10:21
49:13
studio 34:5,6
stuff 25:10,12
50:8 102:24
subsequent 49:9
76:15 103:20
104:4,8 105:23
subsequently
49:3 89:17
success 20:19
such-and-such
41:12,13
suggest 99:15
suggested 33:24
34:15,19 35:22
35:23
suggestion 75:23
suing 97:20
Suite 1:24,24 2:2
supervision
111:21
support 5:24
18:21 43:6,11
84:11,22 91:6
suppose 96:17
supposed 28:8
sure 13:20 19:13

22:2,4 25:20
38:2 43:24
56:21 59:19,24
62:2 66:5
69:17 70:15
77:8 83:7
84:23 98:4
104:22
swore 102:20
sworn 4:5
102:20 103:14
system 65:16

---

**T**

T 111:1,1
take 5:23,23
23:12 32:12
33:8 44:18
51:8,10 52:4
53:12 103:12
taken 111:5
takes 85:21
talk 26:9 28:21
30:13,18 31:20
40:21 45:12
54:9 66:1
talked 35:20
93:6
talking 10:13
16:13 29:9
35:17 48:13
59:25 77:6
90:12 107:4
tasks 32:13
team 109:4,8
tech 61:8
technology
83:11
telephone 9:13
11:3
television 5:21
66:14
tell 42:14 46:22
46:23 47:3
55:7 78:3
telling 67:21
103:14

**term** 64:7 87:17
  87:17 89:4
  101:22 109:9
**terminate** 13:1
  59:6 61:25
  85:8,10,11
**terminated** 58:7
  59:18,22 61:15
  85:13
**terminating**
  62:19
**terminations**
  60:24 61:4
**terminology**
  90:10
**terms** 8:5 10:18
  10:22 12:9,23
  12:24 13:5
  25:4 33:1,3
  34:25 47:10
  50:1 76:19,25
  77:3 78:8
  88:20 99:16
  101:11 104:12
**testified** 4:5
  20:20 26:20
  80:18 98:24
  101:8 103:6
  108:15
**testify** 55:6
  63:19
**testifying** 53:21
  53:23
**testimony** 11:24
  16:2,3 23:25
  24:23 41:20
  42:18 47:17,18
  48:25 49:1
  54:15 55:17
  58:17 62:18,22
  63:2,3 71:16
  71:19,21 75:20
  76:17 80:17
  81:22,25 87:16
  107:23 108:21
**Thank** 31:2,24
  69:9 90:15

95:7 98:15
  102:11
**thing** 26:11
  67:21 102:15
**things** 11:21
  13:14 25:4
  27:13 28:17
  35:19 49:22
  57:12 60:18
  77:6 83:8
  99:15
**think** 8:1 9:11
  9:23 10:12
  17:13 19:6
  20:1,18 21:16
  22:15,19 24:18
  24:21 25:3
  27:6,15 32:5
  32:15,16 33:3
  41:8 42:17,21
  46:2 53:7
  55:25 56:7,13
  61:10,13 62:2
  62:5,25 63:10
  64:12 65:1
  66:11,11 68:3
  68:20 70:5
  73:19 79:7,8,9
  79:10 82:23
  83:13,17 89:22
  90:3,6 91:8,13
  92:7,10,13,24
  93:7 96:3,9
  98:19 101:8
  106:2,3 107:10
  108:25 110:9
**thinking** 32:14
  68:7
**thought** 19:9
  37:11 48:11
  68:4
**three** 2:13 5:2
  36:1,6,9 60:14
  65:21 70:2
  102:25 103:12
  104:5 107:6
**thrown** 109:9

**tie** 102:10
**tied** 64:16
**time** 4:15 6:16
  8:4,12,24 11:2
  25:13 27:23
  29:19 31:12,19
  32:12,16 37:6
  37:10 39:14
  44:6 50:23
  51:9 52:15
  54:10 57:9
  58:1 59:13,14
  59:17 60:1
  62:11,15 67:2
  67:6,7 69:12
  69:23 70:9,10
  73:25 78:13
  82:24 83:6,9
  87:12 93:25
  94:15 95:12
  97:11 98:9,25
  103:12 107:3
  109:13,22
  110:11
**times** 5:1 8:7
  14:10 30:22
  72:6 78:13
  81:10 85:11
**today** 7:24 8:18
  8:21 14:6 27:7
  34:14 56:25
  57:15 62:18
  63:19,20 90:17
  97:10
**told** 31:16 41:8,8
  46:17 68:21
  77:13
**top** 41:1 55:9,13
  62:3 100:4
  103:25 104:3
**total** 65:22
**track** 70:9 107:1
**training** 6:1
**transcript** 111:7
  111:18
**travel** 14:1,10,11
  67:12 75:17,18

75:21
**traveling** 25:25
**TRIAL** 1:7
**true** 34:23 44:9
  44:10 109:25
**Trust** 94:23
**try** 57:14 91:9
**trying** 27:21
  30:23 31:22
  32:15 53:22
  62:2 72:23
  106:2 110:6
**turn** 7:11 48:6
  51:25 52:1
  56:17 94:3
**turned** 102:14
**two** 5:2 24:25
  35:5 51:11
  55:11 75:6
  100:11,19
  101:9
**type** 56:9 87:3
**typically** 15:15
  15:15 41:3
  44:18 45:8,23
  46:1 58:7
  59:14 60:21
  84:17 87:4,5

**U**

**Um-hum** 65:23
**uncut** 68:23
**understand** 5:9
  36:8,8 38:21
  38:22 48:19,19
  63:9 71:9
  87:25 88:3
  100:24
**understanding**
  8:6 16:12
  29:21 32:11
  38:6 46:22
  76:23 77:10,12
  79:12 80:19
  82:10 89:3
  91:19,23 92:19
  98:5 100:10

101:20 103:6
  105:11
**understood** 48:2
  109:2
**Union** 23:23
**UNITED** 1:1
**updated** 25:22
**use** 32:20,21
  34:2 107:21
**Usual** 4:18
**usually** 15:17
  22:23 32:23
  38:3 60:16
  106:25 107:6

**V**

**V** 1:17 111:3,13
**valid** 46:24 47:5
**value** 70:13,20
  71:1,3,10,17
**varied** 67:8
**variety** 5:18 6:2
**various** 67:9
  74:23
**verbal** 33:6
  60:16 81:9
**verbally** 33:4
  60:24
**verified** 103:2
**versions** 68:23
**vice** 23:22
**video** 14:18,22
  15:2,5,8 32:20
  33:3 68:21
  69:21 72:7
  73:6,7,11 93:7
**videos** 73:11
**view** 34:3 43:13
  43:16
**viewed** 34:4
**VS** 1:4

**W**

**walked** 89:16,17
**want** 13:21
  15:19 39:17
  44:15 53:10

54:7,13,17
57:14,20,23
80:4 85:15
88:16 91:9
92:9 102:9,13
103:7,11 109:4
**wanted** 37:4,8
61:16 92:12
**wants** 55:5
62:11
**warring** 100:12
**Washington**
16:22,24 17:16
17:17,18 25:25
75:18
**wasn't** 18:9,10
18:11 29:10
30:19 42:8
44:3 48:17
64:19 68:20
69:19 72:1
75:24 86:15
95:4,19
**watching** 26:16
**way** 8:14 13:13
30:7 31:9
44:24 49:15,18
57:22 60:20
62:6 66:3,4
67:17 70:9
84:19 85:15
91:12 101:14
102:9
**ways** 86:6
**we'll** 28:20 30:5
44:16 51:17
59:25 61:1
68:13 84:17
**we're** 5:17 7:24
27:6,14 28:11
40:25 54:5,14
55:5 56:24
59:25 60:3,5
61:13 68:13
77:6 90:12
109:2
**we've** 28:5 36:3

59:19,24 60:17
60:18 61:6,7
63:13 66:5
76:15 85:16
86:5
**website** 6:5,8
84:6
**weekly** 11:3 37:2
37:3 101:16
**went** 22:7,8
25:11 26:11
28:15 30:7
33:25 42:13
61:9 69:13
**Wentz** 1:17
111:3,13
**weren't** 13:20
28:8 42:25
44:4 67:22
68:3 83:1
**Wheeler** 66:19
66:20
**Whittlesey** 26:1
26:9,12 28:16
30:4,6,8,19
31:15 34:24
35:9 69:5
75:24
**wide** 16:23
**William** 24:22
**wisely** 83:13
**witness** 3:2
22:18 23:10
31:22 39:25
41:23 47:24
49:6 50:11,19
50:21 51:4
52:2 53:21,21
53:25 54:2,10
54:19,23 55:1
55:11,14 62:25
71:23 72:6
73:22 77:16
78:7 82:6
88:14 103:3,9
106:7
**wondering** 28:2

**words** 73:3
**work** 5:4,20 6:1
10:13,23,24
11:1 13:6,11
13:12,13 15:25
17:2,7 19:11
19:24 21:20,21
23:18 25:7
26:10 27:14
31:15 34:20,22
35:2 37:25
38:4,5,10,12
38:14,15,18,19
38:20,20,23,25
42:5 43:10,14
43:17,20,21,22
43:25 45:21
46:4 49:25
50:3,5 52:21
58:9 59:8,9,11
59:24 60:7
61:17,21 64:24
64:25 65:6,7
65:19 67:14,16
68:3,7,16,18
68:25 69:1,2
69:24 70:3,3,5
70:11,14,21
74:13,16 75:12
82:18,21,25
83:2 84:2,3,5,5
84:7,8,15,17
84:22 85:4,13
85:18,19 86:1
86:9,14 95:22
95:25 96:6
97:12
**workday** 67:2
**worked** 24:24
25:1 36:24
60:19 61:8
63:14 69:17
83:3
**working** 5:3,6
5:12 18:13,17
26:7 35:13
37:10 49:25

60:3 64:4 67:7
68:14 72:15
83:5,7 84:24
90:2,7 109:2,4
109:7,8
**works** 30:8,10
44:8 71:14
**worth** 63:22
70:16 71:25
**wouldn't** 40:15
42:11 107:20
**write** 15:19
56:10 64:18
100:8,14 105:5
**writing** 45:8
61:1,2 64:19
79:1
**writings** 57:13
57:13
**written** 28:1,1
45:19,23 46:11
46:16,17,23
47:4 80:22
81:16,23 93:3
96:10 101:11
101:21
**wrong** 106:4
**wrote** 35:16
37:15

**X**

**Y**

**yeah** 15:22
19:13 27:9
29:2,6 32:15
38:9,9,22
39:23 43:11
45:2,2,20
47:24 50:17
51:16 52:12
56:2 60:23
80:18 81:15
88:13 103:19
106:24 109:11
**year** 64:12 66:19
78:24

**years** 5:14 7:24
35:5 58:22,24
59:20 62:17
**years'** 63:22
**Yep** 38:11 65:25
79:23 91:14
**younger** 18:17
18:18
**Yvette** 1:5

**Z**

**zero** 71:17

**0**

**07931** 2:7

**1**

**1** 3:14 4:16,21
39:24
**1,000** 36:14,15
**1:17cv1640** 1:4
**10** 36:12,20
81:25 82:12
**10,000** 78:22
79:10,21 80:9
81:6,18,21
**10:02** 1:16 4:2
**100,000-plus**
71:25
**1000** 2:2
**102** 3:7
**105** 3:8
**108** 3:9
**11:10** 52:5
**11:18** 52:6
**110** 3:10
**112** 1:15,23
**12** 88:11
**12:46** 110:17
**1213** 73:24
**13** 41:11 88:11
**130** 19:17 20:21
**130,000** 70:15
**13th** 42:14 48:10
**140** 19:18
**16** 7:6,8 9:10
47:8,11,13

48:10
**17** 7:11,14 8:5
  8:16 9:6,11,20
  11:18,18,19
  42:20 48:6
**17013** 1:24
**17101** 1:16,24
**1717** 2:13
**17th** 80:1 82:16
**18th** 41:16,24
**19103** 2:14
**19462** 2:3

___

**2**
**2** 3:15 6:15,16
  6:19,24 7:4,7,9
  24:3 41:11
  47:8 80:25
**20** 36:18,19
  65:12 78:20
  82:12
**20,000** 43:13,15
  43:19 44:2,6
  45:11,16,22
  46:6,10 47:12
  70:15 76:2,5
  76:18,22 77:4
  77:9,11,14
  78:4,22 81:6
  81:18,25
**200** 19:20
**201** 1:24
**2016** 7:23 8:13
  41:12,16,16,24
  42:15 43:7
  95:14 104:10
  108:5 110:11
**2017** 23:16,21
  29:19 67:20
  82:16
**2018** 64:2 65:2,4
**2019** 1:11 63:23
**215** 2:15
**21st** 7:23 8:13
  104:9 107:24
  108:5
**23** 1:11

**243-9770** 1:22
**25** 25:24 30:12
**26** 32:1
**27** 24:7
**2nd** 29:19

___

**3**
**3** 80:1
**30** 65:10,11,15
**32** 73:21 74:2,3
  88:10
**34** 39:17,23 94:3
**35** 102:13,15

___

**4**
**4** 3:3,14
**406** 1:24
**484** 2:4
**49** 94:5

___

**5**
**5** 7:7,8
**50** 36:16,17
**500** 6:3 61:8
  75:5
**501c3** 38:20,23
  38:24 39:9
  88:4,22 89:13
  91:1 93:12,17
  101:23
**501c4** 88:1 91:17
  91:21,25 93:20
  94:10 101:6
  107:17 108:5
  108:14
**54** 94:6
**568-2000** 2:15
**5th** 2:13

___

**6**
**6** 3:15 7:12
**68** 80:4
**681-9387** 2:4
**69** 80:25 81:23

___

**7**
**70** 94:16,18,20
**717** 1:22

**719-8608** 2:8
**78** 94:19

___

**8**
**8** 1:23
**87** 3:4

___

**9**
**908** 2:8
**939** 2:7
**95** 3:5
**98** 3:6